1  **JILL WILLIAMS - State Bar No. 221793**
2  **KIMBERLY SARMIENTO - State Bar No. 345641**
   **CARPENTER, ROTHANS & DUMONT**
3  **500 South Grand Avenue, 19th Floor**
   **Los Angeles, California 90071**
   **(213) 228-0400 / (213) 228-0401 (Fax)**
4  **jwilliams@crdlaw.com / ksarmiento@crdlaw.com**

5  Attorneys for Defendants, Santa Ana Police Department,
   City of Santa Ana, Cpl. Jimmy Correal, and
6  Officers Luis Casillas, Jesse Hernandez, and Deborah Wolen

7

8  ## UNITED STATES DISTRICT COURT

9  ## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

10

11  SEAN KINNEY,                         Case No. 8:24-cv-01286-JWH-JDE
                                         Consol. w/ 8:24-cv-01287-JWH-JDE
12              Plaintiffs,              [Assigned to the Hon. John W. Holcomb]

13        vs.                           **JOINT APPENDIX OF EVIDENCE**

14  SANTA ANA POLICE
    DEPARTMENT; CITY OF SANTA            Date:    December 19, 2025
15  ANA; JIMMY CORREAL, an               Time:    9:00 a.m.
    individual; LUIS CASILLAS, an        Ctrm:    9D
16  individual; JESSE HERNANDEZ,
    an individual; DEBORAH
17  WOLLEN, an individual; and DOES
    1 to 35, inclusive,
18
                Defendants.
19

20  ────────────────────────────
    AND ALL RELATED ACTIONS.
21

22

23       The parties respectfully submit the following joint appendix of evidence to
24  accompany the Joint Exhibit:
25  ///
26  ///
27  ///
28

# JOINT APPENDIX EVIDENCE

| Party | Exhibit Part | Description |
|---|---|---|
| Defendants | Part A | Officer Luis Casillas's Body Worn Camera Footage 1 |
| Defendants | Part B | Officer Luis Casillas's Body Worn Camera Footage 2 |
| Defendants | Part C | Officer Luis Casillas's Body Worn Camera Footage 3 |
| Defendants | Part D | Officer Luis Casillas's Body Worn Camera Footage 4 |
| Defendants | Part E | Cpl. Correal's Body Worn Camera Footage 1 |
| Defendants | Part F | Cpl. Correal's Body Worn Camera Footage 2 |
| Defendants | Part G | Cpl. Correal's Body Worn Camera Footage 3 |
| Defendants | Part H | Cpl. Correal's Body Worn Camera Footage 4 |
| Defendants | Part I | Cpl. Correal's Body Worn Camera Footage 5 |
| Defendants | Part J | Officer Yasmin Garcia's Body Worn Camera Footage 1 |
| Defendants | Part K | Officer Yasmin Garcia's Body Worn Camera Footage 2 |
| Defendants | Part L | Officer Yasmin Garcia's Body Worn Camera Footage 3 |
| Defendants | Part M | Officer Jesse Hernandez's Body Worn Camera Footage 1 |

JOINT APPENDIX OF EVIDENCE

| **Party** | **Exhibit Part** | **Description** |
|---|---|---|
| Defendants | Part N | Officer Jesse Hernandez's Body Worn Camera Footage 2 |
| Defendants | Part O | Officer Richard Nevarez's Body Worn Camera Footage 1 |
| Defendants | Part P | Officer Richard Nevarez's Body Worn Camera Footage 2 |
| Defendants | Part Q | Deborah Wolen's Body Worn Camera Footage |
| Defendants | Part R | CAD Report |
| Defendants | Part S | Property Receipt |
| Defendants | Part T | Release Document |
| Defendants | Part U | SAPD Policy 802 |
| Defendants | Part V | Department of Justice Letter |
| Defendants | Part W | Relevant Portions of the Deposition Transcript of Plaintiff Sean Kinney |
| Defendants | Part X | Relevant Portions of the Deposition Transcript of Christiane Kinney |
| Defendants | Part Y | Relevant Portions of the Deposition Transcript of Plaintiff I.K. |
| Defendants | Part Z | Declaration of Officer Luis Casillas |
| Defendants | Part AA | Declaration of Cpl. Jimmy Correal |
| Defendants | Part BB | Declaration of Officer Yasmin Garcia |
| Defendants | Part CC | Declaration of Cpl. Nicholas Guijarro |

JOINT APPENDIX OF EVIDENCE

| Party | Exhibit Part | Description |
|-------|--------------|-------------|
| Defendants | Part DD | Declaration of Officer Jesse Hernandez |
| Defendants | Part EE | Declaration of Officer Robert Nevarez |
| Defendants | Part FF | Declaration of Forensic Specialist Deborah Wolen |
| Plaintiff | Part GG | Christiane Kenney Declaration |
| Plaintiff | Part HH | Sean Kinney Declaration |
| Plaintiff | Part II | Relevant Portion of Residential Lease Agreement |
| Plaintiff | Part JJ | SAPD Procedure 4041 |
| Plaintiff | Part KK | SAPD Procedure 311 |
| Plaintiff | Part LL | SAPD Procedure 6103 |
| Plaintiff | Part MM | SAPD Daily Training Bulletins for Contacts and Temporary Detentions |
| Plaintiff | Part NN | SAPD Daily Training Bulletins for Search and Seizure |
| Plaintiff | Part OO | SAPD Policy Manual 435 |
| Plaintiff | Part PP | SAPD Policy Manual 339 |
| Plaintiff | Part QQ | Relevant Excerpts of Police Report |
| Plaintiff | Part RR | Relevant Excerpts of I.K. Deposition |
| Plaintiff | Part SS | Relevant Excerpts of Sean Kinny Deposition |

JOINT APPENDIX OF EVIDENCE

| Party | Exhibit Part | Description |
|-------|--------------|-------------|
| Plaintiff | Part TT | Relevant Excerpts of TOC BUI Deposition |
| Plaintiff | Part UU | News Article from the Santanero |
| Plaintiff | Part VV | News Article from the last Laist |
| Plaintiff | Part WW | Relevant Excerpts of Christiane Kenney Deposition |
| Plaintiff | Part XX | Relevant Excerpts of Commander Lopez Deposition |

DATED:  November 14, 2025          CARPENTER, ROTHANS & DUMONT


                                   By:  /s/ Kimberly Sarmiento
                                        JILL WILLIAMS
                                        KIMBERLY SARMIENTO
                                        Attorneys for Defendants

JOINT APPENDIX OF EVIDENCE

# PART A

## CASILLAS BWC 1

# PART AA

## CORREAL DECLARATION

1  **JILL WILLIAMS - State Bar No. 221793**
   **KIMBERLY SARMIENTO - State Bar No. 345641**
2  **CARPENTER, ROTHANS & DUMONT**
   **500 South Grand Avenue, 19th Floor**
3  **Los Angeles, California 90071**
   **(213) 228-0400 / (213) 228-0401 (Fax)**
4  jwilliams@crdlaw.com / ksarmiento@crdlaw.com

5  Attorneys for Defendants, Santa Ana Police Department,
   City of Santa Ana, Cpl. Jimmy Correal, and
6  Officers Luis Casillas, Jesse Hernandez, and
   Forensic Specialist Deborah Wolen

7

8  <center>**UNITED STATES DISTRICT COURT**</center>

9  <center>**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**</center>

10

11 SEAN KINNEY,                          Case No. 8:24-cv-01286-JWH-JDE

12          Plaintiffs,                  Consol. w/ 8:24-cv-01287-JWH-JDE
                                         [Assigned to the Hon. John W. Holcomb]
13     vs.
                                         **DECLARATION OF SGT. JIMMY**
14 SANTA ANA POLICE                      **CORREAL**
   DEPARTMENT; CITY OF SANTA
15 ANA; JIMMY CORREAL, an
   individual; LUIS CASILLAS, an
16 individual; JESSE HERNANDEZ,
   an individual; DEBORAH
17 WOLLEN, an individual; and DOES
   1 to 35, inclusive,
18
            Defendants.
19

20 _____

21 AND ALL RELATED ACTIONS.

22

23

24          I, Jimmy Correal, declare that:

25          1.    I am currently employed as a sergeant with the Santa Ana Police

26 Department ("SAPD") and have been with the department for 17 years.  At the

27 time of the incident underlying this lawsuit, I held the rank of corporal.

28          2.    This declaration is made in connection with the Defendants' Motion

<center>-1-</center>
<center>DECLARATION OF SGT. JIMMY CORREAL</center>

JOINT EXHIBIT 002

for Summary Judgment, or in the alternative, Summary Adjudication filed in the above-entitled matter.

3. The following facts are stated from my personal knowledge, except those facts stated on information and belief which I believe to be true, and if called as a witness, I could and would so competently testify thereto under oath.

4. On October 4, 2021, responded to a call for service at 3405 S. Baker Street in the City of Santa Ana, which reported an assault with a deadly weapon involving a gun. Dispatch relayed that the reporting party's crew was doing landscaping work when the tenant inside the residence came outside with a rifle and 417'd (brandished a gun at) a worker. Dispatch further relayed that the worker grabbed the gun, and the suspect forced it away, cutting the worker's hand.

5. The dispatcher also relayed that the suspect was a male white in his 50's, wearing a green shirt with black pants. Dispatch advised that the suspect forced the victim off the property and went back inside the residence.

6. Given the nature of the call for service and concern that the suspect might still be in possession of the shotgun or that he or someone else might attempt to use the shotgun on responding officers, I requested air support from helicopter "Duke" and a K-9 unit. To protect the public, we also set up a perimeter, closed down Baker Street on the immediate block where the residence was located, and requested that an armored vehicle respond and stage on Alton and Baker, the closest cross street.

7. Another officer obtained the homeowner's contact information from the reporting party, Leo Garcia. I contacted the homeowner, Katherine Lane, to confirm that she hired the victim's landscaping company to do work at the residence. I also requested and obtained the contact and identifying information for her tenants. When the armored vehicle arrived, I contacted the suspect, Sean Kinney, via telephone and asked him to step out of the house. I continued to give him instructions on how to exit, for his safety, the officers' safety, and the safety of

-2-

DECLARATION OF SGT. JIMMY CORREAL

JOINT EXHIBIT 003

any surrounding residents, through the loudspeaker of the armored vehicle.  I never unholstered my duty weapon when Mr. Kinney, Ms. Kinney, and I.K. exited the residence.  Although there was an officer situated at the hatch of the armored vehicle, any firearm they would have had would be situated in the low ready position, meaning not pointed directly at anyone.

8.     Also for the safety of the officers and any surrounding residents, other officers and I conducted a protective sweep of the Kinney home to ensure there were no other occupants inside, including suspects, injured persons, or other victims.

9.     Prior to this incident, I never had any contact with or knew of the Kinney family.  I never had an agreement with any member of the SAPD to engage in conduct that would violate the Kinney family's rights.  I did not use any force on Mr. Kinney or his daughter, I.K., during my response to this incident.

10.     During my response to this call for service and interaction with the Kinney family, I had my department-issued body worn camera activated.  Attached to the Joint Exhibit as Parts "E"-"I" are true and correct copies of my body worn camera footage.

-3-

DECLARATION OF SGT. JIMMY CORREAL

JOINT EXHIBIT 004

*     *     *

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __3__ day of October 2025 at __Santa Ana__, California.

*Jimmy Correal*
_____
Sgt. Jimmy Correal

-4-
DECLARATION OF SGT. JIMMY CORREAL

# PART B

## CASILLAS BWC 2

# PART BB

## GARCIA DECLARATION

1  **JILL WILLIAMS - State Bar No. 221793**
2  **KIMBERLY SARMIENTO - State Bar No. 345641**
   **CARPENTER, ROTHANS & DUMONT**
   **500 South Grand Avenue, 19th Floor**
3  **Los Angeles, California 90071**
   **(213) 228-0400 / (213) 228-0401 (Fax)**
4  **jwilliams@crdlaw.com / ksarmiento@crdlaw.com**

5  Attorneys for Defendants, Santa Ana Police Department,
   City of Santa Ana, Cpl. Jimmy Correal, and
6  Officers Luis Casillas, Jesse Hernandez, and
   Forensic Specialist Deborah Wolen

7

8              **UNITED STATES DISTRICT COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

10

11  SEAN KINNEY,                          Case No. 8:24-cv-01286-JWH-JDE

12            Plaintiffs,                 Consol. w/ 8:24-cv-01287-JWH-JDE
                                          [Assigned to the Hon. John W. Holcomb]
13       vs.
                                          **DECLARATION OF OFFICER**
14  SANTA ANA POLICE                      **YAZMIN GARCIA**
    DEPARTMENT; CITY OF SANTA
15  ANA; JIMMY CORREAL, an
    individual; LUIS CASILLAS, an
16  individual; JESSE HERNANDEZ,
    an individual; DEBORAH
17  WOLLEN, an individual; and DOES
    1 to 35, inclusive,
18
              Defendants.
19

20  ─────────────────────────────

21  AND ALL RELATED ACTIONS.

22

23

24       I, Yazmin Garcia, declare that:

25       1.    I am currently employed as a police officer with the Santa Ana Police

26  Department ("SAPD") and have been with the department for 7 years.

27       2.    This declaration is made in connection with the Defendants' Motion

28  for Summary Judgment, or in the alternative, Summary Adjudication filed in the

                                    -1-
                 DECLARATION OF OFFICER YAZMIN GARCIA

1  above-entitled matter.

2      3.    The following facts are stated from my personal knowledge, except

3  those facts stated on information and belief which I believe to be true, and if called

4  as a witness, I could and would so competently testify thereto under oath.

5      4.    On October 4, 2021, responded to a call for service at 3405 S. Baker

6  Street in the City of Santa Ana, which reported an assault with a deadly weapon

7  involving a gun.  Dispatch relayed that the reporting party's crew was doing

8  landscaping work when the tenant inside the residence came outside with a rifle

9  and 417'd (brandished a gun at) a worker.

10     5.     The dispatcher also relayed that the suspect was a male white in his

11 50's, wearing a green shirt with black pants.  Dispatch advised that the suspect

12 forced the victim off the property and went back inside the residence.

13     6.    I responded to the call with Officer Luis Casillas.  Upon our arrival, I

14 made contact with Hector Hernandez and spoke with him in Spanish.  Hernandez

15 advised that he and Jaime Diaz worked for Workgrove Landscape and were

16 working on the property at 3405 S. Baker Street.  Hernandez was picking weeds in

17 the front yard while Diaz was working in the backyard.

18     7.    Hernandez reported that he heard a loud bang from the backyard, so

19 he walked towards the backyard, where he saw a man (who he later identified as

20 Sean Kinney) pointing a shotgun at Diaz's stomach.  He stated that Mr. Kinney

21 was approximately three feet away from Diaz while he was pointing the shotgun.

22 Hernandez further reported that Mr. Kinney told them to leave the property, so he

23 and Diaz walked away while Mr. Kinney entered the residence.  Hernandez

24 reported that Mr. Kinney was extremely upset and using foul language when

25 speaking to them.  He also stated that he was frightened when he saw the shotgun.

26     8.    I also spoke with Leo Garcia, who was the reporting party.  Garcia

27 stated that he was owner of Workgrove Landscape.  His employee, Jaime Diaz,

28 contacted to advise him of the encounter with Mr. Kinney.  Garcia advised that the

-2-

DECLARATION OF OFFICER YAZMIN GARCIA

residence was owned by Katherine Lane and was recently rented approximately one month prior.  Garcia provided me with Ms. Lane's contact information.

9.    During the time Mr. Kinney, Ms. Kinney, and I.K. exited the residence, I was situated on another street as part of the perimeter and was not near the front of the Kinney residence.

10.    Prior to this incident, I never had any contact with or knew of the Kinney family.  I never had an agreement with any member of the SAPD to engage in conduct that would violate the Kinney family's rights.  I did not use any force on Mr. Kinney or his daughter, I.K., during my response to this incident.

11.    During my response to this call for service and interaction with the Kinney family, I had my department-issued body worn camera activated.  Attached to the Joint Exhibit as Parts "J"-"L" are true and correct copies of my body worn camera footage.

DECLARATION OF OFFICER YAZMIN GARCIA

JOINT EXHIBIT 008

1

\*        \*        \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **3** day of October 2025 at _Santa  Ana_, California.

Officer Yazmin Garcia

DECLARATION OF OFFICER YAZMIN GARCIA

# PART C

## CASILLAS BWC 3

# PART CC

## GUIJARRO DECLARATON

1  **JILL WILLIAMS - State Bar No. 221793**
2  **KIMBERLY SARMIENTO - State Bar No. 345641**
   **CARPENTER, ROTHANS & DUMONT**
   **500 South Grand Avenue, 19th Floor**
3  **Los Angeles, California 90071**
   **(213) 228-0400 / (213) 228-0401 (Fax)**
4  **jwilliams@crdlaw.com / ksarmiento@crdlaw.com**

5  Attorneys for Defendants, Santa Ana Police Department,
   City of Santa Ana, Cpl. Jimmy Correal, and
6  Officers Luis Casillas, Jesse Hernandez, and Deborah Wolen

7

8              **UNITED STATES DISTRICT COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

10

11  SEAN KINNEY,                          Case No. 8:24-cv-01286-JWH-JDE

12              Plaintiffs,               Consol. w/ 8:24-cv-01287-JWH-JDE
                                          [Assigned to the Hon. John W. Holcomb]
13       vs.
                                          **DECLARATION OF CPL. NICHOLAS**
14  SANTA ANA POLICE                      **GUIJARRO**
    DEPARTMENT; CITY OF SANTA
15  ANA; JIMMY CORREAL, an
    individual; LUIS CASILLAS, an
16  individual; JESSE HERNANDEZ,
    an individual; DEBORAH
17  WOLLEN, an individual; and DOES
    1 to 35, inclusive,
18
                Defendants.
19

20  _____

21  AND ALL RELATED ACTIONS.

22

23

24          I, Nicholas Guijarro, declare that:

25          1.    I am currently employed as a corporal with the Santa Ana Police

26  Department ("SAPD") and have been with the department for 9 years, and I have

27  been a police officer for 12 years.  Since December of 2024, I have been assigned

28  to SAPD Internal Affairs Department, which is my current assignment.

                              -1-

2.    This declaration is made in connection with the Defendants' Motion for Summary Judgment, or in the alternative, Summary Adjudication filed in the above-entitled matter.

3.    The following facts are stated from my personal knowledge, except those facts stated on information and belief which I believe to be true, and if called as a witness, I could and would so competently testify thereto under oath.

4.    Peace Officer Standards and Training ("POST") sets the minimum standards for all peace officers in the state of California.  POST has a set of Learning Domains on all the subjects that are taught to police officers in the state of California.  All SAPD officers must be POST certified by meeting POSTS's basic minimum training requirements.  SAPD police officers receive continuous training on these subjects both formally and in the field, which include the use of force and conducting detentions and arrests.

5.    The SAPD takes steps to ensure that its officers act lawfully and do not violate citizens' civil rights when enforcing the law.

6.    There does not exist, nor did there exist at the time of the events underlying this civil action, within the SAPD, a custom, practice or policy of condoning or encouraging the use of excessive force against citizens.

7.    There does not exist, nor did there exist at the time of the events underlying this civil action, within the SAPD, a custom, practice or policy of condoning or encouraging officers to conduct unlawful searches or seizures.

DECLARATION OF CPL. NICHOLAS GUIJARRO

JOINT EXHIBIT 011

\*     \*     \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  3  day of October 2025 at  Santa Ana . California.

_____

Cpl. Nicholas Guijarro

DECLARATION OF CPL. NICHOLAS GUIJARRO

# PART D

## CASILLAS BWC 4

# PART DD

## HERNANDEZ DECLARATION

**JILL WILLIAMS - State Bar No. 221793**
**KIMBERLY SARMIENTO - State Bar No. 345641**
**CARPENTER, ROTHANS & DUMONT**
**500 South Grand Avenue, 19th Floor**
**Los Angeles, California 90071**
**(213) 228-0400 / (213) 228-0401 (Fax)**
jwilliams@crdlaw.com / ksarmiento@crdlaw.com

Attorneys for Defendants, Santa Ana Police Department,
City of Santa Ana, Cpl. Jimmy Correal, and
Officers Luis Casillas, Jesse Hernandez, and
Forensic Specialist Deborah Wolen

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| SEAN KINNEY,<br><br>        Plaintiffs,<br><br>    vs.<br><br>SANTA ANA POLICE DEPARTMENT; CITY OF SANTA ANA; JIMMY CORREAL, an individual; LUIS CASILLAS, an individual; JESSE HERNANDEZ, an individual; DEBORAH WOLLEN, an individual; and DOES 1 to 35, inclusive,<br><br>        Defendants.<br>_____<br>AND ALL RELATED ACTIONS. | Case No. 8:24-cv-01286-JWH-JDE<br>Consol. w/ 8:24-cv-01287-JWH-JDE<br>[Assigned to the Hon. John W. Holcomb]<br><br>**DECLARATION OF OFFICER JESSE HERNANDEZ** |

        I, Jesse Hernandez, declare that:

        1.      I am currently employed as a police officer with the Santa Ana Police
Department ("SAPD") and have been with the department for 5 years but have
been a police officer for 8 years.

        2.      This declaration is made in connection with the Defendants' Motion

-1-
DECLARATION OF OFFICER JESSE HERNANDEZ

JOINT EXHIBIT 013

1  for Summary Judgment, or in the alternative, Summary Adjudication filed in the

2  above-entitled matter.

3      3.      The following facts are stated from my personal knowledge, except

4  those facts stated on information and belief which I believe to be true, and if called

5  as a witness, I could and would so competently testify thereto under oath.

6      4.      On October 4, 2021, responded to a call for service at 3405 S. Baker

7  Street in the City of Santa Ana, which reported an assault with a deadly weapon

8  involving a gun.  Dispatch relayed that a 417 (brandished a gun) occurred at the

9  location.  Dispatch further relayed that the worker grabbed the gun, and the suspect

10  forced it away, cutting the worker's hand.

11      5.      The dispatcher also relayed that the suspect was a male white in his

12  50's, wearing a green shirt with black pants.  Dispatch advised that the suspect

13  forced the victim off the property and went back inside the residence.

14      6.      Prior to this incident, I never had any contact with or knew of the

15  Kinney family.  I never had an agreement with any member of the SAPD to engage

16  in conduct that would violate the Kinney family's rights.  I did not use any force

17  on Mr. Kinney or his daughter, I.K., during my response to this incident.

18      7.      During my response to this call for service and interaction with the

19  Kinney family, I had my department-issued body worn camera activated.  Attached

20  to the Joint Exhibit as Parts "M"-"N" are true and correct copies of my body worn

21  camera footage.

22

23

24

25

26

27

28

-2-
DECLARATION OF OFFICER JESSE HERNANDEZ

JOINT EXHIBIT 014

\*        \*        \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of October 2025 at ___Santa Ana___, California.

_Jesse Hernandez #3716_
Officer Jesse Hernandez

---

DECLARATION OF OFFICER JESSE HERNANDEZ

# PART E

## CORREAL BWC 1

# PART EE

1  **JILL WILLIAMS - State Bar No. 221793**
   **KIMBERLY SARMIENTO - State Bar No. 345641**
2  **CARPENTER, ROTHANS & DUMONT**
   **500 South Grand Avenue, 19th Floor**
3  **Los Angeles, California 90071**
   **(213) 228-0400 / (213) 228-0401 (Fax)**
4  **jwilliams@crdlaw.com / ksarmiento@crdlaw.com**

5  Attorneys for Defendants, Santa Ana Police Department,
   City of Santa Ana, Cpl. Jimmy Correal, and
6  Officers Luis Casillas, Jesse Hernandez, and
   Forensic Specialist Deborah Wolen

7

8              **UNITED STATES DISTRICT COURT**

9     **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

10

11  SEAN KINNEY,                          Case No. 8:24-cv-01286-JWH-JDE
                                          Consol. w/ 8:24-cv-01287-JWH-JDE
12              Plaintiffs,               [Assigned to the Hon. John W. Holcomb]

13         vs.                            **DECLARATION OF OFFICER**
                                          **ROBERT NEVAREZ**
14  SANTA ANA POLICE
    DEPARTMENT; CITY OF SANTA
15  ANA; JIMMY CORREAL, an
    individual; LUIS CASILLAS, an
16  individual; JESSE HERNANDEZ,
    an individual; DEBORAH
17  WOLLEN, an individual; and DOES
    1 to 35, inclusive,
18
                Defendants.
19
    _____
20
    AND ALL RELATED ACTIONS.
21

22

23

24         I, Robert Nevarez, declare that:

25    1.    I am currently employed as a police officer with the Santa Ana Police

26  Department ("SAPD") and have been with the department for 6 years.

27    2.    This declaration is made in connection with the Defendants' Motion

28  for Summary Judgment, or in the alternative, Summary Adjudication filed in the

                                     -1-
                 DECLARATION OF OFFICER ROBERT NEVAREZ

1  above-entitled matter.

2      3.    The following facts are stated from my personal knowledge, except

3  those facts stated on information and belief which I believe to be true, and if called

4  as a witness, I could and would so competently testify thereto under oath.

5      4.    On October 4, 2021, responded to a call for service at 3405 S. Baker

6  Street in the City of Santa Ana, which reported an assault with a deadly weapon

7  involving a gun.  Dispatch relayed that the reporting party's crew was doing

8  landscaping work when the tenant inside the residence came outside with a rifle

9  and 417'd (brandished a gun at) a worker.  Dispatch further relayed that the worker

10  grabbed the gun, and the suspect forced it away, cutting the worker's hand.

11      5.    The dispatcher also relayed that the suspect was a male white in his

12  50's, wearing a green shirt with black pants.  Dispatch advised that the suspect

13  forced the victim off the property and went back inside the residence.

14      6.    Because of the nature of the call for service and concern that the

15  suspect, Sean Kinney, or any other occupant of the residence might be armed, I

16  held my department-issued firearm at the low-ready position (pointed generally at

17  an angle downward) while Mr. Kinney exited the residence.  I never pointed my

18  firearm directly at Mr. Kinney, Ms. Kinney, or their daughter, I.K.  I estimate that

19  the closest I was to Mr. Kinney while I was had my firearm in the low-ready

20  position was approximately 15 feet.  As soon as Officer Hernadez handcuffed Mr.

21  Kinney and stood him up off the ground, I holstered my firearm.  My firearm

22  remained holstered while Ms. Kinney and I.K. exited the residence, and I never

23  handcuffed I.K.

24      7.    Prior to this incident, I never had any contact with or knew of the

25  Kinney family.  I never had an agreement with any member of the SAPD to engage

26  in conduct that would violate the Kinney family's rights.  Aside from having my

27  firearm in the low-ready position at certain points during the incident as noted

28  above, I did not use any force on Mr. Kinney or his daughter, I.K., during my

-2-
DECLARATION OF OFFICER ROBERT NEVAREZ

1    response to this incident.

2       8.     During my response to this call for service and interaction with the

3    Kinney family, I had my department-issued body worn camera activated. Attached

4    to the Joint Exhibit as Parts "O"-"P" are true and correct copies of my body worn

5    camera footage.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF OFFICER ROBERT NEVAREZ

1

2          \*          \*          \*

3       I declare under penalty of perjury that the foregoing is true and correct.

4       Executed this  07  day of October 2025 at  SANTA  ANA        , California.

5
                                    _____
6                                        Officer Robert Nevarez

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF OFFICER ROBERT NEVAREZ

# PART F

## CORREAL BWC 2

# PART FF

1 **JILL WILLIAMS - State Bar No. 221793**
**KIMBERLY SARMIENTO - State Bar No. 345641**
2 **CARPENTER, ROTHANS & DUMONT**
**500 South Grand Avenue, 19th Floor**
3 **Los Angeles, California 90071**
**(213) 228-0400 / (213) 228-0401 (Fax)**
4 jwilliams@crdlaw.com / ksarmiento@crdlaw.com

5 Attorneys for Defendants, Santa Ana Police Department,
City of Santa Ana, Cpl. Jimmy Correal, and
6 Officers Luis Casillas, Jesse Hernandez, and
Forensic Specialist Deborah Wolen
7

8 ## UNITED STATES DISTRICT COURT

9 ## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

10

11 SEAN KINNEY,                          Case No. 8:24-cv-01286-JWH-JDE

12          Plaintiffs,                  Consol. w/ 8:24-cv-01287-JWH-JDE
                                         [Assigned to the Hon. John W. Holcomb]
13      vs.
                                         **DECLARATION OF FORENSIC**
14 SANTA ANA POLICE                      **SPECIALIST DEBORAH WOLEN**
DEPARTMENT; CITY OF SANTA
15 ANA; JIMMY CORREAL, an
individual; LUIS CASILLAS, an
16 individual; JESSE HERNANDEZ,
an individual; DEBORAH
17 WOLLEN, an individual; and DOES
1 to 35, inclusive,
18
          Defendants.
19

20 _____

21 AND ALL RELATED ACTIONS.

22

23

24          I, Deborah Wolen, declare that:

25          1.      I am currently employed as a Forensic Specialist with the Santa Ana

26 Police Department ("SAPD") and have been with the department in this capacity

27 for more than 5 years.

28          2.      This declaration is made in connection with the Defendants' Motion

-1-
DECLARATION OF FORENSIC SPECIALIST DEBORAH WOLEN

JOINT EXHIBIT 020

1  for Summary Judgment, or in the alternative, Summary Adjudication filed in the

2  above-entitled matter.

3      3.    The following facts are stated from my personal knowledge, except

4  those facts stated on information and belief which I believe to be true, and if called

5  as a witness, I could and would so competently testify thereto under oath.

6      4.    On October 4, 2021, I was called to the scene of a call for service at

7  3405 S. Baker Street in the City of Santa Ana.  I took photographs of the area

8  inside the residence where SAPD officers located a shotgun, which was believed to

9  be used in connection with a crime.  I took photographs of the shotgun, which

10  Officer Hernandez placed on top of the bed after retrieving it from underneath the

11  bed.  After I took photographs of the area and the shotgun, Officer Robert

12  Santaella took the gun from the bed and brought it outside while we exited the

13  residence together.  Outside, Officer Santaella read off the shotgun's serial number

14  (MV77895B) to me and Officer Hernandez.  Once the officers rendered the gun

15  safe, I collected the shotgun and transported it to the station, where I processed it

16  and booked it into evidence.

17      5.    I identified the gun as a MAVERICK ARMS (EAGLE PASS TX) -

18  US, 88, 12 ga. Caliber, Pump Action, Shotgun, Maverick Arms model #88 12 ga.

19  shotgun with serial number MV77895B.

20      6.    During my response to the scene, I never had any contact or

21  communication with Sean Kinney, Christiane Kinney, or their daughter I.K.  Prior

22  to responding this incident, I never interacted with or knew of the Kinney family.  I

23  used no force against any member of the Kinney family.  I never had an agreement

24  with any member of the SAPD to engage in conduct that would violate the Kinney

25  family's rights.  Because I am not a sworn peace officer, I do not carry a firearm.

26      7.    While responding to this call, I had my department-issued body worn

27  camera activated.  Attached to the Joint Exhibit as Part "Q" is a true and correct

28  copy of the footage from my body worn camera.

-2-

DECLARATION OF FORENSIC SPECIALIST DEBORAH WOLEN

JOINT EXHIBIT 021

*     *     *

1

2    I declare under penalty of perjury that the foregoing is true and correct.

3    Executed this __03__ day of October 2025 at __Los Angeles__, California.

4    _____

5             Forensic Specialist Deborah Wolen

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF FORENSIC SPECIALIST DEBORAH WOLEN

# PART G

## CORREAL BWC 3

# PART H

## CORREAL BWC 4

# PART I

## CORREAL BWC 5

# PART J

## GARCIA BWC 1

# PART K

## GARCIA BWC 2

# PART L

**GARCIA BWC 3**

# PART M

## HERNANDEZ BWC 1

# PART N

## HERNANDEZ BWC 2

# PART O

## NEVAREZ BWC 1

# PART P

## NEVAREZ BWC 2

# PART Q

## WOLEN BWC

# PART R

<sup>Ca</sup>**Santa Ana Police Department**

Case #:2021-21255                               CallForService #: 211002050

| Event |
| --- |

**3405 S Baker St Santa Ana, 92707**

| | |
| --- | --- |
| **Call Type:** | 417O |
| **Call Received:** | 10/04/2021 07:51:59 |
| **Priority:** | 2 |
| **Cross Street:** | W CURIE AV /W ALTON AV |
| **Beat:** | Southcoast Beat 3 |
| **Reporting Area:** | SCBeat3 |
| **District:** | SC |
| **Grid:** | |
| **Latitude:** | 33.702224 |
| **Longitude:** | -117.883074 |
| **Call Taker:** | MENDOZA, JENNIFER |
| **Call Status:** | C |
| **First Unit Assigned:** | 10/04/2021 07:54:07 |
| **First Unit Enroute:** | 10/04/2021 07:54:09 |
| **First Unit Arrived:** | 10/04/2021 07:56:56 |
| **First Unit Dispatched:** | 10/04/2021 07:54:07 |
| **Call Closed:** | 10/04/2021 17:32:17 |
| **Primary Officer:** | CASILLAS, LUIS |
| **Call Disposition:** | AT_Action taken, NR_No Report, AS_Assist, AS_Assist, AS_Assist, AS_Assist, AS_Assist, AS_Assist, CC_CSI, AS_Assist, AS_Assist, AS_Assist, AS_Assist, CR_Call report, AS_Assist, CA_Call arrest |
| **Jurisdiction:** | City of Santa Ana |
| **Battalion:** | SC3 |

| Person (2) |
| --- |

**SUPERVISOR, LEO /**

| | |
| --- | --- |
| **Phone:** | (714) 580-6562 |

**2**

| | |
| --- | --- |
| **License Number:** | b9850380 |

| Vehicle (2) |
| --- |

| | |
| --- | --- |
| **License:** | BHB125 |
| **License State:** | |

| | |
| --- | --- |
| **License:** | 8HBY125 |
| **License State:** | |

| Comments (1) |
| --- |

**Inform CAD Comments**

10/04/2021

JOINT EXHIBIT 023

Ca
# Santa Ana Police Department

Case #:2021-21255                                              CallForService #: 211002050

Location:

10/4/2021 7:52:18 AM, Performed By: P3205

Comment: 2ND HAND INFO TO CP, OCC'D 30 MINS AGO

10/4/2021 7:53:03 AM, Performed By: P3205

Comment: CP'S CREW WAS 97 DOING LANDSCAPING WORK , TENANT INS THE RES CAME OUT W/ A RIFLE AND 417'D A WORKER

10/4/2021 7:53:32 AM, Performed By: P3205

Comment: WORKER GRABBED THE GUN AND THE SUSP FORCED IT AWAY CUTTING THE WORKERS HAND

10/4/2021 7:54:03 AM, Performed By: P3205

Comment: CP IS ARRIVING NOW, GETTING DESC

10/4/2021 7:54:24 AM, Performed By: P3205

Comment: M/W 50'S BEARD WEARING GRN SHIRT BLK PANTS

10/4/2021 7:54:28 AM, Performed By: PSAPD

Comment: Backed up 172 with 155

10/4/2021 7:54:28 AM, Performed By: PSAPD

Comment: MobileCAD assist from Unit 155

JOINT EXHIBIT 024

## <sup>Ca</sup>Santa Ana Police Department

Case #:2021-21255                                          CallForService #: 211002050

10/4/2021 7:54:36 AM, Performed By: PSAPD

Comment: Backed up 177 with 171

10/4/2021 7:54:36 AM, Performed By: PSAPD

Comment: MobileCAD assist from Unit 171

10/4/2021 7:54:51 AM, Performed By: P3205

Comment: SUSP FORCED VICT OFF PROPERTY , POSS WENT BACK INS HIS RES

10/4/2021 7:54:56 AM, Performed By: PSAPD

Comment: Backed up 155 with 113

10/4/2021 7:54:56 AM, Performed By: PSAPD

Comment: MobileCAD assist from Unit 113

10/4/2021 7:55:12 AM, Performed By: P3385

Comment: Backed up 155 with 170

10/4/2021 7:55:43 AM, Performed By: P3205

Comment: CP AND VICT ARE WAITING ON BAKER NORTH OF THE RES

^Ca **Santa Ana Police Department**

Case #:2021-21255                                    CallForService #: 211002050

10/4/2021 7:56:13 AM, Performed By: P3205

Comment: VICT REF MEDICS

10/4/2021 7:56:26 AM, Performed By: P3205

Comment: CP STANDING BY IN WHI TRK

10/4/2021 7:56:34 AM, Performed By: P3385

Comment: 172 HAVE CP T87 AT BAKER/ALTON PLS

10/4/2021 7:56:45 AM, Performed By: P3205

Comment: CP WILL 87 AT ALTON/BAKER

10/4/2021 8:00:02 AM, Performed By: P3385

Comment: 177 OUT WITH THE CP

10/4/2021 8:05:32 AM, Performed By: P3385

Comment: 172 REQ DUKE

10/4/2021 8:06:24 AM, Performed By: P2994

Comment: WILL COPY GRN2

Ca

# Santa Ana Police Department

Case #:2021-21255                                        CallForService #: 211002050

10/4/2021 8:06:58 AM, Performed By: P3385

Comment: 172 REQ CLEARANCE ON GRN 2

10/4/2021 8:09:23 AM, Performed By: P3385

Comment: Backed up 113 with 114

10/4/2021 8:09:43 AM, Performed By: P2994

Comment: 113 STANDING BY E/O BRISTOL ON ALTON W/THE CP

10/4/2021 8:10:19 AM, Performed By: P2994

Comment: 155 ON CURIE

10/4/2021 8:10:40 AM, Performed By: P2994

Comment: Secondary Location for 155: W CURIE AV / S PARK DR, W CURIE AV / S PARK DR,SANTA ANA,
CA 92707.

10/4/2021 8:11:50 AM, Performed By: P2994

Comment: 177 SUSP IS MW, BLUE EYES, BALD , GRY BEARD , GRN SHIRT, BLK PANTS, L/S ENTERING THE
RES W/ A BLK SHOT GUN

10/4/2021 8:15:39 AM, Performed By: P2994

Comment: 172 WIT ADVISED SUSP'S WIFE WILL POSS BE LEAVING IN A BLK 4DR SEDAN TO DROP OF 14
Y/O AT SCHOOL

Ca **Santa Ana Police Department**

Case #:2021-21255                                      CallForService #: 211002050

10/4/2021 8:16:46 AM, Performed By: P2994

Comment: [Query] DUKE, 1. DMV / SVS Query: C,CA,BHB125,2017

10/4/2021 8:16:46 AM, Performed By: P2994

Comment: [Query] DUKE, 2. AWSS Vehicle Query: C,CA,BHB125,1

10/4/2021 8:16:46 AM, Performed By: P2994

Comment: [Query] DUKE, 3. CAD BOLO Vehicle Query: CA,BHB125

10/4/2021 8:16:46 AM, Performed By: P2994

Comment: [Query] DUKE, 4. CAD SI Vehicle Query: CA,BHB125

10/4/2021 8:16:56 AM, Performed By: P2994

Comment: 171 HAVE 114 PARK AND CURIE

10/4/2021 8:17:06 AM, Performed By: P2994

Comment: Secondary Location for 114: S PARK DR / W CURIE AV, S PARK DR / W CURIE AV,SANTA ANA, CA 92707.

10/4/2021 8:17:26 AM, Performed By: P2994

Comment: DUKE NO MOVEMENT , DUKE HAS A GOOD VIEW OF THE RES ALL 4 SIDES , GARAGE IS CLOSED , 4DR BLK HB STYLE FORD

Ca **Santa Ana Police Department**

Case #:2021-21255                                    CallForService #: 211002050

10/4/2021 8:17:38 AM, Performed By: P2994

Comment: [Query] DUKE, 1. DMV / SVS Query: C,CA,8HBY125,2017

10/4/2021 8:17:38 AM, Performed By: P2994

Comment: [Query] DUKE, 2. AWSS Vehicle Query: C,CA,8HBY125,1

10/4/2021 8:17:38 AM, Performed By: P2994

Comment: [Query] DUKE, 3. CAD BOLO Vehicle Query: CA,8HBY125

10/4/2021 8:17:38 AM, Performed By: P2994

Comment: [Query] DUKE, 4. CAD SI Vehicle Query: CA,8HBY125

10/4/2021 8:18:05 AM, Performed By: P2994

Comment: [Return] REG VALID FROM: 01/12/21 TO 01/12/22

LIC#:8HBY125 YRMD:15 MAKE:FORD BTM :4D VIN :1FADP5AU1FL105607

R/O :KINNEY CHRISTIANE, 3405 S BAKER STREET CITY:SANTA ANA C.C.:30

ZIP#:92707

10/4/2021 8:20:11 AM, Performed By: WebRMS

Comment: Requested Case Number(s) issued for Incident #[211002050], Jurisdiction: City of Santa Ana.
Case Number(s): 2021-21255. requested by 177.

Ca **Santa Ana Police Department**

Case #:2021-21255                    CallForService #: 211002050

10/4/2021 8:21:57 AM, Performed By: P2994

Comment: DUKE STILL NO MOVEMENT - SB BAKER 2ND TO LAST HOUSE ON THE LEFT , BEFORE IT CURVES TO CURIE , E/SIDE OF THE ST

10/4/2021 8:22:12 AM, Performed By: P2994

Comment: CHECK RMS - NO CALL HISTORY AT T20

10/4/2021 8:23:02 AM, Performed By: P2994

Comment: 170 SHUT DOWN EB TRAFFIC FROM ALTON TO BRISTOL - SEND A T8 UNIT TO P/U TERRADYNE FROM STATION

10/4/2021 8:24:55 AM, Performed By: P2994

Comment: 170 HAVE TERRADYNE STAGE ON ALTON W/O BAKER IN PLOT OF SAMMY'S CAMERAS

10/4/2021 8:25:11 AM, Performed By: P3385

Comment: Backed up 170 with 792

10/4/2021 8:25:22 AM, Performed By: P2994

Comment: Secondary Location for 792: W ALTON AV / S BRISTOL ST, W ALTON AV / S BRISTOL ST,SANTA ANA, CA 92707.

10/4/2021 8:25:26 AM, Performed By: PSAPD

Ca **Santa Ana Police Department**

Case #:2021-21255                                    CallForService #: 211002050

Comment: Backed up 113 with 112

10/4/2021 8:25:26 AM, Performed By: PSAPD

Comment: MobileCAD assist from Unit 112

10/4/2021 8:25:38 AM, Performed By: P3385

Comment: Backed up 170 with 152

10/4/2021 8:25:49 AM, Performed By: P3385

Comment: 152 AT STATION AND WILL P/U TD

10/4/2021 8:30:17 AM, Performed By: P2994

Comment: DUKE MALE WALKING NB ON BAKER , E/SIDE OF ST , GRY/BLK SWTSHIRT, GRY SHORTS , NB
ON BAKER, GRY BEARD

10/4/2021 8:31:33 AM, Performed By: P2994

Comment: 177 MW, 50-60 YRS

10/4/2021 8:35:16 AM, Performed By: P2994

Comment: 170 ALTON AND PARK TO CUT OFF TRAFFIC OR DIVERT SB ON PARK

10/4/2021 8:36:16 AM, Performed By: P3385

Ca **Santa Ana Police Department**

Case #:2021-21255                                    CallForService #: 211002050

Comment: Backed up 170 with 841


10/4/2021 8:36:32 AM, Performed By: P3385

Comment: Secondary Location for 112: W ALTON AV / S PARK DR, W ALTON AV / S PARK DR,SANTA ANA, CA 92707.


10/4/2021 8:40:48 AM, Performed By: PSAPD

Comment: Backed up 177 with 174


10/4/2021 8:40:48 AM, Performed By: PSAPD

Comment: MobileCAD assist from Unit 174


10/4/2021 8:43:16 AM, Performed By: PSAPD

Comment: Backed up 170 with 175


10/4/2021 8:43:16 AM, Performed By: PSAPD

Comment: MobileCAD assist from Unit 175


10/4/2021 8:43:56 AM, Performed By: P2994

Comment: 170 WILL USE PLOT AS CP - PCOS WILL BE LOGGING IN AT 0900


10/4/2021 8:50:02 AM, Performed By: P2994

<sup>Ca</sup> **Santa Ana Police Department**

Case #:2021-21255                                        CallForService #: 211002050

Comment: T39 TO FIRE - STAGE BRISTOL/ALTON

10/4/2021 8:52:38 AM, Performed By: P2994

Comment: 170 START 2 ADD'L UNITS

10/4/2021 8:52:54 AM, Performed By: P2994

Comment: 170 HAVE UNITS T87 CP - BRISTOL / ALTON

10/4/2021 8:53:50 AM, Performed By: P2994

Comment: 171 TRANSFER ANY CALLS FROM 3405 S BAKER TO 714-944-5690 - HNT PHONE

10/4/2021 8:53:52 AM, Performed By: P3385

Comment: Backed up 170 with 143

10/4/2021 8:54:11 AM, Performed By: P3385

Comment: Secondary Location for 143: S BRISTOL ST / W ALTON AV, S BRISTOL ST / W ALTON AV,SANTA ANA, CA 92707.

10/4/2021 8:54:17 AM, Performed By: P3385

Comment: Secondary Location for 111: S BRISTOL ST / W ALTON AV,,SANTA ANA, CA 92707.

10/4/2021 8:54:17 AM, Performed By: P3385

<sup>Ca</sup> **Santa Ana Police Department**

Case #:2021-21255                          CallForService #: 211002050

Comment: Backed up 143 with 111

10/4/2021 9:07:27 AM, Performed By: P2994

Comment: 171 START K9

10/4/2021 9:07:46 AM, Performed By: P2994

Comment: 171 T39 TO W/C

10/4/2021 9:14:59 AM, Performed By: P3205

Comment: WC ADV K9 HAS BEEN NOTIFIED

10/4/2021 9:17:00 AM, Performed By: P2994

Comment: 111 143 SET UP ON COLUMBINE

10/4/2021 9:17:13 AM, Performed By: P2994

Comment: Secondary Location for 111: W COLUMBINE AV / S PARK DR, W COLUMBINE AV / S PARK
DR,SANTA ANA, CA 92707.

10/4/2021 9:17:13 AM, Performed By: P2994

Comment: Secondary Location for 143: W COLUMBINE AV / S PARK DR, W COLUMBINE AV / S PARK
DR,SANTA ANA, CA 92707.

Ca

**Santa Ana Police Department**

Case #:2021-21255                                    CallForService #: 211002050

10/4/2021 9:19:44 AM, Performed By: PSAPD

Comment: Secondary Location for 796: W ALTON AV / S BRISTOL ST,,SANTA ANA, CA 92707.

10/4/2021 9:19:45 AM, Performed By: PSAPD

Comment: Backed up 792 with 796

10/4/2021 9:19:45 AM, Performed By: PSAPD

Comment: MobileCAD assist from Unit 796

10/4/2021 9:19:45 AM, Performed By: PSAPD

Comment: Secondary Location for 796: W ALTON AV / S BRISTOL ST.

10/4/2021 9:28:08 AM, Performed By: P2994

Comment: 171 NEED 2 ON COLUMBINE AND 2 ON CURIE

10/4/2021 9:34:36 AM, Performed By: P2994

Comment: 170 STANDING BY FOR K9 TO ARRIVE BEFORE CONTACT IS MADE AT THE RES

10/4/2021 9:38:22 AM, Performed By: P2994

Comment: 170 NO CHANGES IN THE RES - ALL DOORS, WINDOWS , AND BLINDS ARE CLOSED

10/4/2021 9:40:37 AM, Performed By: P2994

Ca **Santa Ana Police Department**

Case #:2021-21255                                    CallForService #: 211002050

Comment: DUKE ABOUT 1 HR LEFT OF FUEL

10/4/2021 9:41:00 AM, Performed By: P2994

Comment: 171 894K IS ABOUT 30 MINS OUT

10/4/2021 9:56:13 AM, Performed By: PSAPD

Comment: Secondary Location for 155: S PARK DR / W CURIE AV,,SANTA ANA, CA 92707.

10/4/2021 9:56:14 AM, Performed By: PSAPD

Comment: Backed up 114 with 155

10/4/2021 9:56:14 AM, Performed By: PSAPD

Comment: MobileCAD assist from Unit 155

10/4/2021 9:56:14 AM, Performed By: PSAPD

Comment: Secondary Location for 155: S PARK DR / W CURIE AV.

10/4/2021 9:56:56 AM, Performed By: P2994

Comment: Backed up 171 with 894K

10/4/2021 9:59:08 AM, Performed By: P2994

Ca **Santa Ana Police Department**

Case #:2021-21255                           CallForService #: 211002050

Comment: DUKE FEM , RED LONG HAIR, DK GRY SWTRSHIRT, SWTPANTS, SANDALS , WALKED INTO
FRONT COURTYARD OF TARGET HOUSE , WALKED FROM FRONT DOOR , IN FRONT OF BLK VEH IN THE
DW

10/4/2021 9:59:19 AM, Performed By: P2994

Comment: DUKE TALKING TO NBOR ON THE N/FENCE LINE

10/4/2021 10:02:38 AM, Performed By: P3385

Comment: 170 BEGINNING APPROACH TO TARGET RESD

10/4/2021 10:03:09 AM, Performed By: P3334

Comment: 170 BEGINNING APP TO THE RESD

10/4/2021 10:03:15 AM, Performed By: P3334

Comment: DUKE FEM WALKED BACK INTO THE RESD

10/4/2021 10:07:16 AM, Performed By: P3334

Comment: 171 MOVING IN

10/4/2021 10:08:32 AM, Performed By: P3334

Comment: 152 CALLING INS

10/4/2021 10:08:39 AM, Performed By: P3334

Ca
# Santa Ana Police Department

Case #:2021-21255                                    CallForService #: 211002050

Comment: 170 T97 AT TARGET LOC

10/4/2021 10:08:55 AM, Performed By: P3334

Comment: 152 SPEAKING TO SUSP ON T21

10/4/2021 10:09:10 AM, Performed By: P3334

Comment: 152 GIVING SUSP COMMANDS TO EXIT RESD W/HANDS UP

10/4/2021 10:09:21 AM, Performed By: P3334

Comment: 152 SUSP ADV HE WILL COMPLY

10/4/2021 10:09:51 AM, Performed By: P3334

Comment: 152 SUBJ IN FRONT WINDOW - SUSP EXITING W/HIS HANDS UP

10/4/2021 10:10:25 AM, Performed By: P3334

Comment: 152 GIVING COMMANDS

10/4/2021 10:11:00 AM, Performed By: P3334

Comment: 152 MALE IS DET

10/4/2021 10:12:33 AM, Performed By: P3334

<sup>Ca</sup> **Santa Ana Police Department**

Case #:2021-21255                                   CallForService #: 211002050

Comment: 152 GIVING COMMANDS TO FEM

10/4/2021 10:13:13 AM, Performed By: P3334

Comment: 152 FEM W/TEENAGER WENT BACK INS THE RESD

10/4/2021 10:14:01 AM, Performed By: P3334

Comment: 152 GIVING COMMANDS TO 2ND FEM

10/4/2021 10:14:37 AM, Performed By: P3334

Comment: 152 2ND FEM DET

10/4/2021 10:15:33 AM, Performed By: P3334

Comment: 152 MAKING ANNOUCEMENTS INS THE RESD

10/4/2021 10:16:07 AM, Performed By: P3334

Comment: 155 ANNOUNCEMENTS HEARD AT PARK/CURIE

10/4/2021 10:16:14 AM, Performed By: P3334

Comment: 111 ANNOUNCEMENTS SLIGHTLY HEARD

10/4/2021 10:17:41 AM, Performed By: P3334

Comment: DUKE NO MOVEMENT TO THE REAR AND SIDE OF RESD

Ca

# Santa Ana Police Department

Case #:2021-21255                                    CallForService #: 211002050

10/4/2021 10:17:48 AM, Performed By: P3334

Comment: 152 PER RESD NO ONE ELSE INS

10/4/2021 10:22:05 AM, Performed By: P3334

Comment: 170 C4 INS RESD

10/4/2021 10:24:59 AM, Performed By: P3334

Comment: 171 PREPARING FOR INFIELD

10/4/2021 10:28:14 AM, Performed By: P3334

Comment: 177 ENR FOR IN FIELD

10/4/2021 10:30:25 AM, Performed By: P3334

Comment: 171 POSITIVE ID ON 1ST SUBJ

10/4/2021 10:30:42 AM, Performed By: P3334

Comment: 172 ALREADY ADV OCFA TO T22

10/4/2021 10:30:58 AM, Performed By: P3334

Comment: 170 TRAFFIC CAN BE OPENED IN ALL DIRECTIONS

<sup>Ca</sup> **Santa Ana Police Department**

Case #:2021-21255                                    CallForService #: 211002050

10/4/2021 10:41:15 AM, Performed By: P3205

Comment: 172 REQ CSI

10/4/2021 10:41:21 AM, Performed By: P3205

Comment: Backed up 172 with 563

10/4/2021 10:59:41 AM, Performed By: P3334

Comment: 171 T34 GRN 2

10/4/2021 11:19:16 AM, Performed By: 177

Comment: Secondary Location for 177: 62 CIVIC CENTER PLAZA,SANTA ANA,CA 92703

10/4/2021 11:27:28 AM, Performed By: 171

Comment: Secondary Location for 171: 62 CIVIC CENTER PLAZA,SANTA ANA,CA 92703

10/4/2021 11:40:36 AM, Performed By: 177

Comment: ID

DATE:10-04-21*TIME:11:40*

DMV RECORD FOR LAW ENFORCEMENT USE ONLY

DL/NO:B9850380*B/D:08-13-1970*NAME:KINNEY SEAN PHILLIP*

MAIL ADDR AS OF 09-07-21:3405 S BAKER STREET SANTA ANA 92707*

Ca **Santa Ana Police Department**

Case #:2021-21255                                        CallForService #: 211002050

OTH/ADDR AS OF 08-05-21:6146 COLGATE AVE LOS ANGELES *

AKA:KINNEY SEAN P*

IDENTIFYING INFORMATION:

SEX:MALE*HAIR:BLOND*EYES:BLU*HT:5-10*WT:205*

LIC/ISS:08-05-21*EXPIRES:08-13-26*CLASS:C NON-COMMERCIAL

& M1 MOTORCYCLE*

ENDORSEMENTS:NONE*

ORIGINAL DL ISSUE DATE:02-21-03*

LATEST APP:

DL TYPE:RENEWAL*ISS/DATE: 08-05-21*OFFICE: HLY*BATES:LIS*

LICENSE STATUS:

VALID*

DEPARTMENTAL ACTIONS:

NONE

CONVICTIONS:

NONE

FAILURES TO APPEAR:

NONE

ACCIDENTS:

NONE

END

<sup>Ca</sup> **Santa Ana Police Department**

---

Case #:2021-21255                                    CallForService #: 211002050

---

10/4/2021 12:06:47 PM, Performed By: 177

Comment: Secondary Location for 177: 60 CIVIC CENTER PLAZA,SANTA ANA,CA 92703

| Unit (20) |
|---|

### Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3755 CASILLAS, LUIS, V861 Car 861 |
| **Unit:** | 177 |
| **Assigned:** | 10/04/2021 07:54:07 |
| **Assigned By:** | CASWELL, JEANA |
| **Enroute:** | 10/04/2021 07:54:09 |
| **On Scene:** | 10/04/2021 07:56:56 |
| **Cleared:** | 10/04/2021 17:32:17 |
| **Enroute2:** | 10/04/2021 11:19:16 |
| **On Scene2:** | 10/04/2021 11:33:28 |

### Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3577 GARCIA, YAZMIN, V845 Car 845 |
| **Unit:** | 172 |
| **Assigned:** | 10/04/2021 07:54:07 |
| **Assigned By:** | CASWELL, JEANA |
| **Enroute:** | 10/04/2021 07:54:15 |
| **On Scene:** | 10/04/2021 08:03:25 |
| **Cleared:** | 10/04/2021 11:57:50 |

### Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3701 MARTINEZ, ADRIAN, V859 Car 859 |
| **Unit:** | 155 |
| **Assigned:** | 10/04/2021 07:54:27 |
| **Assigned By:** | SAPD CAD Service |
| **Enroute:** | 10/04/2021 07:54:27 |
| **On Scene:** | 10/04/2021 08:02:24 |
| **Cleared:** | 10/04/2021 09:55:07 |
| **Enroute2:** | 10/04/2021 08:10:40 |
| **On Scene2:** | 10/04/2021 08:10:40 |

JOINT EXHIBIT 043

Ca

# Santa Ana Police Department

Case #:2021-21255                                    CallForService #: 211002050

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3177 CORREAL, JIMMY, V811 Car 811 |
| **Unit:** | 171 |
| **Assigned:** | 10/04/2021 07:54:36 |
| **Assigned By:** | SAPD CAD Service |
| **Enroute:** | 10/04/2021 07:54:36 |
| **On Scene:** | 10/04/2021 08:02:52 |
| **Cleared:** | 10/04/2021 12:18:15 |
| **Enroute2:** | 10/04/2021 11:27:28 |
| **On Scene2:** | 10/04/2021 11:35:40 |

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3674 JOHNSON, JACOB, V815 Car 815 |
| **Unit:** | 113 |
| **Assigned:** | 10/04/2021 07:54:56 |
| **Assigned By:** | SAPD CAD Service |
| **Enroute:** | 10/04/2021 07:54:56 |
| **On Scene:** | 10/04/2021 08:05:42 |
| **Cleared:** | 10/04/2021 11:10:29 |

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P2567 DIAZ, RICARDO, V832 Car 832 |
| **Unit:** | 170 |
| **Assigned:** | 10/04/2021 07:55:12 |
| **Assigned By:** | CASWELL, JEANA |
| **Enroute:** | 10/04/2021 07:55:42 |
| **On Scene:** | 10/04/2021 08:16:12 |
| **Cleared:** | 10/04/2021 11:35:26 |

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | |
| **Unit:** | DUKE |
| **Assigned:** | 10/04/2021 08:06:24 |
| **Assigned By:** | GARCIA, JESSICA |
| **Enroute:** | 10/04/2021 08:06:24 |
| **On Scene:** | 10/04/2021 08:13:57 |
| **Cleared:** | 10/04/2021 10:23:27 |

Ca

# Santa Ana Police Department

Case #:2021-21255                                          CallForService #: 211002050

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3675 MORA, ZACHARY, V868 Car 868 |
| **Unit:** | 114 |
| **Assigned:** | 10/04/2021 08:09:23 |
| **Assigned By:** | CASWELL, JEANA |
| **Enroute:** | 10/04/2021 08:09:32 |
| **On Scene:** | |
| **Cleared:** | 10/04/2021 10:42:33 |
| **Enroute2:** | 10/04/2021 08:17:06 |
| **On Scene2:** | 10/04/2021 08:22:54 |

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P2676 VILLA, TONY, V771 Car 771 |
| **Unit:** | 792 |
| **Assigned:** | 10/04/2021 08:25:10 |
| **Assigned By:** | CASWELL, JEANA |
| **On Scene:** | 10/04/2021 08:25:10 |
| **Cleared:** | 10/04/2021 10:41:30 |
| **Enroute2:** | 10/04/2021 08:25:22 |
| **On Scene2:** | 10/04/2021 08:25:22 |

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3673 NEVAREZ, ROBERT, V871 Car 871 |
| **Unit:** | 112 |
| **Assigned:** | 10/04/2021 08:25:25 |
| **Assigned By:** | SAPD CAD Service |
| **Enroute:** | 10/04/2021 08:25:25 |
| **On Scene:** | |
| **Cleared:** | 10/04/2021 11:10:24 |
| **Enroute2:** | 10/04/2021 08:36:32 |
| **On Scene2:** | 10/04/2021 08:43:10 |

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3327 SHARP, BRADLEY, V809 Car 809 |
| **Unit:** | 152 |
| **Assigned:** | 10/04/2021 08:25:37 |
| **Assigned By:** | CASWELL, JEANA |
| **Enroute:** | 10/04/2021 08:30:29 |
| **On Scene:** | 10/04/2021 08:52:34 |
| **Cleared:** | 10/04/2021 11:55:18 |

Ca **Santa Ana Police Department**

Case #:2021-21255                                    CallForService #: 211002050

### Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3231 GARCIA, DAVID, V59691 Car 59691 |
| **Unit:** | 841 |
| **Assigned:** | 10/04/2021 08:36:16 |
| **Assigned By:** | CASWELL, JEANA |
| **On Scene:** | |
| **Cleared:** | 10/04/2021 08:36:27 |

### Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3716 HERNANDEZ, JESSE, V870 Car 870 |
| **Unit:** | 174 |
| **Assigned:** | 10/04/2021 08:40:47 |
| **Assigned By:** | SAPD CAD Service |
| **Enroute:** | 10/04/2021 08:40:47 |
| **On Scene:** | 10/04/2021 08:40:53 |
| **Cleared:** | 10/04/2021 11:25:44 |

### Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3717 SANTAELLA, ROBERT, V830 Car 830 |
| **Unit:** | 175 |
| **Assigned:** | 10/04/2021 08:43:16 |
| **Assigned By:** | SAPD CAD Service |
| **On Scene:** | 10/04/2021 08:43:16 |
| **Cleared:** | 10/04/2021 11:54:05 |

### Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3698 VAN LUVEN, KEVIN, V881 Car 881 |
| **Unit:** | 143 |
| **Assigned:** | 10/04/2021 08:53:52 |
| **Assigned By:** | CASWELL, JEANA |
| **On Scene:** | |
| **Cleared:** | 10/04/2021 10:46:59 |
| **Enroute2:** | 10/04/2021 08:54:13 |
| **On Scene2:** | 10/04/2021 09:07:52 |

### Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P2909 GONZALEZ, ALAN, V860 Car 860 |
| **Unit:** | 111 |
| **Assigned:** | 10/04/2021 08:54:17 |
| **Assigned By:** | CASWELL, JEANA |
| **On Scene:** | |
| **Cleared:** | 10/04/2021 10:48:04 |
| **Enroute2:** | 10/04/2021 08:54:37 |
| **On Scene2:** | 10/04/2021 09:04:26 |

Ca

# Santa Ana Police Department

Case #:2021-21255                                    CallForService #: 211002050

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3292 GUERRA, CHRISTOPHER, V776 Car 776 |
| **Unit:** | 796 |
| **Assigned:** | 10/04/2021 09:19:44 |
| **Assigned By:** | SAPD CAD Service |
| **On Scene:** | |
| **Cleared:** | 10/04/2021 10:42:33 |
| **Enroute2:** | 10/04/2021 09:19:45 |
| **On Scene2:** | 10/04/2021 09:37:44 |

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3701 MARTINEZ, ADRIAN, V859 Car 859 |
| **Unit:** | 155 |
| **Assigned:** | 10/04/2021 09:56:13 |
| **Assigned By:** | SAPD CAD Service |
| **On Scene:** | |
| **Cleared:** | 10/04/2021 11:02:48 |
| **Enroute2:** | 10/04/2021 08:10:40 |
| **On Scene2:** | 10/04/2021 08:10:40 |

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | |
| **Unit:** | 894K |
| **Assigned:** | 10/04/2021 09:56:56 |
| **Assigned By:** | GARCIA, JESSICA |
| **On Scene:** | 10/04/2021 09:56:56 |
| **Cleared:** | 10/04/2021 10:35:37 |

## Unknown

| | |
|---|---|
| **Personnel / Vehicle:** | P3665 WOLEN, DEBORAH, V993 Car 993 |
| **Unit:** | 563 |
| **Assigned:** | 10/04/2021 10:41:21 |
| **Assigned By:** | MENDOZA, JENNIFER |
| **Enroute:** | 10/04/2021 10:47:41 |
| **On Scene:** | 10/04/2021 11:07:45 |
| **Cleared:** | 10/04/2021 11:22:44 |

Ca **Santa Ana Police Department**

Case #:2021-21255                                    CallForService #: 211002050

| E911 (1) |
|---|

**Unknown**

| | |
|---|---|
| **ANI Phone Number:** | (714) 580-6562 |
| **Answered Time:** | 10/04/2021 07:50:28 |
| **Class Of Service:** | Phase2 |
| **Customer Name:** | |
| **City:** | Santa Ana |
| **ESN:** | 742 |
| **Latitude:** | 33.702149 |
| **Longitude:** | -117.881284 |
| **Raw ALI Data:** | 209 (714) 580-6562 07:50 10 /04 3220 S BRISTOL ST SA CW 742 WPH2 AT&T MOBILITY 800 635 6840 4 (714) 511-0788 8850216 E ATTMO SANTA ANA PD QUERY CALLER FOR LOCATION LAT 33.70214900 LON -117.881284 METERS 14 PERCENT 090 |

# PART S

Exhibit 7

Kinney, S.
02/05/25
optus.

## SANTA ANA
## POLICE DEPARTMENT

### *PROPERTY RECEIPT*
#### See reverse side for Property Retrieval Information

**SAPD CASE #:** 2021-21255

### RECEIPT ISSUED TO:

| KINNEY | SEAN | PHILLIP | B98503800 |
|--------|------|---------|-----------|
| *LAST NAME* | *FIRST* | *MIDDLE* | *CDL#* |

| 3405 S. BAKER ST. | SANTA ANA | CA | 92707 | (323) 385-7326 |
|-------------------|-----------|-----|-------|----------------|
| *ADDRESS* | *CITY* | *STATE* | *ZIP* | *PHONE #* |

| QTY | DESCRIPTION | SERIAL # |
|-----|-------------|----------|
| 1 | MAVERICK ARMS MODEL #88  12 G.A  SHOTGUN | MV77895B |
| | | |
| | | |
| | | |
| | | |
| | | |

### RECEIPT ISSUED BY:

OFFICER: L. CASILLAS     BADGE #: 3755     DATE: 10 / 4 / 21

#### HOLD REASON FOR ABOVE LISTED PROPERTY (SELECT ONE):

☑ **EVIDENCE**    ☐ **SAFEKEEPING**    ☐ **FOUND**    ☐ **RECOVERED**

X _____                    10 / 4 / 21
SIGNATURE OF PROPERTY OWNER                           *DATE*

WHITE COPY- UPLOAD INTO TRITECH          PINK COPY- OWNER'S RECEIPT

SAPD S-85 (REV 8/19)

# PART T

JOINT EXHIBIT 049

## Santa Ana Police Department

## Booking Release Report for:        10/04/2021 13:59:27

| | |
|---|---|
| **Booking No** | 2100002485 |
| **Inmate Name** | KINNEY, SEAN PHILLIP |
| **Booking Type** | BOOK |
| **Cleared Date** | 10/04/2021 |
| **Cleared Reason** | INMATE RELEASED 849(B) |
| **Court Docket** | |
| **Case Number** | 21-21255 |

_____
Inmate Signature

F5r Ftes 3643
Staff Signature

# PART U

**Policy**

**802**

# Property and Evidence

## 802.1   PURPOSE AND SCOPE

This  policy provides for the proper collection, storage, and security of evidence and other property. Additionally, this policy provides for the protection of the chain of evidence and identifies those persons authorized to remove and/or destroy property.

## 802.2   DEFINITIONS

**Property** - Includes all items of evidence, items taken for safekeeping and found property.

**Evidence** - Includes items taken or recovered in the course of an investigation that may be used in the prosecution of a case. This includes photographs and latent fingerprints.

**Safekeeping** - Includes the following types of property:

•    Property obtained by the Department for safekeeping such as a firearm

•    Personal property of an arrestee not taken as evidence

•    Property taken for safekeeping under authority of a law (e.g., Welfare and Institutions Code § 5150 (mentally ill persons))

**Found property** - Includes property found by an employee or citizen that has no apparent evidentiary value and where the owner cannot be readily identified or contacted.

## 802.3   PROPERTY HANDLING

Any  employee who first comes into possession of any property shall retain such property in his/ her possession until it is properly tagged and placed in the designated property locker or storage room along with the property form. Members shall ensure they maintain the chain of custody for all evidence.

Where ownership can be established as to found property with no apparent evidentiary value, such property may be released to the owner without the need for booking. The property form must be completed to document the release of property not booked and the owner shall sign the form acknowledging receipt of the items.

### 802.3.1   PROPERTY BOOKING PROCEDURE

All property must be booked prior to the employee going off-duty unless otherwise approved by a supervisor. For specific procedures regarding the booking of evidence, see Property and Evidence Handling Procedures.

### 802.3.2   NARCOTICS AND DANGEROUS DRUGS

All  narcotics and dangerous drugs shall be booked separately using a separate property record. For specific procedures regarding the booking, see Controlled Substances Testing and Collection Procedure.

Copyright Lexipol, LLC 2021/12/14, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
## Santa Ana PD Policy Manual

## *Property and Evidence*

The officer seizing the narcotics and dangerous drugs shall place them in the designated locker accompanied by two copies of the form for the Records Division and detectives. The remaining copy will be detached and submitted with the case report.

### 802.3.3   EXPLOSIVES, ARSON EVIDENCE & FLAMMABLES

Officers who encounter a suspected explosive device shall promptly notify their immediate supervisor or the Watch Commander. The bomb squad will be called to handle explosive-related incidents and will be responsible for the handling, storage, sampling and disposal of all suspected explosives.

Explosives will not be retained in the police facility. By definition, a "flammable" is virtually anything that is easily set on fire so special packaging is important.  Arson evidence shall be sealed into Teflon coated metal cans provided in both the bike locker and report room and the cans then placed in the yellow flammable locker located in the bike locker.  All flammable items are to be packaged individually and not mixed with other evidence.  Fireworks are never to be booked into any evidence locker.

### 802.3.4   EXCEPTIONAL HANDLING

Certain property items require a separate process. The following items shall be processed in the described manner:

(a)   Bodily fluids such as blood or semen stains shall be air-dried prior to booking.

(b)   License plates found not to be stolen or connected with a known crime, should be released directly to the Evidence and Supply Specialist, or placed in the designated container for return to the Department of Motor Vehicles. No formal property booking process is required.

(c)   All bicycles and bicycle frames require a property record. Property tags will be securely attached to each bicycle or bicycle frame. The property shall be placed in the bicycle storage area until a Evidence and Supply Specialist can log the property.

(d)   A Property Receipt (SAPD S-85) shall be issued for all confiscated money from known owners.  When booking money, the quantity of each denomination will be recorded on the evidence slip and the amount totaled.  Values over $100.00 require a second officer's verification and signature on the money envelope.

City property, unless connected to a known criminal case, should be released directly to the appropriate City department. No formal booking is required. In cases where no responsible person can be located, the property should be booked for safekeeping in the normal manner.

### 802.3.5   RELINQUISHED FIREARMS

Individuals who relinquish firearms pursuant to the provisions of Penal Code § 29850 shall be issued a receipt that describes the firearm, the serial number or other identification of the firearm at the time of relinquishment (Penal Code § 29810).

Relinquished firearms shall be retained for 30 days, after which time they may be destroyed, retained, sold or otherwise transferred, unless (Penal Code § 29810):

Copyright Lexipol, LLC 2021/12/14, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
### Santa Ana PD Policy Manual

## Property and Evidence

    (a)   A certificate is issued by a judge of a court of record or the District Attorney stating the firearms shall be retained; or

    (b)   The convicted person provides written notice of an intent to appeal the conviction that necessitated the relinquishment; or

    (c)   The Automated Firearms System indicates that the firearm was reported lost or stolen.

        1.   In such event, the firearm shall be restored to the lawful owner as soon as it is no longer needed as evidence, the lawful owner has identified the weapon and provided proof of ownership, and the Department has complied with the requirements of Penal Code § 33850 et seq.

The Evidence and Supply Specialist shall ensure the Records Manager is notified of the relinquished firearm for purposes of updating the Automated Firearms System and the disposition of the firearm for purposes of notifying the California Department of Justice (DOJ) (See the Records Division Policy).

## 802.4   PACKAGING OF PROPERTY

Certain items require special consideration and shall be booked separately as follows:

    (a)   Narcotics and dangerous drugs

    (b)   Firearms (ensure they are unloaded and booked separately from ammunition)

    (c)   Property with more than one known owner

    (d)   Paraphernalia as described in Health and Safety Code § 11364

    (e)   Contraband

For specific details regarding the packaging of evidence and property. See Property and Evidence Handling Procedure

### 802.4.1   PACKAGING CONTAINER

Employees shall package all property, except narcotics and dangerous drugs in a suitable container available for its size. Knife boxes should be used to package knives, and syringe tubes should be used to package syringes and needles.

A property tag shall be securely attached to the outside of all items or group of items packaged together.

### 802.4.2   PACKAGING NARCOTICS

See Controlled Substances Testing and Collection Procedure.

## 802.5   RECORDING OF PROPERTY

The Evidence and Supply Specialist will receive custody of evidence and use the current Records Management System to record, locate and store all evidence.

Copyright Lexipol, LLC 2021/12/14, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
## Santa Ana PD Policy Manual

## Property and Evidence

### 802.6  PROPERTY CONTROL

Anytime the Evidence and Supply Specialist receives property or releases property to another person, he/she shall use the current Records Management System to record each transaction.

### 802.6.1  RESPONSIBILITY OF OTHER PERSONNEL

Every time property is released or received, an appropriate entry on the evidence chain of custody shall be completed to maintain the chain of evidence. No property or evidence is to be released without first receiving written authorization from a supervisor or detective.

Request for analysis for items other than narcotics or drugs shall be completed on the appropriate forms and submitted to the Evidence and Supply Specialist. This request may be filled out any time after booking of the property or evidence.

### 802.6.2  TRANSFER OF EVIDENCE TO CRIME LABORATORY

The transporting employee will check the evidence out of property, indicating the date and time on the property control card and the request for laboratory analysis.

The Evidence and Supply Specialist releasing the evidence must complete the required information on the property control card and the evidence. The lab forms will be transported with the property to the examining laboratory. Upon delivering the item involved, the officer will record the delivery time on both copies, and indicate the locker in which the item was placed or the employee to whom it was delivered.

### 802.6.3  STATUS OF PROPERTY

Each person receiving property will make the appropriate entry to document the chain of evidence. Temporary release of property to officers for investigative purposes, or for court, shall be noted on the property control card, stating the date, time and to whom released.

The Evidence and Supply Specialist shall obtain the signature of the person to whom property is released, and the reason for release. Any employee receiving property shall be responsible for such property until it is properly returned to property or properly released to another authorized person or entity.

The return of the property should be recorded on the property control card, indicating date, time, and the person who returned the property.

### 802.6.4  AUTHORITY TO RELEASE PROPERTY

The Investigative Bureau shall authorize the disposition or release of all evidence and property coming into the care and custody of the Department, with some exceptions (safekeeping, found property).

### 802.6.5  RELEASE OF PROPERTY

All reasonable attempts shall be made to identify the rightful owner of found property or evidence not needed for an investigation.

JOINT EXHIBIT 054

# Santa Ana Police Department
### Santa Ana PD Policy Manual

## Property and Evidence

---

Release of property shall be made upon receipt of an authorized release form, listing the name and address of the person to whom the property is to be released. The release authorization shall be signed by the authorizing supervisor or detective and must conform to the items listed on the property form or must specify the specific item(s) to be released. Release of all property shall be documented on the property form.

With the exception of firearms and other property specifically regulated by statute, found property and property held for safekeeping shall be held for a minimum of 90 days. During such period, property personnel shall attempt to contact the rightful owner by telephone and/or mail when sufficient identifying information is available. Property not held for any other purpose and not claimed within 90 days after notification (or receipt, if notification is not feasible) may be auctioned to the highest bidder at a properly published public auction. If such property is not sold at auction or otherwise lawfully claimed, it may thereafter be destroyed (Civil Code § 2080.6). The final disposition of all such property shall be fully documented in related reports.

A Evidence and Supply Specialist shall release the property upon proper identification being presented by the owner for which an authorized release has been received. A signature of the person receiving the property shall be recorded on the original property form. If some items of property have not been released the property card will remain with the Property and Evidence Section. Upon release, the proper entry shall be documented in the Records Management System.

Under no circumstances shall any firearm, magazine, or ammunition be returned to any individual unless and until such person presents valid identification and written notification from the California Department of Justice that conforms to the provisions of Penal Code § 33865.

The Property and Evidence Section Supervisor should also make reasonable efforts to determine whether the person is the subject of any court order preventing the person from possessing a firearm and if so, the firearm should not be released to the person while the order is in effect.

The Department is not required to retain any firearm, magazine, or ammunition longer than 180 days after notice has been provided to the owner that such items are available for return. At the expiration of such period, the firearm, magazine, or ammunition may be processed for disposal in accordance with applicable law (Penal Code § 33875).

### 802.6.6   DISPUTED CLAIMS TO PROPERTY
Occasionally more than one party may claim an interest in property being held by the Department, and the legal rights of the parties cannot be clearly established. Such property shall not be released until one party has obtained a valid court order or other undisputed right to the involved property.

All parties should be advised that their claims are civil and in extreme situations, legal counsel for the Department may wish to file an interpleader to resolve the disputed claim (Code of Civil Procedure § 386(b)).

---

Copyright Lexipol, LLC 2021/12/14, All Rights Reserved.
Published with permission by Santa Ana Police Department
Property and Evidence - 5

# Santa Ana Police Department
Santa Ana PD Policy Manual

*Property and Evidence*

---

### 802.6.7   CONTROL OF NARCOTICS AND DANGEROUS DRUGS

The Evidence Unit will be responsible for the storage, control and destruction of all narcotics and dangerous drugs coming into the custody of this department, including paraphernalia as described in Health and Safety Code § 11364.

### 802.6.8   RELEASE OF FIREARM IN DOMESTIC VIOLENCE MATTERS

Within five days of the expiration of a restraining order issued in a domestic violence matter that required the relinquishment of a firearm or ammunition, the Evidence and Supply Specialist shall return the weapon or ammunition to the owner if the requirements of Penal Code § 33850 and Penal Code § 33855 are met, unless the firearm or ammunition is determined to be stolen, evidence in a criminal investigation, or the individual is otherwise prohibited from possessing a firearm (Family Code § 6389(g); Penal Code § 33855).

### 802.6.9   RELEASE OF FIREARMS IN GUN VIOLENCE RESTRAINING ORDER MATTERS

Firearms and ammunition that were taken into temporary custody or surrendered pursuant to a gun violence restraining order shall be returned to the restrained person upon the expiration of the order and in accordance with the requirements of Penal Code § 33850 et seq. (Penal Code § 18120).

If the restrained person who owns the firearms or ammunition does not wish to have the firearm or ammunition returned, he/she is entitled to sell or transfer title to a licensed dealer, provided that the firearms or ammunition are legal to own or possess and the restrained person has right to title of the firearms or ammunition (Penal Code § 18120).

If a person other than the restrained person claims title to the firearms or ammunition surrendered pursuant to Penal Code § 18120 and the Santa Ana Police Department determines him/her to be the lawful owner, the firearms or ammunition shall be returned in accordance with the requirements of Penal Code § 33850 et seq. (Penal Code § 18120).

Firearms and ammunition that are not claimed are subject to the requirements of Penal Code § 34000.

### 802.6.10   RELEASE OF FIREARMS AND WEAPONS IN MENTAL ILLNESS MATTERS

Firearms and other deadly weapons confiscated from an individual detained for an evaluation by a mental health professional or subject to the provisions of Welfare and Institutions Code § 8100 or Welfare and Institutions Code § 8103 shall be released or disposed of as follows:

(a)   If a petition for a hearing regarding the return of a firearm or a weapon has been initiated pursuant to Welfare and Institutions Code § 8102(c), the firearm or weapon shall be released or disposed of as provided by an order of the court. If the court orders a firearm returned, the firearm shall not be returned unless and until the person presents valid identification and written notification from the California Department of Justice (DOJ) that conforms to the provisions of Penal Code § 33865.

(b)   If no petition has been initiated pursuant to Welfare and Institutions Code § 8102(c) and the firearm or weapon is not retained as evidence, the Department shall make the firearm or weapon available for return. No firearm will be returned unless and until

Copyright Lexipol, LLC 2021/12/14, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
Santa Ana PD Policy Manual

## Property and Evidence

the person presents valid identification and written notification from the California DOJ that conforms to the provisions of Penal Code § 33865.

(c)    Unless the person contacts the Department to facilitate the sale or transfer of the firearm to a licensed dealer pursuant to Penal Code § 33870, firearms not returned should be sold, transferred, destroyed, or retained as provided in Welfare and Institutions Code § 8102.

### 802.6.11   RELEASE OF FIREARMS, MAGAZINES, AND AMMUNITION
The Department shall not return any firearm, magazine, or ammunition taken into custody to any individual unless all requirements of Penal Code § 33855 are met.

### 802.7   DISPOSITION OF PROPERTY
All property not held for evidence in a pending criminal investigation or proceeding, and held for six months or longer where the owner has not been located or fails to claim the property, may be disposed of in compliance with existing laws upon receipt of proper authorization for disposal. The Evidence and Supply Specialist shall request a disposition or status on all property which has been held in excess of 120 days, and for which no disposition has been received from a supervisor or detective.

### 802.7.1   EXCEPTIONAL DISPOSITIONS
The following types of property shall be destroyed or disposed of in the manner, and at the time prescribed by law, unless a different disposition is ordered by a court of competent jurisdiction:

- Weapons declared by law to be nuisances (Penal Code § 29300; Penal Code § 18010; Penal Code § 32750)

- Animals, birds, and related equipment that have been ordered forfeited by the court (Penal Code § 599a)

- Counterfeiting equipment (Penal Code § 480)

- Gaming devices (Penal Code § 335a)

- Obscene matter ordered to be destroyed by the court (Penal Code § 312)

- Altered vehicles or component parts (Vehicle Code § 10751)

- Narcotics (Health and Safety Code § 11474 et seq.)

- Unclaimed, stolen, or embezzled property (Penal Code § 1411)

- Destructive devices (Penal Code § 19000)

- Sexual assault evidence (Penal Code § 680)

### 802.7.2   UNCLAIMED MONEY
If found or seized money is no longer required as evidence and remains unclaimed after three years, the Department shall cause a notice to be published each week for a period of two consecutive weeks in a local newspaper of general circulation (Government Code § 50050). Such notice shall state the amount of money, the fund in which it is held and that the money will become

# Santa Ana Police Department

Santa Ana PD Policy Manual

## Property and Evidence

the property of the agency on a designated date not less than 45 days and not more than 60 days after the first publication (Government Code § 50051).

Any individual item with a value of less than $15.00, or any amount if the depositor/owner's name is unknown, which remains unclaimed for a year or by order of the court, may be transferred to the general fund without the necessity of public notice (Government Code § 50055).

If the money remains unclaimed as of the date designated in the published notice, the money will become the property of this department to fund official law enforcement operations. Money representing restitution collected on behalf of victims shall either be deposited into the Restitution Fund or used for purposes of victim services.

### 802.7.3   RETENTION OF BIOLOGICAL EVIDENCE

The Property and Evidence Section Supervisor shall ensure that no biological evidence held by the Department is destroyed without adequate notification to the following persons, when applicable:

    (a)    The defendant

    (b)    The defendant's attorney

    (c)    The appropriate prosecutor and Attorney General

    (d)    Any sexual assault victim

    (e)    The Investigations Bureau supervisor

Biological evidence shall be retained for either a minimum period that has been established by law (Penal Code § 1417.9) or that has been established by the Property and Evidence Section Supervisor, or until the expiration of any imposed sentence that is related to the evidence, whichever time period is greater. Following the retention period, notifications should be made by certified mail and should inform the recipient that the evidence will be destroyed after a date specified in the notice unless a motion seeking an order to retain the sample is filed and served on the Department within 180 days of the date of the notification. A record of all certified mail receipts shall be retained in the appropriate file. Any objection to, or motion regarding, the destruction of the biological evidence should be retained in the appropriate file and a copy forwarded to the Investigations Bureau supervisor.

Biological evidence related to a homicide shall be retained indefinitely and may only be destroyed with the written approval of the Chief of Police and the head of the applicable prosecutor's office.

Biological evidence or other crime scene evidence from an unsolved sexual assault shall not be disposed of prior to the expiration of the statute of limitations and shall be retained as required in Penal Code § 680. Even after expiration of an applicable statute of limitations, the Investigations Bureau supervisor should be consulted and the sexual assault victim shall be notified at least 60 days prior to the disposal (Penal Code § 680). Reasons for not analyzing biological evidence shall be documented in writing (Penal Code § 680.3).

Copyright Lexipol, LLC 2021/12/14, All Rights Reserved.
Published with permission by Santa Ana Police Department

JOINT EXHIBIT 058

# Santa Ana Police Department
Santa Ana PD Policy Manual

*Property and Evidence*

## 802.8  INSPECTIONS OF THE EVIDENCE ROOM

(a)   On a monthly basis, the supervisor of the evidence custodian shall make an inspection of the evidence storage facilities and practices to ensure adherence to appropriate policies and procedures.

(b)   Unannounced inspections of evidence storage areas shall be conducted annually as directed by the Chief of Police.

(c)   An annual audit of evidence held by the Department shall be conducted by a Bureau Commander (as appointed by the Chief of Police) not routinely or directly connected with evidence control.

(d)   Whenever a change is made in personnel who have access to the evidence room, an inventory of all evidence/property shall be made by an individual not associated to the property room or function to ensure that records are correct and all evidence property is accounted for.

Copyright Lexipol, LLC 2021/12/14, All Rights Reserved.
Published with permission by Santa Ana Police Department
Property and Evidence - 9

# PART V

**ROB BONTA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

BUREAU OF FIREARMS
P.O. BOX 820200
SACRAMENTO, CA 94203-0200
Telephone: (916) 210-2300
Fax: (916) 227-3744

December 08, 2021

Sean Kinney
3405 S Baker St
Santa Ana, CA 92707

Re:    **Report of Firearm Ownership Approval**

Sean Kinney:

This letter acknowledges the California Department of Justice (the Department), Bureau of Firearms has received your firearm application. Accordingly, the following firearm(s) has been recorded in your name in the Department's Automated Firearms System:

| Serial Number | Make | Model | Caliber |
|---|---|---|---|
| MV77895B | MRM | 88 | 12 |

Should you decide to transfer ownership of any firearm in the future, Penal Code sections 27545 and 28050 et seq. requires that all firearm private party transfers be conducted through a licensed California firearms dealer, as defined in Penal Code sections 26700 through 26915.

If you have any questions, please contact the Bureau of Firearms at (916) 210-2300.

FIREARMS CLEARANCE SECTION
Bureau of Firearms

For    ROB BONTA
Attorney General

DROSRPT01

# PART W

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  SOUTHERN DIVISION

 4

 5

 6

   SEAN KINNEY,                  )
 7                               )
                     Plaintiff,  )
 8                               )
        vs.                      ) Case No.
 9                               ) 8:24-cv-01286-JWH-JDE
   SANTA ANA POLICE DEPARTMENT; )
10 CITY OF SANTA ANA; JIMMY      )
   CORREAL, an individual; LUIS )
11 CASILLAS, an individual;      )
   JESSE HERNANDEZ, an           )
12 individual; DEBORAH WOLEN,    )
   an individual; and DOES 1     )
13 to 35, inclusive,             )
                                 )
14                   Defendants. )
   _____)
15

16

17

18

19         DEPOSITION OF SEAN PHILLIP KINNEY

20            Wednesday, February 5, 2025

21

22

23

   Reported by:
24 Annette Shaver
   CSR No. 6169
25 Job No. 10157551
```

**Sean Phillip Kinney**

1           Deposition of SEAN PHILLIP KINNEY,

2   taken on behalf of Defendant, Santa Ana Police

3   Department, at 20 Civic Center Plaza, M-29, 7th

4   Floor, Santa Ana, California beginning at 9:35

5   a.m., on Wednesday, February 5, 2025, before

6   Annette Shaver, Certified Shorthand Reporter

7   No. 6169.

8

9

10  APPEARANCES:

11  For Plaintiff:

12        KINNEY LAW P.C.
          BY:  CHRISTIANE CARGILL KINNEY, ESQ.
13        Suite 1568
          8023 Beverly Boulevard
14        Los Angeles, California 90048
          (310) 751-0354
15        christiane@ckinneylaw.com

16

17  For Defendant Santa Ana Police Department:

18        SANTA ANA CITY HALL
          SANTA ANA CITY ATTORNEY'S OFFICE
19        BY:  TAMARA BOGOSIAN, SENIOR ASSISTANT
              CITY ATTORNEY
20        20 Civic Center Plaza
          M-29, 7th Floor
21        Santa Ana, California 92701
          (714) 647-5204
22        tbogosian@santa-ana.org

23

24

25

Sean Phillip Kinney

1    preparation four your deposition here today?

2        A.    I have not.

3        Q.    What's your date of birth?

4        A.    8/13/ of 1970.

5        Q.    What's your current address of residence?

6        A.    We split our residency at two different

7    places, it's still the same, 3405 South Baker

8    Street, Santa Ana, California, 92707.

9        Q.    And is that a home, a single family home?

10       A.    Yes, it is.

11       Q.    Do you own or rent that home?

12       A.    Rent.

13       Q.    And approximately when did you move into

14   that home in Santa Ana on Baker?

15       A.    Three'ish years ago, three and a half

16   years ago.

17       Q.    Is that where you were residing with your

18   family on October 4th, 2021?

19       A.    Yes.

20       Q.    And can you tell me the members of your

21   family, please.

22       A.    Myself, my wife, Christiane Kinney, my

23   son, Zaiden Kinney, and my daughter, Ireland Kinney.

24       Q.    Did you graduate high school?

25       A.    Yes.

1   there a guarantee you were going to get the job?

2       A.   Yes.  So I was auditioning to be a

3   contestant, and for the game show network on

4   occasion I will do what they call a preshow run,

5   so if they are developing a new show, I am the guy

6   that they have as a fake contestant to try to see

7   if there's any gaps or holes in the show.

8       Q.   How much were you expecting to earn if

9   you had gotten that spot?

10      A.   There's no way to know that.

11      Q.   Was it to be one day, two days of work,

12  multiple days?

13      A.   If the show goes smooth you get one day,

14  and if there's problems they pull you back until

15  they smooth it out, so you don't know.  And I can't

16  answer the amount because if I would have made it on

17  the game show that would have got picked up I have

18  no idea if I would have won or not.

19      Q.   When did you and your family move into the

20  residence on Baker?

21      A.   I'm not 100 percent sure.

22      Q.   Just your best estimate.

23      A.   August or September.

24      Q.   Of 2021?

25      A.   Yes.

Sean Phillip Kinney

Sean Kinney vs.
Santa Ana Police Department

1      A.   I received just the gun as a gift.

2      Q.   **Same question for the black shotgun, was**

3  **it registered?**

4      MS. KINNEY:  Same objection; calls for

5  speculation.  If you are aware.

6      THE WITNESS:  When I received the shotgun,

7  there was no paperwork; I received the shotgun as a

8  gift upon my stepfather's passing.

9      Q.   **So sitting here today, back on October 4th,**

10  **2021 did you know one way or another whether the**

11  **black shotgun was registered?**

12      A.   I know there was no registration, I had

13  bought it for my stepfather as a gift at a gun show

14  in Fort Worth, Texas, and back then you just paid

15  the cash and you got the gun.

16      Q.   **When you eventually made your way to**

17  **become a resident of California, did you take any**

18  **steps at all with either the Department of Justice**

19  **or any firearm dealer or any governmental agency**

20  **to register the black shotgun?**

21      A.   When I became a resident I did not have

22  that gun.

23      Q.   **But that wasn't my question.**

24      A.   I am so sorry, can you please repeat it?

25      Q.   **Yes.  She can read it to you.**

Sean Phillip Kinney

```
 1              (Record read.)

 2       MS. KINNEY:  And I'll object that it was asked

 3    and answered.

 4       THE WITNESS:  It was answered, but I'll

 5    reinstate it to be clear.  At the time of becoming

 6    a resident I did not own or possess that shotgun.

 7    BY MS. BOGOSIAN:

 8       Q.    Where was it?

 9       A.    With my stepfather.

10       Q.    In what state?

11       A.    I don't mean to be difficult, the reason

12    why I bought the shotgun for him, him and my mother

13    bought a big RV for their retirement, and they were

14    doing what they call the "Golden Triangle," and --

15       Q.    I don't need the details, sir, I really

16    need to focus on the black shotgun.  At what

17    point --

18       A.    I got it.  I don't know --

19       Q.    -- when you became a resident in California

20    did the shotgun come back into your possession?

21       MS. KINNEY:  I am just going to object, if he's

22    going to let your questions go, you have to let him

23    answer fully, too; and if you can answer that, that

24    that's fine.

25       THE WITNESS:  The one she just asked or the one
```

Sean Phillip Kinney

```
 1   before?

 2        MS. KINNEY:  The one she just asked.

 3        THE WITNESS:  I was not listening because I was

 4   still talking.  We're here to get answers.  There's

 5   no tension at all.  So I apologize, I was still

 6   trying to answer your previous question; can you

 7   please ask your question again?

 8        MS. BOGOSIAN:  The court reporter can read it to

 9   you, sir.

10           (Record read.)

11        THE WITNESS:  Approximately ten years after.

12   BY MS. BOGOSIAN:

13        Q.    Ten years after what?

14        A.    I became a resident.

15        Q.    So when did you become a resident of

16   California?

17        A.    1994.

18        Q.    So in 2004 the black shotgun came back

19   into your possession?

20        A.    Yes.

21        Q.    And from 2004 to the date of the incident,

22   October 4th, 2021, did you take any steps to

23   register the black shotgun?

24        A.    No.

25        Q.    Did you know there was requirement to do
```

**Page 33**

```
 1   so?

 2        A.   No.

 3        Q.   Prior to October 4th, 2021, have you had

 4   any significant law enforcement contacts, and let

 5   me define it for you.  I don't need to know about

 6   any traffic citations or any parking tickets or any

 7   consensual encounters where either you speak to an

 8   officer simply to ask them how they are doing or to

 9   thank them for your service, or because you have

10   called the police because your alarm went off, I am

11   talking about any significant contacts with law

12   enforcement where either there was an investigation

13   or where you were the suspect or arrested.

14        A.   No.

15        Q.   And I mean law enforcement in any state

16   that you've lived in; is your answer the same?

17        A.   Yes.

18        Q.   Perfect, thank you.  And that would mean

19   then you've never been convicted of a felony, is

20   that fair?

21        A.   That is fair.

22        Q.   Before October 4th, 2021, had you had any

23   contact with any Santa Ana officer?

24        A.   No.

25        Q.   Okay.  Now we're going to start looking at
```

1    some exhibits.  So I have them on the screen, and

2    your attorney should have a thumb drive with these

3    documents, a lot of these documents should already

4    be in her possession.

5            But what I'd like to do here is Exhibit 1

6    is being identified as the Complaint in the United

7    States District Federal Court, Southern Division,

8    entitled Sean Kinney versus Santa Ana Police

9    Department, Jimmy Correal, Luis Casillas, Jesse

10   Hernandez and Deborah Wolen.

11           (The document referred to was

12           marked Defendants' Exhibit 1 for

13           identification.)

14   BY MS. BOGOSIAN:

15      Q.   Did I read that correctly, sir, in the

16   heading of the Complaint?

17      A.   Yes; there's more to it, but you are

18   correct with the names.

19      Q.   Who is Jimmy Correal, do you know?

20      MS. KINNEY:  Objection; calls for speculation.

21      THE WITNESS:  No.

22      MS. KINNEY:  You can answer if you know.

23      THE WITNESS:  I said no.

24   BY MS. BOGOSIAN:

25      Q.   You don't know who he is?

**Sean Phillip Kinney**

 1      A.   I heard the name mentioned on the day in

 2   question, is that what you call it?  But I don't

 3   know him, I don't know him personally and I don't

 4   know him professionally.

 5      Q.   Who is Luis Casillas?

 6      MS. KINNEY:  Same objection, calls for

 7   speculation.

 8      THE WITNESS:  I don't know, but I think that

 9   was the young guy; it seemed like his first day.

10      Q.   Who is Jesse Hernandez?

11      MS. KINNEY:  Calls for speculation.

12      THE WITNESS:  I don't know.

13   BY MS. BOGOSIAN:

14      Q.   And who is Deborah Wolen?

15      MS. KINNEY:  Calls for speculation.

16      THE WITNESS:  I don't know.

17   BY MS. BOGOSIAN:

18      Q.   Okay.

19      THE WITNESS:  Is that enough space in timing?

20      THE REPORTER:  Yes.

21   BY MS. BOGOSIAN:

22      Q.   Focusing your attention to paragraph 19,

23   I'm going to read what the Complaint alleges and

24   then ask you some questions.  It says "Plaintiff

25   has worked as a Federal Deputy for the Strategic

**Sean Phillip Kinney**

 1    A.   Yes, ma'am.

 2    Q.   Can you give me a description of where

 3  this second latched gate is.

 4    A.   Yes, ma'am.  So on the western most part

 5  of the house is the front, and so you would have to

 6  walk up the driveway, and at that point there's a

 7  gate that goes down the side of the house, and the

 8  second gate is towards the back of the house on the

 9  north side, there's another gate that goes into the

10  backyard.

11    Q.   And again, when it says "latched" here in

12  the Complaint, do you agree with me that "latched"

13  does not mean locked?

14    A.   I agree with that, yes.

15    Q.   So at what point did you go get your

16  shotgun, and where did you get it the from?

17    A.   After the alarm went off I watched what

18  was going on, I saw someone in the front yard, he

19  was looking around, and I sleep nude, so I got up

20  and I put on shorts and a T-shirt first, and then I

21  got the shotgun from underneath the bed.

22    Q.   Did you tell anyone what you were doing?

23    A.   No.

24    Q.   That last sentence, "Plaintiff told him to

25  leave and he did."

**Page 44**

```
 1        A.   Yes.

 2        Q.   There were some things that occurred

 3   between you and this alleged intruder before you

 4   told him to leave and he did, is that fair?

 5        A.   Yes.

 6        Q.   But that's not included there, do you see

 7   it included here?

 8        A.   I do not.

 9        Q.   Do you know why?

10        A.   I have no idea.  I don't think it's

11   relevant towards the lawsuit that we're filing.

12        Q.   Okay, I appreciate that, sir.

13        A.   There was --

14        Q.   There's no question pending.

15        A.   Oh, sorry.

16        Q.   On October 4th, 2021, was your daughter

17   Ireland inside the home?

18        MS. KINNEY:  At what time?

19   BY MS. BOGOSIAN:

20        Q.   At the time that you retrieved the

21   shotgun.

22        A.   Yes.

23        Q.   And at the time that Santa Ana officers

24   arrived to your home was your daughter Ireland at

25   home?
```

**Sean Phillip Kinney**

```
 1        A.   Yes.

 2        Q.   Was she attending school remotely via

 3   Zoom or via video conference?

 4        A.   Yes.

 5        Q.   And how old was she back in October of

 6   2021?

 7        MS. KINNEY:  Objection; calls for speculation.

 8        THE WITNESS:  I'm very horrible with dates, I

 9   apologize.  To my best knowledge she was 12 at

10   that time.

11   BY MS. BOGOSIAN:

12        Q.   Was anyone else at home other than you

13   and your daughter Ireland?

14        MS. KINNEY:  At what time?

15   BY MS. BOGOSIAN:

16        Q.   7 a.m. when you retrieved the shotgun.

17        A.   Yes, my son Zaiden and my wife Christiane.

18        Q.   How old was your son in October of 2021?

19        MS. KINNEY:  Objection; calls for speculation.

20        THE WITNESS:  14'ish.

21   BY MS. BOGOSIAN:

22        Q.   At some point did your son leave the

23   residence before Santa Ana officers arrived?

24        A.   Yes.

25        Q.   Where did he go, if you know?
```

1    Q.   Let's talk about the excessive force that

2    you allege here.  Is this in connection with being

3    handcuffed?

4    A.   It's in connection to the full attention,

5    it wasn't one specific point in time.

6    Q.   Can you give me a brief description of

7    what you mean here in your Complaint with respect

8    to the excessive force.

9    A.   So when I walked outside, I had a 50

10   caliber machine gun pointed at my head, they had

11   me come forward, they had me get down on the ground,

12   the concrete, where they were handcuffing me and

13   securing me so they could pull out the other people

14   from the house.

15   Q.   Other than being handcuffed, did any Santa

16   Ana officer use any other type of force on any part

17   of your body?  And what I mean by that is either

18   using any type of weapons, any hand or fist, hands

19   or fists, any baton, any TASER, any less lethal,

20   that's what I mean, okay?

21   A.   Okay.  Multiple times throughout the

22   detention they would hold me in place.

23   Q.   Okay, but other than being handcuffed and

24   holding you in place, there were no other weapons

25   or uses of force, is that fair?

Sean Phillip Kinney

```
 1        MS. KINNEY:  Objection; calls for speculation.

 2   If you know.

 3        THE WITNESS:  I think that is fair.

 4   BY MS. BOGOSIAN:

 5        Q.   And when you say "holding you in place,"

 6   that is to keep you in a particular location, is

 7   that fair?

 8        A.   That seems fair, yes.

 9        Q.   And then with respect to the handcuffs,

10   when they were first placed on your wrists, did

11   you feel any pain on your wrists?

12        A.   Yes, I still have a scar from it.

13        Q.   Did you complain to any officer at the

14   scene or later at the detention center with respect

15   to the handcuffs being tight?

16        A.   Yes.

17        Q.   Who did you complain to?

18        A.   Multiple people, and the last time I

19   opened my mouth is when the tall gentleman that

20   removed my hat and patted me down going in said

21   "Stop being a fucking pussy," and I knew that I

22   had no sympathy or empathy for the situation I was

23   in at that moment.

24        Q.   Okay.  And we'll show you some body-worn

25   camera footage -
```

Page 49

Sean Phillip Kinney

```
 1       A.    I would love to see that.
 2       Q.    -- with respect to your request that
 3  officers loosen your handcuffs; do you remember
 4  that?
 5       A.    Yes.
 6       Q.    And they did, is that right?
 7       MS. KINNEY:  Objection as far as one time.
 8  You can answer.
 9       THE WITNESS:  At one point they loosened it,
10  but they did tighten up afterwards again multiple
11  times.
12  BY MS. BOGOSIAN:
13       Q.    Can you show me the scars that were left
14  on your wrists?
15       A.    (Indicating.)  The one right there.
16       Q.    And did you see any medical professional
17  with respect to the scar on your wrist?
18       MS. KINNEY:  Just a quick objection for the
19  record, that he showed a scar on his left hand on
20  the wrist.
21       MS. BOGOSIAN:  I'm going to object to the
22  characterization that it's a scar as a result of
23  this incident, but you are welcome to on the record
24  state that he showed me a scar.
25       MS. KINNEY:  Sounds good.
```

Page 50

**Sean Phillip Kinney**

 1    home without any permission or warrant."

 2         So that's a compound sentence, part of it

 3    is incorrect, so I'm not going to agree to the

 4    entire answer that that is correct or incorrect

 5    because you are adding multiple things together

 6    and trying to make me give you a definitive answer

 7    whether something is true or not, and there was

 8    never a warrant presented, we asked them if they

 9    had a warrant, they said they didn't need a

10    warrant.

11         Q.   You gave officers permission to enter

12    your home, didn't you?

13         MS. KINNEY:  At what time?

14         MS. BOGOSIAN:  I'm asking the questions.

15         MS. KINNEY:  I'm going to object --

16    BY MS. BOGOSIAN:

17         Q.   Did you give officers permission to enter

18    the home?

19         MS. KINNEY:  I'm going to object to the form,

20    the question is argumentative, it's vague as to

21    time, there were multiple entries into the home.

22    BY MS. BOGOSIAN:

23         Q.   Did you give officers permission to enter

24    your home?

25         A.   The first time they entered the home, no.

**Sean Phillip Kinney**

 1   When they came back with a different line of

 2   questioning hours later I said they were allowed

 3   to go get the shotgun.  The first time --

 4        Q.   Thank you.  Sir, I have no further

 5   questions there.

 6        A.   Okay, well then I'll have no further

 7   answers if you won't let me answer in full detail.

 8        Q.   We're going to go all the way to the end.

 9             (Discussion held off the record.)

10   BY MS. BOGOSIAN:

11        Q.   Actually, I think I'm done with Exhibit 1,

12   let's take a break.  It is 10:36, how about 10:45,

13   is that enough time?

14        MS. KINNEY:  Yes.

15             (Recess.)

16   BY MS. BOGOSIAN:

17        Q.   We're back on the record, sir, and we're

18   now going to Exhibit 2.

19             (The document referred to was

20             marked Defendants' Exhibit 2 for

21             identification.)

22   BY MS. BOGOSIAN:

23        Q.   So for the record, Exhibit 2 is a Santa

24   Ana Police Department Crime Report for a case

25   involving an assault with a deadly weapon for the

1       THE WITNESS:  The whole first part of that

2   statement is incorrect.

3   BY MS. BOGOSIAN:

4       Q.   I didn't ask you about the first part, I

5   asked you --

6       A.   Got it.

7       Q.   -- whether or not the male, who's

8   identified here, and I am going to give the

9   identification in just a moment, who entered from

10  the west walkway into the backyard with a black

11  shotgun was you?

12      A.   I assume so.

13      Q.   I don't want you to assume.  Let's keep

14  reading, and then maybe I can get some kind of a

15  definitive answer from you.  It says "The male," and

16  then in parentheses "later identified as Sean

17  Kinney, was described by Felix as a male, white,

18  approximately 50 to 60 years old, bald with a long

19  gray beard, wearing a green shirt and black pants

20  armed with a black shotgun."

21           Now does that give you context in order

22  to answer my question as to whether it was you who

23  entered the west walkway into the backyard with a

24  black shotgun at 3405 South Baker on 10/4/21?

25      A.   There's no west walkway in that backyard,

1   and yes, I did approach him with a shotgun, I am

2   not saying I didn't, but I am not bald, and it's

3   not what I was wearing.  So if somebody else came

4   up at a different time, which is not likely at all,

5   but I just completely disagree with that statement

6   because that is not how, when, where it went down,

7   nor it was how he was facing, nor what he was doing.

8       Q.   I didn't ask you to confirm those facts,

9   right?  I simply asked you was it you who entered

10  your backyard with a black shotgun?

11      MS. KINNEY:  And I am going to object, asked and

12  answered, he's allowed to clarify your response if

13  you say something incorrect.

14  BY MS. BOGOSIAN:

15      Q.   Go ahead, you can answer.

16      A.   She said "asked and answered."

17      Q.   That's not an objection that --

18      MS. KINNEY:  That's not restricting you.  I'll

19  instruct him, thanks; I'm not restricting you from

20  answering.

21      THE WITNESS:  Got it.  So I am Sean Kinney, so

22  if that's who he identified, that is me.

23  BY MS. BOGOSIAN:

24      Q.   Well again, I didn't ask you if you were

25  Sean Kinney, I asked you if you were the man who

1    **entered in the backyard with a black shotgun at**

2    **3405 South Baker on 10/4/21.**

3        MS. KINNEY:  Objection; asked and answered.  You

4    can answer.

5        THE WITNESS:  I guess.

6    BY MS. BOGOSIAN:

7        **Q.   I don't want you to guess, sir.**

8        A.   Oh, my gosh, this is getting painful.

9        MS. KINNEY:  He's already answered this.

10   BY MS. BOGOSIAN:

11       **Q.   I gave you the instructions regarding a**

12   **deposition at the beginning, I don't want you to**

13   **guess.**

14       A.   Great.  So to the best of my knowledge

15   that was me, but you are putting me into a false

16   situation at a false time doing false things,

17   wearing false things, and I did not shave my head

18   bald.

19           So if you want to play along in this

20   hypothetical, something that is not true, this is

21   the first time I am seeing this, so I am not going

22   to agree to something that is not true, because you

23   told me to tell the truth and I was under oath.  I

24   cannot and will not agree to something that I know

25   is false.  So am I Sean Kinney?  Did I enter the

**Sean Phillip Kinney**                                    Sean Kinney vs.
                                                  **Santa Ana Police Department**

1    back of my house with a shotgun to confront someone

2    that was back there?  Yes, that looks like the

3    correct date and approximate time.

4            Nothing else in that statement is correct,

5    and I will not answer any other way.  If you don't

6    want me to be honest, then why are we here?

7        **Q.    Did you point the shotgun at him?**

8        **A.    At first, no, when he rushed towards me,**

9    **yes.**

10       **Q.    Were you shouldering the shotgun while you**

11   **were pointing it at him?**

12       **A.    At the time I pointed the shotgun it was**

13   **against my shoulder.**  Shouldering means to rest a

14   gun over your head, I was not doing that.

15       **Q.    Was the shotgun loaded?**

16       A.    No.

17       **Q.    Did you make any kind of forward and**

18   **backyard motion as if you were loading the gun?**

19       A.    No.

20       **Q.    Did you attempt to hit the man in your**

21   **backyard with the barrel of the gun?**

22       A.    No.

23       **Q.    Did the man grab the shotgun by the barrel**

24   **and move it away from his direction?**

25       A.    No.

**Sean Phillip Kinney**

```
 1   he ran into the end of the gun, and at that point I

 2   knew the gun, since it was inert and unloaded, did

 3   me no good; if he didn't care a gun was pointed at

 4   him it would do no good to lead the gun up where he

 5   might be able to grab it and use it as an baton or

 6   some type of bludgeon weapon, so I lowered the gun.

 7        Q.   Can you please explain the difference

 8   between how you identified or described your

 9   movement as raising the shotgun as opposed to

10   pointing it at him?

11        A.   The raise and the point were one in the

12   same, it was one action that happened once.

13        Q.   So you did point the weapon at him.

14        A.   Yes.

15        MS. KINNEY:  Objection; asked and answered.

16             (Discussion held off the record.)

17        MS. BOGOSIAN:  Let's go off the record for just

18   a second.  I'm having some issues.

19             (Discussion held off the record.)

20   BY MS. BOGOSIAN:

21        Q.   And then on Exhibit 2 there is a line here

22   in Officer Casillas' report that says "Felix said

23   he was in fear for his life and thought Kinney was

24   going to kill him with the shotgun," did I read that

25   correctly?
```

**Sean Phillip Kinney**

1     THE WITNESS:  I heard someone working in the

2   front yard.

3   BY MS. BOGOSIAN:

4     Q.   And do you see here in the bottom of page

5   3 of officer Casillas's Police Report that states

6   "Hernandez had an unobstructed view and positively

7   identified Kinney as the person who had the shotgun

8   in his hands as he walked into the house from the

9   front yard."

10    A.   I see that.

11    Q.   Just one moment.

12    A.   Sure.

13    Q.   We are now on page 4 of Officer Casillas's

14   report, there's the page number for reference, and

15   here's Officer Casillas' name, and we're going I

16   guess more than a little bit more than halfway down

17   it states here -- I'm going to read it and ask you

18   some questions.  **"Kinney described exactly where the**

19   **weapon was located in his residence (under his bed**

20   **on the south side of the residence.)"  Did I read**

21   **that correctly?**

22    A.   Yes, ma'am.

23    **Q.   And is that what you told the Officer?**

24    A.   No, it is not, but I said it was at the

25   foot of the bed, which would be the same.

**Page 69**

Sean Phillip Kinney

Sean Kinney vs.
Santa Ana Police Department

1       Q.   Is that "underneath his bed on the south

2    side of the residence" accurate?

3       MS. KINNEY:  Objection; calls for speculation.

4    If you know.

5       THE WITNESS:  My best recollection is I said

6    "underneath the bed at the foot of the bed."

7    BY MS. BOGOSIAN:

8       Q.   And then it states "Corporate Correal asked

9    Kinney 'Do I have your authority to go in and get

10   it?'"  Did I read that correctly?

11      A.   Yes.

12      Q.   And was that the question that an officer,

13   whether it was Corporal Correal or not, asked you?

14      A.   Yes, some officer asked me, and I assumed

15   if they said it was Correal then it was.

16      Q.   And then the next sentence says "Kinney

17   responded 'You have my authority to go in,'" did I

18   read that correctly?  In the report did I read it

19   correctly?

20      A.   You read it correctly in the report,

21   that's not what I said.

22      Q.   Okay, what did you say?

23      A.   I actually thought I was a little more

24   lenient, I said "You are more than welcome to go

25   get the gun," yes.

Sean Phillip Kinney

```
 1        Q.    Thank you.
 2        A.    They at the time wanted to look at the gun
 3   to confirm that it matched what the gentleman said
 4   it looked like.
 5        Q.    Thank you, sir.
 6        A.    Sure.
 7        Q.    I think we are done with Exhibit 2.
 8   Exhibit 3.  Exhibit 3 is a report by -- let me make
 9   sure we are going to Exhibit 3.  Just give me one
10   second.
11        A.    Sure.
12        Q.    We are not quite at Exhibit 3 yet.
13              At some point while you were still inside
14   your residence on the morning of October 4th you
15   received a phone call I believe on your cell phone
16   from a Santa Ana officer, correct?
17        A.    Correct.
18        Q.    Can you give me your best recollection, I
19   don't need word for word, unless you remember it,
20   what was said to you by the Officer and your
21   response.
22        A.    My best recollection he said "This is
23   Officer so and so," I don't remember a name.
24        Q.    That's fine.
25        A.    He said "We would like you to come
```

**Page 71**

1   outside."

2        Q.   And what was your response?

3        A.   "Okay," or I don't know what my response

4   was, I said something like "Okay" or whatever, "I

5   would come right out," or something like that.

6        Q.   But you agreed to come out, correct?

7        A.   Yes.

8        Q.   And there was no -- just one moment.

9        A.   Sure.

10       Q.   Do you remember during that phone call the

11  Officer asking you to come out because he didn't

12  know who was inside, how many people, or whether or

13  not someone was in your home who was suspected of

14  exhibiting a shotgun, did he say anything along

15  those lines?

16       A.   I don't recall that, no.

17       Q.   Did he say anything to you along the

18  lines of "If you don't come out we're coming in"?

19       A.   I don't recall him saying that.

20       Q.   Did he say anything along the lines of

21  You're surrounded, you have no choice but to come

22  out," any iteration of that insinuation?

23       A.   There was an insinuating fact, I saw a tank

24  drive up into my driveway with a 50 caliber machine

25  gun pointed straight into our kitchen where we were

**Sean Phillip Kinney**

```
 1   correct?
 2        A.   I don't know who was talking to me.
 3        Q.   Right.  And again, you are referring to
 4   it as a tank, it's not a tank, but we can talk
 5   about what it is, but there was a potential crime
 6   that had occurred with the use of a shotgun, would
 7   you disagree with that?
 8        A.   I do disagree with that.
 9        Q.   But you admitted that you pointed the gun
10   at Mr. Felix.
11        A.   Yes, ma'am, on my property in my backyard
12   behind two closed fences.
13        Q.   Have you read Penal Code Section 245?
14        A.   I don't know if I have.  I did a -- I just
15   want to clarify, because I don't want to come off
16   as being untruthful.  I've consulted as a ghost
17   writer on many projects that had to do with police
18   procedurals, so if I happen to know some weird fact,
19   it's only due to work, but I've done no research
20   for this or anything, and I do not know what that
21   Code is.
22        Q.   Do you know the difference between a
23   detention and an arrest?
24        A.   I do not.
25        Q.   But you don't dispute that officers had
```

1    reasonable suspicion to detain you and investigate

2    whether a crime had occurred, do you?

3        MS. KINNEY:  Objection; argumentative, calls

4    for a legal conclusion.  You can answer if you have

5    an answer.

6        THE WITNESS:  I do disagree they had a right to

7    detain me.

8    BY MS. BOGOSIAN:

9        Q.   Okay.  So when you came out of your home

10   after the phone call with the officer, there was no

11   officer at the front door who escorted you out,

12   correct?

13       A.   No one escorted me out of the house, I

14   stepped out of the house, and then they had me back

15   up into them.

16       Q.   Okay, perfect.  And no officer made any

17   threats to you at the time?  Do you understand what

18   I mean by threats, a threat to harm you or your

19   family?

20       A.   When someone points a loaded gun at me I

21   considered that a threat, and there were multiple

22   weapons pointed at me, but no one verbally made a

23   threat towards me.  Thank you for letting me

24   clarify.

25            (Discussion held off the record.)

**Sean Phillip Kinney**

1    six plus.

2         Q.    Okay.  And were they all pointing weapons?

3         A.    I don't know.

4         Q.    And after you pointed the shotgun at

5    Mr. Felix and you came back into your home, where

6    did you place the shotgun?

7         A.    Back in its original position that we have

8    defined.

9         Q.    So you still had access to it, correct?

10        A.    No.

11        Q.    You could not go to get it?

12        A.    It was --

13        MS. KINNEY:  At what point?

14   BY MS. BOGOSIAN:

15        Q.    When you were inside your home when

16   officers called you.

17        A.    When officers called me it was on the

18   opposite side of the house stowed in the sleeve and

19   under the bed, it would not have been easily

20   recoverable, no.

21        Q.    Well that wasn't my question; you had

22   access to it, correct?

23        A.    No; we are defining access differently,

24   apparently.

25        Q.    The way you are defining it isn't the way

1    I'm asking it; access is could you go get it?

2        A.    It would have been possible with proper

3    amount of time.

4        Q.    Thank you.

5        A.    I define access as was it accessible

6    currently, and it was not, it was packed up.

7        Q.    So the officer didn't demand that you come

8    out of the residence, right?

9        A.    They did.

10       Q.    He said "would you" or "could you"?

11       A.    I don't remember, but I remember that I

12   was told I had to come out of the residence.

13       Q.    We'll watch the video.

14       A.    Absolutely; thank you for having that.

15       Q.    He didn't coerce you to come out, correct?

16           (Discussion held off the record.)

17   BY MS. BOGOSIAN:

18       Q.    And also we don't necessarily need

19   commentary on what I say if there isn't a question

20   pending, okay?  He didn't coerce you to come out of

21   the residence, correct?

22       MS. KINNEY:  Objection; asked and answered.

23       THE WITNESS:  I've already answered that.

24       MS. KINNEY:  You can answer again.

25   BY MS. BOGOSIAN:

**Sean Phillip Kinney**

1      Q.    Go ahead.

2      MS. KINNEY:  Go ahead, within reason.

3      THE WITNESS:  I feel that I was coerced to come

4   out, yes.

5   BY MS. BOGOSIAN:

6      Q.    He didn't threaten you to come out of the

7   residence, correct?

8      A.    Verbally, no; when you point a gun at

9   someone, I consider that a threat.

10      Q.    The officer that was speaking to you, was

11   he pointing a gun at you?

12      A.    I don't know who was speaking to me; I

13   was on my phone, I didn't see a person on the phone

14   in the front yard.  So I don't know who he was or

15   where he was, he was the person giving the

16   instructions, I don't know where he was.

17      Q.    And in fact, sir, you were not reluctant

18   to come out of your residence, correct?  You wanted

19   to come out to clarify with officers what had

20   occurred.

21      A.    Absolutely, yes.

22      Q.    Yes.  And when you came out of your home,

23   you voluntarily surrendered your expectation of

24   privacy, correct?

25      A.    No.

**Page 80**

**Sean Phillip Kinney**

1   right to remain silent, the Miranda Rights.

2       A.   A few hours later.

3       Q.   Okay.  Right now I am not focused on the

4   time, I am just asking if you were provided your

5   Miranda Rights.

6       A.   Sorry, if that's what you meant, I was not

7   clear that's what you meant; at some point, yes, I

8   was given my Miranda Rights.

9       Q.   And when they were read to you, and again,

10  we have video of it, but when they were read to you

11  you understood them, correct?

12      A.   Yes.

13      Q.   And you gave a waiver of your rights and

14  began to answer questions, correct?

15      MS. KINNEY:  Objection to the extent it calls

16  for a legal conclusion.  You can answer what you

17  remember.

18      THE WITNESS:  Incorrect, I asked for my

19  attorney.

20  BY MS. BOGOSIAN:

21      Q.   At some point you answered the questions

22  after your Miranda Rights were given, correct?

23      A.   At some point, yes, ma'am.

24      Q.   Now we're going to go to what is marked

25  as Exhibit 11.21.

**Sean Phillip Kinney**

```
 1        A.   Yes, ma'am.

 2        Q.   And then do you see "SAPD case number" here

 3   as 2021-21255?

 4        A.   Yes, ma'am.

 5        Q.   And just going back real quick to Exhibit

 6   3, which is Miss Wolen's report, does that number in

 7   the Property Receipt match the number up here under

 8   "Case Number"?

 9        A.   Yes, ma'am.

10             (The document referred to was

11             marked Defendant's Exhibit 7

12             for identification.)

13   BY MS. BOGOSIAN:

14        Q.   Going back to Exhibit 7.  This report

15   receipt was given to you, is that correct,

16   Mr. Kinney?

17        A.   I don't recall if I got a Property Receipt

18   or not.

19        Q.   Is this "Signature of Property Owner" your

20   signature?

21        A.   Yes.

22        Q.   And it's dated 10/4/21, correct?

23        A.   Yes.

24        Q.   At the time that you signed this Property

25   Receipt, did you contest that it was the Maverick
```

**Page 99**

**Sean Phillip Kinney**

1    Q.    And it has your name here, "Sean Kinney,"

2    correct?

3    A.    Yes, ma'am.

4    Q.    And you paid $100 to get your weapon back,

5    is that correct?

6    A.    That's what it says; to be honest, I

7    absolutely don't remember.

8    Q.    You don't remember getting your shotgun

9    back?

10    A.    I remember getting it back, I don't

11    remember paying for it.

12    Q.    That's fine.  But from the date of the

13    incident when the firearm shotgun -- excuse me --

14    was seized from your home to June of 2022, my

15    understanding, and correct me if I am wrong, is that

16    it's approximately eight months, would you agree or

17    dispute that characterization?

18    A.    Sounds fair, yes.

19    Q.    And is it your position, testimony that

20    $100 for storing your shotgun for eight months is

21    unreasonable?

22    A.    I don't know what gun storage fees are, I

23    don't know if that's reasonable or if it's

24    unreasonable, but that's what it was, and I didn't

25    make a stink about it.

**Page 101**

1    Q.   Okay.  Approximately, again, I just used

2    my calculator, it's about $12.50 a month, is that

3    fair?

4    A.   Fair.

5    Q.   Does that seem exorbitant to you or

6    excessive?

7    A.   I don't know what the normal storage fees

8    are.

9    Q.   I'm just asking your opinion.  Does it seem

10    unfair?

11    A.   It seems unfair.

12    Q.   It does.  How much do you think would be a

13    fair fee for storing a shotgun for eight months at

14    the Santa Ana Police Department?

15    A.   I think if someone wants to take anything,

16    and for their own doing, whether it be a just or

17    noble cause or not, that the other person shouldn't

18    be penalized, taxed or said to have paid a fee for

19    anything for someone else's convenience.

20    Q.   Appreciate that position, sir, thank you.

21         Last exhibit is Exhibit 13.

22         (The document referred to was

23         marked Defendants' Exhibit 13 for

24         identification.)

25    BY MS. BOGOSIAN:

Sean Phillip Kinney

Sean Kinney vs.
Santa Ana Police Department

1   paragraph that I will highlight for you, so I am

2   going to read it and ask you a few questions.

3          Officer Hernandez writes "Towards the end

4   of the investigation we were given consent to enter

5   the residence to locate the weapon used in the

6   commission of the crime."

7          Sir, did you give consent to officers to

8   enter your residence?

9          A.   I told them they could go look at the

10  weapon, yes.

11         Q.   "While looking for the weapon in Sean and

12  Christiane's bedroom, I discovered a black shotgun

13  on its side with the ejection port facing up under

14  the bed with the barrel pointing south while the

15  stock was facing north.  I removed the shotgun from

16  under the bed and rendered it safe.  Upon rendering

17  safe I placed the shotgun on top of the bed and

18  waited for Crime Scene Investigator Wolen's arrival.

19  The shotgun was not loaded."

20         Does the description of the shotgun in

21  terms of its location appear accurate to you?

22         A.   Absolutely, yes, ma'am.

23         Q.   And when we read Officer Crime Scene

24  Investigator Wolen's report, which for the record

25  was Exhibit 3, and I can go back to that if you

**Sean Phillip Kinney**

```
 1        A.   Yes, they do.
 2        Q.   At some point either you or your wife were
 3   advised one way or another by someone, or some
 4   representative, I should say, of the Santa Ana
 5   Police Department that in order for the department
 6   to lawfully return your shotgun to you, you needed
 7   to get a Law Enforcement Release, do you remember
 8   that, that that's what you had to do?
 9        MS. KINNEY:  Objection; calls for speculation,
10   but you can answer to your personal knowledge.
11        THE WITNESS:  Yes, that's -- what I was told
12   was not phrased the same way, but I did thoroughly
13   understand that we would have to have it registered
14   if we wanted it back.
15   BY MS. BOGOSIAN:
16        Q.   Okay.  And do you see Exhibit 9, and it's
17   just for the record an 11-page document which we'll
18   go through in just a moment.
19             (The document referred to was
20             marked Defendants' Exhibit 9 for
21             identification.)
22        THE WITNESS:  Okay.
23   BY MS. BOGOSIAN:
24        Q.   And this is a letter dated June 2, 2022
25   from the Department of Justice to you, Sean Phillip
```

**Page 113**

Sean Phillip Kinney

Sean Kinney vs.
Santa Ana Police Department

1    Q.    In the footage that I played in Exhibit

2    12.9, correct?

3    A.    No.

4    Q.    I am sorry, what I meant to ask is that

5    was you talking in Exhibit 12.76 which is the Ring

6    video, correct?

7    A.    Yes, ma'am.

8    Q.    And that is the same phone call as in

9    Exhibit 12.9, correct?

10   A.    It appears to be.

11   Q.    So let's talk about 12.9 for just a second.

12   Corporate Correal never told you you were under

13   arrest during that call, correct?

14   A.    Correct.

15   Q.    He never told you you are going to be

16   arrested, correct?

17   A.    Correct.

18   Q.    He never ordered you out of the house,

19   correct?  You want me to play it again?

20   A.    Sure, if you don't mind, he asked me to

21   come outside.

22   Q.    You want to hear your side or his side?

23   A.    I don't care, I am just trying to answer

24   your question, either side is fine.

25        (Counsel playing video clip.)

Sean Phillip Kinney

Sean Kinney vs.
Santa Ana Police Department

```
 1   BY MS. BOGOSIAN:

 2       Q.   Did you hear him order you to come out?

 3       A.   Yes, in my opinion, yes.

 4       Q.   What were the words he used that were an

 5   order?

 6       A.   He said "You need to come outside."

 7       Q.   When did he say that?  I'm going to play

 8   it again, and you tell me when he said that.

 9       MS. KINNEY:  I'm going to object, the document

10   speaks for itself.

11            (Counsel playing video clip.)

12       THE WITNESS:  At 1:45 he said "We need you to

13   come out with your hands up."

14   BY MS. BOGOSIAN:

15       Q.   And you took that as an order?

16       A.   Yes; I often take things as an order when

17   someone's pointing a gun at me.

18       Q.   Okay, thank you.  And you hear during this

19   call, and I can play it for you again if you need

20   me to, where Corporate Correal says "So he's coming

21   out," did you hear him say that?

22       A.   Yes.

23       Q.   And that's because you agreed to it, is

24   that right?

25       A.   I did.
```

**Sean Kinney vs.**
                                                         **Santa Ana Police Department**

1      Q.   All right.  And it was after not before

2   you consented to come out of your residence that

3   officers gave you orders through the loud speaker,

4   correct?

5      A.   Yes.

6      Q.   You voluntarily exited your home even

7   knowing there were police outside your home,

8   correct?

9      A.   Absolutely; I don't fear police and have

10  nothing against them.

11     Q.   You voluntarily exited your home even

12  knowing there was a police vehicle parked outside

13  your home, correct?

14     A.   Yes.

15     Q.   You voluntarily exited your home even

16  knowing that you were asked to place your hands

17  straight up in the air as you exited, correct?

18     A.   Yes.

19     Q.   You voluntarily exited your home even

20  knowing that once you exited officers would lead

21  you the rest of the way, correct?

22     A.   I didn't know what they would do after I

23  exited, but I was okay with it.  There was no issue

24  with that.

25     Q.   Okay, perfect.  We're going to go to

                                                                **Page 135**

```
 1   Exhibit 12.12.
 2            (The document referred to was
 3            marked Defendants' Exhibit 12.12
 4            for identification.)
 5   BY MS. BOGOSIAN:
 6       Q.   And I'm going to go to 12.12, and we're
 7   going to go to 11:43, I am going to play this.  I'll
 8   stop it at some point.  I don't think we are going
 9   to go all the way to the end, and then I'll ask you
10   some questions.
11            (Counsel playing video clip.)
12       MS. BOGOSIAN:  I'm stopping at Exhibit 12.12
13   at 25:37.
14       Q.   Sir, the very first Officer that read you
15   your Miranda Rights, he was kind and professional to
16   you, correct?
17       A.   Yes.
18       Q.   And you waived your rights and answered
19   his questions, correct?
20       A.   Yes.
21       Q.   You admitted during your Mirandized
22   statement that you raised your gun towards the
23   gardener.
24       A.   When he approached me violently, yes, I
25   said so on the tape.
```

Sean Phillip Kinney

Sean Kinney vs.
Santa Ana Police Department

1    said "We're going to go grab that"?

2        A.    She said "Awesome."

3        Q.    And then later on in the video, and I can

4    play it again.  The officer says "We're going to

5    take the shotgun as evidence and you can go pick it

6    up after you go through the DOJ process," do you

7    remember that?

8        A.    Yes.

9        Q.    So you gave the officers consent to go

10    into your residence, correct?

11        A.    Correct.

12        Q.    And there was consent to seize it as

13    it was evidence of a crime, correct?

14        A.    There was no consent to seize it.  Would

15    you mind playing it back so you cannot hear that?

16        Q.    Did you hear the officer in the video say

17    to your wife "I'm going to go grab that"?

18        A.    In the video only, not in person.  I was

19    not aware that they were going to grab the gun, I

20    told them -- if you play the video back you

21    you'll hear it, I said "Please go look at that," I

22    never said "Please go seize my weapon."

23        Q.    And did you hear your wife say "Awesome"?

24        A.    No, in person I heard none of that, I was

25    handcuffed in the back of --

**Page 140**

```
 1            I don't know what was or was not said when

 2   I was not around.  In the video I heard the officer

 3   address my wife only, not me, that he was going to

 4   get the gun.  They never told me in any of that

 5   footage clip 12.12, no one ever told me to my face

 6   that they were going to get the gun after I gave

 7   them permission to simply go in and look at it;

 8   they informed me after they seized the weapon that

 9   they were going to take it, I cannot be more

10   thorough than that.

11   BY MS. BOGOSIAN:

12        Q.    In the video that we just played in 12.12

13   you see the officers locating the shotgun under the

14   bed as you directed, correct?

15        A.    Correct.

16        Q.    And then they put it on top of the bed,

17   correct?

18        A.    Correct.

19        Q.    And that is consistent with the photos

20   Deborah Wolen took that I showed you in the

21   exhibits of the firearm in exhibits --

22        A.    I'm familiar with all the 11s; if you

23   would like to finish your question, I'd be happy

24   to answer it.

25        Q.    -- 11.6, 11.7 and 11.8, correct?
```

Page 144

**Sean Phillip Kinney**

1      A.    I assume.

2      Q.    **Well, you know that now.**

3      A.    I know that now, yes, ma'am, absolutely.

4      Q.    **And so did officers conduct a pat down of**

5   **you after you exited the residence?**

6      A.    **Yes, ma'am.**

7      Q.    **Now let me go to 12.15.**

8            (The document referred to was

9            marked Defendants' Exhibit 12.15

10           for identification.)

11  BY MS. BOGOSIAN:

12     Q.    **Let me see if this is the right video.**

13  **There's so many.**

14     A.    That's okay.

15           (Counsel playing video clip.)

16  BY MS. BOGOSIAN:

17     Q.    **In this clip in 12.15 you are having a**

18  **very cordial, very -- you need a break?**

19     MS. KINNEY:   I need a cough drop.

20  BY MS. BOGOSIAN:

21     Q.    **-- a very non-adversarial conversation**

22  **with the officer, correct?**

23     A.    Yes, ma'am.

24           (Counsel playing video clip.)

25  BY MS. BOGOSIAN:

**Page 148**

**Sean Phillip Kinney**

1    trouble reading.

2        Q.   Okay.

3        A.   And so in the video I do see that I signed

4    something, and I don't know if you are going here,

5    but it does look like that form you showed me.

6        Q.   Okay.  It looks like the Property Receipt

7    Form?

8        A.   There's no way to tell on this video.

9        Q.   I actually think there is, and I'll try

10   to stop it right where I see it.

11            (Counsel playing video clip.)

12   BY MS. BOGOSIAN:

13       Q.   Probably right there is the best spot for

14   it, the Officer is keeping one copy and giving you

15   one copy.  Now let's see if there's a way to

16   collapse this.  No, not really.

17       MS. KINNEY:  Try to click on the main screen.

18   For the record, something is kind of blocking the

19   document.

20       THE WITNESS:  It does look like that's it, if

21   that's what you mean.

22            (Counsel playing video clip.)

23       THE WITNESS:  Can't tell definitively.

24   BY MS. BOGOSIAN:

25       Q.   Is that a better view of it?

**Page 158**

1      A.   No, it's --

2      Q.   As he's handing it to you, right?

3      A.   32 to 34 he hands it, but I think --

4      Q.   Does that say "Property Receipt" on it?

5   If you want you can get closer to the screen.

6   There is a way probably --

7      A.   It still pixelized.  There is a way to

8   clean that up, but I can see that it looks just

9   like it, but I just don't want to say definitively

10  because I just want to be straight, but yes.

11     Q.   That's fine.  And then you give the officer

12  a fist bump, correct?  Do you see that?

13     A.   He was the young one, there was a young

14  one and an older one.

15     Q.   But that wasn't my question; you have to

16  listen to my questions, please, I didn't ask if he

17  was young or old, did you give the officer a fist

18  bump?

19     A.   Yes.

20     Q.   Let's keep going.

21          (Counsel playing video clip.)

22  BY MS. BOGOSIAN:

23     Q.   I believe, and correct me if I am wrong

24  because you were there and I wasn't, but from

25  watching the video it appears you, your wife and

Sean Phillip Kinney

Sean Kinney vs.
Santa Ana Police Department

1    **Corporate Correal are discussing the shotgun that**

2    **was taken as evidence.**

3        A.    Correct.

4        Q.    And you asked about the serial number,

5    correct?

6        A.    I did not, no.

7            (Counsel playing video clip.)

8    BY MS. BOGOSIAN:

9        Q.    A question was asked about the serial

10    number, correct?

11        A.    Correct.

12        Q.    And the officer pointed to the document

13    that we were just referring to in the video as the

14    serial number being on there, correct?

15        A.    Correct.

16        Q.    And you said even though you didn't want

17    to concede 100 percent, but if I showed you -- well,

18    I have it up here, too.  Let me put it up here.

19        A.    It does look like that document.

20        Q.    Exhibit 7, the Property Receipt here that

21    shows the Maverick Arms model 12 gauge shotgun

22    MV77895B, correct?

23        A.    It's a little dirtier in the video, but

24    it looks very similar to that.

25        Q.    And then there is a white copy, it says at

1    clip is broke, it's cut, and for the record, I'm an

2    award winning editor and I work in film and TV, and

3    if there's two different clips, you cannot establish

4    anything from one clip to the next, we actually use

5    this device, it's called the "Magician's Sleight of

6    Hand"; there's no way without an uninterrupted and

7    unedited clip that you can verify that something is

8    the same from one clip to the other.

9        Q.   Let's go back to the very beginning here.

10   Do you see the shotgun on the bed?

11       A.   I do.

12       Q.   Where is the sleight of hand?

13       A.   Show me what happens before the beginning

14   of this clip.  After the officer puts it on the bed,

15   show me a piece of video footage that shows that the

16   gun was not molested, moved or interrupted.

17       Q.   Molested?

18       A.   "Molested"; in film terms "molested" means

19   someone touched it that wasn't supposed to touch it,

20   it's actually a technical term, you don't want an

21   actor to put a fake, a real bullet or switching,

22   something like that.

23       Q.   Is this entire lawsuit about the fact that

24   you didn't get your shotgun back?

25       A.   No, I did get my shotgun back.

1    video that you just showed me, they were not trained

2    proper for the stack to go into a house, and I

3    consider someone undisciplined if they don't have

4    the wherewithal to show and demonstrate their job

5    being done properly.

6        Q.   I have a few more questions, then what I

7    would like to do is take literally a five-minute

8    break and make sure because this is my only chance

9    to make sure.

10            Obviously the incident that we are here

11   for today occurred on October 4, 2021.  Without

12   telling me anything about your communications with

13   your attorney, when did you decide to sue the City

14   of Santa Ana and the officers, approximately, after

15   the incident, a week?  Two weeks?  Three months?  I

16   don't need an exact date.

17       MS. KINNEY:  I will object just to the extent

18   that it could violate attorney-client privilege and

19   marital privilege; so if you have anything outside

20   of your communications with me, that's fine.

21   BY MS. BOGOSIAN:

22       Q.   When did you make the decision, right,

23   without discussing or consulting with an attorney,

24   I don't want to know about any of that, or your

25   wife?

**Sean Phillip Kinney**                                    **Sean Kinney vs.**
                                        **Santa Ana Police Department**

1    A.    It was months after we got the weapon

2    back.

3    Q.    And we have a receipt that shows you got

4    it in June of 2022, so would it be fair to say

5    between June, and even we'll go as far as December

6    of 2022?

7    A.    I think it was less than that, it was -- I

8    think police are overworked, and I think there's

9    real criminals, and I don't like to waste people's

10   times on something that I think wouldn't be

11   fruitful, so it was a hard thing for me to grasp

12   with.

13   Q.    So sometime after June of 2022 is when

14   you made the decision.

15   A.    Yes, ma'am.

16   Q.    And what is it that you are seeking from

17   this lawsuit?

18   A.    I'll leave that up to my attorney as I

19   don't know.

20   Q.    Well you are the plaintiff, so I am

21   entitled to probe you, I am not asking for any legal

22   statutory basis for attorneys' fees, I am simply

23   asking what is it that you are seeking from this

24   lawsuit?

25   MS. KINNEY:  And I'll just for the record object

**Page 191**

1    love to get your card, if that's okay.

2              (Whereupon, at the hour of 4:08 p.m.

3              the deposition was concluded.)

4                    -- o0o --

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Sean Phillip Kinney**

```
 1  COUNTY OF LOS ANGELES,  )

 2  STATE OF CALIFORNIA,    )

 3         I, Annette Shaver, Certified Shorthand

 4  Reporter licences in the State of California,

 5  License No 6169, hereby certify that the deponent

 6  was by me first duly sworn and the foregoing

 7  testimony was reported by me and was thereafter

 8  transcribed with Computer-Aided Transcription; that

 9  the foregoing is a full, complete, and true record

10  of said proceeding.

11         I further certify that I am not of counsel or

12  attorney for either or any of the parties in the

13  foregoing proceeding and caption named or in any

14  way interested in the outcome of the cause in said

15  caption.  The dismantling, unsealing, or unbinding

16  of the transcript will render the reporter's

17  certificates null and void.

18         In witness whereof, I have hereunto set my

19  hand this day: 18th of February, 2025.

20         __X__ Reading and Signing was requested.

21         _____ Reading and Signing was waived.

22         _____ Reading and Signing was not requested.

23

24         _____

25              ANNETTE SHAVER, CSR NO. 6169
```

**Page 226**

# PART X

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    SOUTHERN DIVISION

 4

 5   SEAN KINNEY,                    )
                                     )
 6           Plaintiff,              )
                                     )
 7      vs.                          ) Case No. 8:24-cv-01286
                                     )           JWH-JDE
 8   SANTA ANA POLICE DEPARTMENT; )
     CITY OF SANTA ANA; JIMMY        )
 9   CORREAL, an individual; LUIS )
     CASILLAS, an individual;        )
10   JESSE HERNANDEZ, an             )
     individual; and DOES 1 to 35,)
11   inclusive,                      )
                                     )
12           Defendants.             )
     _____)
13

14

15

16

17           DEPOSITION OF CHRISTIANE KINNEY

18                Santa Ana, California

19                 February 6, 2025

20

21

22

23   Stenographically Reported by:
     Vicki Resch, RPR, CSR 6645
24
     Job No. 10157552
25
```

Christiane Kinney

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                     SOUTHERN DIVISION

 4

 5   SEAN KINNEY,                     )
                                      )
 6            Plaintiff,              )
                                      )
 7      vs.                           )   Case No. 8:24-cv-01286
                                      )               JWH-JDE
 8   SANTA ANA POLICE DEPARTMENT; )
     CITY OF SANTA ANA; JIMMY         )
 9   CORREAL, an individual; LUIS )
     CASILLAS, an individual;         )
10   JESSE HERNANDEZ, an              )
     individual; and DOES 1 to 35,)
11   inclusive,                       )
                                      )
12            Defendants.             )
     _____)

13

14       DEPOSITION OF CHRISTIANE KINNEY, taken on behalf

15   of the Defendants, at 10:02 a.m., Thursday,

16   February 6, 2025, at 20 Civic Center Plaza, Santa Ana,

17   California, before Vicki Resch, Certified Shorthand

18   Reporter No. 6645 in the State of California.

19                          -oOo-

20

21

22

23

24

25
```

Page 2

**Christiane Kinney**

```
 1    APPEARANCES OF COUNSEL:

 2

 3    For the Plaintiff:

 4            KINNEY LAW P.C.
              BY:  CHRISTIANE CARGILL KINNEY, ESQ.
 5            8023 Beverly Boulevard
              Suite 1568
 6            Los Angeles, California 90048
              310.751.0354
 7            ckinneylaw.com

 8

      For the Defendants:
 9
              SANTA ANA CITY ATTORNEY'S OFFICE
10            BY:  TAMARA BOGOSIAN, ESQ.
              20 Civic Center
11            Plaza-M-29, 7th Floor
              Santa Ana, California 92701
12            tbogosian@santa-ana.org

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

Christiane Kinney

1    Q    Did you contact him by phone or in any other

2    method following your husband's arrest?

3    A    I contacted the D.A.'s office, yes, while he

4    was in detention and let me know that.

5    Q    Who did you speak to at the D.A.'s office?

6    A    Probably the main office line to ask if they

7    had any information about him being held.  They said

8    we don't have anything right now.  I told them a

9    little bit of what was going on.  I remember the

10   person going, "Ugh, Santa Ana?"  And he said, I guess,

11   I'll call back?  And she said yeah, it can take a few

12   days to process things.

13   Q    And was that the only communication you had

14   with the D.A.'s office?

15   A    Yes.  After that we had a criminal defense

16   attorney handle further communications.

17   Q    And on the date of the incident, you were

18   residing in the home along with Plaintiff Sean Kinney

19   and your daughter I████████and your son, Z███████,

20   correct?

21   A    Correct.

22   Q    My understanding is that you lease that home?

23   A    Yes.

24   Q    When did you enter into the lease?

25   A    Best of my recollection, it was September 1st

1    of that year, 2021, but we did not move in right away.

2         Q    Okay.  And do you have a copy of the lease, I

3    guess, the original lease from September of 2021?

4         A    Not on me, but yes.

5         Q    I understand.  I wasn't suggesting that you

6    would have it with you.

7              Did that lease, to the best of your

8    recollection, include any information regarding

9    landscaping services?

10        A    I think it did.  It was quite long.

11        Q    All right.  Do you recall the details of

12   that?

13        A    I've looked back since.  I think there was

14   reference to landscapers coming on Mondays.  I don't

15   think there was a time attached to that, to the best

16   of my memory.

17        Q    Did you have any discussions with the owner

18   of the property that you did not want landscapers to

19   come to your home?

20        A    I don't recall that, but we did -- if memory

21   serves, I believe we talked to them about not wanting

22   people in the back area.  And I remember the landlord

23   saying, "This is yours.  Nobody will be back here, so

24   you guys can do what you want in the back."

25        Q    When was that conversation?

1    couldn't see the gardener at that point.  And he said,

2    "Call the police."  And I saw that he had the shotgun,

3    but it was pointed down.

4        Q    Describe the shotgun you saw your husband

5    holding that morning.

6        A    To the best of my knowledge it was our

7    shotgun, which was a long shotgun.  I couldn't -- you

8    know, I can't describe it from that interaction, but I

9    can describe what our shotgun looked like in my

10   memory.

11       Q    Yes, please.

12       A    I remember it having a light -- I think it's

13   called the stock at the back end of it.

14       Q    What do you mean by light stock?

15       A    Light, like a different color than the rest.

16   I remember it kind of being wood.  And I remember the

17   handrail being different than the handrail in the

18   pictures that we'll get to, but otherwise, a shotgun.

19       Q    How many times prior to October 4, 2021 had

20   you seen that shotgun that your husband owned?

21       A    Most of the time we left it in a gray cloth

22   case, but I did see it.  I had to have home safety

23   training on it, so I had to understand how to load and

24   unload the gun in case we had an intruder, so I

25   handled the weapon.

Sean Kinney vs.
Santa Ana Police Department

**Christiane Kinney**

```
 1        Q     How many times?

 2        A     Maybe two or three.

 3        Q     In what years?

 4        A     I would say pre-pandemic.  And I can't be

 5   more specific than that.

 6        Q     Is that 2019 or 2020?

 7        A     I can't be more specific than that.  Before

 8   the -- before the pandemic.

 9        Q     Right.  But 2019 or 2020?

10        A     It could have 2018.

11        Q     Before 2018?

12        A     I don't know.

13        Q     And for what period of time did you handle

14   the shotgun?

15        A     Maybe a half hour.

16        Q     Had you seen any paperwork with respect to

17   the ownership, registration of the shotgun?

18        A     No.

19        Q     Had you seen any paperwork or any

20   documentation with the serial number of the shotgun?

21        A     No.

22        Q     Did you call the police?

23        A     I did not.

24        Q     Why not?

25        A     Because -- well, for one, it happened very,
```

**Page 16**

**Sean Kinney vs.**
                                                                          **Santa Ana Police Department**

```
 1   very fast.  I looked, he said to call the police.  He

 2   walked out with the man that you have pulled up, I

 3   think, but he looked a little different.  And I looked

 4   in the front of the yard, and I saw a work truck.  And

 5   I said, "Wait a minute.  I think these might be the

 6   landscapers.  I think John and Katherine have

 7   landscapers that come."

 8       Q    All right.  Let me ask a few questions based

 9   on what you just testified.

10       A    Yes.

11       Q    You said that -- I have Exhibit 11.1 pulled

12   up --

13       A    Yes.

14       Q    -- which is a photograph of what I believe to

15   be Mr. Felix.

16            (Exhibit 11.1 was marked for identification

17            and is attached hereto.)

18            THE WITNESS:  Mm-hmm.

19   BY MS. BOGOSIAN:

20       Q    And he is wearing a tan shirt and a straw

21   hat.  And on the shirt is a patch that says WorkGrove

22   Landscape.

23            Would you agree with me?

24       A    I agree that that's what's in the picture.

25       Q    Is it your testimony that Mr. Felix, who was
```

                                                                          **Page 17**

Sean Kinney vs.
                                                  Santa Ana Police Department

1    in your backyard that your husband had his rifle

2    pointed at, was not wearing that shirt that morning?

3              MS. KINNEY:  Misstates testimony.

4              THE WITNESS:  I never said that I saw my

5    husband pointing a shotgun at him.  I do not recall --

6    I recall a tan shirt.  I do not recall seeing any

7    signage on the shirt.

8    BY MS. BOGOSIAN:

9        Q    Okay.  But that doesn't mean it didn't have

10   it, right?

11       A    I don't believe it had it.

12       Q    Okay.  So are you testifying affirmatively

13   that the man you saw in your backyard did not have

14   this shirt on?

15       A    To the best of my recollection, that was not

16   the shirt he was wearing.

17       Q    What shirt was he wearing?

18       A    I believe it was a plain tan shirt.

19       Q    Could you be mistaken?

20       A    I could be, but I do not remember seeing

21   that.

22       Q    Okay.  Was there another gentleman along with

23   him that had the same type of shirt?

24       A    A tan shirt perhaps.  I didn't interact with

25   the other individual, really, at all.  There was a

Christiane Kinney

```
 1   person in the front yard doing actual landscaping, I
 2   believe.  And when I looked down and saw the truck, I
 3   noticed someone there.
 4       Q    What was he doing landscaping in the front
 5   yard?
 6       A    I didn't really pay attention to him.  As
 7   soon as I saw the truck, I realized this might be a
 8   misunderstanding, let me call the landlords and figure
 9   this out.
10       Q    Okay.  Yesterday your husband testified there
11   is no landscaping to be done in the front.
12            Do you agree or disagree with that statement?
13       A    In the front or in the back?
14       Q    In the front.
15       A    I believe they had landscaping in the front.
16   I don't know that my husband ever read the lease
17   agreement or was aware of that at the time.
18       Q    Okay.  All right.  So did you call the
19   landlord?
20       A    Yes, I did.
21       Q    All right.  Who was the landlord at the time,
22   unless it's changed?
23       A    There's two.  I called John first.
24       Q    Last name?
25       A    Lane.
```

Page 19

**Christiane Kinney**

1      Q      L-A-N-E?

2      A      Mm-hmm.

3      Q      Was that a "yes"?

4      A      Yeah.

5      Q      And the second one?

6      A      Katherine.  I think same name.  Last name.

7      Q      All right.  Are they related?

8      A      I believe they're husband and wife.

9      Q      And they are the property owners?

10     A      To the best of my knowledge, yes.

11     Q      And what were the lease terms in terms of the

12     monthly rent?

13     A      $2800 a month.

14     Q      Okay.  And that included the landscaping?

15     A      Yes, I believe so.

16     Q      All right.  Were you able to connect with

17     Katherine?

18     A      I was.

19     Q      And just describe briefly your conversation

20     with her.

21     A      I said, "Do we have landscapers here on

22     Mondays," something of that nature.

23     Q      Mm-hmm.

24     A      And she said yes.  I said, "Can you please

25     tell me the name of the landscaping company that you

Page 20

1    hired?"  And she did.  I think it was Orange Grove.

2         And I checked -- I didn't see a sign on his

3    shirt.  I saw a truck, though, that had a similar logo

4    to what you had showed in the previous Exhibit 11.1.

5    I don't know if the logo looked like that on the

6    truck, but it said WorkGrove Landscape, and Katherine

7    indicated that they had hired WorkGrove Landscape.

8    And I said thank you, and I kept her on the line.

9         I told my husband, I'm like, "Okay.

10   Katherine confirmed these are the landscapers."  So he

11   walked him out and said, "Well, I need you guys to

12   leave."  And they left.  And at the same time, Z█████

13   and I left.

14       Q    Okay.  What time was your phone call with

15   Ms. Lane, approximately?

16       A    I would say a minute of me walking out of the

17   house.  And I don't have precision on when I walked

18   out of the house.

19       Q    Just your best estimate?

20       A    Maybe 7:15.  Maybe 7:00.  Somewhere in that

21   bracket.  Because we needed to leave for football.

22       Q    And your husband and your daughter, I██████,

23   remained at home when you took your son to school?

24       A    To the best of my knowledge, yes.

25       Q    What happened when you returned?

**Christiane Kinney**

```
 1   12.9?
 2             MS. BOGOSIAN:  I just did.
 3             MS. KINNEY:  Okay.  I didn't hear you say
 4   that.
 5             MS. BOGOSIAN:  That's okay.
 6             (Plays video.)
 7   BY MS. BOGOSIAN:
 8        Q    All right.  I'm going to stop it there.  Your
 9   husband had his cell phone on speaker at the time he
10   was speaking to Corporal Correal, correct?
11        A    For part of it, yes.
12        Q    And you heard Corporal Correal both here and
13   on the speakerphone correct?
14        A    Correct.
15        Q    And you heard your husband on the
16   speakerphone on your side while you were in your
17   kitchen?
18        A    I heard him in real life.
19        Q    Yes.  Okay.  And you heard Corporal Correal
20   say, "I need to speak with you about something,"
21   correct?
22        A    I think so.
23        Q    Do you want me to go back?
24        A    I believe the conversation was as it's
25   represented in this exhibit.
```

Christiane Kinney

1    Are you asking if he said that on this phone call that

2    he was --

3    BY MS. BOGOSIAN:

4        Q    That is exactly what I am asking.

5        A    Okay.  I did not hear him say that.

6        Q    Okay.  And Corporal Correal never ordered

7    your husband out of the house, correct?

8        A    He said, "You need to come outside."

9        Q    Okay.  Did he say, "You are ordered by the

10    Santa Ana Police Department to come outside"?

11        A    I didn't hear the word "order."  I heard the

12    word "need."

13        Q    And your husband was very agreeable in coming

14    outside, right?

15        A    He was cooperative.

16        Q    Mm-hmm.  And it was after, not before your

17    husband consented to come out of the home that

18    officers gave him orders through the loudspeaker,

19    correct?

20        A    Can you ask that again?

21        Q    Yes.  It was after, not before your husband

22    consented to come out of the home that officers gave

23    him orders through the loudspeaker?

24        A    I don't recall.

25        Q    Okay.  And your husband voluntarily exited

**Christiane Kinney**

```
 1      Q     By your husband?

 2      A     Presumably so.

 3      Q     Who is a plaintiff in this case, right?

 4      A     Correct.

 5            (Plays video.)

 6  BY MS. BOGOSIAN:

 7      Q     So, ma'am, did you know that the landscapers

 8  were coming on Mondays before this incident?

 9      A     It sounds like, at that time, I probably was

10  aware of it, because I had done the lease agreement

11  pretty soon in time.

12      Q     Okay.

13            (Plays video.)

14  BY MS. BOGOSIAN:

15      Q     Okay.  So here you are affirmatively saying

16  you don't know if there was a scuffle or an

17  altercation, correct?

18      A     Yes.

19      Q     Okay.  And at the time that you were giving

20  this statement to Corporal Correal, did you know that

21  he had a body-worn camera on?

22      A     I don't know.  I don't know if I was thinking

23  about that at the time.

24            (Plays video.)

25  ///
```

Christiane Kinney

```
 1              (Plays video.)
 2    BY MS. BOGOSIAN:
 3        Q     And at 12.11, your daughter is seated next to
 4    you on the curb, correct?
 5        A     There's a black box over us, but yeah, that
 6    looks like I███████.
 7        Q     Do you have any reason to dispute that that's
 8    your daughter?
 9        A     It looks like her.
10        Q     And is she in handcuffs?
11        A     Her hands are blocked by the officer writing.
12        Q     Was she handcuffed there, ma'am?
13        A     I can't see her hands.  Let's play it
14    through.
15              (Plays video.)
16              THE WITNESS:  I see something around her
17    wrist.  The guy's blocking her.  No.
18    BY MS. BOGOSIAN:
19        Q     No?
20        A     No.
21              (Plays video.)
22    BY MS. BOGOSIAN:
23        Q     Was that nervous laughter there at
24    approximately time stamp 1:17, 1:18?
25        A     That was me making a joke.
```

1    hoops to get back a lawful weapon, yes.

2        Q    Okay.  When you say forcing you to jump

3    through hoops, again, just for clarification, the

4    officer there is explaining that there is a process

5    through the Department of Justice, correct?

6        A    The officer mentioned to check with the DOJ.

7        Q    Okay.  And just to confirm, do you know one

8    way or the other whether or not the shotgun that was

9    seized from your home on October 4 was registered to

10   your husband?

11       A    I don't know.

12       Q    Did you fill out in your capacity as a

13   witness, not as an attorney, any kind of forms to

14   retrieve the weapon back?

15       A    So the serial number that was put on all of

16   the paperwork, yes, I did.

17       Q    Okay.  And then did your husband, to your

18   knowledge, receive a clearance letter from the DOJ

19   indicating that he was -- he could lawfully possess

20   the shotgun?

21       A    Correct.

22       Q    And then once that document was shown to

23   property staff at the police department, the shotgun

24   was returned and a $100 fee was paid by your husband,

25   correct?

Christiane Kinney

1  that's when they handcuffed me.

2        MS. BOGOSIAN:  Okay.  So I'm going to have

3  Sara -- let's go off the record.

4        (Discussion held off the record.)

5  BY MS. BOGOSIAN:

6        Q     Did you or your husband contact the Santa Ana

7  Police Department after this incident to complain

8  about the incident?

9        A     Yes.

10       Q     When did you do that?

11       A     I don't know the exact date, but around

12  October of 2023, I started an internal investigation.

13        (Interruption in proceedings.)

14  BY MS. BOGOSIAN:

15       Q     You mentioned before we took a brief break

16  that you had filed -- you complained about the

17  officers' actions at your home on Baker Street

18  stemming from the October 4th, 2021 incident, correct?

19       A     Correct.

20       Q     And you did that two years later, in October

21  of 2023?

22       A     That's my recollection.

23       Q     Okay.  And why did you wait so long?

24       A     Frankly, just fear of them and still being in

25  Santa Ana not wanting to deal with it.

Christiane Kinney

```
 1            I, VICKI RENEE RESCH, RPR, CSR No. 6645,

 2    certify:  that the foregoing proceedings were taken

 3    before me at the time and place herein set forth; at

 4    which time the witness was duly sworn; and that the

 5    transcript is a true record of the testimony so given.

 6

 7       Witness review, correction and signature was

 8     (X) by Code.                (X) requested.

 9     ( ) waived.                 ( ) not requested.

10     ( ) not handled by the deposition officer due to

11         party stipulation.

12

13       The dismantling, unsealing, or unbinding of the

14    original transcript will render the reporter's

15    certificate null and void.

16            I further certify that I am not financially

17    interested in the action, and I am not a relative or

18    employee of any attorney of the parties, nor of any of

19    the parties.

20            Dated this 14th day of February, 2025.

21

22

23     _____
                 VICKI RESCH

24

25
```

Page 121

# PART Y

```
 1                UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

 3

 4   SEAN KINNEY,                    ) Case No.
                                     ) 8:24-cv-01286-JWH-JDE
 5        Plaintiff,                 ) Consolidated with Case
                                     ) No.
 6            vs.                    ) 8:24-cv-01287-JWH-JDE
                                     )
 7   SANTA ANA POLICE DEPARTMENT;    )
     CITY OF SANTA ANA; JIMMY        )
 8   CORREAL, an individual; LUIS    )
     CASILLAS, an individual;        )
 9   JESSE HERNANDEZ, an             )
     individual; DEBORAH WOLEN, an   )
10   individual  and DOES 1 through  )
     35, inclusive,                  )
11                                   )
          Defendants.                )
12   _____  )

13

14                      CONFIDENTIAL

15

16                  DEPOSITION OF I.K.

17                 Santa Ana, CALIFORNIA

18                 Monday, April 14, 2025

19

20

21

22

23   Reported by:
     Gideon Choi
24   CSR No. 13258

25
```

Page 1

```
 1                 UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

 3

 4    SEAN KINNEY,                      )  Case No.
                                        )  8:24-cv-01286-JWH-JDE
 5        Plaintiff,                    )  Consolidated with Case
                                        )  No.
 6            vs.                       )  8:24-cv-01287-JWH-JDE
                                        )
 7    SANTA ANA POLICE DEPARTMENT;      )
      CITY OF SANTA ANA; JIMMY          )
 8    CORREAL, an individual; LUIS      )
      CASILLAS, an individual;          )
 9    JESSE HERNANDEZ, an               )
      individual; DEBORAH WOLEN, an     )
10    individual  and DOES 1 through    )
      35, inclusive,                    )
11                                      )
          Defendants.                   )
12    _____     )

13

14

15          Deposition of I.K., taken on behalf of

16      Defendant, at 20 Civic Center Plaza, 7th Floor,

17      Santa Ana, California, beginning at 9:02 a.m. and

18      ending at 11:02 a.m., on Monday, April 14, 2025,

19      before Gideon Choi, Certified Shorthand Reporter

20      No. 13258.

21

22

23

24

25

                                              Page  2
```

```
 1                        APPEARANCES
 2
 3     For the Plaintiff, SEAN KINNEY:
 4             KINNEY LAW, P.C.
               BY:  CHRISTIANE KINNEY, ESQ.
 5             8023 Beverly Boulevard
               Suite 1568
 6             Los Angeles, CA 90048
               Telephone:  (310) 751-0354
 7             E-mail:  christiane@ckinneylaw.com
 8
       For the Defendants, SANTA ANA POLICE DEPARTMENT, CITY OF
 9     SANTA ANA, JIMMY CORREAL, LUIS CASILLAS, JESSE HERNANDEZ,
       DEBORAH WOLEN:
10
               SANTA ANA CITY ATTORNEY'S OFFICE
11             BY:  TAMARA BOGOSIAN, ESQ.
               20 Civic Center Plaza
12             7th Floor
               Santa Ana, CA 92701
13             Telephone:  (714) 647-5221
               E-mail:  tbogosian@santa-ana.org
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page  3
```

JOINT EXHIBIT 135                                      CONFIDENTIAL

```
 1        A    Eventually, they grabbed me and started patting me     09:19
 2   down, and then they instructed me to sit on the curb.           09:19
 3        Q    Okay.  Now, at the time that they patted you          09:20
 4   down, did you have any pockets --                               09:20
 5        A    Yes.                                                  09:20
 6        Q    -- on any of your pajamas?                            09:20
 7        A    Yes.                                                  09:20
 8        Q    Where were the pockets located?                      09:20
 9        A    On the sides of my pants.                            09:20
10        Q    And is that where they patted you, at your pockets?  09:20
11        A    They patted down full body.                          09:20
12        Q    Was it a female officer or a male officer?           09:20
13        A    A male officer.                                      09:20
14        Q    And did you feel uncomfortable when the officer did  09:20
15   that?                                                          09:20
16        A    No.                                                  09:20
17        Q    None of the officers had any guns pointed at you;    09:20
18   correct?                                                       09:20
19        A    They did have guns pointed at me.                    09:20
20        Q    And we'll go over the videos, and I'm going to ask   09:20
21   you to show me where the guns were pointed; okay?              09:20
22        But no officer used any force on your body?  In other     09:20
23   words, there were no kicks or hits or punches or any type of   09:20
24   force; correct?                                                09:20
25        A    Correct.                                             09:20
```

                                                        Page 21

1    Q    And no officer used any weapons -- no baton, no    09:20

2    Taser, nothing like that?    09:21

3    A    Not on me.    09:21

4    Q    All right.  Now, at some point after they patted you    09:21

5    down, they asked you to go sit somewhere or stand somewhere?    09:21

6    A    Sit on the curb.    09:21

7    Q    Okay.  On the curb.  If you're facing your home, to    09:21

8    the right of your home or to the left of your home?    09:21

9    A    I was on the right facing the street.    09:21

10    Q    Okay.  And did you do what they asked?    09:21

11    A    Yes.    09:21

12    Q    Why?    09:21

13    A    Again, I was being cooperative because I had no idea    09:21

14    what was going on.    09:21

15    Q    At the time that you finally got to the curb and    09:21

16    took a seat, did you see either your mother or your father?    09:21

17    A    No.    09:21

18    Q    Okay.  Did you know where they were?    09:21

19    A    No.    09:21

20    Q    Did any officer tell you where they were?    09:21

21    A    No.    09:21

22    Q    Now, at some point an officer contacted you,    09:21

23    correct, while you were on the curb?    09:21

24    A    Yes.    09:21

25    Q    And was that officer kind to you?    09:21

Page 22

```
 1      A    Potentially.                                      09:22

 2      Q    Okay.  Let's talk about your demeanor with the    09:22

 3  officers that you interacted with in front of your home.   09:23

 4  Would you agree with me that you were kind?                09:23

 5      A    Yes.                                              09:23

 6      Q    That you were jovial, like, just smiling and talking  09:23

 7  and laughing in a very what I would call, like, a light    09:23

 8  manner?                                                    09:23

 9      A    I was trying to be.                               09:23

10      Q    Okay.  But the video depicts you being very calm and  09:23

11  funny and articulate about your life and things that you had  09:23

12  experienced; right?                                       09:23

13      A    I was not calm.  I was very nervous and that was  09:23

14  coming out through talking a lot.                         09:23

15      Q    Did you tell anyone at the scene that you were    09:23

16  nervous?                                                  09:23

17      A    Not to my memory.                                09:23

18      Q    Okay.  Is there any way that the officers who     09:23

19  interacted with you would have known you were nervous?     09:23

20      A    Through body language.                           09:23

21      Q    When we get to the videos, if you can show me where  09:23

22  on the videos you see yourself acting nervous; okay?       09:23

23          And the officer that you interacted with mainly in  09:24

24  front of your home, he did not interrogate you at all about  09:24

25  the incident that the officers were there for; right?      09:24
```

                                                    Page 24

| | | |
|---|---|---|
| 1 | MS. KINNEY:  I'll just object to the extent it calls for | 09:24 |
| 2 | speculation, and it's a 15- or 20-minute glimpse. | 09:24 |
| 3 | So, if you know, you can answer the question. | 09:24 |
| 4 | THE WITNESS:  I'm not fully aware. | 09:24 |
| 5 | BY MS. BOGOSIAN: | 09:24 |
| 6 | Q     Do you know what interrogation is? | 09:24 |
| 7 | A     Yes. | 09:24 |
| 8 | Q     And the officer didn't ask you about the incident at | 09:24 |
| 9 | all, correct, about the landscaper, your father, the gun, | 09:24 |
| 10 | nothing? | 09:24 |
| 11 | A     Not to my memory. | 09:24 |
| 12 | MS. BOGOSIAN:  Okay.  Well, let's go to the exhibits | 09:24 |
| 13 | now.  All right.  We're going to now -- I'm going to show | 09:24 |
| 14 | you Exhibit 12.3.  This is body-worn camera footage from | 09:24 |
| 15 | Officer Luis Casillas.  I may stop the video at various | 09:25 |
| 16 | times or we may watch it all the way through, and I'll ask | 09:25 |
| 17 | you some questions about it; okay? | 09:25 |
| 18 | (Exhibit 12.3 was marked for identification by | 09:25 |
| 19 | the Certified Shorthand Reporter, a copy of | 09:25 |
| 20 | which is attached hereto.) | 09:25 |
| 21 | (Whereupon, a video was played.) | 09:25 |
| 22 | BY MS. BOGOSIAN: | 09:25 |
| 23 | Q     I stopped the video at 21 seconds, although the | 09:25 |
| 24 | sound hasn't kicked in yet.  Just so you know, the sound | 09:25 |
| 25 | kicks in at 30 seconds through the Axon program. | 09:25 |

Page 25

JOINT EXHIBIT 139                    CONFIDENTIAL

```
 1    I repeat that correctly?                          09:39

 2       A    Yes.                                      09:39

 3       Q    Is that what you heard that day?          09:39

 4       A    Yes.                                      09:39

 5       Q    Did you find that that direction was an order or a   09:39

 6    request?                                          09:39

 7       A    An order.                                 09:39

 8       Q    Okay.                                     09:39

 9            (Whereupon, a video was played.)          09:40

10       Q    All right.  Now, in this clip here where I stopped   09:40

11    it at 7:04, an officer approaches you; correct?   09:40

12       A    Yes.                                      09:40

13       Q    Is that the officer that you previously testified   09:40

14    patted you down?                                  09:40

15       A    Yes.                                      09:40

16       Q    Now, we see -- correct me if I'm wrong -- the   09:40

17    officer does not have anything in his hands; correct?   09:40

18       MS. KINNEY:  Objection.  It's blocked by a tree.   09:40

19          If you know.                                09:40

20    BY MS. BOGOSIAN:                                  09:40

21       Q    Do you want me to go back a little bit?   09:40

22       A    Sure.                                     09:40

23       Q    Okay.                                     09:40

24            (Whereupon, a video was played.)          09:41

25       Q    I want you, instead of focusing on yourself, focus   09:41
```

                                                  Page 34

```
 1    on the officer who's giving you directions; okay?     09:41

 2            (Whereupon, a video was played.)             09:41

 3    Q    All right.  Did you see the officer's hands in that  09:41

 4    clip?                                                 09:41

 5    A    Yes.                                             09:41

 6    Q    Did he have anything in his hands?               09:41

 7    A    No.                                              09:41

 8    Q    He didn't have a gun or anything; correct?       09:41

 9    A    No.                                              09:41

10    Q    Is that correct?                                 09:41

11    A    Yes.                                             09:41

12    Q    Okay.  And he had gloves on; correct?            09:41

13    A    Yes.                                             09:41

14    Q    Okay.  We'll play it.                            09:41

15            (Whereupon, a video was played.)             09:41

16    MS. BOGOSIAN:  All right.  Okay.  Now we're going to play  09:42

17    Exhibit 12.43 which is Officer Adrian Martinez's body-worn  09:42

18    camera footage, and I am going to go to 4:36.        09:42

19            (Exhibit 12.43 was marked for identification  09:42

20            by the Certified Shorthand Reporter, a copy of  09:42

21            which is attached hereto.)                   09:42

22            (Whereupon, a video was played.)             09:42

23    BY MS. BOGOSIAN:                                     09:42

24    Q    Now, these videos that we've watched so far, I   09:42

25    realize we haven't watched all of them, but are these the  09:42
```

Page 35

```
 1    videos that you reviewed prior to your deposition here        09:42

 2    today?                                                        09:42

 3        A    Some of them.                                        09:42

 4        Q    Okay.  All right.                                    09:42

 5              (Whereupon, a video was played.)                    09:43

 6        Q    All right.  So, here, an officer says, "Do you want  09:43

 7    to hang out with me here"; correct?                           09:43

 8        A    Yes.                                                  09:43

 9        Q    And this is when you were moved -- you were asked to 09:43

10    move away from your mom and hang out with the officer sort    09:43

11    of between your home and your neighbor's home?                09:43

12        A    Yes.                                                  09:43

13        Q    Okay.  I'll play a little bit more.                  09:43

14              (Whereupon, a video was played.)                    09:43

15        Q    All right.  You didn't hear any objection by        09:43

16    yourself or your mother of you going to hang over here with   09:43

17    the officer; correct?                                         09:43

18        A    No objection.                                        09:43

19        Q    Okay.  And then now at this point of the video, the  09:43

20    officer starts to ask you some questions.  We'll play the     09:43

21    clip, a little portion, and then I'll ask you some            09:43

22    questions.                                                     09:44

23              (Whereupon, a video was played.)                    09:46

24        Q    I.K., would you agree with the statement that this   09:46

25    discussion with the officer is a conversation and not an      09:46
```

Page 36

```
1    interrogation?                                              09:46

2    A    Yes.                                                   09:46

3    Q    And there were times, at least up to the point where  09:46

4    we stopped it now at 7:26, where the officer doesn't ask you 09:46

5    a question and yet you initiate conversation with him;      09:46

6    correct?                                                    09:46

7    A    Yes.                                                   09:46

8    Q    Okay.  And you're not crying; correct?                09:46

9    A    Correct.                                               09:46

10   Q    You're not asking to go to your mom; right?           09:46

11   A    Correct.                                               09:47

12   Q    And can you -- from where you're standing, could you  09:47

13   on that day hear your mom speaking?                         09:47

14   A    No.                                                    09:47

15   Q    Can you in the video hear her speaking?               09:47

16   A    In the video.                                          09:47

17   Q    Okay.  And you can hear your mom laughing; correct?   09:47

18   A    In the video.                                          09:47

19   Q    All right.                                             09:47

20        (Whereupon, a video was played.)                      09:48

21   Q    Would you agree with me that you don't appear         09:48

22   nervous here, at least in this portion?                     09:48

23   A    I do appear nervous.                                  09:48

24   Q    Okay.  Would you like me to go back at all for you    09:48

25   to tell me where you started to exhibit signs of nervousness 09:48
```

                                                          Page 37

```
 1      Q    Okay.  Now, you referred to "broken into".  Where    09:59

 2   did you get that idea from?                                   09:59

 3      MS. KINNEY:  Objection to the extent it calls for          09:59

 4   attorney-client privilege.                                    09:59

 5          You can answer for anything you talked to dad about    09:59

 6   or that you know on your own.                                 09:59

 7      THE WITNESS:  The gardeners were not allowed to be in our  09:59

 8   backyard, and he had broken through two fences where he had   09:59

 9   to open it from the inside to get into our backyard.          09:59

10   BY MS. BOGOSIAN:                                              09:59

11      Q    All right.  How did you know the gardeners were not   09:59

12   allowed to be in your backyard?                               09:59

13      A    Because my dad told me later on that day.             09:59

14      Q    You guys were renting the property to the best of     09:59

15   your knowledge; right?                                        09:59

16      A    Yes.                                                  09:59

17      Q    And did you know whether or not the property owners   09:59

18   had hired a landscaping company to do the landscaping?        09:59

19      A    They did.                                             09:59

20      Q    Okay.  And so your dad was telling you his opinion    09:59

21   that the landscaper was not allowed to be in the --           09:59

22      A    Well, the landlords told us.                          09:59

23      Q    You've got to let me finish.                          09:59

24      A    Sorry.                                                10:00

25      Q    That's okay.  Your dad told you later this day,       10:00
```

Page 43

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 1 | A | Correct. | 10:09 |
| 2 | Q | Okay. | 10:09 |
| 3 | | (Whereupon, a video was played.) | 10:09 |
| 4 | Q | All right. Do you see at least the left hand of the | 10:09 |
| 5 | | officer in the forefront here? | 10:09 |
| 6 | A | Yes. | 10:09 |
| 7 | Q | And does he have a weapon in his hand? | 10:09 |
| 8 | A | Not in his left hand. | 10:09 |
| 9 | | MS. BOGOSIAN: Was that just an earthquake? It is an | 10:09 |
| 10 | | earthquake. No, it's terrifying. | 10:09 |
| 11 | | MS. KINNEY: Is this your first one that you can feel. | 10:09 |
| 12 | | THE COURT REPORTER: Off the record? | 10:09 |
| 13 | | MS. BOGOSIAN: Yes, please. | 10:09 |
| 14 | | (Recess taken from 10:09 a.m. to 10:11 a.m.) | 10:09 |
| 15 | | BY MS. BOGOSIAN: | 10:09 |
| 16 | Q | Okay. And the officer to the right, so the furthest | 10:11 |
| 17 | | right on the screen, do you see if he has a weapon in his | 10:11 |
| 18 | | hand? | 10:11 |
| 19 | A | It looks like he has a gun in his hand. | 10:11 |
| 20 | Q | And where is the gun pointed? | 10:11 |
| 21 | A | Down. | 10:11 |
| 22 | Q | Okay. | 10:11 |
| 23 | | (Whereupon, a video was played.) | 10:12 |
| 24 | Q | All right. So is it fair to say, I.K., that neither | 10:12 |
| 25 | | of these two officers had guns pointed at you; correct? | 10:12 |

Page 47

| | | |
|---|---|---|
| 1 | A    Not pointed at me. | 10:12 |
| 2 | Q    Okay.  And the pat down that you previously | 10:12 |
| 3 | testified about that appears to be depicted in this | 10:12 |
| 4 | video, let me know if you disagree, it was a quick pat of | 10:12 |
| 5 | your left and right pant pocket; correct? | 10:12 |
| 6 | MS. KINNEY:  I think -- | 10:12 |
| 7 | MS. BOGOSIAN:  Do you want me to go back? | 10:12 |
| 8 | MS. KINNEY:  Yeah, because I can't tell if there's | 10:12 |
| 9 | another officer blocking the pat down. | 10:12 |
| 10 | MS. BOGOSIAN:  Sure.  And I'm focused on the officer here | 10:12 |
| 11 | where you can clearly see the words "Police" to the left of | 10:13 |
| 12 | the screen. | 10:13 |
| 13 | MS. KINNEY:  Yeah. | 10:13 |
| 14 | (Whereupon, a video was played.) | 10:13 |
| 15 | BY MS. BOGOSIAN: | 10:13 |
| 16 | Q    All right.  Did you see that? | 10:13 |
| 17 | A    Yes. | 10:13 |
| 18 | Q    All right.  We're at 7:08 approximately on this | 10:13 |
| 19 | exhibit.  At no time did the officer touch any of your what | 10:13 |
| 20 | I'm going to refer to as private parts; correct? | 10:13 |
| 21 | A    Correct. | 10:13 |
| 22 | Q    Now, prior to this, this clip, when you first exited | 10:13 |
| 23 | the residence, is it your testimony that guns, one or more | 10:13 |
| 24 | guns were pointed at you? | 10:13 |
| 25 | A    Yeah. | 10:13 |

Page 48

JOINT EXHIBIT 146                              CONFIDENTIAL

1                        CERTIFICATION

2                             OF

3              CERTIFIED SHORTHAND REPORTER

4

5         I, the undersigned, a Certified Shorthand Reporter

6    of the State of California do hereby certify:

7         That the foregoing proceedings were taken before me

8    at the time and place herein set forth; that any witnesses

9    in the foregoing proceedings, prior to testifying, were

10   placed under oath; that a verbatim record of the

11   proceedings was made by me using machine shorthand which

12   was thereafter transcribed under my direction; further,

13   that the foregoing is an accurate transcription thereof.

14        I further certify that I am neither financially

15   interested in the action nor a relative or employee of any

16   attorney of any of the parties.

17

18        IN WITNESS HEREOF, I have this date subscribed

19   my name.

20

21

22        Gideon Choi, CSR

23        Certificate No. 13258

24

25   Dated:   April 26, 2025

                                              Page 81

# PART Z

1  **JILL WILLIAMS - State Bar No. 221793**
**KIMBERLY SARMIENTO - State Bar No. 345641**
2  **CARPENTER, ROTHANS & DUMONT**
**500 South Grand Avenue, 19th Floor**
3  **Los Angeles, California 90071**
**(213) 228-0400 / (213) 228-0401 (Fax)**
4  jwilliams@crdlaw.com / ksarmiento@crdlaw.com

5  Attorneys for Defendants, Santa Ana Police Department,
City of Santa Ana, Cpl. Jimmy Correal, and
6  Officers Luis Casillas, Jesse Hernandez, and
Forensic Specialist Deborah Wolen
7

8  ## UNITED STATES DISTRICT COURT

9  ## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

10

11  SEAN KINNEY,                              Case No. 8:24-cv-01286-JWH-JDE

12          Plaintiffs,                       Consol. w/ 8:24-cv-01287-JWH-JDE
                                              [Assigned to the Hon. John W. Holcomb]
13      vs.
                                              **DECLARATION OF OFFICER LUIS**
14  SANTA ANA POLICE                          **CASILLAS**
DEPARTMENT; CITY OF SANTA
15  ANA; JIMMY CORREAL, an
individual; LUIS CASILLAS, an
16  individual; JESSE HERNANDEZ,
an individual; DEBORAH
17  WOLLEN, an individual; and DOES
1 to 35, inclusive,
18
        Defendants.
19

20  _____

21  AND ALL RELATED ACTIONS.

22

23

24          I, Luis Casillas, declare that:

25          1.      I am currently employed as a police officer with the Santa Ana Police

26  Department ("SAPD") and have been with the department for 5 years.

27          2.      This declaration is made in connection with the Defendants' Motion

28  for Summary Judgment, or in the alternative, Summary Adjudication filed in the

-1-
DECLARATION OF OFFICER LUIS CASILLAS

1    above-entitled matter.

2        3.    The following facts are stated from my personal knowledge, except

3    those facts stated on information and belief which I believe to be true, and if called

4    as a witness, I could and would so competently testify thereto under oath.

5        4.    On October 4, 2021, responded to a call for service at 3405 S. Baker

6    Street in the City of Santa Ana, which reported an assault with a deadly weapon

7    involving a gun.  Dispatch relayed that the reporting party's crew was doing

8    landscaping work when the tenant inside the residence came outside with a rifle

9    and 417'd (brandished a gun at) a worker.  Dispatch further relayed that the worker

10   grabbed the gun, and the suspect forced it away, cutting the worker's hand.

11       5.    The dispatcher also relayed that the suspect was a male white in his

12   50's, wearing a green shirt with black pants.  Dispatch advised that the suspect

13   forced the victim off the property and went back inside the residence.  Attached to

14   the Joint Exhibit as Part "R" is a true and correct copy of the computer aided

15   dispatch report ("CAD") from that call for service.

16       6.    Upon my arrival, I made contact with the victim, Jaime Felix Diaz,

17   and spoke with him in Spanish.  Diaz reported that he was a gardener with

18   Workgrove Landscape and had been providing landscaping services to the

19   residence located at 3405 S. Baker Street every Monday for the past month.  Diaz

20   reported that at the time of his encounter with the property tenant, he was working

21   with his co-worker, Hector Hernandez.  I noticed that Felix and Hernandez were

22   both wearing tan long sleeved shirts with the Workgrove Landscape logo on the

23   front of their shirts.

24       7.    Diaz reported that he was pulling and spraying weeds along the north

25   fence line when he noticed a male, whom he later identified as Sean Kinney, enter

26   the backyard with a black shotgun.  He stated that as he was pulling weeds, he

27   turned around and saw Mr. Kinney pointing the black shotgun at him, at which

28   point Mr. Kinney approached him in a forward motion shouldering the shotgun

-2-
DECLARATION OF OFFICER LUIS CASILLAS

JOINT EXHIBIT 149

while pointing it at him.  Diaz further reported that Mr. Kinney moved the end of the gun in a forwards and backwards motion, which led Diaz to believe he was loading the gun and that Mr. Kinney tried to hit him with the barrel of the gun. Diaz said that in an attempt to prevent the barrel of the gun from hitting him, Diaz grabbed the shotgun by its barrel and moved it away, causing a small laceration to his left thumb.

8.    Diaz stated that Mr. Kinney told him in English that he was going to kill him if he did not leave the location, explaining that although he understood limited English, he recognized the phrase "kill you" and the word "leave."  Diaz reported that Mr. Kinney told him not to move while he walked backwards out of the backyard while continuing to point the shotgun at him, eventually exiting the walkway towards the front door.  Diaz said he was in fear for his life and thought Mr. Kinney was going to kill him with the shotgun.

9.    Due to the nature of the crime reported, I requested the assistance of backup officers.

10.    At approximately 10:30 a.m., I transported Diaz in my patrol vehicle outside of the location.  I gave Diaz instructions for identifying the suspect.  After Mr. Kinney exited the residence, Diaz positively identified him as the suspect who pointed a shotgun at him, while he was seated in my patrol vehicle from approximately 15 yards away.  Specifically, Diaz identified Mr. Kinney by his long, gray beard, body structure, and facial features, acknowledging that it appeared Mr. Kinney had changed clothes.  Because I was conducting the line up identification with the victim, I was not near the entrance of the Kinney residence as Mr. Kinney, Ms. Kinney, or I.K. exited the house.

11.    At 11:19 a.m., I transported Mr. Kinney to the Santa Ana Jail and booked him on charges of assault with a deadly weapon, firearm (Penal Code section 245(a)(2)) and criminal threats (Penal Code section 422).  He was released that same day at approximately 1:59 p.m.  Attached to the Joint Exhibit as Part "T"

-3-

DECLARATION OF OFFICER LUIS CASILLAS

1    is a true and correct copy of the release form pertaining to Mr. Kinney's arrest.

2         12.    SAPD retained possession of Mr. Kinney's shotgun as evidence

3    pending a filing decision from the Orange County District Attorney's Office and

4    written notification from the California Department of Justice ("DOJ"), pursuant to

5    the department's policy, Policy 802.  Attached to the Joint Exhibit as Part "U" is a

6    true and correct copy of SAPD's Policy 802, which was in effect at the time of this

7    incident.

8         13.    I provided Mr. Kinney with a property receipt that identified the

9    shotgun as a "Maverick Arms Model #88 12 GA shotgun" with serial number

10   MV77895B, which he signed.  Attached to the Joint Exhibit as Part "S" is a true

11   and correct copy of that property receipt.

12        14.    As part of the department's protocol, I conducted a check of the

13   shotgun's serial number (MV77895B) in the California Law Enforcement

14   Telecommunications System ("CLETS"), which showed there was no record or

15   registered owner on file.  Attached to the Joint Exhibit as Part "V" is a true and

16   correct copy of the DOJ letter Mr. Kinney provided to the department for release

17   of his shotgun.

18        15.    Prior to this incident, I never had any contact with or knew of the

19   Kinney family.  I never had an agreement with any member of the SAPD to engage

20   in conduct that would violate the Kinney family's rights.  I did not use any force

21   on Mr. Kinney or his daughter, I.K., during my response to this incident.

22        16.    During my response to this call for service and interaction with the

23   Kinney family, I had my department-issued body worn camera activated.  Attached

24   to the Joint Exhibit as Parts "A"-"D" are true and correct copies of my body worn

25   camera footage.

26

27

28

-4-
DECLARATION OF OFFICER LUIS CASILLAS

\*     \*     \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _6th_ day of October 2025 at _SANTA ANA_, California.

_Luis Casillas_
_____
Officer Luis Casillas

DECLARATION OF OFFICER LUIS CASILLAS

# PART GG

## CHRISTIANE KINNEY DECLARATION

JOINT EXHIBIT 152

CHRISTIANE C. KINNEY (SBN 199056)
christiane@ckinneylaw.com
**KINNEY LAW**
**A PROFESSIONAL CORPORATION**
8023 Beverly Blvd., Suite 1568
Los Angeles, California 90048
Telephone: (310) 751-0354

Attorneys for Plaintiffs
SEAN KINNEY and I.K., a minor

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN KINNEY,<br><br>        Plaintiff,<br><br>    vs.<br><br>SANTA ANA POLICE DEPARTMENT;<br>CITY OF SANTA ANA; JIMMY CORREAL,<br>an individual; LUIS CASILLAS, an individual;<br>JESSE HERNANDEZ, an individual;<br>DEBORAH WOLEN, an individual; and<br>DOES 1 to 35, inclusive,<br><br>        Defendants.<br><br>AND ALL RELATED ACTIONS. | Case No.: 8:24-cv-01286-JWH-JDE<br>Consol. w/ 8:24-cv-01287-JWH-JDE<br>[Assigned to the Hon. John W. Holcomb]<br><br>**DECLARATION OF CHRISTIANE C. KINNEY** |

I, Christiane C. Kinney, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1.      I am the attorney of record for Plaintiffs in this action. I am also a witness to events relevant to this action, beginning on October 4, 2021 and continuing thereafter. I have personal knowledge of the facts stated herein, except as to those facts stated on information and belief which I believe to be true, and if called as a witness, I could and would testify competently thereto.

2.      This declaration is made in opposition to Defendant's anticipated Motion for Summary Judgment, or in the alternative, Summary Adjudication.

JOINT EXHIBIT 153

3.      The Residential Lease Agreement for 3405 S. Baker Street includes the following language relevant to landscaping: "Landlord will provide the following landscaping services: **Regular maintenance of the water-wise front yard landscaping. Landscaping in the courtyard and backyard is the responsibility of the tenant.** The cost of landscaping services is included in the Monthly Rent." A true and correct copy of the relevant page of the Residential Lease Agreement is attached as Part II to the Joint Exhibits.

4.      A true and correct copy of Santa Ana Police Department Procedure 4041, Armored Vehicle Deployment for Patrol, published by the Santa Ana Police Department on its website, is attached as Part JJ to the Joint Exhibits.

5.      A true and correct copy of Santa Ana Police Department Procedure 311, Search and Seizure, published by the Santa Ana Police Department on its website and produced by the City of Santa Ana as COSA 000087-000088, is attached as Part KK to the Joint Exhibits.

6.      A true and correct copy of Santa Ana Police Department Procedure 6103, Property and Evidence Handling, published by the Santa Ana Police Department on its website and produced y the City of Santa Ana as COSA 000098-000113 is attached as Part LL to the Joint Exhibits.

7.      A true and correct copy of the Santa Ana Police Department Daily Training Bulletins for Contacts and Temporary Detentions, produced by the City of Santa Ana under Rule 26(a) as COSA 000120-000132, is attached collectively as Part MM to the Joint Exhibits.

8.      A true and correct copy of the Santa Ana Police Department Daily Training Bulletins for Search and Seizure, produced by the City of Santa Ana under Rule 26(a) as COSA 000133-000163, is attached collectively as Part NN to the Joint Exhibits.

9.      A true and correct copy of the Santa Ana Police Department Policy Manual 435 regarding Body Worn Cameras, published by the Santa Ana Police Department on its website, is attached as Part OO to the Joint Exhibits.

DECLARATION OF CHRISTIANE C. KINNEY IN SUPPORT OF
JOINT STIPULATION RE: DISCOVERY MATTER
(Case No. 8:24-cv-01286-JWH-JDE)

JOINT EXHIBIT 154

10.    A true and correct copy of the Santa Ana Police Department Policy Manual 339 regarding Child and Dependent Adult Safety, published by the Santa Ana Police Department on its website, is attached as Part PP to the Joint Exhibits.

11.    I have reviewed the body-worn camera footage produced by the City of Santa Ana pursuant to FRCP Rule 26(a)(1). I have also reviewed a list of all officers present on October 4, 2021 (see Part R to Joint Exhibits). No body-worn camera footage was produced under Rule 26(a) or otherwise for Zachary Mora (SAPD officer), Tony Villa (civilian employee – traffic control officer), Alan Gonzalez (SAPD officer), or Christopher Guerra.

12.    Upon information and belief, based on my review of all of the body worn camera footage produced by the City of Santa Ana in this case, as well as our own security footage of the incident, one of the four individuals identified in paragraph 11 was the person in the hatch of the Terradyne Vehicle pointing the .50 caliber machine gun at me, my husband, and our twelve-year old daughter. That person's body worn camera footage was not produced in this case.

13.    According to the Call for Service log (Part R to the Joint Exhibits), ***nineteen officers*** came to our home that morning, some of them civilian employees, plus one K-9.

14.    No crime was reported against myself or my daughter. My husband had already gone outside voluntarily and was detained when SAPD officers ordered me and my then twelve-year old daughter to come outside.

15.    While I lawfully filmed the incident, SAPD officers ordered me to put down my cell phone and come out with my hands up, pointed guns at me, then proceeded to handcuff me and place me in the back of a police vehicle for approximately fourteen minutes. They ordered me to call my daughter outside, despite her not having any idea what was happening or where we were. SAPD Officers separated us at one point while an officer questioned my daughter without Mirandizing her for almost twenty minutes. While the conversation was casual at times, she did

DECLARATION OF CHRISTIANE C. KINNEY IN SUPPORT OF
JOINT STIPULATION RE: DISCOVERY MATTER
(Case No. 8:24-cv-01286-JWH-JDE)

JOINT EXHIBIT 155

speak about the events that were happening. We were both detained for over an hour outside, while various SAPD officers came in and out of the house without our permission or consent.

16.     The SAPD refused to let me see my client as his attorney while he was being held at the police station for approximately four hours. Police told my daughter and I to wait outside of the police station, rather than in the lobby area, throughout his additional four hour detention.

17.     Besides the front door entrance, there are three sliding glass door entry ways into the house, one in the kitchen, one in the living room, and one in the master bedroom where a shotgun was seized. Both the kitchen and master bedroom sliding glass door entry ways had been unlocked at some point during the incident.

18.     There were civilian officers as well as regular police officers present during the incident. Based on my personal observations from that day, as well as a review of the body worn camera footage and our security camera footage, Defendant Jimmy Correal and other SAPD officers used this call for service as a glorified training mission on civilians. At least one of the officers, Luis Casillas, shared that he was relatively new there. Multiple officers expressed confusion throughout the day as to how to fill out a form, or what do to during a protective sweep. In my view, the actions of the Santa Ana Police Department that day were shameful, dangerous, and inexcusable.

19.     I was present with my husband when we went to pick up our shotgun on June 14, 2022. I do not recognize the shotgun we received back from the SAPD.

20.     Defendant Jimmy Correal revealed himself on a phone call with our landlord as a "hostage negotiator" and requested the names of our children to use as "leverage." He also called for an armored vehicle, and upon information and belief, he also called for the helicopter, K9 unit, and all of the backup that showed up that day. He did this despite the so-called "victim" being with the SAPD and not in any alleged danger. Defendant Jimmy Correal was also present for retrieval

3

of a shotgun from beneath the bed, and covered his body worn camera footage during portions of the retrieval.

21.    Defendant Luis Casillas filmed a Miranda warning that he gave to my husband, after my husband had previously asked to speak with his attorney. Despite previously asking for his attorney, Defendant Casillas chose to film this after the fact, seeking consent to go inside the house for the shotgun. Casillas joked multiple times that day that Plaintiff had asked to speak with his attorney, laughing after each time.

22.    Defendant Jesse Hernandez is the police officer that retrieved a shotgun from underneath the bed, which was not inside of its case when retrieved. There is also footage of him walking by himself around the backyard and sideyard areas where there are other entries and egresses from the house, before shutting off his camera.

23.    Defendant Deborah Wolen is the civilian officer that photographed and later took custody of the shotgun. The gun crosses many hands that day with no proper documentation by the SAPD in terms of the chain of custody at the scene. Defendant Wolen takes the shotgun down the street toward Mr. Felix, saying she will get a swab from the alleged victim for elimination purposes. She turns off her body worn camera footage as she is walking down the street, and there is no footage of what happens to the shotgun after that.

24.    Based on my review of the body worn camera footage, there are numerous times when the officers turned their body worn cameras on and off or did not engage sound.

25.    The alleged victim as identified on page one of the subject crime report is Jaime Felix. A true and correct copy of the first page of the crime report (redacted for other witness names and personal identifying information) is attached as Part QQ to the Joint Exhibits.

26.    A true and correct copy of the relevant portions of the Deposition Testimony of I.K., a minor, is attached as Part RR to the Joint Exhibits.

4

DECLARATION OF CHRISTIANE C. KINNEY IN SUPPORT OF
JOINT STIPULATION RE: DISCOVERY MATTER
(Case No. 8:24-cv-01286-JWH-JDE)

JOINT EXHIBIT 157

27.  A true and correct copy of the relevant portions of the Deposition Testimony of Sean Kinney is attached as Part SS to the Joint Exhibits.

28.  A true and correct copy of the relevant portions of the Deposition Testimony of Toc Bui is attached as Part TT to the Joint Exhibits.

29.  A true and correct copy of a news article printout from the Santanero dated January 15, 2025, entitled "Opinion: Santa Ana's Police Policies Betray Public Trust" is attached as Part UU to the Joint Exhibits.

30.  A true and correct copy of a news article printout from the LAist dated August 15, 2025, entitled "Santa Ana police have been violating state military equipment law for 2 years: 'We messed up', is attached as Part VV to the Joint Exhibits.

31.  A true and correct copy of the relevant portions of the Deposition Testimony of Commander Lopez is attached as Part XX to the Joint Exhibits.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on November 14, 2025 in Alhambra, California.

_____
Christiane C. Kinney

5

DECLARATION OF CHRISTIANE C. KINNEY IN SUPPORT OF
JOINT STIPULATION RE: DISCOVERY MATTER
(Case No. 8:24-cv-01286-JWH-JDE)

# PART HH

**SEAN KINNEY DECLARATION**

CHRISTIANE C. KINNEY (SBN 199056)
christiane@ckinneylaw.com
**KINNEY LAW**
**A PROFESSIONAL CORPORATION**
8023 Beverly Blvd., Suite 1568
Los Angeles, California 90048
Telephone: (310) 751-0354

Attorneys for Plaintiffs
SEAN KINNEY and I.K., a minor

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN KINNEY,<br><br>        Plaintiff,<br><br>    vs.<br><br>SANTA ANA POLICE DEPARTMENT;<br>CITY OF SANTA ANA; JIMMY CORREAL,<br>an individual; LUIS CASILLAS, an individual;<br>JESSE HERNANDEZ, an individual;<br>DEBORAH WOLEN, an individual; and<br>DOES 1 to 35, inclusive,<br><br>        Defendants.<br><br>AND ALL RELATED ACTIONS. | Case No.: 8:24-cv-01286-JWH-JDE<br>Consol. w/ 8:24-cv-01287-JWH-JDE<br>[Assigned to the Hon. John W. Holcomb]<br><br>**DECLARATION OF SEAN KINNEY** |

I, Sean Kinney, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

    1.      I am a Plaintiff in this action, and guardian ad litem for Plaintiff, I.K., a minor. I am a witness to events relevant to this action, beginning on October 4, 2021 and continuing thereafter. I have personal knowledge of the facts stated herein, except as to those facts stated on information and belief which I believe to be true, and if called as a witness, I could and would testify competently thereto.

2.      This declaration is made in opposition to Defendant's Motion for Summary Judgment, or in the alternative, Summary Adjudication.

3.      My wife and I rented a home located at 3405 S. Baker Street in Santa Ana on August 12, 2021. We did not move in until September 10, 2021.

4.      Between September 10, 2021 and October 3, 2021, I never heard or saw any landscapers on the property. At the time, I was not aware that landscapers were hired by our landlords to come to our home.

5.      On the morning of October 4, 2021, I heard a security alarm from our newly installed doorbell Ring camera, which showed our private courtyard, located behind one latched gate. I saw a stranger wearing a holster on his right hip with a weapon sticking out. He looked around suspiciously on the security footage, before walking toward our backyard, behind a second latched gate. I was in fear for my safety and the safety of my wife and two children, who were both at home at the time.

6.      When I went into our backyard, the man wearing a holster was peeking through our kitchen sliding glass door, and it looked like he was touching himself through his pants pocket. I recall he wore a plain tan shirt with no identifying logos, and I believe he changed shirts before speaking with the police. The other worker never left our front yard area. The man with the holster ran toward me very aggressively. I never threatened him, but I asked him to identify himself or to leave. He could not identify himself, so he left.

7.      Despite prior requests for copies of all relevant police reports, we did not receive a copy of any reports or witness statements relevant to this matter until November 29, 2023, as part of an internal investigation. Names were redacted, but that was the first time we were able to see the crime report and supplemental reports, and to verify the nature of the false statements the landscapers made to the police.

1

DECLARATION OF CHRISTIANE C. KINNEY IN SUPPORT OF
JOINT STIPULATION RE: DISCOVERY MATTER
(Case No. 8:24-cv-01286-JWH-JDE)

8.      To the best of my memory, the shotgun I inherited from my stepfather was a Remington 870 shotgun, which I had purchased for him at a gun show in Texas years before. The shotgun came back into my possession in approximately 2004. I recall my shotgun had a prettier stock that was lighter in color.

9.      After the two men left our home, I went back inside and placed my shotgun back in its sleeve under the bed. It was unloaded. When I saw the body worn camera footage of a gun being pulled out from beneath the bed, the shotgun is in a similar location to where mine was, but it was no longer inside the gun sleeve as I left it.

10.     I did not own any other shotguns on the date of the incident.

11.     No police officers called to talk to me or ask me about the incident before descending on our home that day.

12.     When Cpl. Correal called my cell phone after approximately 10 a.m. that morning, he said "We need you to come out with your hands up." I looked outside the kitchen window and saw an armored vehicle in our driveway with a .50-caliber machine gun pointed at the house, and multiple police cars and police officers with their weapons drawn. My wife and minor daughter, then twelve years old, were inside the home. I took this as an order.

13.     I came outside voluntarily, cooperated with police, and was handcuffed and detained. When I walked outside, I had a .50 caliber machine gun pointed at my head, and multiple weapons pointed at me. Police had me get down on the concrete to handcuff me and hold me in place. My detention lasted approximately six hours, and I have scarring from the handcuffs. While one officer was nice and loosened the handcuffs at one point, they retightened, and when I complained later, an officer at the police station told me to "Stop being a fucking pussy."

2

DECLARATION OF CHRISTIANE C. KINNEY IN SUPPORT OF
JOINT STIPULATION RE: DISCOVERY MATTER
(Case No. 8:24-cv-01286-JWH-JDE)

14.    Shortly after I was detained, I asked to speak with my attorney. SAPD police officers denied my request and continued to interrogate me, then filmed a Miranda warning after I had already asked several times to speak with my attorney.

15.    I never gave officers permission to go inside our home or inspect the shotgun until after I had asked to speak to my attorney and was denied that right.

16.    One of the SAPD officers was wearing a nametag "Training Officer" and had to explain things to various officers that day. They called a helicopter out for around two hours, blocked off our street with four officers, took an entire armored vehicle, and essentially ran a training mission on civilians, including my twelve-year old daughter.  I have firearms training, and there were untrained officers pointing weapons at me, including the officer who had his finger on the trigger of the .50 caliber machine gun. From my personal observations as well as watching our security camera footage, the officers were undisciplined with their muzzle control, and put me and my family in danger that day.

17.    At the police station, I was forced to sign things despite not having my reading glasses or being able to see what I was reading. This included the property receipt. I expressed that concern to officers multiple times but they said I had to sign the documents.

18.    Police officers threatened to tap into our home security cameras remotely, saying things like "We are going to watch you from here on out, we are going to tap into your systems, we are going to listen to everything you do." For the next several months, unmarked cars would drive past our house on a regular basis, parking outside and creating a fearful environment for me and my family.

19.    We also received continued harassment from a man at the police station whose son went to the same school as our son. He would tell other parents "Oh, get away from him, he's a

3

DECLARATION OF CHRISTIANE C. KINNEY IN SUPPORT OF
JOINT STIPULATION RE: DISCOVERY MATTER
(Case No. 8:24-cv-01286-JWH-JDE)

bad dude." The harassment was so bad and continuous, we changed schools in the middle of our son's sophomore year, in January of 2023.

20.    Since filing this lawsuit, we have had SAPD police vehicles parked outside of our home. They do not engage with us, but they just park and watch the house. We have also reported two crimes against our family to the SAPD since the lawsuit was filed, including a car break-in, and someone trying to run us off the road. Both times, the police did not come out, investigate, or prepare a police report. We do not feel safe in our own home or city.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on October 17, 2025 in Santa Ana, California.


_____
Sean Kinney

4

DECLARATION OF CHRISTIANE C. KINNEY IN SUPPORT OF
JOINT STIPULATION RE: DISCOVERY MATTER
(Case No. 8:24-cv-01286-JWH-JDE)

# PART II

## RELEVANT PORTION OF

## RESIDENTIAL LEASE AGREEMENT

# Residential Lease Agreement

**3405 S Baker St**
**Santa Ana, California 92707**

This Residential Lease (**Lease**) is entered into on the date of the last signature below (the Effective Date) between **John Lane** and **Katherine Lane** (together and separately, **Landlord**) and

**Christiane Kinney** and **Sean Kinney** (together and separately, **Tenant**) for **3405 S Baker St Santa Ana, CA 92707 (Property).**

Landlord hereby leases the Property to Tenant, and Tenant leases the Property from Landlord, subject to the terms and conditions of this Lease:

# 1. Basic Terms

## 1.1. AMOUNT DUE UPFRONT

The following items will be paid by Tenant to Landlord under this Lease:

### 1.1.1. REFUNDABLE DEPOSIT

▨▨▨▨▨ Security Deposit due at signing (Section 1.7 below)

### 1.1.2. RENT FOR FIRST MONTH

▨▨▨ Prorated Monthly Rent for partial first month of the Term due at signing (See Section 1.5 below)

▨▨▨▨ Monthly Rent for full first month of the Term due at signing (See Section 1.5 below) **1.1.3.**

**TOTAL DUE UPFRONT**

▨▨▨▨ due at signing.

▨▨ due at Start Date (as hereinafter defined in Section 1.4 below).

## 1.2. ADDITIONAL OCCUPANT INFORMATION

The following additional occupants (**Occupants**) may occupy the Property.

| Additional Occupant Name | Age |
|---|---|
| ▨▨▨▨▨ | 13 |
| ▨▨▨▨▨ | 12 |

## 1.3. PROPERTY

| Property Location |
|---|
| **3405 S Baker St Santa Ana, CA 92707** |

The Property is a single-family residence (a house) (**Building**) located at **3405 S Baker St Santa Ana, CA 92707**.

### 1.6.6. SNOW REMOVAL

Snow removal is not normally required for the Property and will be reasonably handled by the parties in the event snowfall occurs.

### 1.6.7. LANDSCAPING

Landlord will provide the following landscaping services: **Regular maintenance of the water-wise front yard landscaping. Landscaping in the courtyard and backyard is the responsibility of the tenant.** The cost of landscaping services is included in the Monthly Rent.

### 1.6.8. TELEPHONE

Tenant will arrange and pay for the cost of telephone services, if desired.

### 1.6.9. CABLE TELEVISION

Tenant will arrange and pay for the cost of cable or other premium television services, if desired.

### 1.6.10. INTERNET

Tenant will arrange and pay for the cost of internet service, if desired.

## 1.7. SECURITY DEPOSIT

Tenant is required to pay a security deposit to Landlord when the Lease is signed. The security deposit is $**2,800.00** (**Security Deposit**). Section 2.4 of this Lease contains terms relating to the Security Deposit.

## 1.8. TENANT INSURANCE

Tenant may, but is not required to, maintain renter's insurance during the Term.

## 1.9. PARKING

Tenant may park in areas designated by Landlord on Building grounds (**Parking Area**) and the cost of parking is included in the Monthly Rent. An addendum (**Parking Addendum**) is attached to this Lease which sets forth the specific terms of, and limitations on, Tenant's parking rights. Except as expressly permitted in the Parking Addendum, neither Tenant nor any other Occupants are allowed to park, or permit any of their guests or invitees to park, on the Building grounds.

## 1.10. STORAGE SPACE

No storage room/storage locker (including any common areas) or other area exterior to the Property is provided for in this Lease. Tenant may bring their own personal storage bins which may be placed in the backyard, sideyard, and/or garage area.

## 1.11. PETS

# PART JJ

## SAPD PROCEDURE 4041

| Procedure | Santa Ana Police Department |
|---|---|
| **4041** | Santa Ana PD Procedures Manual |

JOINT EXHIBIT 166

# ARMORED VEHICLE DEPLOYMENT FOR PATROL

## 4041.1  PURPOSE

The purpose of this procedure is to provide technical and procedural information regarding the deployment of the Santa Ana PD Light Armored Rescue Vehicle by Patrol personnel. The information contained within this procedure is relevant to the use of any armored rescue vehicle deployed by the Santa Ana Police Department without a special licensing requirement (ie. Class B License). This procedure will address general information regarding the intent of this program, logistical information of the vehicle, the approval process, deployment techniques, and capabilities and limitations of the armored rescue vehicle.

## 4041.2  INTRODUCTION

The Light Armored Rescue Vehicle is a four-wheeled, lightly armored vehicle. The Light Armored Rescue Vehicle is designed primarily for the use of law enforcement agencies in urban environments, where a threat of contacting resistance from armed suspects exists. Historically, the Department has utilized the Light Armored Rescue Vehicle for SWAT related events, in which SWAT personnel were present to operate and safely deploy the vehicle. This procedure will provide officers with a reference point to effectively and appropriately deploy the Light Armored Rescue Vehicle and/or other armored vehicles in situations requiring immediate action

## 4041.3  TACTICAL DEPLOYMENT

An armored rescue vehicle can significantly decrease the threat to officers when deployed appropriately in situations such as:

1.  Active Shooters
2.  Officer/Citizen down rescues
3.  Armed barricaded suspects
4.  Major incidents where an act of violence or threat of violence is imminent

Armored rescue vehicles can also be used to increase safety to officers and the community in other situations, including but not limited to:

1.  Evacuation Efforts
2.  Clearing vehicles during high-risk traffic stops involving possibly armed suspects
3.  Creating breach points
4.  Re-supplying officers in high-risk locations
5.  As a distraction
6.  As a blocking element
7.  To pin a suspect in a vehicle or structure to restrict or eliminate mobility

Copyright Lexipol, LLC 2019/07/03, All Rights Reserved.
Published with permission by Santa Ana Police Department

Santa Ana Police Department

Santa Ana PD Procedures Manual

## ARMORED VEHICLE DEPLOYMENT FOR PATROL

### 4041.3.1 FACTORS TO CONSIDER

1. Officers should determine if the incident is exigent in nature and requires an immediate response, or if the situation meets the criteria for a SWAT call-out. For further refer to the Special Weapons and Tactics Policy.

2. Whether or not the environment is conductive to the movement of an armored vehicle (i.e., narrow streets, parked vehicles, hard-scape or structures restricting movement.)

3. Whether the officers at the scene possess the necessary capabilities; considering their experience, applicable training and physical ability to effectively deploy from and with the armored vehicle.

### 4041.4 CAPABILITIES AND LIMITATIONS OF THE LIGHT ARMORED RESCUE VEHICLE

1. The Light Armored Rescue Vehicle has a top speed of approximately 70 mph.

2. It can accommodate up to eight officers with gear inside the vehicle. Four additional officers can be transported on the rear step for short distances within the city; however, this method should not be employed when a threat of gun fire exists and officers shall wear helmets while the vehicle is in transport.

3. The Light Armored Rescue Vehicle provides ballistic protection above and beyond a standard patrol car with more interior space for conducting evacuations/rescues.

4. Five direct view vision blocks and two large ballistic windshields offer good visibility while providing greater ballistic protection.

5. Seven ports are co-located near the available vision blocks and can be opened and closed from the interior of the vehicle.

6. Rotating turret on the roof of the vehicle allows one officer to hold an elevated position with 360 degree movement and rotating cover.

7. Equipped with emergency lights and siren.

### 4041.5 DEPLOYMENT APPROVAL AND LOGISTICS

Use of a Light Armored Rescue Vehicle shall be limited to police personnel trained in the deployment and operation of the armored vehicle. Its deployment shall be approved by the scene supervisor and authorized by the on duty Watch Commander. A spare key to the Light Armored Rescue Vehicle will be stored in the Watch Commander's office and can only be issued by the Watch Commander or his/her designee.

The Light Armored Rescue Vehicle is parked in the north/west corner of the secured parking structure on the ground level, facing west. The vehicle runs on unleaded fuel and should be filled after each deployment, prior to storage. All equipment in the vehicle shall be secured within and the key returned to the Watch Commander's office immediately after use. The Light Armored Rescue Vehicle's deployment shall be documented in a supervisor's log and forwarded to the SWAT Commander for review.

Copyright Lexipol, LLC 2019/07/03, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
### Santa Ana PD Procedures Manual

## *ARMORED VEHICLE DEPLOYMENT FOR PATROL*

### 4041.6  SUMMARY
The availability and deployment of the Light Armored Rescue Vehicle within Field Operations provides officers with an additional safety resource, affording them and the community greater protection in handling critical situations. The decision and manner in which to deploy this asset will be based on the tactical concerns the incident commander may face when addressing high-risk incidents or threats to the community.

# PART KK

## SAPD PROCEDURE 311

JOINT EXHIBIT 169

JOINT EXHIBIT 169

| Policy **311** | Santa Ana Police Department |
|---|---|
| | Santa Ana PD Policy Manual |

# Search and Seizure

## 311.1  PURPOSE AND SCOPE

Both the federal and state Constitutions provide every individual with the right to be free from unreasonable searches and seizures. This policy provides general guidelines for Santa Ana Police Department personnel to consider when dealing with search and seizure issues.

## 311.2  POLICY

It is the policy of the Santa Ana Police Department to respect the fundamental privacy rights of individuals. Members of this department will conduct searches in strict observance of the constitutional rights of persons being searched. All seizures by this department will comply with relevant federal and state law governing the seizure of persons and property.

The Department will provide relevant and current training to officers as guidance for the application of current law, local community standards and prosecutorial considerations regarding specific search and seizure situations, as appropriate.

## 311.3  SEARCHES

The U.S. Constitution generally provides that a valid warrant is required in order for a search to be valid. There are, however, several exceptions that permit a warrantless search.

Examples of law enforcement activities that are exceptions to the general warrant requirement include, but are not limited to, searches pursuant to the following:

- Valid consent

- Incident to a lawful arrest

- Legitimate community caretaking interests

- Vehicle searches under certain circumstances

- Exigent circumstances

Certain other activities are recognized by federal and state courts and by certain statutes as legitimate law enforcement activities that also do not require a warrant. Such activities may include seizure and examination of abandoned property, and observations of activities and property located on open public areas.

Because case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this department is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law.

Whenever practicable, officers are encouraged to contact a supervisor to resolve questions regarding search and seizure issues prior to electing a course of action.

# Santa Ana Police Department
## Santa Ana PD Policy Manual

*Search and Seizure*

## 311.4   SEARCH PROTOCOL

Although conditions will vary and officer safety and other exigencies must be considered in every search situation, the following guidelines should be followed whenever circumstances permit:

(a) Members of this department will strive to conduct searches with dignity and courtesy.

(b) Officers should explain to the person being searched the reason for the search and how the search will be conducted.

(c) Searches should be carried out with due regard and respect for private property interests and in a manner that minimizes damage. Property should be left in a condition as close as reasonably possible to its pre-search condition.

(d) In order to minimize the need for forcible entry, an attempt should be made to obtain keys, combinations or access codes when a search of locked property is anticipated.

(e) When the person to be searched is of the opposite sex as the searching officer, a reasonable effort should be made to summon an officer of the same sex as the subject to conduct the search. When it is not practicable to summon an officer of the same sex as the subject, the following guidelines should be followed:

   1. Another officer or a supervisor should witness the search.

   2. The officer should not search areas of the body covered by tight-fitting clothing, sheer clothing or clothing that could not reasonably conceal a weapon or other articulable contraband if a member of the same gender is not reasonably available.

## 311.5   DOCUMENTATION

Officers are responsible to document any search resulting in an arrest and to ensure any required reports include, at minimum, documentation of the following:

• Reason for the search

• Any efforts used to minimize the intrusiveness of any search (e.g., asking for consent or keys)

• What, if any, injuries or damage occurred

• All steps taken to secure property

• The results of the search, including a description of any property or contraband seized

• If the person searched is the opposite sex, any efforts to summon an officer of the same sex as the person being searched and the identification of any witness officer

Supervisors shall review reports to ensure the reports are accurate, actions are properly documented and current legal requirements and department policy have been met.

Copyright Lexipol, LLC 2018/09/25, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000088

# PART LL

## SAPD PROCEDURE 6103

JOINT EXHIBIT 171

**Procedure**

**6103**

Santa Ana Police Department

Santa Ana PD Procedures Manual

# PROPERTY AND EVIDENCE HANDLING

### 6103.1  PURPOSE

These procedures provide guidance for handling and packaging property and evidence. This will assure maximum safety, efficiency, and lawful compliance in introducing evidence into the judicial system and ensure that a proper chain of custody is maintained.

There may be times evidence does not fit into any of the below categories so handling officers will need to be creative and package an item in a way as they feel best preserves it while maintaining the legal chain of custody, based on their training and experience. If questions arise, seek advice/ guidance from Evidence personnel and/or the on-duty Watch Commander.

### 6103.2  DEFINITIONS

**Evidence:** Property that must appear in court and be packaged in a way that validates and certifies the chain of custody.

**Property:**  Items taken into possession by Department members that will not be used for court purposes. Examples include, but are not limited to, items held for safekeeping or items found and turned over to Department members regardless if the owner is known or not.

### 6103.3  PACKAGING

The essential goal when packaging evidence is to preserve the integrity of the item or sample being handled. Items/samples should be handled with gloves to minimize contamination.

Most evidence should be packaged in clean paper packaging. Paper packaging may include envelopes or bags, or items may be wrapped in paper secured with evidence tape. Other examples of packaging that may be used, in appropriate instances, include specially designed cardboard boxes, heat-sealed plastic bags, and Metal Friction Lid Cans (MFLCs). All packages or containers must be clean and not previously used.

### 6103.4  LABELING

Each item/sample, or collection of like items/samples, of evidence should be properly labeled in order to preserve its identity and chain of custody. Labeling should not be done on the item itself, but rather on the individual evidence packaging or container, or on a tag which is attached to the item in instances where the item cannot be packaged. All outer evidence containers or packaging must be labeled.

All evidence items must be labeled and properly sealed with evidence tape. In order for a seal to be considered proper, the evidence tape should completely cover all openings to the evidence package or container. The seals must have, at minimum, the initials or signature of the personnel sealing the package and the date the seal was placed. The labeling on the tape should extend over the edge of the seal. All labeling and sealing marks shall be made with permanent ink.

## PROPERTY AND EVIDENCE HANDLING

All items suspected of containing blood or other bodily fluids must be labeled as "Biohazard" using appropriately marked labels.

All drugs suspected of containing FENTANYL shall be affixed with a warning label to the package along with an email sent to #PD EVIDENCE, advising that suspected Fentanyl has been booked.

### 6103.5  CHAIN OF CUSTODY
The chain of custody provides an official record of the location of an evidence package. Any time a package is transferred from one location or person to another, or any time a package is opened and/or resealed, the information must be accurately noted in a report and on the attached chain of custody once an item has been booked.

### 6103.6  BOOKING PROCEDURES
When considering which type of packaging to use, keep in mind the purposes the packages serve:

- • Keeping the evidence as close to it's original condition as possible

- • Preventing the inadvertent loss of evidence (i.e., falling out of the package) by properly securing all containers

- • Preventing contamination of evidence

- • Preserving the individual identity of evidence for court presentation

#### 6103.6.1  PROPERTY RECEIPTS
A Property Receipt (SAPD S-85) shall be issued by the handling officer to owners when collecting personal property. A copy of the receipt shall be uploaded into RMS by the booking officer and the original copy shall be placed in the "Evidence" Mailbox.

#### 6103.6.2  LIQUIDS
It is not necessary to book samples of alcohol into evidence in alcohol related cases such as misdemeanor DUI, open containers, minors in possession. In these cases officers must describe the substance in their report, i.e. a 12-oz can of Budweiser that still has approx. 6 oz. of a light brown liquid inside the can. A photograph of the beverage should also be included. When it is necessary to book a small amount of liquid as evidence, the liquid should be secured in a small glass vial and attached to the original container. Place both containers into an evidence envelope or paper bag, seal it and attach the property slip. If a glass vial or bottle is used, indicate "glass" on the outside of the package. An example of a beverage to be placed in a vial is one that is suspected to be contaminated.

#### 6103.6.3  BICYCLES
Bicycles that are booked as found, recovered, safekeeping or as evidence will be placed in the Bike locker. The brand, description, and serial number, if known, must be included on the property slip. All serialized bicycles must be verified that they are not stolen and should be entered appropriately into CLETS system by the officer booking in the bicycle. A property receipt (SAPD S-85) shall be issued to the owner. All bicycles booked must include the owner's name and address information

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

## Santa Ana Police Department
### Santa Ana PD Procedures Manual

## PROPERTY AND EVIDENCE HANDLING

on the attached canary copy of the property receipt. Only found bicycles, whose owners remain unknown, will be accepted without owner information. All personal items such as backpacks, helmets and clothing must be removed from the bicycle and booked separately.

### 6103.6.4  BIOLOGICAL EVIDENCE

Blood or semen stains shall be air-dried first and then wrapped in butcher paper and packaged in paper bags. Air drying lockers are available in the first floor oversized evidence/bike locker room. Do not use plastic packaging. Once air-dried, CSI or the handling officer will return and book the samples as follows:

1.  Freezer – Biological evidence from homicides, kidnappings, suspicious deaths, fatal traffic accidents, child molestations, rapes, and other felony sexual assaults will be placed into the freezer. All biological evidence collected by swab shall also be placed into the evidence freezer, regardless of crime type. Examples:

    (a)    Blood stains and standards

    (b)    Semen

    (c)    Feces

    (d)    Saliva (buccal) swabs

    (e)    Vaginal secretions / swabs

    (f)    Hair

    (g)    Rape Kits

    (h)    Glass fragments containing biological evidence

    (i)    Penile swabs

    (j)    Swabs – standards, control, and transfer

    (k)    Bloody clothing

    (l)    Scent/sweat pads

    (m)    Miscellaneous items, such as chewed gum, cigarettes, and used facial tissue

2.  Refrigerator – For all crime type biological storage. Examples:

    (a)    Body Tissue

    (b)    Urine

    (c)    Vials of liquid blood

3.  Room Temperature DNA Storage – With the exception of all swabs, biological evidence not listed above for the freezer or refrigerator categories, such as assault, robbery, burglary, and misdemeanor cases, shall be booked into the general evidence lockers. If an assault indicates it may be elevated to a homicide, those items shall be frozen. Detectives will advise evidence whenever a case is upgraded to ensure increased / proper handling and storage.

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000100

Santa Ana Police Department
Santa Ana PD Procedures Manual

## PROPERTY AND EVIDENCE HANDLING

4. Confirmation Swabs Booked Directly to OCCL – From time to time, it is necessary to collect a "confirmation swab" from a suspect and take it directly to the Orange County Crime Lab (OCCL) for immediate analysis. This might occur as a result of a pending court hearing, for example. After the OCCL has completed the analysis, the item is returned to SAPD Evidence. It is important that the collection, booking, transfer and return of this evidence be properly documented. The protocol to be followed if you encounter such as situation is listed below:

(a) Prepare a report in the RMS stating when, where and how the evidence was collected. This should include a description of the legal means you used to obtain the swab (search warrant, consent, etc.)

(b) In the report writing system, "complete" the packaging of the swab by selecting "Location Booked" on the drop down menu and selecting the Orange County Crime Lab option.

(c) Finish your report as you normally would, then print and sign the evidence slip. Forward the slip to the Evidence Section.

(d) Take the swab to the OCCL and deposit it there in the appropriate manner.

### 6103.6.5  MEDIA
All media, memory cards, discs, or other digital image media shall be treated as evidence and packaged in photo envelopes or original media sleeves (even if it was produced by SAPD personnel or confiscated as evidence). Media for DIMS shall be downloaded in the report room or placed in the Latent/Film Locker for download by Forensics. DIMS will be listed as property in the report and a package created to ensure discoverability. Do not print an Evidence slip.

**Missing Person Photos:**

Photos of missing persons (provided by outside sources) shall have the CI number written on the back, be placed in a photo envelope, marked as "missing person detail", and attached to the original report. The Records Division shall forward the photo to the missing person investigator along with a copy of the report.

### 6103.6.6  NARCOTICS
Narcotics and illegal drugs such as Heroin, Methamphetamine, Cocaine, Peyote, PCP, Barbiturates, Amphetamines, LSD, Marijuana, and Fentanyl and/or its analogues, shall be packaged as described below and placed in a Pink/Salmon colored narcotic envelope (SAPD P-115). The Orange County Crime Lab provides analysis for all narcotics intended for criminal proceedings. The Orange County Sheriff-Coroner Department Forensic Science Services "Request for Evidence Examination" form (available online "Forms & Resources" under CSI) shall be attached to the evidence envelope, which then will be delivered to the Orange County Crime lab by evidence personnel. The Orange County Crime Lab does not accept packages of controlled substances that are over 10 kilos/22 lbs. (10 bundles). The District Attorney's office does not require amounts less than one ounce of Marijuana pursuant to H&S 11357 (b) to be analyzed.

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

## PROPERTY AND EVIDENCE HANDLING

Medical Marijuana that must be booked into evidence that is legally possessed shall be booked as safekeeping, a receipt issued to the prescribed/recommended owner and available for release immediately upon proof of identification. Per TB 08-06 the Officer booking this medical Marijuana shall make the decision if owner is qualified to possess.

Marijuana growth and dispensary evidence has unique inherent health concerns. Whenever evidence is booked from a Marijuana grower or dispensary, an e-mail will be sent to #PD EVIDENCE, #PD CDC, #PD CSI and Watch Commanders to ensure that all proper safety gear (PPE) is used appropriately by affected personnel.

Should fingerprint comparisons be required, it must be requested prior to the substance being sent to the Orange County Crime lab for analysis. The SAPD Forensic Analysis Request (available online) shall be attached to these packages at the time of booking. Large amounts of narcotics may be boxed or bagged, but they shall always have a completed narcotic envelope attached. No narcotics will be transported to OCCL until they are requested by OCCL.

1. Evidence requiring fingerprint comparison should be packaged as described in #7 below and fingerprint comparisons shall be requested in the special handling remarks category.

2. Narcotics booked as found shall be packaged as described in #7 below and processed for immediate destruction. "Booked for destruction" should be indicated on the property slip in the special handling requirements category and noted in the report.

3. Oversized narcotics packages shall be packaged as described in #7 below and placed into an appropriate size paper bag that is closest to the evidence size being booked. A narcotic envelope also shall be attached to the package, flagging the sensitive contents and indicating the case number.

4. Package only like narcotics together, indicating the weights of all substances.

5. Incorrectly, packaged narcotics shall be returned to the officer via a Package Correction Notice.  The correction shall  be completed prior  to the end of the officer's next workday or the officer's supervisor shall be notified.

6. Live and/or fresh Marijuana plants shall be removed from the pots and loose dirt dislodged before the paper bag is sealed.

7. Due to increasing safety risks associated with street drugs, including Fentanyl and/or its analogs, the Orange County Crime Lab requests that all narcotics evidence be safely packaged in the following manner:

    (a) All narcotics evidence must be packaged in a Ziploc or heat sealed plastic bag, of appropriate size, unless plant material. Plant material will mold in plastic. All primary evidence packaging (baggie, bindler, paper, Ziploc) must be contained in at least one additional (sealed) plastic bag. Evidence should then be placed in a sealed narcotics envelope with red evidence tape, initialed and dated.

    (b) In addition to the primary package, evidence suspected to be Fentanyl, (or similar toxic substance) must be contained in at least two plastic bags.

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
Santa Ana PD Procedures Manual

## PROPERTY AND EVIDENCE HANDLING

(c)    All large item cases (400 grams or more), including kilos, must be in plastic Ziploc or heat seal bags prior to placement in boxes or paper bags.

(d)    If Fentanyl or similar toxic substance is suspected, it must be noted on the WRCS evidence request and documented on the evidence form. A warning label shall be affixed to the package as well as an email sent to Evidence staff, advising suspected Fentanyl has being booked in.

### 6103.6.7  PARAPHERNALIA

Scales, pipes, burnt cans, lab type mixing containers, etc., will be packaged separately and not mixed with any other items, including narcotics. The Orange County Crime Lab will NOT accept narcotics that are packaged with or inside of paraphernalia. If a large amount of paraphernalia is seized in one location, (for example: a box or a jewelry box, etc.), the entire contents can be listed as one item, i.e., "one box containing miscellaneous bong and pipes." Hypodermic needles should be secured in plastic syringe tubes that are in the Report Writing Room or in the Evidence Unit. Place the tube in an evidence envelope, seal and initial. DO NOT place the tube in a narcotics envelope.  Place a biohazard label on the envelope.

If fingerprint comparisons are needed, indicate so by attaching a completed SAPD Forensic Analysis Request (available online). If the paraphernalia is not evidence the property slip should indicate "booked for destruction" under the special handling instructions and noted in the report.

### 6103.6.8  EXPLOSIVES, ARSON AND FLAMMABLES

Explosives, such as bombs, non-deployed vehicle airbags, dynamite, large quantities of fireworks which may have an aggregate total of powder to make them a destructive device, and unstable chemicals shall never be brought into the Police Department.

Depending upon the circumstances, the officer shall inform the watch commander who may request the services of the Orange County Sheriff's Department bomb squad, Orange County Law Enforcement Response Team, or the Orange County Fire Authority Hazardous Materials Unit to the site where the evidence is located. If possible, the devices or substances shall first be photographed and the media booked in per sub-section 6103.6.5 of this procedure. Do not use camera flash devices to take photographs without prior approval of the Sheriff's bomb squad.

By definition, a "flammable" is virtually anything that is easily set on fire so special packaging is important. Arson evidence shall be sealed into Teflon coated metal cans provided in both the bike locker and report room and the cans then placed into an evidence locker. Small quantities of fireworks shall be placed in the metal locker labeled "Flammables", located in the first floor evidence bike locker, if the aggregate total of powder does not make it a destructive device. Fireworks are never to be booked into any report room evidence locker. A property slip shall be attached to each package. All flammable items are to be packaged individually and not mixed with other evidence items. Property slips shall indicate if the item is to be held for safekeeping, evidence reasons or is "OK to destroy".

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
Santa Ana PD Procedures Manual

## PROPERTY AND EVIDENCE HANDLING

### 6103.6.9   FOOD PERISHABLES

Facilities are not available in the Police Department to store perishable foods. If an owner of such food is known, photograph the food items and remove labels and markings suitable as evidence. Notify the owner of the recovery and give them an opportunity to reclaim the property. If the owner declines the food or is unknown, the food shall be transported to the police facility and destroyed by depositing it into the loading dock dumpster. Perishable food shall not be booked into the Evidence Facility unless the items collected are evidence, such as in a poisoning case. Food shall not be offered to charitable organizations because of the risk of spoilage or contamination.

### 6103.6.10   GUN SHOT RESIDUE KITS (GSR KITS)

GSR kits are available on an as-needed basis. In the event a GSR kit is utilized, the kit shall be booked into a regular evidence locker.

### 6103.6.11   JEWELRY, RARE COINS OR COLLECTOR STAMPS

When jewelry, rare coins, or collector items, such as stamps, baseball cards and any other item of potential value greater than its face value are booked as evidence, a Property Receipt (SAPD S-85) shall be issued to the person from whom it was received. The receipt shall provide a detailed description of the item, such as one 1887 U.S. Silver dollar, 1 ounce U.S. gold colored coin, one 35 cent U.S. flower stamp, etc. Terms such as "gold colored" or "clear stone" shall be used if the officer doesn't have proof or there are no markings to show the item is real gold, a real diamond, etc. All jewelry and collections shall be handled with enhanced security in a manner consistent with its perceived value. They should be individually documented and packaged with a close-up photograph taken of each, which shall also be booked or downloaded to DIMS . The outside of the package shall be marked "Special Storage" to ensure it is handled with enhanced security by evidence personnel. A copy of the receipt shall be uploaded into RMS by the booking officer and the original copy shall be placed in the "Evidence" Mailbox.

### 6103.6.12   CASH/MONEY/CURRENCY

A Property Receipt (SAPD S-85) shall be issued for all confiscated money from known owners. All cash received by an officer, regardless of the source, shall be counted as to the exact amount. Money shall be placed into a green money envelope (SAPD P-114) and sealed with red evidence tape. Initials and current date are to be written on the taped seal. A copy of the receipt shall be uploaded into RMS by the booking officer and the original copy shall be placed in the "Evidence" Mailbox. A completed property slip shall be attached to the green money envelope, which shall be deposited into the secured money-drop mailbox in the report room. Booking officer shall indicate on the log on the money-drop mailbox the date, time, name, badge #, case #, and package # and amount in package.

When booking money, the quantity of each denomination shall be recorded on the evidence slip and the amount totaled. Values over $100.00 require a second officer's verification and signature on the money envelope and initials on the evidence seal. All packages booked shall be sealed with red evidence tape, initialed and dated by the officer(s) booking the property. If not filled out in its entirety it will be sent back for a package correction. If cash/currency is not needed for court there

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
### Santa Ana PD Procedures Manual

## PROPERTY AND EVIDENCE HANDLING

is no need to mark the envelope "hold for court." No other type of evidence shall be packaged with cash/currency.

For large quantities of cash/currency, the booking officer shall notify the Watch Commander who will decide if Evidence will be called in for special handling. During working hours, large cash/currency packages shall be submitted at the Evidence Officer's window near the Report Room. Large quantities may be boxed or bagged, but a green money envelope will always be attached to the package.

In the case of cash/currency taken from more than one person on the same case, a separate green money envelope shall be used for each person. Each envelope shall be booked separately and have its own booking slip attached.

Improperly packaged cash/currency shall be returned to the officer for correction via a Package Correction Notice. The correction shall be completed prior to the end of the officer's next workday or the officer's supervisor shall be notified.

### 6103.6.13  COUNTERFEIT MONEY
Counterfeit money shall be booked in using the buff colored evidence envelopes (SAPD P-50), not the green money envelopes, and sealed with red evidence tape. Initials and current date are to be written on the tape seal. A completed property slip shall be attached to the envelope, which shall be deposited into the secured money-drop mailbox in the report room. The face value shall be included in the description. All counterfeit money is forwarded by the evidence staff to the Secret Service after obtaining authorization from the Economic Crimes Investigator. If the actual bills(s) are to be retained as physical evidence it is the booking officers responsibility to contact the Economic Crimes Investigator and request a hold be placed on this evidence. All counterfeit money booked into evidence require a Property Receipt (SAPD S-85) be issued and must include the owner's name, address information, and release authorization should the bill turn out to be genuine.

### 6103.6.14  PRISONER PERSONAL PROPERTY
Personal property of a prisoner, (not evidence), shall accompany the arrestee to the Orange County Jail or Santa Ana City Jail. This enables the prisoner to receive his/her property promptly upon their release from jail.

Oversized prisoner property, which is too large for Santa Ana City Jail or Orange County Jail to accept, shall be booked into the evidence facility. A Property Receipt (SAPD S-85) shall also be issued. These items shall be marked as safekeeping or prisoner property and noted in the report as well to ensure they are available for immediate release. A copy of the receipt shall be uploaded into RMS by the booking officer and the original copy shall be placed in the "Evidence" Mailbox. Property shall be placed in one of the specially marked "Prisoner Property" report room booking lockers. Personal property booked at the Police Department shall include only one person's property in each package.

## PROPERTY AND EVIDENCE HANDLING

### 6103.6.15  FOUND PROPERTY

Found property shall be inspected by the booking officer to determine the owner's identity. The booking officer shall attempt to notify the owner if an identity is determined. Known owner information shall be listed on the property slip and in the report by the booking officer.  The evidence staff shall also inspect the found property prior to disposal in an attempt to locate possible owner information when a found item is booked without a known owner.

### 6103.6.16  RAPE KITS

Victim rape kits are completed by forensic nurses at Anaheim Memorial Hospital. Suspect rape kits are completed by the handling officer, CSI personnel, or Forensic nurses and are available in the SAPD Forensic Services Section, at the Orange County Sheriff's Department and Anaheim Memorial Hospital. Collection instructions are listed on the kits. Rape kits shall be booked into the evidence facility with a property slip that lists either the suspect and/or victim information. Rape kit preservation is maintained at freezing levels and must be booked in either the freezers located in the report room or in the chest freezer within the first floor bike locker. Blood and urine samples obtained shall be stored refrigerated, not frozen, and shall be kept separated from the rape kit. (Refer to Section D, Biological Evidence). A copy of the medical report shall be attached to the crime report and the original booked into evidence.

For all sexual assaults, the SART Nurse's packaging is the preferred packaging. Book items exactly as packaged by the SART Nurse, attaching unique evidence slips to each and every package. Do not combine items; each is handled in a unique manner. No biological evidence will be transported to OCCL until they are requested by OCCL.

### 6103.6.17  SYRINGES AND SHARP OBJECTS

All syringes and sharp objects, such as knives, razors, and box cutters, can cut or puncture the skin which elevates the significant concern due to the risk of infection from whatever biological or chemical contaminant may be on the sharp object. The hazard from syringes and sharp objects is very real, and extra care is needed to insure employee safety. All sharp objects shall be sealed in a plastic test tube when possible. All knives and sharp instruments shall be placed in a knife box, which is available in the report writing room. Never adhere packaging tape directly on the object. Syringes and/or sharp objects should never be packaged in paper bags or envelopes. Place biohazard labels on the package if the item is possibly tainted with body fluids.

All syringes shall be placed inside plastic tubes, which are provided in the report writing room. The syringes are to be securely capped, closed and placed inside an evidence envelope with   a property slip attached. Do not package drugs and needles/syringes together. The Orange County Sheriff's Crime Lab will refuse analysis unless the syringe involves the only evidentiary narcotic in the case and the package legibly indicates the presence of a hypodermic needle. Syringes for OCCL analysis must be marked "SHARP" boldly on the packaging. So, if the syringe contains liquid that is to be tested, leave the liquid in the syringe, place it inside a plastic tube, then into a narcotic evidence envelope, and attach an Orange County Sheriff- Coroner Department Forensic

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
## Santa Ana PD Procedures Manual

## PROPERTY AND EVIDENCE HANDLING

Science Services "Request for Evidence Examination" form, giving instructions as to the type of test needed. Request should also state "Sharp handle with caution" boldly in the instructions.

### 6103.6.18   URINE
If analysis is required, the Orange County Sheriff Department Forensic Science Services "Request for Evidence Examination" will be completed on line by the investigator. No biologicals will be transported to OCCL until they are requested by OCCL.

### 6103.6.19   WEAPONS
All firearms shall be unloaded, preferably at the scene, prior to booking into Evidence. If being unloaded at the PD, officers shall use one of the clearing barrels located near the exterior of the range. If the weapon is jammed or the officer is unfamiliar with proper unloading procedures, officers shall contact another officer, the Watch Commander, the Range Master, or the Firearms Examiner for assistance. If a weapon cannot be safely unloaded and must be temporarily secured while awaiting the arrival of the Range Master or Firearms Examiner, it shall be placed into Unsafe Firearm Locker #92 or one of the evidence firearm lockers if #92 is not available, within the report writing room. Written notification, using large font and a bright color, shall be placed in the locker with the weapon clearly indicating the weapon is loaded, only being temporarily stored until it can be unloaded, and who the contact officer is.

An e-mail marked with High Importance shall be sent to # PD Evidence advising to use caution when handling the item and the locker # where it was booked.

Property Receipts (SAPD S-85), listing the owner's information shall be issued when confiscating weapons. A copy of the property receipt shall be attached to the package containing the firearm. All weapons with serial numbers shall be checked through and entered into the Automated Firearms System in CLETS and NCIC by the officer. All firearms, with the exception of those confiscated for safekeeping, shall not be released or destroyed without approval of the Weapons Interdiction Team (WIT) investigator. All evidence, found, under observation firearms must be printed, swabbed, test fired & NIBIN entry performed; no lab requests are required. If testing for ballistics or fingerprints is requested, attach a completed SAPD Identification/Crime Scene Investigation Analysis Request form (SAPD S-84) and indicate the special handling instructions on the property slip. Also effective 1-1-05, no weapon will be released unless the owner presents a "California Department of Justice Law Enforcement Release Application" letter LERA (via request form BOF 119) to the evidence staff. A weapons storage fee will be assessed per gun at the time of release.

1. Handguns – Cardboard gun boxes shall be used when booking handguns and are located in the report room and bike locker. Attach a completed property slip to the outside of the gun box. Secure the handgun in place using the zip-tie provided inside the box. The magazine may be included in the gun box; however, it shall be removed from the weapon. Loose live ammunition shall be booked separately from the magazine and gun. A zip tie/cable tie or tubing (available in the report room) shall be inserted through the barrel to clearly indicate the weapon is safe to handle. No other evidence or property shall be placed in the same box with the handgun and

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000107

## PROPERTY AND EVIDENCE HANDLING

each handgun shall be packaged separately. List the ammo and number of magazines under 'description' when booking the weapon and book the magazine and live ammo separately. The brand, serial number, model number, and weapon type shall be indicated on the property slip.  A copy of the property receipt shall also be attached to the property slip.  The gun box shall be sealed with red evidence tape with the officer's initials and the current date written across the tape and package.

2.   Long Guns – To maximize evidence storage space, shotguns and rifles shall be removed from carrying cases and booked separately. Collector/valuable long guns should be preserved in carrying cases. A zip tie or plastic tubing (available in the report room) shall be inserted through the barrel to clearly indicate the weapon has been rendered safe. A separate property slip, indicating the make, caliber, model and serial numbers shall be attached to each individual weapon by stapling the property slip to a wire tag and attaching the wire tag to the weapon. A copy of the property receipt shall also be attached to the property and the original will be uploaded into RMS by the booking officer. Weapons should not be disassembled before being booked into evidence. Any and all magazines should be removed and booked separately. Should a long gun have evidentiary value from DNA or prints, the long gun must be packaged in brown paper or sealed in the carrying case to prevent contamination during handling. NOTE: Never use red evidence tape directly on handguns, rifles, clips, magazines, or ammunition.

3.   Domestic Violence Guns – When handguns or long guns are booked for a domestic violence offense, a property receipt (SAPD S-85) shall be issued to the owner for all weapons booked for safekeeping (in accordance with PC 12028) and shall have a 5-day Weapons Release Form (SAPD P-122) filled out and placed in the evidence locker along with each weapon. The receipt gives specific legal requirements for the return of firearms, explains fees and consequences if the item is not claimed in a timely fashion. Weapons shall be safely packaged according to the above parameters. Ammunition need not be collected, as it proves to be problematic when the firearm(s) are returned. For everyone's safety, if ammunition is collected it shall be packaged separately for a prompt return to the owner. All owners must have a current DOJ LERAfor each handgun / long gun before a firearm will be returned. Weapons surrendered under Family Code 6389 will have a 'Surrender of Firearms Information Sheet' (SAPD S-88) completed and distributed as noted on the form. This form provides the individual surrendering firearms with all necessary information to later make a claim for the firearms and acknowledges all appropriate fees, procedures, and time limits.

## 6103.6.20   COMPUTER HARDWARE

Whenever possible, computers and related data storage devices should be booked in original packaging. Original packaging is designed for transport and handling of these items, and typically eliminates the need for expensive anti-static packaging. Keyboards, mice, generic power cords, and accessories are usually not required except when they may potentially store information (external hard drives, memory cards, thumb drives, or digital cameras), but seize them when in doubt. Best forensic practices have been 1) do not turn a computer on if it is already off, and 2) if a computer is on, then pull its plug directly from the computer to turn it off. However, advances in encryption technologies may render data inaccessible once a computer is turned off, therefore

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000108

## PROPERTY AND EVIDENCE HANDLING

a computer forensics examiner should be consulted whenever possible particularly if the digital evidence may be critical.

### 6103.6.21   HAZARDOUS AND/OR QUESTIONABLE MATERIALS

Hazardous and questionable materials are divided into two categories: Credible and Non-Credible. When a threat or a substance is believed to be credible – that is the material is likely to be hazardous – then a complicated response is initiated with the Fire Department, the military and other agencies that handle, transport and test this material at outside labs. These items shall never be brought into our facility.

When a threat or substance is believed to be non-credible, the items shall be photographed and taken to Orange County Fire Authority Station 79 (1320 E. Warner) and placed in a container in the Hazmat area. The handling officer shall contact one of the fire personnel at the station who shall direct them which barrel to place the evidence in. The photograph shall be booked into police evidence or downloaded according to Section 6103.6.5.

### 6103.6.22   MARIJUANA SAMPLING

1.  The following procedures shall be followed during the Marijuana sampling/destruction process, including the safety precautions that should be taken and the minimum evidentiary retention and documentation requirements.

2.  Whenever a member intends to bring bulk Marijuana or other unknown substances that emit odors or that could create a respiratory irritant and/or unpleasant working environment onto the grounds of the Department, the member should send an e-mail to #PD Evidence, #PD CDC, #PD CSI and Watch Commanders to ensure that staff (including School Police) are notified to avoid the area unless the proper PPE (listed in section 6 (b)(I) below) is used.

3.  In accordance with H&S 11479, whenever large quantities of controlled substances are collected, the bulk of the material may be disposed of without any additional Court order provided that samples are collected, photos will record the scene and all weights are documented. These cases will be booked in IRM and all packages associated will have evidence slips printed and attached to the packages. (See section 10 below for further reference to sampling.)

4.  The Narcotic and Vice Team will collect and package items in a manner to expedite the disposal of the bulk of the controlled substance. Ideally, the required samples will be labeled as 'samples for retention' and the remaining amount will be marked 'for destruction' with an "X" to assist with evidence processing. Material will be packaged in large 'earth bags' or a cardboard box; NO PLASTIC PACKAGING, as plastic promotes mold growth and poses safety concerns.

5.  Location of Sampling: The sampling shall take place in the field in a well-ventilated open outdoor area. If circumstances arise that requires sampling to be conducted indoors, the room where sampling is to take place should be properly ventilated with HVAC filters to the exterior and protections in place to avoid exhaust into other interior rooms. (Follow up with maintenance regarding ventilation clean-up.)

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
### Santa Ana PD Procedures Manual

## PROPERTY AND EVIDENCE HANDLING

6. Persons Participating in Sampling: The Narcotic and Vice Team will conduct the sampling. Individuals with immune system or respiratory deficiencies should consult with a physician prior to participating in the sampling.

   (a) Provide a copy of Signed Court Order for Destruction to Evidence Supervisor and the Records Manager

   (b) Precautions Before, During, and After Sampling

   I. PPE Required – All persons participating in the sampling will wear at minimum the "Level C" (per OSHA guidelines) PPE as described below

   II. Full-face or half-face fit-tested powered air-purifying respirator (PAPR) or air-purifying respirator with a minimum of a P-100 filter (wipe down mask and dispose of filter cartridges after sampling)

   III. Goggles/eye protection (if half-face respirator used)

   IV. Protective gloves

   V. Tyvek coveralls

   VI. Boot/shoe cover

   VII. Chemical-resistant boots with slip and puncture protection (for MGO operations)

7. Immediate Removal from Sampling Area – If staff at any time during the sampling process begins to feel ill, everyone shall immediately leave the sampling area. The affected person(s) should seek immediate medical attention if necessary. The Watch Commanders shall be contacted and he/she will contact Orange County Fire Authority who will determine when the environment is safe for re-entry.

8. Clean-Up of Sampling Area – After the sampling process is completed, the area shall be decontaminated as follows:

   (a) Work and all ingress and egress areas (including clean walls, shelves, and floors) should be cleaned with a sanitizing cleaning solution and damp cloths

   (b) All molded/damaged materials should be discarded

9. Employees Obligations Post Clean-Up – After the area has been cleaned, any disposable covering worn over clothing and the used respirator filters, as well as any contaminated clothing, should be disposed of in protective bagging. Blowing off or shaking the contaminated materials prior to bagging should be avoided.

10. Evidentiary Sampling Requirements

    (a) Samples – the following samples must be retained:

    I. At least one (1) sample with a gross weight of at least 10 pounds (at time of sampling) for each type of controlled substance (e.g., one 10+ pound sample each for dried Marijuana, plant material, edibles, etc.) For Marijuana plant material, the 10+ pound sample can include stalks, branches, leaves

Copyright Lexipol, LLC 2023/05/16, All Rights Reserved.
Published with permission by Santa Ana Police Department

## PROPERTY AND EVIDENCE HANDLING

       II.    At least an additional five (5) random and representative samples (e.g., at least 5 additional samples of each type of substance (plant, dried, edibles), from different rooms, cabinets, etc.). For Marijuana plant material, must be leaves or buds

       III.    Document the exact number and weight of the above retained samples

    (b)    Photographs must be taken that reasonably demonstrate the total amount of the suspected controlled substance to be destroyed

    (c)    Weight

       I.    Determine the total gross weight of the suspected controlled substance (either by actually weighing the suspected controlled substance or by estimating that weight after dimensional measurement of the total suspected controlled substance)

    (d)    Labeling

       I.    Label evidence to be retained (including sample of at least 1 minimum 10 lb. gross weight for each type of controlled substance and at least 5 additional random and representative samples

       II.    Label evidence to be destroyed above minimum evidentiary retention requirements

11.    Calendar Completion of Required Health & Safety Code Section 11479 Affidavit.

### 6103.6.23  RESPIRATORY IRRITANTS

Marijuana and other respiratory irritants that could create an unpleasant working environment shall be processed according to the following procedures. Notification to Department employees shall be made in accordance with section 6103.6.22:

1.    Bulk Marijuana Evidence - Marijuana evidence shall be sampled per Health & Safety Code Section 11479. Other than the 10 lb. sample required by Health & Safety Code Section 11479, bulk Marijuana shall not be brought onto the loading dock or into the Police Headquarters facility.

    (a)    Bulk Marijuana over 10 lbs. shall be stored in the Marijuana storage unit adjacent to the Police Headquarters loading dock. The bulk Marijuana storage unit shall be marked with signage that states: "Bulk Marijuana Storage: Respiratory protection and full PPE required".

2.    Marijuana Storage (10 lbs. or less):

    (a)    Marijuana evidence weighing 10 lbs. or less per occurrence shall be stored in the Evidence Section narcotics room.

    (b)    Staff shall wear the following PPE when processing new Marijuana evidence, respiratory irritants, and when entering the narcotics room, and the outdoor Marijuana storage unit:

## PROPERTY AND EVIDENCE HANDLING

      I.    Full-face or half-face fit-tested powered air-purifying respirator (PAPR) or air-purifying respirator with a minimum of a P-100 filter (wipe down mask and dispose of filter cartridges after sampling)

      II.   Goggles/eye protection (if half-face respirator used)

  (c)   Other Respiratory Irritants:

      I.    Hazardous and/or questionable materials shall be handled in accordance with section 6103.6.21

      II.   Substances emitting odors that could create a respiratory irritant and/or unpleasant working environment shall not be brought into the building

      III.  Contact the Police Property and Evidence Supervisor or Watch Commander for special handling instructions for respiratory irritants

  (d)   Police Department staff shall wear the following PPE while dealing with bulk Marijuana, unknown substances, and respiratory irritants:

      I.    Full-face or half-face fit-tested powered air-purifying respirator (PAPR) or air-purifying respirator with a minimum of a P-100 filter (wipe down mask and dispose of filter cartridges after sampling)

      II.   Goggles/eye protection (if half-face respirator used)

      III.  Protective gloves

      IV.  Boot/shoe covers

      V.   Tyvek coveralls

3.   Definitions: As it relates to this section, a "respiratory irritant" is any substance that can cause inflammation or other adverse reactions in the respiratory system (lungs, nose, mouth, larynx and trachea). "Other unknown substance" is any substance that emits an odor that could create a respiratory irritant and/or unpleasant working environment.

## 6103.7  ADDITIONAL INFORMATION

### 6103.7.1  HOLD REASONS

When entering evidence in RMS, please be mindful of the Hold Reason used when booking evidence.  **Multiple hold reasons cannot apply.**  Common Hold Reasons are listed below:

**Evidence** - property and evidence booked as EVIDENCE will be retained until the case has been adjudicated, and or will require Officer/Detective approval for release to owner.

**Found** - property booked as FOUND will be retained for 90 days.  Property not claimed after 90 days will be disposed of as provided by law.  A Finder's Affidavit Form must be completed and submitted to the Evidence Section if the finder wishes to claim the property.

**Safekeeping/Prisoner Property** - property booked in as SAFEKEEPING or PRISONER PROPERTY will be retained for 60 days.  Property not claimed after 90 days will be considered "abandoned property" and disposed of as provided by law

## PROPERTY AND EVIDENCE HANDLING

***Destruction*** - property booked for destruction will be disposed of immediately

### 6103.7.2   RED EVIDENCE TAPE

Red evidence tape shall be placed side to side over the seal of each package to finalize the closing and serves to maintain the chain of custody and provides a tamper proof seal. Red evidence tape shall be used initially when packaging items, as well as repackaging them after examination. Initials and the current date shall be written on half of the evidence tape seal and half on the package each time the package is closed after being opened. DO NOT USE the Red evidence tape to affix property slips to package. Staple, wire tag, or use transparent tape to attach property slip.

### 6103.7.3   PACKAGE CORRECTION NOTIFICATION

Package correction notices shall immediately be sent by the evidence staff to the person booking the item to correct any improperly packaged, labeled, or tagged items, as the evidence staff has the "right of refusal" for items failing to meet listed packaging standards. These noted problems shall be corrected immediately by the personnel receiving the written or email notices.

1.   First notice goes to the person booking the item in.

2.   Second notice goes to the person's Supervisor or Sergeant, with a copy sent to the Evidence Supervisor.

3.   Third notice goes to the person's Commander or Manager, with a copy sent to the Records Manager. The Records Manager shall follow-up to insure timely compliance after the third notice.

### 6103.7.4   HEAVY/BULKY ITEMS

Keep in mind evidence packages are moved within the evidence facility, transported to court, viewed by investigators, etc. All packages, especially heavy, bulky items shall be packaged correctly to ensure they withstand this handling and the weight of the item itself. Package all items with durability in mind, using heavy packaging tape when necessary, to insure seams don't rip open or bulky items do not protrude, thus creating a tear in the packaging material.

### 6103.7.5   SAFETY

Safety a priority. Always package with safety in mind. Place any helpful information on the property slip or on the outer packaging material that will enhance the safety of handling personnel.

### 6103.8   REPORTING

All items must be properly itemized in an appropriate report template and booked into the appropriate evidence location. All items should be booked in an expedient fashion.

### 6103.9   BODY WORN CAMERA

Department personnel are required to activate their BWC to record the booking and processing of all narcotics and money. Department personnel shall also denote, in their reports, that this process was captured on their BWC.

# PART MM

**SAPD DAILY TRAINING BULLETINS**

**FOR CONTACTS AND TEMPORARY DETENTIONS**

# Santa Ana Police Department
Daily Training Bulletin

# Contacts and Temporary Detentions

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**

*Sure is quiet tonight*, Officer Christina Gillespie thinks, sitting in her darkened patrol vehicle in the shadowy corner of a poorly lit parking lot. She suddenly remembers that thinking such a thought is terrible in her line of work; doing so often seems to invite problems. *And here comes trouble*, she thinks as she watches a darkly clothed individual riding a bicycle onto the lot.

There has been a recent increase in vehicle break-ins in the area Officer Gillespie is surveilling. The man on the bicycle is dressed in dark pants and a black hoodie and wears a dark backpack. The bike he rides has no reflectors or lights.

The man is so focused on looking into different cars that he does not notice the blacked-out patrol vehicle slowly rolling toward him. He peers in the window of a particular car and seems excited. He climbs off his bike, sets his backpack on the ground, and smiles as he approaches the car door.

A blast of red, blue, and white lights shocks the would-be thief, and he leaps back from the car and turns toward the lights. He quickly shoves his right hand into the pocket of his sweatshirt.

"Police! Don't move!" Officer Gillespie commands. The suspect freezes. "Show me your empty hands," she continues, causing the man to face away from her, remove his hand from his pocket gradually and turn both palms toward Officer Gillespie.

*I'm sure this is our guy*, Officer Gillespie thinks, while still sizing up the suspect. *And there were pry marks on some of the other vehicles, so he's probably carrying some sort of tool. And what was he reaching for in the pocket of his hoodie? He could have anything in there. I need to pat him down.*

Officer Gillespie orders the man into a position where she can safely search him. "For your safety and mine, don't move. Do you understand?" she asks.

"Yes," he replies.

Officer Gillespie moves forward to conduct her search.

**ISSUE: What is the purpose of this search?**

---

**REFER:**

**418.4   PAT-DOWN SEARCHES**

Once a valid stop has been made, and consistent with the officer's training and experience, an officer may pat a suspect's outer clothing for weapons if the officer has a reasonable, articulable suspicion the suspect may pose a safety risk. The purpose of this limited search is not to discover

---

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000120

# Santa Ana Police Department

Daily Training Bulletin

---

evidence of a crime, but to allow the officer to pursue the investigation without fear of violence. Circumstances that may establish justification for performing a pat-down search include but are not limited to:

(a) The type of crime suspected, particularly in crimes of violence where the use or threat of deadly weapons is involved.

(b) Where more than one suspect must be handled by a single officer.

(c) The hour of the day and the location or neighborhood where the stop takes place.

(d) Prior knowledge of the suspect's use of force and/or propensity to carry weapons.

(e) The actions and demeanor of the suspect.

(f) Visual indications which suggest the suspect is carrying a firearm or other weapon.

Whenever practicable, a pat-down search should not be conducted by a lone officer. A cover officer should be positioned to ensure safety and should not be involved in the search.

---

**ANALYSIS:**

Officer Gillespie is alone in the middle of the night in an area that has experienced an increase in vehicle break-ins. She sees a man dressed in dark clothing, wearing a backpack, and riding a bike with no lights or reflectors. The man is peering into different vehicles in the lot. Based on her training and experience, Officer Gillespie suspects the man is attempting to break into a vehicle. She also suspects that he is carrying a pry tool, like a screwdriver, that could be used as a weapon. Her safety concern is elevated even more when the subject suddenly shoved his hand into his sweatshirt pocket after she shined her lights on him. Officer Gillespie's limited search of the suspect's outer clothing should reveal any concealed weapons that could be used to injure her during her contact with the suspect.

**CONCLUSION:**

The purpose of Officer Gillespie's search of the suspect's outer clothing is to check for weapons to ensure she can pursue her investigation without fear of violence.

**QUESTION:**

Which of the following is *not* a factor that may establish justification for performing a pat-down search?

**ANSWERS:**

(a) Actions and demeanor of the suspect

(b) Visual indications that the suspect is carrying a weapon

(c) Instinctive gut feeling that something is wrong

(d) Location or area where the stop takes place

---

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000121

JOINT EXHIBIT 189

# Santa Ana Police Department

Daily Training Bulletin

**CORRECT ANSWER:**
Instinctive gut feeling that something is wrong

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000122

# Santa Ana Police Department

Daily Training Bulletin

# Contacts and Temporary Detentions

**Topic:** Search & Seizure
**DTB Date:**

**SCENARIO:**

*This training bulletin is part one of a two-part series.*

"What's going on here?" Officer Quy Tran says to himself, grabbing his mic. "I'll be out at Fifth and Orange with a young adult male pedestrian. Possible theft from vehicle suspect," he radios, giving a quick description of the man.

Moments before, as he turned onto Fifth Street, Officer Tran spotted the man pulling something out of the passenger window of a car and hurriedly stuffing it into his pants pocket as the patrol vehicle came into view. He then turned and quickly walked away from the car.

As Officer Tran pulls to the curb to talk to the suspicious man, he sees that the passenger side window of the car is partway down; whether it was forced down or left open is not yet apparent. Vehicle break-ins have been frequent in this older neighborhood of small shops, bars, restaurants, and apartment buildings. At this early hour, there is little vehicle or foot traffic.

Officer Tran intercepts the man, stepping in front of him on the sidewalk. "Excuse me, sir. I'd like to talk to you for a moment," Officer Tran says. "May I see some identification?"

"I'm late," he says nervously, attempting to sidestep the officer.

Officer Tran mirrors his sidestep, extends his arm to block the man from leaving, and says, "Stop. I said I need to see your ID. And what were you doing in that car?"

**ISSUE: Is this contact a field interview or a consensual encounter?**

---

**REFER:**

418.1.1   DEFINITIONS

Definitions related to this policy include:

**Consensual encounter** - When an officer contacts an individual but does not create a detention through words, actions, or other means. In other words, a reasonable individual would believe that his/her contact with the officer is voluntary.

**Field interview** - The brief detainment of an individual, whether on foot or in a vehicle, based on reasonable suspicion for the purpose of determining the individual's identity and resolving the officer's suspicions.

**Field photographs** - Posed photographs taken of a person during a contact, temporary detention, or arrest in the field. Undercover surveillance photographs of an individual and recordings captured

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000123

# Santa Ana Police Department

### Daily Training Bulletin

by the normal operation of a Mobile Audio Video (MAV) system, body-worn camera, or public safety camera when persons are not posed for the purpose of photographing are not considered field photographs.

**Pat-down search** - A type of search used by officers in the field to check an individual for dangerous weapons. It involves a thorough patting-down of clothing to locate any weapons or dangerous items that could pose a danger to the officer, the detainee, or others.

**Reasonable suspicion** - When, under the totality of the circumstances, an officer has articulable facts that criminal activity may be afoot and a particular person is connected with that possible criminal activity.

**Temporary detention** - When an officer intentionally, through words, actions, or physical force, causes an individual to reasonably believe he/she is required to restrict his/her movement without an actual arrest. Temporary detentions also occur when an officer actually restrains a person's freedom of movement.

**ANALYSIS:**

Officer Tran suspects that the young man may have been stealing something from the parked car, based on the man's furtive movements and apparent attempts to distance himself from the vehicle after seeing the patrol vehicle. Officer Tran has intercepted the man on the sidewalk, deliberately, but subtly, interfered with his apparent direction of travel, and asked him more than once to provide identification. Although Officer Tran has not restrained the man, a reasonable person in the man's position likely would not feel free to leave.

**CONCLUSION:**

This contact is a field interview, which allows Officer Tran to briefly detain the man to determine his identity and resolve Officer Tran's suspicions.

**QUESTION:**

A field interview involves all of the following *except*:

**ANSWERS:**

      (a)    Temporary detainment of an individual.

      (b)    Probable cause.

      (c)    Determination of the individual's identity and resolving the member's suspicions.

      (d)    Reasonable suspicion.

**CORRECT ANSWER:**

Probable cause.

---

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000124

# Santa Ana Police Department
Daily Training Bulletin

# Contacts and Temporary Detentions

**Topic:** Search & Seizure
**DTB Date:**

**SCENARIO:**

*You would think the cold would keep the criminals home*, Officer Ben Holt thinks, tugging the sides of his beanie lower over his ears. It is around 11 p.m., and a wave of recent nighttime business break-ins has Officer Holt on foot patrol, checking the stores in his patrol area to make sure their doors are locked, and nothing is amiss.

He walks along the sidewall of a small shop and hears what he has heard many times before – the unmistakable sound of the slide of a semi-automatic pistol being pulled back and released. Officer Holt pauses and strains to listen as the steam from his breath dissipates. A voice from a nearby alley declares a little too loudly, "It's like I said before, I will take Freddy out and not even sweat it."

Officer Holt peeks around the corner of the building and sees two males dressed in heavy jackets, beanies, and denim jeans. *They look like kids,* he thinks. *Maybe fourteen or fifteen. Too young to be smoking cigarettes, and way too young to be carrying a gun.*

The boys do not notice Officer Holt, but he watches them and notices their empty hands. He also sees that the right front pocket of one of the boys' jackets is sagging downward as if it holds something heavy. The sagging-pocket boy repeatedly gestures with his hands as he talks, but every few seconds, he reaches down and touches the pocket, seemingly to confirm the contents of his pocket are still secure. The other boy rubs his hands together briskly as he tries to keep them warm on this unseasonably cold night.

Officer Holt quietly asks Communications Division for backup while he continues watching the boys. After what seems like an eternity, Officer Holt hears the familiar sound of a patrol vehicle accelerating down the block. Unfortunately, the sound of the roaring patrol vehicle engine catches the boys' attention too. "What's that?" one calls out, stepping back from the other.

Deciding that he must act now, Officer Holt keeps his body behind the brick wall for cover and places his hand on his firearm just in case. "Police! Don't move!" he calls out to the boys.

Both boys freeze and slowly turn their heads to look toward Officer Holt. They raise their hands to chest level, with their palms facing Officer Holt, as their jaws drop and their lit cigarettes tumble from their lips. "Don't move!" Officer Holt commands the boys, as his backup arrives. "Let's get them restrained, then I want to do a pat-down search," Officer Holt explains to his backup officer.

**ISSUE: What factors could support Officer Holt's decision to conduct a pat-down search?**

**REFER:**

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000125

# Santa Ana Police Department
### Daily Training Bulletin

## 418.4  PAT-DOWN SEARCHES

Once a valid stop has been made, and consistent with the officer's training and experience, an officer may pat a suspect's outer clothing for weapons if the officer has a reasonable, articulable suspicion the suspect may pose a safety risk. The purpose of this limited search is not to discover evidence of a crime, but to allow the officer to pursue the investigation without fear of violence. Circumstances that may establish justification for performing a pat-down search include but are not limited to:

(a)    The type of crime suspected, particularly in crimes of violence where the use or threat of deadly weapons is involved.

(b)    Where more than one suspect must be handled by a single officer.

(c)    The hour of the day and the location or neighborhood where the stop takes place.

(d)    Prior knowledge of the suspect's use of force and/or propensity to carry weapons.

(e)    The actions and demeanor of the suspect.

(f)    Visual indications which suggest the suspect is carrying a firearm or other weapon.

Whenever practicable, a pat-down search should not be conducted by a lone officer. A cover officer should be positioned to ensure safety and should not be involved in the search.

---

**ANALYSIS:**
Officer Holt has detained two suspects, one of which he has reasonable suspicion to believe is armed, based on specific, articulable facts. If the suspect is armed, he presents a threat to the officers' safety.

**CONCLUSION:**
There are a number of factors that support Officer Holt's decision to conduct a pat-down search, including:

•    The sound of a round being chambered into the breach of a semiautomatic pistol.

•    The location of two suspects in relation to previous break-ins.

•    The time of night, in general, and in relation to the times the previous break-ins occurred.

•    His observations of one boy's jacket sagging down as if it contains a heavy object and the boy's repeated touching of the outside of his pocket, consistent with carrying a firearm.

**QUESTION:**

Which of the following is *not* a factor that supports a member's decision to conduct a pat-down search?

**ANSWERS:**

(a)    More than one suspect must be handled by a single member.

---

**Contacts and Temporary Detentions**

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000126

# Santa Ana Police Department

Daily Training Bulletin

---

    (b)    The member observes actions suggesting that the suspect is carrying a dangerous weapon.

    (c)    The member has a strong gut feeling that the suspect is armed.

    (d)    The person is suspected of being involved in a perpetrated or potential crime of violence.

**CORRECT ANSWER:**

The member has a strong gut feeling that the suspect is armed.

---

**Contacts and Temporary Detentions**

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000127

# Santa Ana Police Department
Daily Training Bulletin

# Contacts and Temporary Detentions

**Topic:** Search & Seizure
**DTB Date:**

## SCENARIO:

"Can I get an ETA on the canine unit?" Officer Lauren Wiley asks Communications Division.

You heard Officer Wiley's radio traffic initiating a traffic stop and a few minutes later requesting a canine unit. Curious about what Officer Wiley has, you decide to drop by and assist her while waiting on the canine unit.

You arrive and park behind Officer Wiley. She lowers her window as you approach her patrol vehicle. "Hey, Lauren, what do you have?" you say.

"I know this guy has dope," she says. "He's got all the classic signs. But I don't have enough to arrest or search and he refused consent, so I'm waiting on the dog."

Before you can respond, the dispatcher interrupts your conversation, "Canine advises 10-minute drive time."

"Well, that's no good," Officer Wiley says. "I just completed his citation and have run all the computer checks. How much longer do you think I can keep this guy here while we wait for the dog?"

**ISSUE: How long should Officer Wiley continue the detention?**

## REFER:

### 418.3   FIELD INTERVIEWS

Based on observance of suspicious circumstances or upon information from investigation, an officer may initiate the stop of a person, and conduct an FI, when there is articulable, reasonable suspicion to do so. A person, however, shall not be detained longer than is reasonably necessary to resolve the officer's suspicion.

Nothing in this policy is intended to discourage consensual contacts. Frequent casual contact with consenting individuals is encouraged by the Santa Ana Police Department to strengthen community involvement, community awareness, and problem identification.

## ANALYSIS:

At this point in the traffic stop, Officer Wiley has completed the business of the traffic stop based on the initial violation, which resolves the original reason she stopped the vehicle. She also has not developed sufficient articulable, reasonable suspicion to continue the

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000128

# Santa Ana Police Department

### Daily Training Bulletin

driver's detention for any other offense. Under these circumstances, it is unreasonable to continue the driver's detention for any amount of time without additional reasonable suspicion.

**CONCLUSION:**

Officer Wiley should immediately release the driver unless she has sufficient articulable, reasonable suspicion to continue the detention.

**QUESTION:**

A person detained based upon reasonable suspicion must be released as soon as an officer's reasonable suspicion is resolved.

**ANSWERS:**

      (a)   True

      (b)   False

**CORRECT ANSWER:**

True

---

DTB Date:
**Contacts and Temporary Detentions**

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000129

# Santa Ana Police Department
Daily Training Bulletin

# Contacts and Temporary Detentions

**Topic:** Search & Seizure
**DTB Date:**

**SCENARIO:**

"I'm following the vehicle, westbound on Main Street, occupied twice," Officer Judi Summer says over the police radio. "No violations to stop, so far."

The vehicle Officer Summer is following is at the center of an ongoing illegal drugs and weapons investigation. She is communicating with Detective Mervin Jernigan, the lead undercover investigator on the case. Detective Jernigan is conducting surveillance on a house connected to the investigation and just saw two unidentified men walk out of the house and drive away in the car Officer Summer is now following. She responded to Detective Jernigan's request for a marked patrol unit to follow the vehicle and conduct a traffic stop to identify the occupants if the driver commits a traffic violation. However, Detective Jernigan was clear that he does not have enough evidence to stop the vehicle and that Officer Summer needs to develop cause for the stop.

Detective Jernigan replies to Officer Summer, "What about the plates? I couldn't tell if the rear plate was expired when it left the house."

"No, the plate looks good, but now he's back and forth in the lane and his speed is real erratic. I think he might be drunk or high," Officer Summer responds. "Whoa! He almost hit a parked car. I'm going to stop him for DUI."

**ISSUE: What must Officer Summer articulate as the basis for the traffic stop?**

---

**REFER:**

418.1.1   DEFINITIONS

Definitions related to this policy include:

**Consensual encounter** - When an officer contacts an individual but does not create a detention through words, actions, or other means. In other words, a reasonable individual would believe that his/her contact with the officer is voluntary.

**Field interview** - The brief detainment of an individual, whether on foot or in a vehicle, based on reasonable suspicion for the purpose of determining the individual's identity and resolving the officer's suspicions.

**Field photographs** - Posed photographs taken of a person during a contact, temporary detention, or arrest in the field. Undercover surveillance photographs of an individual and recordings captured by the normal operation of a Mobile Audio Video (MAV) system, body-worn camera, or public safety camera when persons are not posed for the purpose of photographing are not considered field photographs.

---

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000130

# Santa Ana Police Department
### Daily Training Bulletin

**Pat-down search** - A type of search used by officers in the field to check an individual for dangerous weapons. It involves a thorough patting-down of clothing to locate any weapons or dangerous items that could pose a danger to the officer, the detainee, or others.

**Reasonable suspicion** - When, under the totality of the circumstances, an officer has articulable facts that criminal activity may be afoot and a particular person is connected with that possible criminal activity.

**Temporary detention** - When an officer intentionally, through words, actions, or physical force, causes an individual to reasonably believe he/she is required to restrict his/her movement without an actual arrest. Temporary detentions also occur when an officer actually restrains a person's freedom of movement.

## 418.3  FIELD INTERVIEWS

Based on observance of suspicious circumstances or upon information from investigation, an officer may initiate the stop of a person, and conduct an FI, when there is articulable, reasonable suspicion to do so. A person, however, shall not be detained longer than is reasonably necessary to resolve the officer's suspicion.

Nothing in this policy is intended to discourage consensual contacts. Frequent casual contact with consenting individuals is encouraged by the Santa Ana Police Department to strengthen community involvement, community awareness, and problem identification.

---

**ANALYSIS:**
To initiate a traffic stop, or otherwise detain the driver, Officer Summer must have articulable, reasonable suspicion to do so. From the conversation between Officer Summer and Detective Jernigan, we can discern that Detective Jernigan does not have an independent basis to initiate a traffic stop or otherwise temporarily detain the driver. Officer Summer's observations likely provide reasonable suspicion the driver is driving the vehicle while impaired.

**CONCLUSION:**
Officer Summer should be prepared to explain all specific facts that led her to develop articulable, reasonable suspicion to believe the driver is committing a traffic violation.

**QUESTION:**

Fill in the missing policy language:

*Based on observance of suspicious circumstances or upon information from investigation, an officer may initiate the stop of a person, and conduct an FI, when there is articulable, _____ to do so.*

**ANSWERS:**

       (a)   Suspicion

---

DTB Date:                                     2
**Contacts and Temporary Detentions**

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000131

# Santa Ana Police Department

Daily Training Bulletin

(b)   Reasonable suspicion

(c)   Proof

(d)   Cause

**CORRECT ANSWER:**
Reasonable suspicion

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000132

# PART NN

## SAPD DAILY TRAINING BULLETINS

## FOR SEARCH AND SEIZURE

# Santa Ana Police Department

Daily Training Bulletin

# Search and Seizure

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**

Officer Angela Balogh stops Otis Buday because one of his headlights is out, intending to give him a warning. She discovers that Mr. Buday has a warrant for failing to appear on driving on a suspended license. She arrests Mr. Buday, who is fully cooperative.

After Mr. Buday is handcuffed, searched, and placed in the rear seat of the patrol vehicle, assisting Officer Samuel Peto offers to stand by while Officer Balogh conducts a search of Mr. Buday's vehicle, incident to his arrest. Officer Balogh pulls her sunglasses down her nose and gives Officer Peto the raised eyebrows. "And how, exactly, am I to justify that?" she asks.

**ISSUE: Is Officer Balogh permitted to search Mr. Buday's vehicle incident to his arrest under these circumstances?**

**REFER:**

**311.3   SEARCHES**

The U.S. Constitution generally provides that a valid warrant is required in order for a search to be valid. There are, however, several exceptions that permit a warrantless search.

Examples of law enforcement activities that are exceptions to the general warrant requirement include, but are not limited to, searches pursuant to the following:

- Valid consent

- Incident to a lawful arrest

- Legitimate community caretaking interests

- Vehicle searches under certain circumstances

- Exigent circumstances

Certain other activities are recognized by federal and state courts and by certain statutes as legitimate law enforcement activities that also do not require a warrant. Such activities may include seizure and examination of abandoned property, and observations of activities and property located on open public areas.

Because case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this department is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law.

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000133

# Santa Ana Police Department

### Daily Training Bulletin

Whenever practicable, officers are encouraged to contact a supervisor to resolve questions regarding search and seizure issues prior to electing a course of action.

**ANALYSIS:**

Officer Balogh arrested Mr. Buday for a warrant for driving on a suspended license, evidence of which is not likely to be found in his vehicle. Additionally, Mr. Buday is handcuffed and confined in the rear of a patrol vehicle. Therefore, he cannot access a weapon from within his vehicle. The facts presented do not provide reason to believe that Mr. Buday can retrieve a weapon or that evidence of the offense for which Mr. Buday was arrested is located within the vehicle.

**CONCLUSION:**

Officer Balogh is not permitted to search Mr. Buday's vehicle incident to his arrest under these circumstances.

**QUESTION:**

Officers may search the passenger compartment of a vehicle incident to the recent occupant's arrest only if it is reasonable to believe that:

**ANSWERS:**

    (a)   The arrestee might access the vehicle at the time of the search, or the vehicle contains evidence of the offense that resulted in the arrest.

    (b)   State law permits the search.

    (c)   Both of the above are required.

    (d)   None of the above.

**CORRECT ANSWER:**

Both of the above are required.

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000134

# Santa Ana Police Department

Daily Training Bulletin

## Search and Seizure

**Topic:** Search & Seizure
**DTB Date:**

**SCENARIO:**

You pick up your office phone and are greeted by Officer Deziree Cory's voice on the other end. You have supervised Officer Cory for several years. She is well-known around the department for her aggressive drunk driving enforcement. In fact, she is informally regarded as a subject matter expert, and you have even learned a few things from reviewing her reports.

"Hey, Deziree. What's up?" you ask.

"I've got a bit of a situation, Sergeant," she starts. "I hooked a guy for DUI. It was a slam dunk. You know, he had trouble walking and needed help getting into my car, yada, yada, yada."

"Yeah. That doesn't sound like a problem for our resident drunk driving expert," you reply.

"Well, when I got him back to the department for a breath test, he was passed out in the back seat. I mean, he was really out," Officer Cory explains. "I tried everything but couldn't wake him up and got concerned that maybe he needed medical. So, I hauled him to the hospital."

"OK. I'm following," you respond.

"He was still pretty much passed out and unresponsive when I asked him for consent for a blood test," Officer Cory continues. "I haven't gotten any blood. Seems like I remember hearing that a search warrant is no longer required to compel a blood draw under these circumstances, but I can't remember for sure. Do I need to get a warrant, or can I tell the nurse to take his blood while he's passed out?" she asks.

**ISSUE: How should you answer Officer Cory's question?**

---

**REFER:**

### 311.3  SEARCHES

The U.S. Constitution generally provides that a valid warrant is required in order for a search to be valid. There are, however, several exceptions that permit a warrantless search.

Examples of law enforcement activities that are exceptions to the general warrant requirement include, but are not limited to, searches pursuant to the following:

·     Valid consent

·     Incident to a lawful arrest

·     Legitimate community caretaking interests

---

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000135

# Santa Ana Police Department
### Daily Training Bulletin

- Vehicle searches under certain circumstances

- Exigent circumstances

Certain other activities are recognized by federal and state courts and by certain statutes as legitimate law enforcement activities that also do not require a warrant. Such activities may include seizure and examination of abandoned property, and observations of activities and property located on open public areas.

Because case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this department is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law.

Whenever practicable, officers are encouraged to contact a supervisor to resolve questions regarding search and seizure issues prior to electing a course of action.

### 504.6.2  BLOOD SAMPLE WITHOUT CONSENT

A blood sample may be obtained from a person who refuses a chemical test when any of the following conditions exist:

(a)    A search warrant has been obtained (Penal Code § 1524).

(b)    The officer can articulate that exigent circumstances exist. Exigency does not exist solely because of the short time period associated with the natural dissipation of alcohol or controlled or prohibited substances in the person's bloodstream. Exigency can be established by the existence of special facts such as a lengthy time delay in obtaining a blood sample due to an accident investigation or medical treatment of the person.

---

**ANALYSIS:**

Officer Cory correctly associated her suspect's unresponsiveness due to intoxication with a medical emergency and properly arranged medical treatment for him. Subjecting a suspect to a blood draw and collecting blood for evidence is a search and seizure under the Fourth Amendment to the United States Constitution, which requires all searches and seizures to be reasonable. That means these activities are presumed to be unreasonable unless an officer is authorized to conduct the search or seizure by a search warrant or exception to the general warrant requirement.

Officer Cory does not have a search warrant, so drawing and collecting a blood sample must fall within one of the exceptions to the warrant requirement to comply with the Fourth Amendment. The suspect is unresponsive and unable to provide valid consent, which is different from a conscious suspect who has refused consent. The circumstances present some exigency, because the suspect is metabolizing alcohol, which is causing his blood alcohol content to fall. However, these circumstances are considered insufficient facts to support invoking the exigent circumstances exception to the warrant requirement. This is true because this arrest is routine and, based

---

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000136

# Santa Ana Police Department

### Daily Training Bulletin

on Officer Cory's description, the suspect's blood alcohol content is likely well above the limit. Additionally, there is time to secure a search warrant. None of the other exceptions to the warrant requirement are applicable.

**CONCLUSION:**

You should tell Officer Cory the safest course is to seek and secure a search warrant for the suspect's blood, since time and circumstances permit.

**QUESTION:**

The natural dissipation of alcohol from a suspect's blood creates a sufficient exigency to draw his or her blood without consent or a search warrant during a routine DUI arrest.

**ANSWERS:**

(a)   True

(b)   False

**CORRECT ANSWER:**

False

---

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000137

# Santa Ana Police Department
Daily Training Bulletin

# Search and Seizure

**Topic:** Search & Seizure
**DTB Date:**

**SCENARIO:**

Officer Carla Navarro stops a vehicle for speeding. As she speaks to the driver, Billy Marcial, she notices Mr. Marcial seems to be overly nervous. He is sweating and talking rapidly, and his whole body is shaking. Trusting her instincts, Officer Navarro suspects this stop involves more than a minor traffic violation. The driver consents to a search of the interior of the vehicle, and Officer Navarro escorts him to a safe place, away from the vehicle, as Officer June Gully arrives to assist. Officer Navarro returns to the vehicle and begins the search while Officer Gully remains with Mr. Marcial.

During the search, Officer Navarro does not locate any contraband but suspects she has found a hidden compartment in the vehicle, located in the dash, under the radio. After unsuccessfully trying to open the compartment, Officer Navarro returns to Officer Gully.

"I didn't find drugs, but I'm pretty sure I found a secret compartment in the dash," she whispers to Officer Gully. "But I can't get it open."

"Hmmm. What's your plan?" Officer Gully asks.

"He's given me consent, but I'm afraid if I ask him how to open the compartment, he'll revoke his consent. So, I'm thinking about just forcing it open, but I know that will damage his car. You know, 'better to ask for forgiveness than permission'," Officer Navarro replies.

**ISSUE: How should Officer Navarro proceed?**

---

**REFER:**

**311.3  SEARCHES**

The U.S. Constitution generally provides that a valid warrant is required in order for a search to be valid. There are, however, several exceptions that permit a warrantless search.

Examples of law enforcement activities that are exceptions to the general warrant requirement include, but are not limited to, searches pursuant to the following:

- Valid consent

- Incident to a lawful arrest

- Legitimate community caretaking interests

- Vehicle searches under certain circumstances

- Exigent circumstances

---

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000138

# Santa Ana Police Department
### Daily Training Bulletin

Certain other activities are recognized by federal and state courts and by certain statutes as legitimate law enforcement activities that also do not require a warrant. Such activities may include seizure and examination of abandoned property, and observations of activities and property located on open public areas.

Because case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this department is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law.

Whenever practicable, officers are encouraged to contact a supervisor to resolve questions regarding search and seizure issues prior to electing a course of action.

## 311.4  SEARCH PROTOCOL

Although conditions will vary and officer safety and other exigencies must be considered in every search situation, the following guidelines should be followed whenever circumstances permit:

(a)    Members of this department will strive to conduct searches with dignity and courtesy.

(b)    Officers should explain to the person being searched the reason for the search and how the search will be conducted.

(c)    Searches should be carried out with due regard and respect for private property interests and in a manner that minimizes damage. Property should be left in a condition as close as reasonably possible to its pre-search condition.

(d)    In order to minimize the need for forcible entry, an attempt should be made to obtain keys, combinations or access codes when a search of locked property is anticipated.

(e)    When the person to be searched is of the opposite sex as the searching officer, a reasonable effort should be made to summon an officer of the same sex as the subject to conduct the search. When it is not practicable to summon an officer of the same sex as the subject, the following guidelines should be followed:

   1.    Another officer or a supervisor should witness the search.

   2.    The officer should not search areas of the body covered by tight-fitting clothing, sheer clothing or clothing that could not reasonably conceal a weapon or other articulable contraband if a member of the same gender is not reasonably available.

**ANALYSIS:**
Officer Navarro searches Mr. Marcial's vehicle but does not find any contraband. Officer Navarro suspects that Mr. Marcial is concealing something within a hidden compartment in his vehicle. Forcibly entering the suspected hidden compartment will surely damage Mr. Marcial's vehicle, and Officer Navarro has not made any attempt to obtain the key, combination, or access code to the suspected hidden compartment.

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000139

# Santa Ana Police Department
### Daily Training Bulletin

**CONCLUSION:**

Officer Navarro should ask for the key, combination, or access code before forcibly entering the suspected secret compartment.

**QUESTION:**

Fill in the missing word below that best states our policy:

In order to minimize the need for forcible entry, an attempt _____ be made to obtain keys, combinations or access codes when a search of locked property is anticipated.

**ANSWERS:**

        (a)   Should

        (b)   Shall

        (c)   Must

        (d)   Has to

**CORRECT ANSWER:**

Should

Copyright Lexipol, LLC 2024/05/08, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000140

# Santa Ana Police Department

Daily Training Bulletin

# Search and Seizure

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**

"Well, Mr. Sims, I've got some bad news," Officer Dwight Gonzalez announces to Johnnie Sims, a homeless man loitering around the pumps at a gas station. "A records check shows you have an active warrant for your arrest."

"Three squares and a roof over my head, at least," the scruffy Mr. Sims replies, as if he has been through this before.

Officer Curtis Williams assists Officer Gonzalez in taking Mr. Sims into custody and the two officers search Mr. Sims incident to the arrest. Before placing him into the waiting patrol vehicle, Mr. Sims nods his head toward the building entrance, some 50 feet away.

"Hey, that's my backpack over there," Mr. Sims advises the officers. "Can you grab it?"

After placing Mr. Sims in the patrol vehicle, Officer Gonzalez retrieves the crusty backpack from across the lot. "Yo, Curtis," he calls. "I don't know what he's got in here, but it's pretty bulky. Should we search it first?"

**ISSUE: Under these circumstances, may the officers search Mr. Sims' backpack incident to his arrest?**

---

**REFER:**

**311.3  SEARCHES**

The U.S. Constitution generally provides that a valid warrant is required in order for a search to be valid. There are, however, several exceptions that permit a warrantless search.

Examples of law enforcement activities that are exceptions to the general warrant requirement include, but are not limited to, searches pursuant to the following:

- Valid consent
- Incident to a lawful arrest
- Legitimate community caretaking interests
- Vehicle searches under certain circumstances
- Exigent circumstances

Certain other activities are recognized by federal and state courts and by certain statutes as legitimate law enforcement activities that also do not require a warrant. Such activities may include

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000141

# Santa Ana Police Department
### Daily Training Bulletin

---

seizure and examination of abandoned property, and observations of activities and property located on open public areas.

Because case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this department is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law.

Whenever practicable, officers are encouraged to contact a supervisor to resolve questions regarding search and seizure issues prior to electing a course of action.

---

**ANALYSIS:**

Mr. Sims was arrested for an outstanding warrant and Officers Gonzalez and Williams properly conducted a warrantless search of his person, incident to his lawful arrest. The officers must now determine if the backpack is also subject to a search incident to Mr. Sims' arrest.

Although it is possible that Mr. Sims' backpack contains a weapon or other dangerous item, the officers should consider that the backpack was not in his possession and that it was beyond lunging distance from Mr. Sims at the time of his arrest. Since he is restrained and confined in the patrol vehicle, Mr. Sims is unable to use anything in the backpack to harm the officers. While an inventory of Mr. Sims' property during the booking process may later reveal the contents of his backpack, the officers' search incident to his lawful arrest is strictly limited in this situation.

**CONCLUSION:**

Under these circumstances, the officers may not search Mr. Sims' backpack incident to his arrest.

**QUESTION:**

Which of the following is *not* an exception to the general warrant requirement for searches?

**ANSWERS:**

      (a)   Exigent circumstances

      (b)   Incident to lawful arrest

      (c)   Proximate distance

      (d)   Valid consent

**CORRECT ANSWER:**

Proximate distance

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000142

# Santa Ana Police Department

Daily Training Bulletin

## Search and Seizure

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**

Sergeant Carter Owens walks over to Officer Alan Rosado and smiles. "Alan, you're an excellent writer. That report on the search warrant was well put together."

"Thank you, Sergeant," Officer Rosado replies. "And we didn't have to use the ram. We got the door keys ahead of time from the apartment manager."

Sergeant Owens briefly raises his eyebrows. "That's what I want to talk to you about. Unfortunately, I must reject your report because you left out something. You got everything else – the reasons for the search, no injuries to anyone, no damage to the door, how you secured the property, and what you seized."

"Uh, let me think." Officer Rosado rubs his chin. "Can't believe I missed something."

"Here's a hint," Sergeant Owens says. "It has to do with why the door wasn't damaged."

**ISSUE: What additional fact should Officer Rosado document in his report?**

**REFER:**

**311.5   DOCUMENTATION**

Officers are responsible to document any search resulting in an arrest and to ensure any required reports include, at minimum, documentation of the following:

- Reason for the search

- Any efforts used to minimize the intrusiveness of any search (e.g., asking for consent or keys)

- What, if any, injuries or damage occurred

- All steps taken to secure property

- The results of the search, including a description of any property or contraband seized

- If the person searched is the opposite sex, any efforts to summon an officer of the same sex as the person being searched and the identification of any witness officer

Supervisors shall review reports to ensure the reports are accurate, actions are properly documented and current legal requirements and department policy have been met.

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000143

# Santa Ana Police Department

### Daily Training Bulletin

**ANALYSIS:**

Our standards for documenting searches and seizures help articulate the circumstances presented at the time of the search or seizure and require sufficient documentation to support the search or seizure. A complete report will help explain Officer Rosado's actions to anyone who was not present at the time and assist with Officer Rosado's recollection of the event at a later time. Here, Officer Rosado's report on the execution of a search warrant was rejected by Sergeant Owens because he must include an additional detail.

**CONCLUSION:**

Officer Rosado should document in his report any efforts used to minimize the intrusiveness of the search. In this case, those efforts include that keys to the apartment were obtained and used for access.

**QUESTION:**

For what purpose must supervisors review search and seizure reports?

**ANSWERS:**

(a)  Accuracy

(b)  Properly documented actions

(c)  To ensure that current legal requirements and agency policy have been met

(d)  All of the above

**CORRECT ANSWER:**

All of the above

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000144

# Santa Ana Police Department
Daily Training Bulletin

## Search and Seizure

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**
As the winter sun dims outside, Officer Felipe Belo hunches over his keyboard, dutifully typing his report. The chaos of the day still buzzes in his ears. He is so engrossed in his task that he fails to notice Detective Angela Barros reading the report over his shoulder.

"Nice report, Belo, but you forgot something," she says, nodding toward the screen.

Officer Belo looks up, eyebrows raised. "What did I miss?"

Her ringing cell phone pulls Detective Barros away before she can answer. "I'll be back," she calls out over her shoulder.

Officer Belo's mind rewinds as he reviews his report and the briefing he attended early this morning. Detectives, acting on a tip from a confidential and reliable informant, extensive surveillance, and other information, developed probable cause and obtained a warrant to search a home with an attached garage. The informant alleged that drivers pull into the garage and shut the door, quickly load narcotics into hidden compartments within the vehicle's doors, and depart again within minutes. Detectives followed several of these vehicles to known narcotics dealer locations.

Today, detectives served the search warrant on the home and garage soon after one of the suspected delivery vehicles left the garage. Officer Belo stopped the suspect vehicle for a traffic violation and a canine unit assisted. The narcotics detection canine hit on the exterior of the vehicle. Officer Belo searched the driver and obtained his keys to open the locked trunk and glove box. A lawful search yielded packages of narcotics hidden behind the interior door panels, which he seized and deposited into evidence. Officers seized the vehicle as evidence and had it towed to a secure storage area.

When Detective Barros returns, Officer Belo is pulling his report from the printer.

"Did you figure it out?" she asks.

"Yep. I included the reason for the search of the vehicle and the driver, the use of the driver's keys to avoid forcing the trunk and glove box open, a description of the vehicle and personal effects within, and of the narcotics we seized. Which, by the way, was a bunch," Officer Belo reports with a grin. "But I did forget one thing. Thanks for catching that."

"It was a good day for sure. And you're welcome," Detective Barros replies.

**ISSUE: What other fact must Officer Belo include in his report?**

**REFER:**

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000145

# Santa Ana Police Department
### Daily Training Bulletin

## 311.5   DOCUMENTATION

Officers are responsible to document any search resulting in an arrest and to ensure any required reports include, at minimum, documentation of the following:

• Reason for the search

• Any efforts used to minimize the intrusiveness of any search (e.g., asking for consent or keys)

• What, if any, injuries or damage occurred

• All steps taken to secure property

• The results of the search, including a description of any property or contraband seized

• If the person searched is the opposite sex, any efforts to summon an officer of the same sex as the person being searched and the identification of any witness officer

Supervisors shall review reports to ensure the reports are accurate, actions are properly documented and current legal requirements and department policy have been met.

**ANALYSIS:**
Search and seizure situations require thorough documentation to articulate the reasons underlying our members' actions and to help officers recall incidents that may have occurred months or even years earlier. Officer Belo drafts a report documenting his actions and includes many, but not all, of the required elements.

**CONCLUSION:**
Officer Belo must also include in his report any damage caused to the suspect vehicle during the search.

**QUESTION:**

All of the following facts must be documented in required reports regarding searches, *except*:

**ANSWERS:**

(a)    The reason for the search.

(b)    All steps taken to secure property.

(c)    Any efforts used to minimize the intrusiveness of any search.

(d)    All training records of the narcotics detection canine.

**CORRECT ANSWER:**
All training records of the narcotics detection canine.

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000146

# Santa Ana Police Department
#### Daily Training Bulletin

# Search and Seizure

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**

Officer Dustin Walsh is on patrol early in the evening. The sky grows dark as he notices the vehicle in front of him has no working taillights. He conducts a traffic stop and greets the driver, Alfred McGee, at his vehicle. During the process of verifying Mr. McGee's identification, Officer Walsh discovers an active warrant for a drug violation.

Overhearing radio traffic about the warrant, Officer Ellis Lawrence arrives moments later. "This guy going to be a problem?" he quietly asks.

"So far so good," Officer Walsh responds. He reapproaches the suspect vehicle to speak to Mr. McGee about the warrant. "Sir, there's an active warrant for your arrest. Please step out of the vehicle and keep your hands where I can see them. You're under arrest."

Mr. McGee is cooperative and does not resist as Officer Walsh secures him in handcuffs. Maintaining a calm demeanor, Officer Walsh begins searching Mr. McGee, who tenses up and gently pulls away. "Please hold still. I need to conduct a search before we take a ride," the officer explains.

Mr. McGee voices his objection, saying, "I don't think this is necessary, officer."

Officer Walsh responds professionally, "I appreciate your concern, but this is just part of the drill."

**ISSUE: What exception to the general warrant requirement permits Officer Walsh to conduct this warrantless search?**

---

**REFER:**

**311.3  SEARCHES**

The U.S. Constitution generally provides that a valid warrant is required in order for a search to be valid. There are, however, several exceptions that permit a warrantless search.

Examples of law enforcement activities that are exceptions to the general warrant requirement include, but are not limited to, searches pursuant to the following:

•    Valid consent

•    Incident to a lawful arrest

•    Legitimate community caretaking interests

•    Vehicle searches under certain circumstances

•    Exigent circumstances

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000147

# Santa Ana Police Department

### Daily Training Bulletin

Certain other activities are recognized by federal and state courts and by certain statutes as legitimate law enforcement activities that also do not require a warrant. Such activities may include seizure and examination of abandoned property, and observations of activities and property located on open public areas.

Because case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this department is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law.

Whenever practicable, officers are encouraged to contact a supervisor to resolve questions regarding search and seizure issues prior to electing a course of action.

**ANALYSIS:**
Our members are expected to respect the privacy rights of all individuals. This respect is demonstrated, in part, by conducting searches within the confines of constitutional protections. In this situation, Officer Walsh makes an arrest for an outstanding warrant. Although Mr. McGee objects to Officer Walsh's planned custody search following Mr. McGee's arrest, an exception to the general warrant requirement permits Officer Walsh to conduct this warrantless search.

**CONCLUSION:**
The search incident to a lawful arrest exception to the general warrant requirement permits Officer Walsh to conduct this warrantless search.

**QUESTION:**

Exceptions to the general warrant requirement include all of the following, *except*:

**ANSWERS:**

(a)   Valid consent.

(b)   Incident to a lawful arrest.

(c)   Routine circumstances.

(d)   Exigent circumstances.

**CORRECT ANSWER:**
Routine circumstances.

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000148

# Santa Ana Police Department
Daily Training Bulletin

# Search and Seizure - Searches

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**

Officer Andre Lindsey pulls alongside the curb. He watches the American flag flutter atop a pole in front of the target house. Officer Lindsey knows this house. It is the home of Raymond Guerrero, a World War II veteran who has been active in community holiday celebrations for many years.

Mr. Guerrero lives in an isolated area of the City and has no family nearby. He is proud that he owns his home and still lives independently in his golden years. His daughter lives out of state and checks on him through regular phone calls. Occasionally, Mr. Guerrero will miss his daughter's call and she will call our department to ask that someone check on him. Today is one of those missed call days.

Officer Lindsey knocks on the home's front door. "Mr. Guerrero! It's Officer Lindsey from the police department." No answer. He knocks again and calls out more loudly. "Mr. Guerrero! It's the police department. Are you home?" Again, no answer.

Officer Lindsey leans over the side of the porch to peek through the window. He sees Mr. Guerrero lying in a recliner. He looks pale and is not moving. Officer Lindsey looks carefully but cannot tell if Mr. Guerrero's chest is rising and falling.

Officer Lindsey pounds on the door. "Mr. Guerrero! Are you OK?" No response. His heart pounding, Officer Lindsey tries turning the front doorknob to see if it is locked.

**ISSUE: What exception to the Fourth Amendment's warrant requirement could apply to make it reasonable for Officer Lindsey to enter Mr. Guerrero's home without a warrant?**

---

**REFER:**

**311.3   SEARCHES**

The U.S. Constitution generally provides that a valid warrant is required in order for a search to be valid. There are, however, several exceptions that permit a warrantless search.

Examples of law enforcement activities that are exceptions to the general warrant requirement include, but are not limited to, searches pursuant to the following:

- Valid consent

- Incident to a lawful arrest

- Legitimate community caretaking interests

- Vehicle searches under certain circumstances

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000149

# Santa Ana Police Department
### Daily Training Bulletin

- Exigent circumstances

Certain other activities are recognized by federal and state courts and by certain statutes as legitimate law enforcement activities that also do not require a warrant. Such activities may include seizure and examination of abandoned property, and observations of activities and property located on open public areas.

Because case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this department is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law.

Whenever practicable, officers are encouraged to contact a supervisor to resolve questions regarding search and seizure issues prior to electing a course of action.

**ANALYSIS:**
Our department respects the fundamental privacy rights of individuals. An officer is only permitted to enter a home in strict observance of the constitutional rights of the person who has authority over the home. Typically, the search of a person's house requires a valid warrant, which Officer Lindsey does not have. However, there are several exceptions to the warrant requirement, such as when there is an emergency inside the home. Officer Lindsey's observations indicate that Mr. Guerrero might be suffering from a medical emergency that requires emergency aid and immediate assistance. However, ultimately, what would be considered a valid exception and make entry into the home reasonable varies greatly depending on the facts, court, jurisdiction, and judge or jury deciding the case.

**CONCLUSION:**
The exigent circumstances exception to the Fourth Amendment's warrant requirement could apply to make it reasonable for Officer Lindsey to enter Mr. Guerrero's home without a warrant.

**QUESTION:**

Which exceptions may, depending on the circumstances, permit officers to conduct a search without a valid warrant?

**ANSWERS:**

(a)   Incident to a lawful arrest

(b)   Exigent circumstances

(c)   Valid consent

(d)   All of the above

**CORRECT ANSWER:**
All of the above

---

DTB Date:                                          2
**Search and Seizure - Searches**

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
### Daily Training Bulletin

# Search and Seizure - Searches

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**

"What do we have here?" Officer Nolan Ramsey mutters, cruising behind a silver sedan that suddenly crosses the centerline. Activating his emergency equipment, the driver pulls to the shoulder moments later.

Officer Ramsey speaks with the driver of the vehicle, Harriot Simone. Ms. Simone's hands visibly shake as she hands over her license and registration. "I stopped you for crossing into the other lane back there," Officer Ramsey says.

"I'm sorry," Ms. Simone replies, a slight tremor in her voice as she avoids the officer's gaze. The brief conversation provides an opportunity for Officer Ramsey to smell the aroma of coffee grounds emanating from within the vehicle. Two cell phones lay on the passenger seat, along with the remnants of a fast-food feast.

Officer Ramsey has seen these signs before and knows they often indicate more than just a simple traffic violation.

"Stay here, ma'am," Officer Ramsey instructs Ms. Simone. He returns to his patrol vehicle to run her information through the appropriate databases. He radios for backup, nervously feeling a twinge of anxiety in his stomach. His instincts tell him that something is not right.

Officer Ramsey scribbles out a warning while waiting for backup. "I didn't see any coffee containers in the car," he says aloud, consumed with the notion that Ms. Simone may be concealing contraband somewhere in the vehicle. *No probable cause to search and not much time left to do something*, he thinks, his mind still racing.

**ISSUE: What exception to the general warrant requirement may permit Officer Ramsey to search Ms. Simone's vehicle without a warrant?**

---

**REFER:**

**311.3  SEARCHES**

The U.S. Constitution generally provides that a valid warrant is required in order for a search to be valid. There are, however, several exceptions that permit a warrantless search.

Examples of law enforcement activities that are exceptions to the general warrant requirement include, but are not limited to, searches pursuant to the following:

- Valid consent

- Incident to a lawful arrest

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000151

# Santa Ana Police Department
### Daily Training Bulletin

- Legitimate community caretaking interests

- Vehicle searches under certain circumstances

- Exigent circumstances

Certain other activities are recognized by federal and state courts and by certain statutes as legitimate law enforcement activities that also do not require a warrant. Such activities may include seizure and examination of abandoned property, and observations of activities and property located on open public areas.

Because case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this department is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law.

Whenever practicable, officers are encouraged to contact a supervisor to resolve questions regarding search and seizure issues prior to electing a course of action.

---

**ANALYSIS:**
Our members are expected to conduct searches while strictly complying with the constitutional rights of the person being searched. In this situation, Officer Ramsey conducts a traffic stop for a traffic violation. During his interactions with the driver, he observes multiple indicators of possible illegal activity that lead him to believe Ms. Simone may potentially be involved in criminal activity. There are limitations on the amount of time Officer Ramsey may detain Ms. Simone, and no probable cause currently exists to perform a search of her vehicle. However, there is another alternative available, which may permit Officer Ramsey to conduct a warrantless search of the vehicle and its contents.

**CONCLUSION:**
The valid consent exception to the general warrant requirement may permit Officer Ramsey to search Ms. Simone's vehicle without a warrant.

**QUESTION:**

Exceptions to the general warrant requirement include, but are not limited to:

**ANSWERS:**

      (a)   Valid consent.

      (b)   Incident to lawful arrest.

      (c)   Legitimate community caretaking interests.

      (d)   All of the above.

**CORRECT ANSWER:**
All of the above.

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000152

# Santa Ana Police Department
Daily Training Bulletin

# Search and Seizure - Searches

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**

Officers Carol Warner and Marcos Adkin park down the street from a modest suburban home. Streetlights illuminate the quiet residential street. After notifying Communications Division of their arrival at the domestic violence call, the officers step out of their patrol vehicle, exchange a quick glance, and walk toward the house.

"This is your first domestic, isn't it?" Officer Warner asks her obviously nervous trainee, Officer Adkin.

"It is," Officer Adkin replies, squirming in his equipment. "We went over a bunch of scenarios in the academy, but I know there's no way to predict what'll happen once we enter the home."

"Exactly," Officer Warner says as they quietly approach the front door. The officers assume tactical positions on either side of the doorway, pausing to hear any sounds that might reveal the activities occurring within the house. Muffled yelling between a man and a woman can be heard through the door, but the officers are unable to discern the words being said.

"I can't make out what they're saying," whispers Officer Adkin, his right hand resting on his holstered duty weapon.

Officer Warner confirms the trainee's observation with a quick nod when a female's voice calls out, desperate and panicked. "Help me! He's going to kill me!"

Knocking on the front door, Officer Warner loudly announces, "Santa Ana Police Department!"

Suddenly, a loud thump emanates from inside the house, followed by a woman screaming. Officer Adkin knocks and announces the officers' presence again as he turns the doorknob with his left hand.

**ISSUE: What exception to the general warrant requirement could permit the officers to enter this home without a search warrant?**

---

**REFER:**

### 311.3   SEARCHES

The U.S. Constitution generally provides that a valid warrant is required in order for a search to be valid. There are, however, several exceptions that permit a warrantless search.

Examples of law enforcement activities that are exceptions to the general warrant requirement include, but are not limited to, searches pursuant to the following:

---

1

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000153

# Santa Ana Police Department

### Daily Training Bulletin

- Valid consent

- Incident to a lawful arrest

- Legitimate community caretaking interests

- Vehicle searches under certain circumstances

- Exigent circumstances

Certain other activities are recognized by federal and state courts and by certain statutes as legitimate law enforcement activities that also do not require a warrant. Such activities may include seizure and examination of abandoned property, and observations of activities and property located on open public areas.

Because case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this department is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law.

Whenever practicable, officers are encouraged to contact a supervisor to resolve questions regarding search and seizure issues prior to electing a course of action.

---

**ANALYSIS:**
Part of our respect of individual privacy rights includes adhering to the requirements found in our state and the U.S. Constitutions. In this situation, our officers are sent to a domestic violence situation occurring within a home. After their arrival, they hear a woman in evident distress but do not have a search warrant or consent to enter the home. Although the occupants of the home have the right to be free from unreasonable searches, the possible life-threatening situation with no time to obtain a warrant may provide an exception to the general warrant requirement and allow the officers to take immediate action.

**CONCLUSION:**
The exigent circumstances exception to the general warrant requirement could permit the officers to enter this home without a search warrant.

**QUESTION:**

Exceptions to the general warrant requirement include all of the following, *except*:

**ANSWERS:**

     (a)   Valid consent.

     (b)   Legitimate community caretaking interests.

     (c)   Reasonable suspicion.

     (d)   Exigent circumstances.

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000154

# Santa Ana Police Department

Daily Training Bulletin

**CORRECT ANSWER:**
Reasonable suspicion.

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000155

# Santa Ana Police Department
Daily Training Bulletin

## Search and Seizure - Search Protocol

**Topic:** Search & Seizure
**DTB Date:**

**SCENARIO:**

Officer Richard Phillips responds to Officer Kimberley Benjamin's request for backup on a traffic stop. He arrives and notes that the vehicle Officer Benjamin stopped has only one occupant. Officer Benjamin says, "Hey, my driver's got a warrant. That's why I called for backup."

Officer Benjamin removes the driver, Maria Albert, places her in handcuffs without incident, and places her in a position to perform a custodial search.

"Whoa! What are you doing?" Ms. Albert asks, attempting to turn to face Officer Benjamin.

"I'm searching you," Officer Benjamin responds, gently returning Ms. Albert to a search position.

"Why?" she asks.

**ISSUE: How should Officer Benjamin respond to Ms. Albert's question?**

---

**REFER:**

### 311.4  SEARCH PROTOCOL

Although conditions will vary and officer safety and other exigencies must be considered in every search situation, the following guidelines should be followed whenever circumstances permit:

(a)    Members of this department will strive to conduct searches with dignity and courtesy.

(b)    Officers should explain to the person being searched the reason for the search and how the search will be conducted.

(c)    Searches should be carried out with due regard and respect for private property interests and in a manner that minimizes damage. Property should be left in a condition as close as reasonably possible to its pre-search condition.

(d)    In order to minimize the need for forcible entry, an attempt should be made to obtain keys, combinations or access codes when a search of locked property is anticipated.

(e)    When the person to be searched is of the opposite sex as the searching officer, a reasonable effort should be made to summon an officer of the same sex as the subject to conduct the search. When it is not practicable to summon an officer of the same sex as the subject, the following guidelines should be followed:

    1.    Another officer or a supervisor should witness the search.

    2.    The officer should not search areas of the body covered by tight-fitting clothing, sheer clothing or clothing that could not reasonably conceal a weapon or other articulable contraband if a member of the same gender is not reasonably available.

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000156

# Santa Ana Police Department

Daily Training Bulletin

**ANALYSIS:**

Conducting searches with dignity and courtesy includes explaining the reason for the search and how it will be conducted whenever circumstances permit. The circumstances presented here (a single suspect and a backup officer) permit Officer Benjamin to answer Ms. Albert's question.

**CONCLUSION:**

Officer Benjamin should explain the reason for the search and how it will be conducted.

**QUESTION:**

Whenever circumstances permit during a search, officers should:

**ANSWERS:**

    (a)   Strive to conduct searches with dignity and courtesy.

    (b)   Explain to the person being searched the reason for the search and how the search will be conducted.

    (c)   Both of the above.

    (d)   None of the above.

**CORRECT ANSWER:**
Both of the above.

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000157

# Santa Ana Police Department

Daily Training Bulletin

# Search and Seizure - Search Protocol

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**
Under the glow of a streetlamp, Officer Markus Ragnor pulls over a vehicle slowly weaving across the center of the roadway. The driver, Mary Simmons, reeks of an alcoholic beverage. Her eyes are glassy and bloodshot, and her speech is slurred. "Ma'am, I need you to step out of the vehicle," Officer Ragnor instructs.

"No way, man," replies Ms. Simmons, slurring her words and locking the car doors. "I'm almost home."

With the situation escalating, Officer Ragnor keys his lapel mic and requests backup. Within moments, Officer Edwin Aylward arrives. "Whatcha got, Markus?" Officer Aylward asks.

"Drunk driver," responds Officer Ragnor. "She's refusing to get out of the car."

Together, the officers manage to coax an unsteady Ms. Simmons out of the vehicle. Despite her protests and struggles, they place her under arrest and secure her in handcuffs.

"One in custody," Officer Ragnor radios. "Do we have a female officer on-duty?" he asks.

"Negative," the dispatcher replies.

**ISSUE: What guidelines should Officer Ragnor follow when performing a custody search of Ms. Simmons?**

---

**REFER:**

**311.4   SEARCH PROTOCOL**

Although conditions will vary and officer safety and other exigencies must be considered in every search situation, the following guidelines should be followed whenever circumstances permit:

(a)     Members of this department will strive to conduct searches with dignity and courtesy.

(b)     Officers should explain to the person being searched the reason for the search and how the search will be conducted.

(c)     Searches should be carried out with due regard and respect for private property interests and in a manner that minimizes damage. Property should be left in a condition as close as reasonably possible to its pre-search condition.

(d)     In order to minimize the need for forcible entry, an attempt should be made to obtain keys, combinations or access codes when a search of locked property is anticipated.

(e)     When the person to be searched is of the opposite sex as the searching officer, a reasonable effort should be made to summon an officer of the same sex as the subject to conduct the

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000158

# Santa Ana Police Department

Daily Training Bulletin

search. When it is not practicable to summon an officer of the same sex as the subject, the following guidelines should be followed:

1. Another officer or a supervisor should witness the search.

2. The officer should not search areas of the body covered by tight-fitting clothing, sheer clothing or clothing that could not reasonably conceal a weapon or other articulable contraband if a member of the same gender is not reasonably available.

**ANALYSIS:**

Our officers are expected to respect the fundamental privacy rights of all individuals. In part, this requires our members to conduct all searches according to the constitutional rights of persons being searched. In addition, we have procedures in place to ensure our members do not act inappropriately when searching a person of the opposite sex and to protect members from unfounded allegations of inappropriate behavior. In this situation, our officers arrest an intoxicated and uncooperative female for an alcohol-related traffic offense. A female officer is not available to assist with searching the driver incident to her arrest. However, there are procedures Officer Ragnor should follow to ensure Ms. Simmons' privacy, while also protecting the officers.

**CONCLUSION:**

While conducting a custody search of Ms. Simmons, Officer Ragnor should ensure that another officer or a supervisor is available to witness the search. Additionally, Officer Ragnor should not search areas of Ms. Simmons' body that are covered with tight-fitting clothing, sheer clothing, or clothing that could not reasonably conceal a weapon.

**QUESTION:**

When a member of the same sex as the subject arrested is unavailable, officers may conduct a search, provided:

**ANSWERS:**

(a) Another member or a supervisor is available to witness the search.

(b) Any area of the subject's body covered by tight-fitting clothing, sheer clothing, or clothing that could not reasonably conceal a weapon is not searched.

(c) Both of the above.

(d) None of the above.

**CORRECT ANSWER:**
Both of the above.

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000159

# Santa Ana Police Department
Daily Training Bulletin

## Search and Seizure - Search Protocol

**Topic:** Search and Seizure
**DTB Date:**

**SCENARIO:**

"You're not gonna find anything," Michael Twitchell says as Officer Raymond Reece steps through the doorway of Mr. Twitchell's home. Officer Reece intends to assist other officers already scouring the residence while executing a search warrant. Mr. Twitchell stands arms crossed, a scowl etched deep into his features. "Make sure you don't break anything," he warns, his voice laced with anger. "I know my rights."

Officer Reece proceeds with meticulous care, opening drawers and checking beneath furniture, his movements systematic and thorough. The sound of shuffling papers and soft murmurs fills the room, creating a rhythm to the search. "Found something," Officer Reece says after spotting a small, sturdy fire safe box. "Looks like it's locked, Sarge."

Sergeant Raymond Miller joins Officer Reece, eyeing the safe critically. "That's listed on the warrant. We'll need to open it."

Mr. Twitchell, overhearing the conversation, interjects sharply, "You have no right to break into my personal property!"

**ISSUE: How should Officer Reece minimize the need for forced entry while accessing the safe?**

---

**REFER:**

**311.4   SEARCH PROTOCOL**

Although conditions will vary and officer safety and other exigencies must be considered in every search situation, the following guidelines should be followed whenever circumstances permit:

(a)    Members of this department will strive to conduct searches with dignity and courtesy.

(b)    Officers should explain to the person being searched the reason for the search and how the search will be conducted.

(c)    Searches should be carried out with due regard and respect for private property interests and in a manner that minimizes damage. Property should be left in a condition as close as reasonably possible to its pre-search condition.

(d)    In order to minimize the need for forcible entry, an attempt should be made to obtain keys, combinations or access codes when a search of locked property is anticipated.

(e)    When the person to be searched is of the opposite sex as the searching officer, a reasonable effort should be made to summon an officer of the same sex as the subject to conduct the search. When it is not practicable to summon an officer of the same sex as the subject, the following guidelines should be followed:

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000160

# Santa Ana Police Department

Daily Training Bulletin

---

1. Another officer or a supervisor should witness the search.

2. The officer should not search areas of the body covered by tight-fitting clothing, sheer clothing or clothing that could not reasonably conceal a weapon or other articulable contraband if a member of the same gender is not reasonably available.

---

**ANALYSIS:**

Our members are expected to respect the fundamental privacy rights of all individuals and only conduct searches according to constitutional limitations. In this situation, our officers execute a residential search warrant and come across a locked container that is expressly part of the search warrant. Officer Reece does not have the key or combination to the container; however, there are other options Officer Reece should attempt before forcing entry.

**CONCLUSION:**

To minimize the need for forced entry, Officer Reece should attempt to obtain keys, combinations, or access codes to access the safe.

**QUESTION:**

Officers should minimize the need to forcibly enter a locked container by:

**ANSWERS:**

(a) Forcibly compelling the owner to unlock the container since it falls within the search warrant's purview.

(b) Attempting to obtain keys, combinations, or access codes for the locked container.

(c) Contacting the container's manufacturer to determine a work-around for gaining access to the contents.

(d) None of the above.

**CORRECT ANSWER:**

Attempting to obtain keys, combinations, or access codes for the locked container.

---

DTB Date:
**Search and Seizure - Search Protocol**

2

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000161

# Santa Ana Police Department
Daily Training Bulletin

# Search Documentation

**Topic:** Search & Seizure
**DTB Date:**

**SCENARIO:**

It all started with a traffic stop for a minor moving violation. While speaking with the driver, Sheila Forman, Officer Josh Randall sees numerous new music CDs and movie DVDs, still in the packaging, in plain sight on the back seat and floorboard of Ms. Forman's vehicle. He notes that there appear to be many duplicates among the titles. Some of the items have inventory stickers with the name of a local music/video store on them. Officer Randall recalls a recent break-in and theft of similar items at a local music/video store bearing the same name.

Ms. Forman says the CDs and DVDs belong to her boyfriend, David Hammond, who used her car two days ago. Ms. Forman tells Officer Randall that she gave Mr. Hammond permission to store similar merchandise in her home about a week ago. This is consistent with the date of the break-in at the music/video store. Ms. Forman seems surprised at the idea that Mr. Hammond acquired the merchandise illegally and agrees to cooperate with Officer Randall. Ms. Forman gives Officer Randall written consent to search the basement of her home. Mr. Hammond is out of town and is not contacted before the search.

Sergeant Gus Torres supervises the search of the residence, which goes smoothly with no damage or injuries. DVDs, CDs, and other items stolen from the music/video store are seized and collected. Ms. Forman is present and cooperative during the search.

As the search team prepares to leave the residence, Sergeant Torres tells Officer Randall, "I'll need your report before you go home today. You know the documentation required, right?"

**ISSUE: At a minimum, what information should Officer Randall include in his report?**

---

**REFER:**

**311.5   DOCUMENTATION**

Officers are responsible to document any search resulting in an arrest and to ensure any required reports include, at minimum, documentation of the following:

• Reason for the search

• Any efforts used to minimize the intrusiveness of any search (e.g., asking for consent or keys)

• What, if any, injuries or damage occurred

• All steps taken to secure property

• The results of the search, including a description of any property or contraband seized

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000162

Case 8:24-cv-01286-JWH-JDE    Document 51-1    Filed 11/14/25    Page 275 of 410 Page ID #:638

# Santa Ana Police Department

Daily Training Bulletin

- If the person searched is the opposite sex, any efforts to summon an officer of the same sex as the person being searched and the identification of any witness officer

Supervisors shall review reports to ensure the reports are accurate, actions are properly documented and current legal requirements and department policy have been met.

**ANALYSIS:**

Our officers conducted a consent search and recovered suspected stolen merchandise. When officers conduct a search, they are responsible for sufficiently documenting certain details about the search in a report.

**CONCLUSION:**

At a minimum, Officer Randall must include the following relevant information in his report:

- Reason for the search

- Any efforts used to minimize the intrusiveness of any search, such as asking for consent

- Steps taken to secure the property

- Results of the search, including a description of any property and/or contraband seized

**QUESTION:**

Officers are not responsible for documenting consent searches.

**ANSWERS:**

(a)   True

(b)   False

**CORRECT ANSWER:**
False

---

Copyright Lexipol, LLC 2024/10/23, All Rights Reserved.
Published with permission by Santa Ana Police Department

COSA000163

# PART OO

**SAPD POLICY MANUAL 435**

JOINT EXHIBIT 230

Policy

**435**

# Body Worn Cameras

## 435.1  PURPOSE AND SCOPE

The Santa Ana Police Department recognizes that audio and video recording of contacts between Department members and the public can provide an objective record of these events. The use of a recording system assists Department personnel in the performance of their official police duties by providing a record of enforcement and investigative contacts. A recording of an event or contact assists the Department in evaluating and improving Department practices, tactics, strategy, officer training and safety practices, and community policing objectives.

The Department provides Body Worn Cameras (BWC) to its members for use while on- duty. The primary purpose and objective of the BWC Program is to collect evidence for use in criminal investigations, including identifying and apprehending offenders and obtaining, collecting, and preserving evidence for use in criminal prosecutions. These recorders will also assist members in the performance of their official police duties by providing audio and video records of contacts. Except as provided in this policy, all enforcement and investigative contacts, as well as all contacts specifically related to a call for service, will be recorded to collect evidence for use in criminal investigations, including identifying and apprehending offenders, and obtaining, collecting and preserving evidence for use in criminal prosecutions. These recordings will also promote accountability and enhance public trust and confidence in the actions of Department members.

While recordings obtained from a BWC provide an objective record of these events, it is understood video recordings captured by a BWC (or any recording device) do not necessarily reflect the experience or state of mind of the individual employee(s) in a given incident. Further, video cameras generally record only a portion of an incident, may lack the context of the event and may not faithfully record light levels leaving out significant aspects of an incident. Also, video is a two-dimensional representation of an incident from a particular perspective that may distort distance and other factors associated with depth of field. A video recording has limitations and may depict events differently than the events recalled by the involved employee and does not present the incident as viewed through human eyes. Differences between human and mechanical processing of information prevent a video from exactly matching what a person sees and hears during a critical confrontation. These differences have to do with field of view, focus of attention, and interpretation. It is understood the BWC may capture information that may not have been heard and/or observed by the involved employee and may not capture information observed by the employee.

## 435.2  DEPARTMENT PERSONNEL RESPONSIBILITIES

Prior to going into service, each employee trained to operate and issued a BWC is responsible for ensuring that the BWC is in proper working order by inspecting and testing the BWC. Personnel assigned to field and enforcement duties during regular and extra duty assignments shall wear

Copyright Lexipol, LLC 2025/07/28, All Rights Reserved.
Published with permission by Santa Ana Police Department

Santa Ana Police Department
Santa Ana PD Policy Manual

*Body Worn Cameras*

the BWC on their person in a forward facing position above the midline torso to maximize the recording field of view.

Personnel are required to upload their digital audio/video files at the end of each work shift, unless otherwise approved by a supervisor. Recordings made at extra duty events will be uploaded on or prior to the employee's next work shift unless otherwise approved by a supervisor.

**POLICY EXCEPTIONS** Exclusive to Motor Officers and Canine Officers ONLY:

Motor Officers and Canine Officers may, at minimum, intermittently upload their BWC footage once per on-duty work week, or as their respective workloads permit during any given shift. On the last day of their respective work week, a Motor Officer or Canine Officer may find it necessary to leave their issued BWC docked at the station for proper uploading and charging, and shall resume normal operation on their first day back to work. No Motor Officer or Canine Officer shall go for more than one (1) on-duty work week without uploading BWC footage.Supervisor approval is not necessary for this exception. A supervisor may reasonably check for policy compliance not to be considered an audit.

The BWC is the responsibility of the employee and will be used with reasonable care to ensure proper functioning and reliability. When an employee determines a BWC is not in proper working order, the employee shall notify a supervisor as soon as practicable to obtain a replacement BWC. The employee shall also send an email to the BWC Coordinator so arrangements for immediate replacement can be made. If the BWC Coordinator is not available for immediate replacement, the affected officer (regardless of officer/unit assignment) will immediately report to the on-duty watch commander for temporary issuance of a loaner BWC. At no time will any officer go into the field to conduct law enforcement duties or investigative services, including overtime assignments at special events without a BWC.

435.2.1   ADDITIONAL DEPARTMENT PERSONNEL RESPONSIBILITIES
Members working plain-clothes assignments may utilize a department issued BWC when they believe such a device may be beneficial and in accordance with this policy. All non-uniformed personnel who are engaging in pre-planned enforcement activities such as serving a search or arrest warrant or conducting or participating in parole/probation searches shall utilize a BWC, unless the use of the BWC unreasonably compromises the identity of undercover officers or jeopardizes tactics or if the officer/detective is assigned to an outside Multi-Agency Task Force. Officers not wearing a BWC during search/arrest warrants and parole/probation searches must have prior approval from a manager at the rank of Commander or higher.

Field Training Officers will be responsible for ensuring their assigned trainee is recording all contacts in accordance with this policy.

**435.3   IDENTIFYING INFORMATION REQUIRED FOR RECORDINGS**
To ensure proper incident tagging of BWC footage via CAD (Computer Aided Dispatching) integration, officers shall notify dispatch of all activity, or self-assign an incident via their unit's

Copyright Lexipol, LLC 2025/07/28, All Rights Reserved.
Published with permission by Santa Ana Police Department

## Body Worn Cameras

mobile computer unless doing so would compromise their immediate personal safety or the safety of others.  In cases where CAD is inoperable or a Motor Officer elects to tag their own recordings, officers shall minimally include the following basic information:

    (a)    CI or CAD Incident number in the following format: "SAPD 16-99999", "P5219374", etc.

    (b)    Type of incident: "Traffic stop", "Call for service", etc.

### 435.4  ACTIVATION OF BODY WORN CAMERAS

Department personnel are required to activate the BWC to record any general duties, investigative or enforcement-related contacts or activity. BWC activation shall begin prior to arriving at a call or initiating enforcement action and shall terminate the recording once the involved officer has cleared the call that initiated activation.  At no time is any officer expected to compromise their immediate personal safety or the safety of others for the purpose of activating their BWC. BWC activation includes, but are not limited to: traffic or vehicle stops, pedestrian stops (including officer-initiated consensual encounters), calls for service, covering another city employee or law enforcement officer during an enforcement contact, field interviews, Code-3 responses (including vehicle pursuits), foot pursuits, consensual encounters (including consensual encounters in which the member is attempting to develop reasonable suspicion concerning the subject of the encounter), detentions, arrests, searches (including searches involving the use of a K-9), a Fourth Amendment waiver search or a consent search in which the officer is looking for evidence or contraband, use of force, encounters with persons present at calls for service who are accused of crimes, prisoner transportation, crowd management and control involving enforcement or investigative contacts, interviews (of suspects, victims, and witnesses), and any contact with members of the public that become adversarial or confrontational. These events shall be recorded without interruption unless an exception outlined in this policy occurs. Officers may, but are not required to, advise members of the public that a recording is in progress.

In the event a Public Safety Statement is required as part of an Officer-Involved Shooting ("OIS") or investigation of a critical incident, the Supervisor ordering a Public Safety statement shall activate his/her BWC and notify the involved officer that their statement is being recorded. The Public Safety Statement shall include questions included in the Officers Index and/or the Public Safety Statement checklist.

When a member believes it is necessary and feasible to interrupt a recording before the end of the contact or activity, he/she should verbally indicate the intent to stop the recording, and upon reactivation, state that he/she has restarted the recording. This interruption and the underlying reasoning shall be documented in the police report. The recording will continue until contact with the member(s) of the public ends as a result of, but not limited to, the following circumstances:

    (a)    The  completion of the booking process and any suspect interview(s), if the contact ended in arrest or juvenile detention

Copyright Lexipol, LLC 2025/07/28, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department

Santa Ana PD Policy Manual

*Body Worn Cameras*

---

(b) I f a subject being detained or arrested is in a holding facility, jail or hospital the officer may temporarily interrupt recording during periods when he/she is out of contact with the subject

(c) Th e member has completed his/her contact or activity and is no longer interacting with the involved member(s) of the public

(d) A recording exception allowed by this policy occurs

In the event a member is unable to activate his/her BWC as directed above, or in any instance during which a member determines a BWC cannot or should not be used, he/she shall document the reason why the BWC was not used in the accompanying police report. If no report has been generated, the member will document the circumstances in the incident's CAD history. If no CAD history was created for the incident, the member shall create one and document the circumstances in the incident's CAD history.

## 435.4.1   EXCEPTIONS TO ACTIVATION

Residents have a reasonable expectation of privacy in their homes. However, when peace officers are lawfully present in a home (warrant, consent, exigent circumstances) in the course of official duties, there is no reasonable expectation of privacy, and recording is lawful. If a resident objects to the BWC recording inside their private residence, the officer may turn off the device in accordance with this policy after considering the totality of the circumstances. Before terminating a recording for reasons of privacy or other concerns, the officer shall at a minimum document the reasons for not recording in accordance with this policy.

Circumstances when a BWC may not be used include, but are not limited to:

(a) Officer safety would be compromised due to an unexpected or sudden altercation.

(b) A health care provider is discussing medical issues with a patient and there is no immediate safety risk to the officer.

(c) While in the hospital for the sole purpose of waiting for an arrestee to be medically cleared and there is no immediate safety risk to the officer.

1. However, the BWC should be turned on in the hospital if a situation arises which requires police action

(d) While the officer is on break or otherwise engaged in personal activities or when the officer is in a location where there is a reasonable expectation of privacy, such as a restroom, locker room, or dressing room or during briefings, meetings or roll calls

(e) During encounters with undercover officers or confidential informants

(f) For officer safety, when officers are handling, reviewing, or discussing an operational plan, conducting undercover surveillance or discussing, developing, planning or engaging in police/investigative tactics or strategies during a pending investigation.

## 435.4.2   DEMONSTRATIONS

---

Copyright Lexipol, LLC 2025/07/28, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
Santa Ana PD Policy Manual

## Body Worn Cameras

    (a)    As a general policy, Department personnel should refrain from video recording or photographing peaceful demonstrations.

    (b)    When there is a reason to believe a planned event has the potential for unlawful activity, Commanding Officers should make the determination whether visual recording or photographing is appropriate.

    (c)    During demonstrations, officers should operate cameras in buffering/stand-by mode. If officers witness crimes occurring among the demonstrators, and/or believe an arrest is likely, they should begin recording in Event mode.

### 435.4.3  ACTIVATION BY CRIME SCENE INVESTIGATORS (CSI)
Personnel within the Crime Scene Investigations Unit (CSI) assigned to the field shall activate their assigned BWC when:

    (a)    Obtaining consent or refusal to recover any evidence from a person (DNA, buccal swab, fingerprints, clothing, hair sample, photos of tattoos, etc.). Footage capturing verbal consent or refusal shall serve in lieu of the SAPD Consent to Search Form.

    (b)    Capturing the initial walkthrough of a crime scene or an administrative investigation.

    (c)    Recovering any items of value or notable significance (cash, narcotics, jewelry, equipment, etc.).

          1.    At the discretion of the CSI officer, capturing footage may cease once evidence is sealed or secured.

EXCEPTIONS TO ACTIVATION FOR CSI INVESTIGATORS

    (a)    CSI investigators are not required to activate their assigned BWC when:

          1.    Recovering evidence pursuant to a search warrant or when recovering sensitive evidence from a victim's breasts, genital area, buttocks, or any anatomically bare area deemed sensitive by a CSI investigator or at the request of the individual from whom the sample is being recovered.

          2.    After the initial walkthrough, when recovering crime scene evidence as it may take several hours beyond the BWC battery capability.

### 435.4.4  ACTIVATION BY PROPERTY AND EVIDENCE SPECIALIST
Personnel within the Evidence Section, Including Police Evidence and Supply Specialists, Senior Clerical Aides, and Police Service Officers, shall activate their assigned BWC when:

    (a)    Receiving and counting any currency.

    (b)    Receiving and documenting any items of value or notable significance, such as jewelry, coins, etc.

    (c)    Receiving and documenting any narcotics.

BWC shall remain in recording mode until the item being processed is re-sealed in the appropriate package.

Copyright Lexipol, LLC 2025/07/28, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
### Santa Ana PD Policy Manual

*Body Worn Cameras*

## 435.5   SURREPTITIOUS RECORDINGS

Penal Code § 632 prohibits an individual from surreptitiously recording a conversation in which any party to the conversation has a reasonable belief the conversation is private or confidential; however, Penal Code § 633 expressly exempts law enforcement officers from this prohibition during the course of a criminal investigation in which the officer reasonably believes that such a recording will be for lawful investigative purpose. The following requirements shall apply:

    (a)    No member of this department may surreptitiously record a conversation of any other member of this department without the express knowledge and consent of all parties

    (b)    A sworn member of this department may surreptitiously record any conversation during the course of a criminal investigation if the officer reasonably believes that such a recording will be beneficial to the investigation

        1.    Any officer contacting an individual suspected of violating any law or during the course of any official law enforcement related activity is presumed to be engaged in a criminal investigation.

## 435.6   PERSONAL USE

Employees shall not use a department-issued BWC for personal use. Employees shall not use a personal BWC during their official duties.

## 435.7   STATEMENTS AND REPORTING

All recorded victim, witness and suspect statements, as well as any other evidence specifically recorded, shall be documented as evidence in the corresponding police report. BWC footage shall not replace a thorough report documenting any statement from a victim, witness, arrestee, or juvenile detainee.

To assist in retrieval of a recorded statement for prosecution purposes, report narratives describing these statements shall include:

    (a)    If the statement or evidence was recorded

    (b)    If the statement or recording was uploaded (booked) as evidence

    (c)    By whom it was recorded

    (d)    Time and date of the recording

Whenever any employee believes a particular contact may lead to a citizen complaint, he/she should bring the contact to the attention of their supervisor or their Watch/Division Commander.

## 435.8   RETENTION OF BODY WORN CAMERA MEDIA FILES

Recorded media uploaded to Evidence.com will be retained according to the BWC footage retention schedule (see BWC Retention Procedure) Inadvertent/accidental recordings of personal events and conversations shall be purged as soon as practicable upon the approval of a Watch/ Division Commander or the BWC Program Coordinator or the Assistant to the BWC Coordinator.

Copyright Lexipol, LLC 2025/07/28, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department

Santa Ana PD Policy Manual

## Body Worn Cameras

Officers and employees shall not edit, alter, erase, duplicate, copy, share, record, or otherwise distribute in any manner BWC images and information without the prior approval of the Chief of Police or his/her designee. Officers and employees shall not remove, dismantle or tamper with any hardware or software components of the BWC system unless for purposes of maintenance, repair, upgrade, or replacement and only at the direction of the Body Worn Camera Coordinator or the Assistant to the BWC Coordinator.Personal computer equipment and software programs shall not be utilized when making copies of the BWC data or files. Using a secondary device such as a video camera, cell phone, or any other electronic device to record or capture BWC data or files is strictly prohibited.

### 435.9   REVIEW OF BODY WORN CAMERA MEDIA FILES

Unless prohibited by applicable law, recorded files may be reviewed on designated Department equipment only, in any of the following circumstances:

(a)   By the officer who originally recorded the incident.

   1.   With prior supervisory approval at the rank of sergeant or above, an employee may review another employee's recording, provided the other employee was also directly involved in the incident in question.

(b)   By a supervisor reviewing or investigating a specific incident involving a member of this department and for which he/she can articulate a reason for review

(c)   By members of the City Attorney's Office or City Risk Management in connection with litigation or anticipated litigation, or for other official purposes

(d)   By a Department employee who is conducting an official investigation such as a personnel, administrative or criminal investigation

(e)   Pursuant to the law, lawful process, or by court personnel otherwise authorized to view evidence in a related case

(f)   At the discretion of the Chief of Police, members of the Major Incident Review Team or Shooting Review Board may review recordings to assess a critical incident, administrative investigation, use of force review or other internal review

(g)   If an employee is the subject of a disciplinary investigation, the employee shall have the option of reviewing his/her BWC recording(s) in the presence of his/her attorney or labor representative. The employee shall also be allowed to review recordings from other BWC's capturing the employee's image or voice during the underlying incident

(h)   In conjunction with department-approved training

(i)   Supervisors should review BWC recordings to assist in investigating and/or resolving citizen complaints. Supervisors have discretion to show BWC recordings to a complainant when it relates to his or her complaint, to assist in clarifying the complaint, resolving the complaint, or having the complaint withdrawn

Subject to the provisions of this policy, the Chief of Police or his/her designee has the discretion to prohibit the review of any recordings by Department employees if it is determined to be in the best interest of the Department or the City.

*Body Worn Cameras*

## 435.10  AUDITS

As directed by the Chief or the Chief's designee, the BWC program shall be audited according to the Monthly BWC Audit by Commanders utilizing Axon Performance. These audits will ensure compliance with operational, retention, and security policies and procedures.

**Commander's Responsibilities**

(a)  Commanders whose personnel have been issued BWCs are required to conduct monthly audits pursuant to the BWC Audit Procedure.

## 435.11  MEDIA FILE STORAGE, RETENTION, AND RELEASE

Storage and transfer of media files (recordings) from Body Worn Camera recordings shall comply with the following provisions:

(a)  Only members designated by the BWC Program Coordinator may transfer or copy recordings onto any third party media storage device. These devices include but are not limited to: Compact discs, floppy disks, portable hard drives, memory sticks, thumb-drives, DVD's, or other electronic media devices.

(b)  Only the BWC Program Coordinator may produce, reproduce or modify recordings for production in response to a subpoena, Public Records Act request or other official request.

(c)  All recordings are considered official Department records and shall not be shared with any person not having authorization to access the files as part of his/her official duties, or otherwise authorized by law.

(d)  Digital files may not be deleted by any person from the recording device or the archival storage media without the authorization of the Chief of Police or the BWC Program Coordinator.

(e)  At the discretion of the Chief of Police, recorded files may be viewed or released outside the organization, if he/she determines it is in the best interest of the Department or the City. When appropriate, involved employees should be notified before viewing or release.

(f)  At the discretion of the Chief of Police or the BWC Coordinator, or his designee, footage may be shared via an Evidence.com link with an allied law enforcement agency charged with investigating an incident.

(g)  At the discretion of the Chief of Police, or his designee, footage may be shared via an Evidence.com link with an allied law enforcement agency charged with investigating an incident related to employee misconduct by of another law enforcement agency's employee.

Employees and supervisors may find it useful, and are encouraged, to review recordings of incidents in which they were involved when beneficial for the purpose of conducting a tactical debrief. When an incident is recorded which may be of value as a training aid for a broad section of the Department, the recording employee or that employee's supervisor should receive approval from their Division Commander to contact the Training Commander who will review the digital

Copyright Lexipol, LLC 2025/07/28, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department

Santa Ana PD Policy Manual

## Body Worn Cameras

evidence to determine the value of the incident for training. If the Training Commander determines the incident would be an appropriate training aid, he/she shall first obtain approval from the Department Legal Advisor and from the involved employees' Bureau Commander(s).

### 435.11.1   RELEASE OF MEDIA FILES

Digital evidence captured by BWC shall be treated as an investigative record and handled pursuant to existing Department policies and procedures. A copy of a recording may only be released to a third party in response to a valid court order or by approval of the Chief of Police or his/her designee. All requests for BWC media files generated by the District Attorney, Attorney General's Office, Grand Jury, City Attorney and/or a Defense Attorney, sworn law enforcement officers of other municipal, state or federal agencies (FBI, U.S. Marshall, etc.) will be handled by the BWC Program Coordinator the Assistant to the BWC Coordinator assigned to BWC Discovery Unit. Requests for BWC media files generated by the U.S. Attorney may be handled by either the Career Criminal Apprehension Unit supervisor or the BWC Program Coordinator.

Requests for recordings in civil matters will be handled by the BWC Program Coordinator.

### 435.11.2   BODY WORN CAMERA DEVICE AS EVIDENCE

In unusual circumstances, the BWC device itself may be booked into evidence prior to any uploading of media storage. Unusual circumstances may include:

- •    Major or significant incidents

- •    At the direction of a Watch/Division Commander or above

- •    If data cannot be uploaded due to a mechanical or technological malfunction

If the BWC device is booked into evidence, established booking procedures shall be followed and documented in the accompanying police report. The booking officer shall notify the BWC Coordinator directly for immediate BWC footage recovery.

### 435.12   BODY WORN CAMERA PROGRAM COORDINATOR

The Department shall designate a Body Worn Camera Program Coordinator who has program oversight including, but not limited to:

(a)   Documenting system malfunctions and equipment failures related to Body Worn Cameras

(b)   Providing training to administrative and investigative staff regarding BWC use, media file retention, and confidentiality of video records

(c)   Maintaining digital video files and equipment in a secure and confidential environment

(d)   Ensuring media files are only released in accordance with Department/City Policy and applicable laws

(e)   Coordinating issuance of BWC devices.

(f)   Providing training and instruction to BWC users on device usage and operation

JOINT EXHIBIT 239

# Santa Ana Police Department
Santa Ana PD Policy Manual

*Body Worn Cameras*

(g)    Providing department management recommendations on policy development and equipment integrity, to be reviewed annually.

(h)    Provide Deputy Chiefs with the monthly audit list on or about the 15th of every month

## 435.13  BODY WORN CAMERA DEVICE ISSUANCE
The BWC coordinator or the Assistant to the BWC Coordinator The Central Distribution Center (CDC) shall not be contacted for any BWC related equipment or program issues.

## 435.14  ASSISTANT TO THE BODY WORN CAMERA COORDINATOR
The Assistant to the Body Worn Camera Coordinator shall be responsible for the following duties, but not limited to:

(a)    Processing the daily requests pursuant to a BWC Discovery Request

(b)    Retaining period category changes of BWC Footage as requested by the Orange County District Attorney's Office

(c)    Assisting with and monitoring the day to day operations of the BWC Program

(d)    Assisting department personnel with the use and navigation of Evidence.com

(e)    Troubleshooting BWC equipment errors and failures

(f)    Assisting with the training of personnel in the use of BWC equipment and related systems

# PART PP

**SAPD POLICY MANUAL 339**

**Policy**

**339**

Santa Ana Police Department

Santa Ana PD Policy Manual

# Child and Dependent Adult Safety

## 339.1   PURPOSE AND SCOPE

This policy provides guidelines to ensure children and dependent adults are not left without appropriate care in the event their caregiver or guardian is arrested or otherwise prevented from providing care due to actions taken by members of this department (Penal Code § 833.2(a)).

This policy does not address actions to be taken during the course of a child abuse or dependent adult investigation. These are covered in the Child Abuse and Senior and Disability Victimization policies.

## 339.2   POLICY

It is the policy of this department to mitigate, to the extent reasonably possible, the stressful experience individuals may have when their parent or caregiver is arrested. The Santa Ana Police Department will endeavor to create a strong, cooperative relationship with local, state and community-based social services to ensure an effective, collaborative response that addresses the needs of those affected, including call-out availability and follow-up responsibilities.

## 339.3   PROCEDURES DURING AN ARREST

When encountering an arrest or prolonged detention situation, officers should make reasonable attempts to determine if the arrestee is responsible for children or dependent adults. In some cases this may be obvious, such as when children or dependent adults are present. However, officers should inquire if the arrestee has caregiver responsibilities for any children or dependent adults who are without appropriate supervision. The following steps should be taken (Penal Code § 13517.7(b)(1)):

(a)   Inquire about and confirm the location of any children or dependent adults.

(b)   Look for evidence of children and dependent adults. Officers should be mindful that some arrestees may conceal the fact they have a dependent for fear they may be taken from them.

(c)   Consider inquiring of witnesses, neighbors, friends and relatives of the arrestee as to whether the person is responsible for a child or dependent adult.

When reasonably possible, officers should take reasonable steps to accomplish the arrest of a parent, guardian or caregiver out of the presence of his/her child or dependent adult. Removing children or dependent adults from the scene in advance of the arrest will generally ensure the best outcome for the individual.

When it is safe to do so, officers should allow the parent or caregiver to assure children or dependent adults that they will be provided care. If this is not safe or if the demeanor of the parent or caregiver suggests this conversation would be non-productive, the officer at the scene should explain the reason for the arrest in age-appropriate language and offer reassurance to the child or dependent adult that he/she will receive appropriate care.

Copyright Lexipol, LLC 2021/03/24, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department

Santa Ana PD Policy Manual

## Child and Dependent Adult Safety

### 339.3.1   AFTER AN ARREST

When an arrest is made, the officer should take all reasonable steps to ensure the safety of the arrestee's disclosed or discovered children or dependent adults.

Officers should allow the arrestee reasonable time to arrange for care of children and dependent adults. Temporary placement with family or friends may be appropriate. However, any decision should give priority to a care solution that is in the best interest of the child or dependent adult. In such cases the following guidelines should be followed:

(a)   Allow the person reasonable time to arrange for the care of children and dependent adults with a responsible party, as appropriate.

    1.   Officers should consider allowing the person to use his/her cell phone to facilitate arrangements through access to contact phone numbers, and to lessen the likelihood of call screening by the recipients due to calls from unknown sources.

(b)   Unless there is evidence to the contrary (e.g., signs of abuse, drug use, unsafe environment), officers should respect the parent or caregiver's judgment regarding arrangements for care. It is generally best if the child or dependent adult remains with relatives or family friends that he/she knows and trusts because familiarity with surroundings and consideration for comfort, emotional state and safety are important.

    1.   Except when a court order exists limiting contact, the officer should attempt to locate and place children or dependent adults with the non-arrested parent, guardian or caregiver.

(c)   Provide for the immediate supervision of children or dependent adults until an appropriate caregiver arrives.

(d)   Notify Child Protective Services or the Division of Aging and Adult Services, if appropriate.

(e)   Notify the field supervisor or Watch Commander of the disposition of children or dependent adults.

If children or dependent adults are at school or another known location outside the household at the time of arrest, the arresting officer should attempt to contact the school or other known location and inform the principal or appropriate responsible adult of the caregiver's arrest and of the arrangements being made for the care of the arrestee's dependent. The result of such actions should be documented in the associated report.

### 339.3.2   DURING THE BOOKING PROCESS

During the booking process the arrestee shall be allowed to make additional telephone calls to relatives or other responsible individuals as is reasonably necessary to arrange for the care of any child or dependent adult. These telephone calls shall be given as soon as practicable and are in addition to any other telephone calls allowed by law (Penal Code § 851.5(c)).

If an arrestee is unable to resolve the care of any child or dependent adult through this process, a supervisor should be contacted to determine the appropriate steps to arrange for care. These steps may include additional telephone calls or contacting a local, county or state services agency.

Copyright Lexipol, LLC 2021/03/24, All Rights Reserved.
Published with permission by Santa Ana Police Department

# Santa Ana Police Department
Santa Ana PD Policy Manual

## Child and Dependent Adult Safety

### 339.3.3  REPORTING

(a) For all arrests where children are present or living in the household, the reporting member will document the following information:

1. Name

2. Sex

3. Age

4. Special needs (e.g., medical, mental health)

5. How, where and with whom or which agency the child was placed

6. Identities and contact information for other potential caregivers

7. Notifications made to other adults (e.g., schools, relatives)

(b) For all arrests where dependent adults are present or living in the household, the reporting member will document the following information:

1. Name

2. Sex

3. Age

4. Whether he/she reasonably appears able to care for him/herself

5. Disposition or placement information if he/she is unable to care for him/herself

### 339.3.4  SUPPORT AND COUNSELING REFERRAL

If, in the judgment of the handling officers, the child or dependent adult would benefit from additional assistance, such as counseling services, contact with a victim advocate or a crisis telephone number, the appropriate referral information may be provided.

### 339.4  DEPENDENT WELFARE SERVICES

Whenever an arrestee is unwilling or incapable of arranging for the appropriate care of any child or dependent adult, the handling officer should contact the appropriate welfare service or other department-approved social service to determine whether protective custody is appropriate (Welfare and Institutions Code § 305).

Only when other reasonable options are exhausted should a child or dependent adult be transported to the police facility, transported in a marked patrol car, or taken into formal protective custody.

Under no circumstances should a child or dependent adult be left unattended or without appropriate care.

# Santa Ana Police Department
Santa Ana PD Policy Manual

## *Child and Dependent Adult Safety*

### 339.5  TRAINING

The Training Commander is responsible to ensure that all personnel of this department who may be involved in arrests affecting children or dependent adults receive POST-approved training on effective safety measures when a parent, guardian or caregiver is arrested (Penal Code § 13517.7).

Copyright Lexipol, LLC 2021/03/24, All Rights Reserved.
Published with permission by Santa Ana Police Department

# PART QQ

## RELEVANT EXCERPTS OF

## POLICE REPORT



| | SANTA ANA<br>**Police Department**<br>60 Civic Center Plaza<br>Santa Ana CA, 92701<br>**Crime Report** | **Case No.**<br>**2021-21255** |
|---|---|---|

---

Case Type:                 ASSAULT W/ DEADLY WEAPON

---

## Incident Activity Summary:

| | |
|---|---|
| **Offenses:** | **245(a)(2) PC - ASSAULT WITH FIREARM ON PERSON** |
| **Offenses:** | **422 PC - THREATEN CRIME WITH INTENT TO TERRORIZE** |
| Incident Date/Time: | Occurred: 10/04/2021 07:51:59 |
| | Reported: 10/04/2021 07:51 |
| **Location Occurred:** | 3405 S Baker St, Santa Ana, CA 92707 |
| Grid: Dist.: SC | |

---

## Factual Synopsis:

Suspect pointed a black shotgun at the victim who was gardening in his backyard and threatened to kill him.

---

**Stolen/Recovered:**   (Report-wide)            $0.00  /  **$0.00**

---

| **Person:** | **JAIME FELIX** |
|---|---|
| Involvement: | **VICTIM** |
| | *245(a)(2) PC - ASSAULT WITH FIREARM ON PERSON*<br>*422 PC - THREATEN CRIME WITH INTENT TO TERRORIZE* |
| Description: | Male, Hispanic, 5'07" tall, 170 lbs grey hair, brown eyes |
| DOB: | |
| | Misc. Number:        MATRICULA, |
| Address/Resides: | |
| Contact Info: | Cell: |
| Scars, Marks, Tattoos, Oddities: | |



# PART RR

## RELEVANT EXCERPTS OF

## I.K. DEPOSITION

```
1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

3

4   SEAN KINNEY,                    ) Case No.
                                    ) 8:24-cv-01286-JWH-JDE
5        Plaintiff,                 ) Consolidated with Case
                                    ) No.
6            vs.                    ) 8:24-cv-01287-JWH-JDE
                                    )
7   SANTA ANA POLICE DEPARTMENT;    )
    CITY OF SANTA ANA; JIMMY        )
8   CORREAL, an individual; LUIS    )
    CASILLAS, an individual;        )
9   JESSE HERNANDEZ, an             )
    individual; DEBORAH WOLEN, an   )
10  individual  and DOES 1 through  )
    35, inclusive,                  )
11                                  )
         Defendants.                )
12  _____ )

13

14

15        Deposition of I.K., taken on behalf of

16     Defendant, at 20 Civic Center Plaza, 7th Floor,

17     Santa Ana, California, beginning at 9:02 a.m. and

18     ending at 11:02 a.m., on Monday, April 14, 2025,

19     before Gideon Choi, Certified Shorthand Reporter

20     No. 13258.

21

22

23

24

25

                                              Page  2
```

| | | |
|---|---|---|
| 1 | THE COURT REPORTER: Good morning.  We are now on the | 09:02 |
| 2 | record.  My name is Gideon Choi, CSR No. 13258.  I will now | 09:02 |
| 3 | swear in the witness. | 09:02 |
| 4 | I.K., | 09:02 |
| 5 | called as a witness by and on behalf of the Defendant, and | 09:02 |
| 6 | having been first duly sworn by the Certified Shorthand | 09:02 |
| 7 | Reporter, was examined and testified as follows: | 09:02 |
| 8 | | 09:02 |
| 9 | MS. BOGOSIAN:  I'd like to place on the record, before we | 09:02 |
| 10 | get started, a stipulation and order that the parties | 09:02 |
| 11 | entered into and that was signed by the judge with respect | 09:02 |
| 12 | to I.K.'s deposition that's taking place today at Santa Ana | 09:02 |
| 13 | City Hall.  The parties agreed and the court ordered that | 09:02 |
| 14 | Plaintiff I.K.'s deposition will not exceed four hours from | 09:03 |
| 15 | the time the deposition commences, excluding any breaks | 09:03 |
| 16 | taken by either party; two, the scope of Plaintiff I.K.'s | 09:03 |
| 17 | deposition will be limited to the allegations related to | 09:03 |
| 18 | Plaintiff I.K.'s complaint, the incident complained about, | 09:03 |
| 19 | and any claimed damages; three, the deposition transcript | 09:03 |
| 20 | shall be marked as confidential to protect the minor's | 09:03 |
| 21 | privacy interests.  The parties will be permitted to use the | 09:03 |
| 22 | transcript for all purposes in this proceeding and any | 09:03 |
| 23 | appeals stemming from this proceeding only. | 09:03 |
| 24 | In accordance with Rule 5.2(a) of the | 09:03 |
| 25 | Federal Rules of Civil Procedure, personal information, | 09:03 |

Page 6

| | | | |
|---|---|---|---|
| 1 | Q | So your answer is still no to that question? | 09:10 |
| 2 | A | Yes. | 09:10 |
| 3 | Q | Okay.  How old are you, I.K.? | 09:10 |
| 4 | A | I'm 15. | 09:10 |
| 5 | Q | And back on October 4th, 2021, did you reside at | 09:10 |

6        XXXXXXXXXXXXXXXX with your mother, Christiane,    09:10

7    your father, Sean, and your brother, ▇▇▇?    09:10

8        MS. KINNEY:  Can I just correct?  Instead of XXX, it's    09:10

9    XXX.    09:11

10       MS. BOGOSIAN:  It's XXX.  Thank you.    09:11

11       MS. KINNEY:  Do you have that in mind?    09:11

12       THE WITNESS:  Yes.    09:11

13    BY MS. BOGOSIAN:    09:11

14       Q    And before I go further into the incident, I wanted    09:11

15    to ask you as well, what is it, in your words, that this    09:11

16    lawsuit is about?  Not what your attorney has told you;    09:11

17    okay?  I'm not entitled to any conversations or    09:11

18    communications you've had with your attorney.  I'm asking    09:11

19    you, what do you think this lawsuit that you've brought, not    09:11

20    your father, is about?    09:11

21       A    Really, just getting my family justice and making    09:11

22    sure that the police don't do this to other citizens,    09:11

23    because it did cause me and my family a lot of trauma and    09:11

24    distrust of the police, and I don't think that should be    09:11

25    happening.    09:11

Page 13

1    Q    Okay.  And when you say "that the police don't do    09:11

2    this", what is the "this" that you're referring to?    09:11

3    A    Don't perform, like, training missions on citizens    09:11

4    and don't harass them.    09:11

5    Q    Okay.  Let's break that down just a little bit    09:12

6    further.  What information do you have -- again, I'm not    09:12

7    asking for any information from your attorney; okay?  What    09:12

8    information do you have that on October 4th, 2021,    09:12

9    Santa Ana Police were performing a training mission?    09:12

10    MS. KINNEY:  And I'll put an objection that I don't know    09:12

11    that she has any information outside of her attorney.    09:12

12        So anything that you know that didn't come from me.    09:12

13    It could come from dad.    09:12

14    THE WITNESS:  Well, my dad was talking about some of the    09:12

15    cameras that we have showing some of the guys, like, not    09:12

16    knowing how to do their jobs and claiming that it was their    09:12

17    first day there and not really understanding what they were    09:12

18    doing so, presumptuously, it was a training mission based    09:12

19    off of just their levels of understanding their job.    09:12

20    BY MS. BOGOSIAN:    09:12

21    Q    Okay.  And now when you discussed, when you said or    09:12

22    used the word "harass", can you give a little bit more    09:12

23    detail what you mean by that?    09:13

24    A    Threatening to tap into our camera system and watch    09:13

25    us.    09:13

Page 14

```
 1     Q    And who do you believe did that?  Do you have a name    09:13

 2   of an officer?                                                 09:13

 3     A    I don't remember any names.                             09:13

 4     Q    Okay.  And do you have any basis or reason as to why    09:13

 5   they would threaten to tap into your camera system to watch    09:13

 6   you?                                                           09:13

 7     A    They said it was to make sure that my father was a      09:13

 8   good guy as he claimed.                                        09:13

 9     Q    All right.  Prior to October 4th, 2021, had you seen    09:13

10   landscapers at your residence at ██████████?                   09:13

11     A    No.                                                     09:13

12     Q    Do you know who was doing the landscaping at the        09:13

13   residence that you were renting?                               09:13

14     A    No.                                                     09:13

15     MS. BOGOSIAN:  Okay.  Just give me one moment.  All          09:13

16   right.  I'm looking at your complaint which is going to be     09:14

17   marked as Exhibit 1.                                           09:14

18          Actually, we'll make this Exhibit 2 because we'll       09:14

19   make the order Exhibit 1.                                      09:14

20              (Exhibit 1 and 2 were marked for                    09:14

21               identification by the Certified Shorthand          09:14

22               Reporter, a copy of which is attached hereto.)     09:14

23   BY MS. BOGOSIAN:                                               09:14

24     Q    The complaint alleges that on October 4th, 2021, you    09:14

25   were 12 years old attending virtual school in your home in    09:14
```

                                                            Page 15

```
 1    Santa Ana, and that at 10:10 a.m. you heard a commotion    09:14
 2    outside of your window and heard your mother knocking on    09:14
 3    your bedroom window to come outside.                        09:14
 4        Did you recall the events that day as that way, that    09:14
 5    you were online at school when you heard a knock on your    09:14
 6    window?                                                     09:14
 7    A    I had gone to school, however, I was taking a break    09:14
 8    and I was asleep at that time.                              09:14
 9    Q    Okay.  But how were you made aware that there was a    09:14
10    commotion outside?  Did you hear something?                 09:15
11    A    I woke up from the knock on my window.                 09:15
12    Q    Okay.  And do you know who was knocking?               09:15
13    A    I assumed my mother.                                   09:15
14    Q    Okay.  But did you know for certain?                   09:15
15    A    I heard her name.  I didn't know for sure.             09:15
16    Q    Okay.  And did you get up from bed?                    09:15
17    A    Yes.                                                   09:15
18    Q    And who did you see at your window?                    09:15
19    A    I didn't see anyone at my window because my blinds     09:15
20    were down.                                                  09:15
21    Q    Did you lift your blinds?                              09:15
22    A    No.                                                    09:15
23    Q    What did you do?                                       09:15
24    A    I walked around my house and I called for my           09:15
25    parents' names, but I didn't see anyone so I looked to my   09:15
```

Page 16

| | | |
|---|---|---|
| 1 | left, and my front door was open. | 09:15 |
| 2 | Q    Okay.  And did you walk towards the front door? | 09:15 |
| 3 | A    I did. | 09:15 |
| 4 | Q    Were you in pajamas, school clothes? | 09:15 |
| 5 | A    I was in pajamas. | 09:15 |
| 6 | Q    And when you got to the front door, what did you | 09:15 |
| 7 | see? | 09:15 |
| 8 | A    I saw my mother's phone leaned down on the floor, | 09:15 |
| 9 | and I peeked outside, and there was multiple police cars and | 09:15 |
| 10 | a tank pointed at me. | 09:15 |
| 11 | Q    Okay.  And when you say pointed at you, can you kind | 09:16 |
| 12 | of describe where the police vehicle was parked in the | 09:16 |
| 13 | driveway?  Like, front end in, back end in?  Can you | 09:16 |
| 14 | describe it? | 09:16 |
| 15 | A    Front end facing towards my door. | 09:16 |
| 16 | Q    And is the garage to the residence at the front of | 09:16 |
| 17 | the house? | 09:16 |
| 18 | A    Yes. | 09:16 |
| 19 | Q    So was the front end of the police vehicle pointed | 09:16 |
| 20 | towards the garage or pointed towards the front door? | 09:16 |
| 21 | MS. KINNEY:  And just for the record, are we talking | 09:16 |
| 22 | about the tank type -- what we're calling the tank, the | 09:16 |
| 23 | rescue vehicle? | 09:16 |
| 24 | MS. KINNEY:  The large one. | 09:16 |
| 25 | MS. BOGOSIAN:  Yes, yes. | 09:16 |

Page 17

```
 1        THE WITNESS:  The tank was right next to my garage faced      09:16

 2   directly towards my door.                                          09:16

 3   BY MS. BOGOSIAN:                                                   09:16

 4        Q    At that point when you first saw the police activity     09:16

 5   outside your home, what were you thinking, if anything?            09:16

 6        A    Genuinely, I was just, like, what is going on?           09:16

 7        Q    Okay.  Did you have any idea?                            09:16

 8        A    No.                                                      09:16

 9        Q    Okay.  What did you do next?                             09:16

10        A    I jumped back inside because I was scared, and then      09:16

11   they called my name on their speaker to come outside with my       09:17

12   hands up, and I cooperated.                                        09:17

13        Q    Okay.  What were you scared of?                          09:17

14        A    I was scared of the array of police outside of my        09:17

15   door.                                                              09:17

16        Q    Now, prior to this incident, had you been afraid of      09:17

17   police at all?                                                     09:17

18        A    No.                                                      09:17

19        Q    I mean, did you have a general feeling of fear           09:17

20   towards law enforcement?                                           09:17

21        A    No.                                                      09:17

22        Q    Okay.  So was there anything about what you observed     09:17

23   outside your front door that caused you fear or was it just        09:17

24   their presence?                                                    09:17

25        A    I just wasn't expecting it.                              09:17
```

Page 18

| | | | |
|---|---|---|---|
| 1 | Q | So it was the unexpected that caused you fear? | 09:17 |
| 2 | A | Yes. | 09:17 |
| 3 | Q | Was there anything that the officers were doing that | 09:17 |
| 4 | | caused you fear? | 09:17 |
| 5 | A | I didn't have my glasses on so I couldn't really see | 09:17 |
| 6 | | them at that time. | 09:17 |
| 7 | Q | And do you use glasses for -- are you near-sighted | 09:18 |
| 8 | | or far-sighted? | 09:18 |
| 9 | A | I can't see far. | 09:18 |
| 10 | Q | Okay.  Where were your glasses, do you know, at the | 09:18 |
| 11 | | time? | 09:18 |
| 12 | A | They were in my room. | 09:18 |
| 13 | Q | All right.  Did you go get them? | 09:18 |
| 14 | A | No. | 09:18 |
| 15 | Q | When you first came out to the front door, before | 09:18 |
| 16 | | you jumped back inside, did you see either your mother, | 09:18 |
| 17 | | Christiane, or your father, Sean? | 09:18 |
| 18 | A | No. | 09:18 |
| 19 | Q | Now, when you came back out, when you heard your | 09:18 |
| 20 | | name over the loud speaker, were you facing the police | 09:18 |
| 21 | | rescue vehicle or was your back to it? | 09:18 |
| 22 | A | When I first came out, it was facing the police. | 09:18 |
| 23 | Q | And at some point were you instructed to turn | 09:18 |
| 24 | | around? | 09:18 |
| 25 | A | Yes. | 09:18 |

Page 19

| | | |
|---|---|---|
| 1 | Q    And did you do so? | 09:18 |
| 2 | A    Yes. | 09:18 |
| 3 | Q    Why did you comply with the officer's commands? | 09:18 |
| 4 | A    I was very nervous, and I had no idea what was going | 09:19 |
| 5 | on.  I didn't know if someone had broken into my house so I | 09:19 |
| 6 | thought I would just cooperate with the police and see what | 09:19 |
| 7 | was going on. | 09:19 |
| 8 | Q    Okay.  Did you have a cell phone at the time? | 09:19 |
| 9 | A    Yes. | 09:19 |
| 10 | Q    Where was that located, if you know? | 09:19 |
| 11 | A    I sat it down next to my mother's on the floor. | 09:19 |
| 12 | Q    Did you at any point ask the police officers if you | 09:19 |
| 13 | could call the Santa Ana Police Department to confirm their | 09:19 |
| 14 | presence there, what their presence there was for? | 09:19 |
| 15 | A    I did not ask. | 09:19 |
| 16 | Q    And then did you walk backwards out of the home? | 09:19 |
| 17 | A    Yes. | 09:19 |
| 18 | Q    Did you have shoes on at the time? | 09:19 |
| 19 | A    No. | 09:19 |
| 20 | Q    All right.  So you were in socks or barefoot? | 09:19 |
| 21 | A    Socks. | 09:19 |
| 22 | Q    But you were fully dressed; right? | 09:19 |
| 23 | A    Yes. | 09:19 |
| 24 | Q    All right.  And so you walked backwards, and then | 09:19 |
| 25 | what happened? | 09:19 |

Page 20

| | | | |
|---|---|---|---|
| 1 | A | Eventually, they grabbed me and started patting me | 09:19 |
| 2 | down, and then they instructed me to sit on the curb. | | 09:19 |
| 3 | Q | Okay.  Now, at the time that they patted you | 09:20 |
| 4 | down, did you have any pockets -- | | 09:20 |
| 5 | A | Yes. | 09:20 |
| 6 | Q | -- on any of your pajamas? | 09:20 |
| 7 | A | Yes. | 09:20 |
| 8 | Q | Where were the pockets located? | 09:20 |
| 9 | A | On the sides of my pants. | 09:20 |
| 10 | Q | And is that where they patted you, at your pockets? | 09:20 |
| 11 | A | They patted down full body. | 09:20 |
| 12 | Q | Was it a female officer or a male officer? | 09:20 |
| 13 | A | A male officer. | 09:20 |
| 14 | Q | And did you feel uncomfortable when the officer did | 09:20 |
| 15 | that? | | 09:20 |
| 16 | A | No. | 09:20 |
| 17 | Q | None of the officers had any guns pointed at you; | 09:20 |
| 18 | correct? | | 09:20 |
| 19 | A | They did have guns pointed at me. | 09:20 |
| 20 | Q | And we'll go over the videos, and I'm going to ask | 09:20 |
| 21 | you to show me where the guns were pointed; okay? | | 09:20 |
| 22 | | But no officer used any force on your body?  In other | 09:20 |
| 23 | words, there were no kicks or hits or punches or any type of | | 09:20 |
| 24 | force; correct? | | 09:20 |
| 25 | A | Correct. | 09:20 |

Page 21

| | | |
|---|---|---|
| 1 | Q    And no officer used any weapons -- no baton, no | 09:20 |
| 2 | Taser, nothing like that? | 09:21 |
| 3 | A    Not on me. | 09:21 |
| 4 | Q    All right.  Now, at some point after they patted you | 09:21 |
| 5 | down, they asked you to go sit somewhere or stand somewhere? | 09:21 |
| 6 | A    Sit on the curb. | 09:21 |
| 7 | Q    Okay.  On the curb.  If you're facing your home, to | 09:21 |
| 8 | the right of your home or to the left of your home? | 09:21 |
| 9 | A    I was on the right facing the street. | 09:21 |
| 10 | Q    Okay.  And did you do what they asked? | 09:21 |
| 11 | A    Yes. | 09:21 |
| 12 | Q    Why? | 09:21 |
| 13 | A    Again, I was being cooperative because I had no idea | 09:21 |
| 14 | what was going on. | 09:21 |
| 15 | Q    At the time that you finally got to the curb and | 09:21 |
| 16 | took a seat, did you see either your mother or your father? | 09:21 |
| 17 | A    No. | 09:21 |
| 18 | Q    Okay.  Did you know where they were? | 09:21 |
| 19 | A    No. | 09:21 |
| 20 | Q    Did any officer tell you where they were? | 09:21 |
| 21 | A    No. | 09:21 |
| 22 | Q    Now, at some point an officer contacted you, | 09:21 |
| 23 | correct, while you were on the curb? | 09:21 |
| 24 | A    Yes. | 09:21 |
| 25 | Q    And was that officer kind to you? | 09:21 |

Page 22

JOINT EXHIBIT 256

CONFIDENTIAL

```
 1        A    Yeah.                                            09:21

 2        Q    They were polite?                               09:21

 3        A    Yeah.                                            09:22

 4        Q    They were professional?                         09:22

 5        A    Not really.                                     09:22

 6        Q    Okay.  Tell me why you believe they were not    09:22

 7   professional.                                             09:22

 8        A    Well, for one, they pulled me away from my mother  09:22

 9   for what seemed like no reason, and it was an extremely   09:22

10   awkward situation, and they were -- they lied to me about my  09:22

11   dad being in the police car.                              09:22

12        Q    Okay.  Did you ask where your dad was?          09:22

13        A    Yes.                                            09:22

14        Q    And what did they say?                          09:22

15        A    He told me he didn't know.                      09:22

16        Q    And how do you know that that was a lie?        09:22

17        A    Because I'm pretty sure on bodycam footage from  09:22

18   earlier, he was seen talking to my dad.  I'm not a hundred  09:22

19   percent certain.                                          09:22

20        Q    Okay.  But just because he was talking to your dad  09:22

21   doesn't mean that he knew where he was at the time that you  09:22

22   asked; right?                                             09:22

23        A    Yeah.                                           09:22

24        Q    Okay.  So, technically, that could potentially not  09:22

25   be a lie; right?                                          09:22
```

                                                    Page 23

| | | |
|---|---|---|
| 1 | A    Potentially. | 09:22 |
| 2 | Q    Okay.  Let's talk about your demeanor with the | 09:22 |
| 3 | officers that you interacted with in front of your home. | 09:23 |
| 4 | Would you agree with me that you were kind? | 09:23 |
| 5 | A    Yes. | 09:23 |
| 6 | Q    That you were jovial, like, just smiling and talking | 09:23 |
| 7 | and laughing in a very what I would call, like, a light | 09:23 |
| 8 | manner? | 09:23 |
| 9 | A    I was trying to be. | 09:23 |
| 10 | Q    Okay.  But the video depicts you being very calm and | 09:23 |
| 11 | funny and articulate about your life and things that you had | 09:23 |
| 12 | experienced; right? | 09:23 |
| 13 | A    I was not calm.  I was very nervous and that was | 09:23 |
| 14 | coming out through talking a lot. | 09:23 |
| 15 | Q    Did you tell anyone at the scene that you were | 09:23 |
| 16 | nervous? | 09:23 |
| 17 | A    Not to my memory. | 09:23 |
| 18 | Q    Okay.  Is there any way that the officers who | 09:23 |
| 19 | interacted with you would have known you were nervous? | 09:23 |
| 20 | A    Through body language. | 09:23 |
| 21 | Q    When we get to the videos, if you can show me where | 09:23 |
| 22 | on the videos you see yourself acting nervous; okay? | 09:23 |
| 23 | And the officer that you interacted with mainly in | 09:24 |
| 24 | front of your home, he did not interrogate you at all about | 09:24 |
| 25 | the incident that the officers were there for; right? | 09:24 |

Page 24

1        You got up from the curb and started walking away; do    09:25
2    you see that?                                                09:25
3        A    Yes.                                                09:25
4        Q    Can you tell me what the circumstances were that    09:25
5    caused you to do that?                                       09:25
6        A    The officer pointed me in that direction, and I     09:25
7    thought that he wanted to talk to my mother alone so I       09:25
8    followed the officer leading me.                             09:25
9        Q    At any time prior to you getting up from the curb or 09:26
10   even once you got up, did you object to being separated from  09:26
11   your mother?                                                 09:26
12       A    No.                                                 09:26
13       Q    Did your mother object from your recollection --    09:26
14   we'll watch the video -- to you being separated from her?    09:26
15       A    She asked if she could come with me, but she didn't 09:26
16   object.                                                      09:26
17       Q    What did the officers, if anything, say to her when 09:26
18   she asked if she could come with you?                        09:26
19       A    To my memory, they just told her they needed me     09:26
20   alone.                                                       09:26
21       Q    Do you, I.K., find it at all unreasonable for the   09:26
22   officers to separate potential witnesses of a crime that     09:26
23   they're investigating?                                       09:26
24       A    Yes.                                                09:26
25       Q    You find that unreasonable?                         09:26

                                                        Page 26

| | | |
|---|---|---|
| 1 | A    Yes. | 09:26 |
| 2 | Q    All right.  We're going to start playing again at | 09:26 |
| 3 | 21 seconds. | 09:26 |
| 4 | (Whereupon, a video was played.) | 09:26 |
| 5 | Q    I'm going to stop the video at 43 seconds.  I'm | 09:27 |
| 6 | going to be focused more on where you are in relation to | 09:27 |
| 7 | your mother versus what your mother is saying here.  Do you | 09:27 |
| 8 | see yourself in this video clip? | 09:27 |
| 9 | A    Yes. | 09:27 |
| 10 | Q    And can you just sort of point out where you are by | 09:27 |
| 11 | giving a description with your words for the screenshot | 09:27 |
| 12 | that's on the screen right now? | 09:27 |
| 13 | A    There's about a house between us.  I'm a couple of | 09:27 |
| 14 | feet away. | 09:27 |
| 15 | Q    Okay.  And are you standing in front of your home or | 09:27 |
| 16 | your neighbor's home? | 09:27 |
| 17 | A    More in the middle. | 09:27 |
| 18 | Q    All right.  And what are you wearing there? | 09:27 |
| 19 | A    My pajamas. | 09:27 |
| 20 | Q    Can you describe the color of the shirt and the | 09:27 |
| 21 | pants? | 09:27 |
| 22 | A    My shirt was a tan crop top, and my pants were | 09:27 |
| 23 | black. | 09:27 |
| 24 | Q    All right.  And from where you were standing at this | 09:27 |
| 25 | point, could you see your mom?  In other words, was she | 09:28 |

Page 27

| | | |
|---|---|---|
| 1 | within eyeshot of you? | 09:28 |
| 2 | A    I could see her. | 09:28 |
| 3 | Q    Could you hear her? | 09:28 |
| 4 | A    No. | 09:28 |
| 5 | Q    Okay.  All right. | 09:28 |
| 6 | (Whereupon, a video was played.) | 09:28 |
| 7 | Q    Okay.  I'm at 6:43 on Exhibit 12.3.  Did you | 09:28 |
| 8 | generally stand in the same area location that you're | 09:28 |
| 9 | standing in in this clip? | 09:28 |
| 10 | A    Yeah. | 09:28 |
| 11 | Q    All right.  Did you move from there at all, at least | 09:28 |
| 12 | until you went back inside your residence with your mom? | 09:28 |
| 13 | A    I walked around the same general area, but I didn't | 09:28 |
| 14 | leave. | 09:28 |
| 15 | Q    And did you by chance get the name of the officer | 09:28 |
| 16 | that you were interacting with in this clip?  And we'll play | 09:28 |
| 17 | other clips, but did you know the officer's name? | 09:29 |
| 18 | A    No. | 09:29 |
| 19 | Q    Okay.  In your words, how would you describe the | 09:29 |
| 20 | officer's demeanor and character towards you? | 09:29 |
| 21 | A    Very awkward.  When I was in that situation, it felt | 09:29 |
| 22 | like he didn't want to be there.  It was just polite | 09:29 |
| 23 | conversation, but very tense. | 09:29 |
| 24 | Q    Okay.  Did he at all ever place any hands on you? | 09:29 |
| 25 | A    No. | 09:29 |

Page 28

| | | | |
|---|---|---|---|
| 1 | | you were sleeping? | 09:37 |
| 2 | A | No. | 09:37 |
| 3 | Q | Did you have music playing? | 09:37 |
| 4 | A | No. | 09:37 |
| 5 | Q | Any TV or any other sound on? | 09:37 |
| 6 | A | No. | 09:37 |
| 7 | Q | But you did not hear these announcements? | 09:37 |
| 8 | A | I'm a very heavy sleeper. | 09:37 |
| 9 | Q | Okay.  I'm going to keep playing starting at 5:22. | 09:37 |
| 10 | | (Whereupon, a video was played.) | 09:37 |
| 11 | Q | Now, do you see at the forefront of the screen a | 09:37 |
| 12 | | black item here? | 09:37 |
| 13 | A | Yeah. | 09:38 |
| 14 | Q | Okay.  Let me go back just a little bit and we'll | 09:38 |
| 15 | | play it again. | 09:38 |
| 16 | | (Whereupon, a video was played.) | 09:38 |
| 17 | Q | Do you know what that item is? | 09:38 |
| 18 | A | It looks like a gun. | 09:38 |
| 19 | Q | And where does it appear that the gun is pointing, | 09:38 |
| 20 | | at least in this clip? | 09:38 |
| 21 | A | Currently pointed down. | 09:38 |
| 22 | Q | Okay. | 09:38 |
| 23 | | (Whereupon, a video was played.) | 09:39 |
| 24 | Q | All right.  We just heard an officer say, "I.K, can | 09:39 |
| 25 | | you come to the front door with nothing in your hands?"  Did | 09:39 |

Page 33

```
 1    I repeat that correctly?                              09:39

 2        A    Yes.                                         09:39

 3        Q    Is that what you heard that day?             09:39

 4        A    Yes.                                         09:39

 5        Q    Did you find that that direction was an order or a   09:39

 6    request?                                              09:39

 7        A    An order.                                    09:39

 8        Q    Okay.                                        09:39

 9             (Whereupon, a video was played.)             09:40

10        Q    All right.  Now, in this clip here where I stopped   09:40

11    it at 7:04, an officer approaches you; correct?       09:40

12        A    Yes.                                         09:40

13        Q    Is that the officer that you previously testified   09:40

14    patted you down?                                      09:40

15        A    Yes.                                         09:40

16        Q    Now, we see -- correct me if I'm wrong -- the   09:40

17    officer does not have anything in his hands; correct?   09:40

18        MS. KINNEY:  Objection.  It's blocked by a tree.   09:40

19        If you know.                                      09:40

20    BY MS. BOGOSIAN:                                      09:40

21        Q    Do you want me to go back a little bit?      09:40

22        A    Sure.                                        09:40

23        Q    Okay.                                        09:40

24             (Whereupon, a video was played.)             09:41

25        Q    I want you, instead of focusing on yourself, focus   09:41
```

Page 34

```
 1    interrogation?                                          09:46

 2       A    Yes.                                            09:46

 3       Q    And there were times, at least up to the point where  09:46

 4    we stopped it now at 7:26, where the officer doesn't ask you  09:46

 5    a question and yet you initiate conversation with him;   09:46

 6    correct?                                                09:46

 7       A    Yes.                                            09:46

 8       Q    Okay.  And you're not crying; correct?          09:46

 9       A    Correct.                                        09:46

10       Q    You're not asking to go to your mom; right?     09:46

11       A    Correct.                                        09:47

12       Q    And can you -- from where you're standing, could you  09:47

13    on that day hear your mom speaking?                     09:47

14       A    No.                                             09:47

15       Q    Can you in the video hear her speaking?         09:47

16       A    In the video.                                   09:47

17       Q    Okay.  And you can hear your mom laughing; correct?  09:47

18       A    In the video.                                   09:47

19       Q    All right.                                      09:47

20            (Whereupon, a video was played.)                09:48

21       Q    Would you agree with me that you don't appear   09:48

22    nervous here, at least in this portion?                 09:48

23       A    I do appear nervous.                            09:48

24       Q    Okay.  Would you like me to go back at all for you  09:48

25    to tell me where you started to exhibit signs of nervousness  09:48
```

Page 37

```
 1    or is this a good place to start?                    09:48

 2        A    It's a good place.  I think I show them throughout    09:48

 3    the entire time I'm talking with him.                09:48

 4        Q    What physical attributes did you have that would    09:48

 5    have clued the officer in that you were nervous?     09:48

 6        A    Physically, I'm playing with my hands constantly, I    09:48

 7    keep touching my hair and messing with it, I'm slouched, and    09:48

 8    I keep looking around to try and figure out kind of what's    09:48

 9    happening and to get out of this situation.          09:48

10        Q    Okay.  And at this point where you're conversing    09:49

11    with the officer, did you know where your father was?    09:49

12        A    No.                                          09:49

13        Q    But you knew where your mother was; right?    09:49

14        A    Yes.                                         09:49

15             (Whereupon, a video was played.)            09:50

16        Q    Did the officer make you feel comfortable in    09:50

17    speaking with him?                                   09:50

18        A    Not really.                                  09:50

19        Q    Okay.                                        09:50

20             (Whereupon, a video was played.)            09:51

21        Q    Is it your testimony, prior to this date, you didn't    09:51

22    play with your hair at all?                          09:51

23        A    I did play with my hair.                     09:52

24        Q    Okay.  Is that only when you're nervous?     09:52

25        A    Usually.                                     09:52
```

Page 38

```
 1        A    Later on, I learned that.                    09:57

 2        Q    Okay.  But at this point in the video when you're    09:58

 3   saying, "I think my dad just freaked out," were you not    09:58

 4   referring to the incident where he exhibited a shotgun at an    09:58

 5   individual?                                              09:58

 6        MS. KINNEY:  Objection.  Calls for speculation.    09:58

 7            You can answer.                                09:58

 8        THE WITNESS:  I don't believe I knew at that point.    09:58

 9   BY MS. BOGOSIAN:                                         09:58

10        Q    Okay.  So what you meant by "my dad was freaked out"    09:58

11   was about the police presence?                           09:58

12        A    To my knowledge.                              09:58

13        Q    How did you know that?                        09:58

14        A    Because police were right in front of me.  I saw    09:58

15   them.                                                    09:58

16        Q    How did you know your dad was freaked out by the    09:58

17   police presence was my question.                         09:58

18        A    I don't remember seeing my dad up to this point so I    09:58

19   think my mom must have told me.                          09:58

20            (Whereupon, a video was played.)               09:58

21        Q    All right.  You mentioned something about a backyard    09:58

22   there and kind of freaked out.  What were you referring to    09:58

23   there?                                                   09:58

24        A    From that, it sounds like I knew that someone had    09:58

25   broken into our backyard.                                09:59
```

                                                    Page 42

```
 1       Q    Okay.  Now, you referred to "broken into".  Where    09:59
 2    did you get that idea from?                                   09:59
 3       MS. KINNEY:  Objection to the extent it calls for          09:59
 4    attorney-client privilege.                                    09:59
 5       You can answer for anything you talked to dad about        09:59
 6    or that you know on your own.                                 09:59
 7       THE WITNESS:  The gardeners were not allowed to be in our  09:59
 8    backyard, and he had broken through two fences where he had   09:59
 9    to open it from the inside to get into our backyard.          09:59
10    BY MS. BOGOSIAN:                                              09:59
11       Q    All right.  How did you know the gardeners were not   09:59
12    allowed to be in your backyard?                               09:59
13       A    Because my dad told me later on that day.             09:59
14       Q    You guys were renting the property to the best of     09:59
15    your knowledge; right?                                        09:59
16       A    Yes.                                                  09:59
17       Q    And did you know whether or not the property owners   09:59
18    had hired a landscaping company to do the landscaping?        09:59
19       A    They did.                                             09:59
20       Q    Okay.  And so your dad was telling you his opinion    09:59
21    that the landscaper was not allowed to be in the --           09:59
22       A    Well, the landlords told us.                          09:59
23       Q    You've got to let me finish.                          09:59
24       A    Sorry.                                                10:00
25       Q    That's okay.  Your dad told you later this day,       10:00
```

Page 43

```
 1    BY MS. BOGOSIAN:                                      10:03

 2       Q    So here you ask about the investigation; would you   10:03

 3    agree?                                                10:03

 4       A    Yes.                                          10:03

 5       Q    And you felt comfortable enough to ask that   10:03

 6    question; correct?                                    10:03

 7       A    I wanted to make sure that I was being taken away   10:03

 8    from my parents for a reason.                         10:03

 9       Q    Okay.  But you felt comfortable enough to ask the   10:03

10    officer that; right?                                  10:03

11       A    Yes.                                          10:03

12       Q    You didn't feel that he was going to do anything to   10:03

13    you for asking that question?                         10:03

14       A    No.                                           10:03

15            (Whereupon, a video was played.)              10:04

16       Q    So here you tell the officer that your window was   10:04

17    open; right?                                          10:05

18       A    Right.                                        10:05

19       Q    So when the police were giving instructions to your   10:05

20    mom to come out, you could not hear that?             10:05

21       A    I didn't remember hearing anything, but I guess I   10:05

22    did based off of what I said from this video.         10:05

23       Q    Okay.                                         10:05

24            (Whereupon, a video was played.)              10:07

25       Q    And the entire time you were conversing with   10:07
```

Page 45

```
 1        A    Not pointed at me.                              10:12

 2        Q    Okay.  And the pat down that you previously     10:12

 3   testified about that appears to be depicted in this       10:12

 4   video, let me know if you disagree, it was a quick pat of 10:12

 5   your left and right pant pocket; correct?                 10:12

 6        MS. KINNEY:  I think --                              10:12

 7        MS. BOGOSIAN:  Do you want me to go back?            10:12

 8        MS. KINNEY:  Yeah, because I can't tell if there's   10:12

 9   another officer blocking the pat down.                    10:12

10        MS. BOGOSIAN:  Sure.  And I'm focused on the officer here 10:12

11   where you can clearly see the words "Police" to the left of 10:13

12   the screen.                                               10:13

13        MS. KINNEY:  Yeah.                                   10:13

14             (Whereupon, a video was played.)                10:13

15   BY MS. BOGOSIAN:                                          10:13

16        Q    All right.  Did you see that?                   10:13

17        A    Yes.                                            10:13

18        Q    All right.  We're at 7:08 approximately on this 10:13

19   exhibit.  At no time did the officer touch any of your what 10:13

20   I'm going to refer to as private parts; correct?          10:13

21        A    Correct.                                        10:13

22        Q    Now, prior to this, this clip, when you first exited 10:13

23   the residence, is it your testimony that guns, one or more 10:13

24   guns were pointed at you?                                 10:13

25        A    Yeah.                                           10:13
```

Page 48

```
 1        Q    Okay.  Tell me where the officer who was pointing a    10:13
 2   gun at you was located.                                          10:13
 3        A    You can't see in this video, but I remember there      10:13
 4   being one on top of the tank and, to my memory, on the other     10:13
 5   side of this video.                                              10:14
 6        Q    Okay.  Let me go back a little here on this exhibit    10:14
 7   and see if we can articulate -- okay.  I'm still at              10:14
 8   Exhibit 20.23, but I've gone back to let's just say              10:14
 9   1 minute, 30 seconds.  Do you see -- you see the rescue          10:14
10   video in your driveway; correct?                                 10:14
11        A    Correct.                                               10:14
12        Q    And there are what appear to be possibly three         10:14
13   officers -- actually, there are three officers to the right      10:14
14   of the rescue vehicle; correct?                                  10:14
15        A    Correct.                                               10:14
16        Q    Do you see any officer to the left where the driver    10:14
17   would sit of the rescue vehicle?                                 10:14
18        A    No.                                                    10:14
19        Q    Okay.  I'll keep playing.                              10:14
20             (Whereupon, a video was played.)                       10:16
21        Q    Do you even know why there was a rescue vehicle in     10:16
22   your driveway that day?                                          10:16
23        A    No.                                                    10:16
24        Q    Okay.                                                  10:16
25             (Whereupon, a video was played.)                       10:17
```

Page 49

```
 1        Q    Do you see -- was it your belief that day that there    10:20

 2   was an officer that was essentially coming out of the tank    10:20

 3   up the top of the roof of the rescue vehicle?    10:21

 4        A    Yes.    10:21

 5        Q    And did that -- that's the officer that you are    10:21

 6   alleging pointed a weapon at you?    10:21

 7        A    Yes.    10:21

 8        Q    All right.  Do you see that officer here in either    10:21

 9   this clip -- or I can go back a little bit.  You tell me.    10:21

10        A    When you scroll back, he's on top of it.    10:21

11        Q    Tell me when to stop.    10:21

12             (Whereupon, a video was played.)    10:21

13        A    If you scroll earlier back, you can see.    10:21

14        Q    Go back?  Okay.  Around here?    10:21

15        A    Yeah, you can see him right there.    10:21

16        Q    We're at 6:31.  So it's your testimony that at the    10:21

17   time that you were, what, at the door or walking out that    10:22

18   he, this officer at the top -- we're going to call the top    10:22

19   of the rescue vehicle pointed a gun at you?    10:22

20        A    Yes.    10:22

21        Q    Which one, when you were at the door or when you    10:22

22   were walking out?    10:22

23        A    I was facing away when I was walking out, but I    10:22

24   think still he was pointing the gun at me.    10:22

25        Q    Okay.  I'm having a hard time understanding.  Maybe    10:22
```

Page 51

```
 1    it's because I'm not asking the question clearly.  You said    10:22

 2    earlier, you testified earlier that when you knew that you     10:22

 3    had to come out of the home, you put your cell phone down;     10:22

 4    correct?                                                       10:22

 5        A    Correct.                                              10:22

 6        Q    And you were facing out from the front door, and you  10:22

 7    could see the rescue vehicle in the driveway?                 10:22

 8        A    Correct.                                              10:22

 9        Q    Is that the time that you saw the officer at the top  10:22

10    of the rescue vehicle pointing a weapon at you?               10:22

11        A    Yes.                                                  10:22

12        Q    Okay.  And how long was that weapon pointed at you?   10:22

13        A    To my knowledge, the entire time I was walking out.   10:22

14        Q    But at some point officers asked you to turn around;  10:22

15    correct?                                                       10:23

16        A    Yes.                                                  10:23

17        Q    So your eyes were no longer facing the rescue         10:23

18    vehicle, they were facing your home; correct?                 10:23

19        A    Yes.                                                  10:23

20        Q    Okay.  So when your back was to the rescue vehicle,   10:23

21    you could not see what the officer or officers were           10:23

22    doing; correct?                                               10:23

23        A    Correct.                                              10:23

24        Q    So you do not know if that weapon was still drawn or  10:23

25    lowered; correct?                                             10:23
```

                                                              Page 52

```
 1    you were seated next to your mom until you were returned      10:24
 2    back to your home with your mom, the best estimate of the     10:24
 3    time?                                                         10:24
 4        MS. KINNEY:  Returned to home like inside the house?      10:24
 5        MS. BOGOSIAN:  Walking with your mom to go inside the     10:24
 6    house.                                                        10:24
 7        THE WITNESS:  I would say an hour or two.                 10:24
 8        MS. BOGOSIAN:  Okay.  Let's go to Exhibit 12.111.         10:24
 9            (Exhibit 12.111 was marked for identification         10:25
10            by the Certified Shorthand Reporter, a copy of        10:25
11            which is attached hereto.)                            10:25
12    BY MS. BOGOSIAN:                                              10:25
13        Q    Before I do that, did you watch any Ring video       10:25
14    footage prior to your deposition today?                       10:25
15        A    I watched it when it first happened.                 10:25
16        Q    Okay.  But not since then?                           10:25
17        A    Not since.                                           10:25
18        Q    Okay.  And was that at your request to watch that    10:25
19    footage or it was just sort of a family thing and you were    10:25
20    all watching it together?                                     10:25
21        A    My father showed it to me.                           10:25
22        Q    Do you know why?                                     10:25
23        A    I can't --                                           10:25
24        MS. KINNEY:  Objection.  Calls for speculation.           10:25
25        THE WITNESS:  I can't remember if I asked him or not.     10:25
```

Page 54

| | | |
|---|---|---|
| 1 | this lawsuit?  I know initially when you started, you talked | 10:36 |
| 2 | about justice, but what does that mean to you? | 10:37 |
| 3 | MS. KINNEY:  And I'll object to the extent it calls for | 10:37 |
| 4 | expert opinion and speculation. | 10:37 |
| 5 | And it is a high brow question for you, but you're a | 10:37 |
| 6 | very smart girl, so if you can, answer it. | 10:37 |
| 7 | THE WITNESS:  Well, I want my father and my entire family | 10:37 |
| 8 | to feel safe in our home and to feel like we can go to the | 10:37 |
| 9 | police if needed.  Lately, there has been some efforts of | 10:37 |
| 10 | going to the police for certain things, however, they | 10:37 |
| 11 | haven't helped us, and we don't know if that's because of | 10:37 |
| 12 | the lawsuit or because of other things, and I believe that | 10:37 |
| 13 | we should be able to trust our police and we just can't | 10:37 |
| 14 | anymore. | 10:37 |
| 15 | BY MS. BOGOSIAN: | 10:37 |
| 16 | Q    Have you sought any kind of medical professional | 10:37 |
| 17 | care as a result of this incident?  And what I mean by that | 10:37 |
| 18 | is have you seen any medical professionals, whether they | 10:37 |
| 19 | have an "M.D." behind their name or an RN, any medical | 10:37 |
| 20 | professionals as a result of this incident? | 10:37 |
| 21 | A    No. | 10:38 |
| 22 | Q    Have you sought any kind of psychological or | 10:38 |
| 23 | psychiatric counseling, any kind of counseling whatsoever | 10:38 |
| 24 | from this incident? | 10:38 |
| 25 | A    No. | 10:38 |

Page 64

| | | |
|---|---|---|
| 1 | You testified earlier that you went with your mom to | 10:49 |
| 2 | the police station to pick up your dad; correct? | 10:49 |
| 3 | A    Correct. | 10:49 |
| 4 | Q    And you waited in the front lobby of the police | 10:49 |
| 5 | department? | 10:49 |
| 6 | A    No, we waited outside of the police station on the | 10:49 |
| 7 | steps to get there. | 10:49 |
| 8 | Q    Okay.  At some point did you go inside? | 10:49 |
| 9 | A    No. | 10:49 |
| 10 | Q    You stayed outside the whole time? | 10:49 |
| 11 | A    The whole time. | 10:49 |
| 12 | Q    Okay.  And at some point was your father reunited | 10:49 |
| 13 | with you and your mother? | 10:49 |
| 14 | A    Yeah.  I don't remember reuniting, but it must have | 10:49 |
| 15 | happened, so -- | 10:49 |
| 16 | Q    And when your father came out of the police station | 10:49 |
| 17 | to reunite with you, what was his appearance?  How did he | 10:49 |
| 18 | appear to you? | 10:49 |
| 19 | A    I don't remember him coming out of the police | 10:49 |
| 20 | station. | 10:50 |
| 21 | Q    Okay.  What do you remember? | 10:50 |
| 22 | A    I remember waiting outside for five hours, and then | 10:50 |
| 23 | there's a block in my memory, and then later on I remember | 10:50 |
| 24 | us trying to figure out how to leave. | 10:50 |
| 25 | Q    How to leave? | 10:50 |

Page 69

| | | |
|---|---|---|
| 1 | A    The police station. | 10:50 |
| 2 | Q    Oh, okay.  But at some point your father was | 10:50 |
| 3 | released from custody; right? | 10:50 |
| 4 | A    Yes. | 10:50 |
| 5 | Q    Okay.  And when he was released, what was his | 10:50 |
| 6 | demeanor and behavior, at least as it relates towards you? | 10:50 |
| 7 | A    He seemed frantic and scared. | 10:50 |
| 8 | Q    Okay.  Did he tell you that he had been in a cell or | 10:50 |
| 9 | anything related to his being taken into custody? | 10:50 |
| 10 | A    I believe he was in an interrogation room. | 10:50 |
| 11 | Q    Okay.  And was he sad?  Was he crying?  Did he need | 10:50 |
| 12 | help?  How would you describe that? | 10:50 |
| 13 | A    He told me that he tried to be joking with the | 10:50 |
| 14 | officers to let them know that he was a good guy and I | 10:51 |
| 15 | didn't mean any harm for whatever they were told. | 10:51 |
| 16 | Q    And what did he tell you was the officers' reaction | 10:51 |
| 17 | to that or response to that, if anything? | 10:51 |
| 18 | A    He said that they were joking back and that they | 10:51 |
| 19 | said he was a good guy and he shouldn't be there. | 10:51 |
| 20 | Q    Okay.  Did you take any kind of notes or keep a | 10:51 |
| 21 | journal or a diary as it relates to this incident? | 10:51 |
| 22 | A    No. | 10:51 |
| 23 | Q    Did you make any videos or any audio recordings as | 10:51 |
| 24 | it relates to this incident? | 10:51 |
| 25 | A    When it happened, I had a video on my phone showing | 10:51 |

Page 70

| | | |
|---|---|---|
| 1 | the rescue truck outside of my home, but I tried to find it | 10:51 |
| 2 | a month later and couldn't. | 10:51 |
| 3 | Q     When did you take that video? | 10:51 |
| 4 | A     Right before I exited the front door. | 10:51 |
| 5 | Q     Okay.  Why did you do that? | 10:52 |
| 6 | A     Because I didn't know where my family was, and I | 10:52 |
| 7 | wanted to record for safety purposes. | 10:52 |
| 8 | Q     Did you delete the video? | 10:52 |
| 9 | A     I don't know what happened to it.  I think I must | 10:52 |
| 10 | have. | 10:52 |
| 11 | Q     Okay.  You didn't upload it to a cloud or save it on | 10:52 |
| 12 | any kind of a thumb drive or hard drive? | 10:52 |
| 13 | A     No. | 10:52 |
| 14 | Q     What do you believe that video depicted and how long | 10:52 |
| 15 | was it? | 10:52 |
| 16 | A     I remember it was only 14 seconds, but it was a | 10:52 |
| 17 | shaky video of me coming to the front door.  It showed a | 10:52 |
| 18 | sliver of the police outside my door, and then it showed | 10:52 |
| 19 | them on the speaker phone saying my name and it showed me | 10:52 |
| 20 | jumping back, and then the video ended. | 10:52 |
| 21 | Q     Then you put your phone down? | 10:52 |
| 22 | A     Yeah. | 10:52 |
| 23 | Q     Has your phone been damaged in any way after this | 10:52 |
| 24 | incident that would have caused that video to be deleted? | 10:52 |
| 25 | A     That was my old phone.  It doesn't really work | 10:52 |

Page 71

```
 1    anymore, but I think I might have deleted it accidentally.    10:53

 2        Q    Okay.  Do you think that you might have deleted it    10:53

 3    before you filed the lawsuit or after?    10:53

 4        A    It was before.    10:53

 5        Q    When do you believe that you filed the lawsuit, just    10:53

 6    again, not the exact date, but a month a year if this    10:53

 7    occurred in October of 2021?    10:53

 8        A    I don't remember fully, but I think it was a couple    10:53

 9    of months after the incident.    10:53

10        Q    Okay.  All right.  Going back to Exhibit I which was    10:53

11    your complaint, under general allegations and specifically    10:53

12    Paragraph 22, there are a list of your alleged damages so I    10:53

13    want to talk about those.    10:53

14            The first one is violation of civil rights.  Do you    10:53

15    understand what that is?    10:53

16        A    Can you explain?    10:53

17        Q    No, because I'm not your attorney so I can't explain    10:53

18    it to you, but do you know what it is?    10:54

19        A    Very -- not really.    10:54

20        Q    Okay.  Loss of freedom of expression?    10:54

21        A    Yes.    10:54

22        Q    What is that?    10:54

23        A    I wasn't able to fully talk and walk where I wanted    10:54

24    to, and I was kept outside in a box or in an area.    10:54

25        Q    Did you ask to talk?    10:54
```

Page 72

```
 1    officers consent to enter the home?                10:56

 2        A    I didn't.                                 10:56

 3        MS. KINNEY:  Objection as to timing.           10:56

 4    BY MS. BOGOSIAN:                                   10:56

 5        Q    The next category is loss of enjoyment of privacy.  10:56

 6    Is that the same thing?                            10:56

 7        A    Yes.                                      10:56

 8        Q    About the room, going in your room?        10:56

 9        A    Yes.  I felt uncomfortable with it.        10:56

10        Q    But you didn't pay rent at your home on that date;  10:56

11    correct?                                           10:56

12        A    Correct.                                  10:56

13        Q    It was your father and mother's home; correct?  10:56

14        A    Correct.                                  10:56

15        Q    So if they wanted to give permission to anyone to  10:56

16    enter, they could; right?                          10:56

17        A    Right.                                    10:57

18        Q    Loss of personal liberty and freedom to physically  10:57

19    move about, what is that damage about?             10:57

20        A    The same thing.  I couldn't get up from the curb,  10:57

21    and as I'm talking with the officer, you could see me  10:57

22    looking around and I want to leave, but I can't really.  10:57

23        Q    Okay.  But we didn't hear you on the body-worn  10:57

24    camera footage ever ask the officer if you could; right?  10:57

25        A    Correct.                                  10:57
```

Page 75

```
 1      Q     Next category of damages, humiliation.  What is that   10:57
 2   about?                                                          10:57
 3      A     Same thing with them going into my room.  I remember   10:57
 4   I was very embarrassed because I didn't want them looking       10:57
 5   through my things, and so I was anxious the entire time that    10:57
 6   they were in my house.  And they were where I lived, and I      10:57
 7   didn't know these people, and I didn't feel comfortable with    10:57
 8   them being in my house.                                         10:57
 9      Q     But other than your saying you saw footage of them     10:57
10   entering your room, you don't have any footage or any           10:57
11   evidence that they actually touched any of your belongings;     10:57
12   correct?                                                        10:58
13      A     Correct.                                               10:58
14      Q     Emotional injury, what's that about?                   10:58
15      A     Distrust of the police and not feeling safe around     10:58
16   them anymore and just feeling anxious when police cars or       10:58
17   police are around me now.                                       10:58
18      Q     Okay.  Pain and suffering?                             10:58
19      A     Same thing.                                            10:58
20      Q     Okay.  And extreme mental anguish?                     10:58
21      A     Yeah, just anxiety and being scared of police.        10:58
22      Q     The anxiety is related to law enforcement?             10:58
23      A     Yes.                                                   10:58
24      Q     Okay.  And have you articulated that to any medical    10:58
25   professional?                                                   10:58
```

Page 76

CONFIDENTIAL

```
 1                        CERTIFICATION

 2                             OF

 3               CERTIFIED SHORTHAND REPORTER

 4

 5           I, the undersigned, a Certified Shorthand Reporter

 6      of the State of California do hereby certify:

 7           That the foregoing proceedings were taken before me

 8      at the time and place herein set forth; that any witnesses

 9      in the foregoing proceedings, prior to testifying, were

10      placed under oath; that a verbatim record of the

11      proceedings was made by me using machine shorthand which

12      was thereafter transcribed under my direction; further,

13      that the foregoing is an accurate transcription thereof.

14           I further certify that I am neither financially

15      interested in the action nor a relative or employee of any

16      attorney of any of the parties.

17

18           IN WITNESS HEREOF, I have this date subscribed

19      my name.

20

21

22           Gideon Choi, CSR

23           Certificate No. 13258

24

25           Dated:   April 26, 2025

                                                    Page 81
```

# PART SS

**RELEVANT EXCERPTS OF**

**SEAN KINNEY DEPOSITION**

Sean Phillip Kinney

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  SOUTHERN DIVISION

 4

 5

 6
   SEAN KINNEY,                    )
 7                                 )
                   Plaintiff,      )
 8                                 )
        vs.                        ) Case No.
 9                                 ) 8:24-cv-01286-JWH-JDE
   SANTA ANA POLICE DEPARTMENT;    )
10 CITY OF SANTA ANA; JIMMY        )
   CORREAL, an individual; LUIS    )
11 CASILLAS, an individual;        )
   JESSE HERNANDEZ, an             )
12 individual; DEBORAH WOLEN,      )
   an individual; and DOES 1       )
13 to 35, inclusive,               )
                                   )
14                 Defendants.     )
   _____)
15

16

17

18

19         DEPOSITION OF SEAN PHILLIP KINNEY

20            Wednesday, February 5, 2025

21

22

23

   Reported by:
24 Annette Shaver
   CSR No. 6169
25 Job No. 10157551
```

Sean Phillip Kinney

```
 1                WEDNESDAY, FEBRUARY 5, 2025

 2                        9:35 A.M.

 3                      -- o0o --

 4

 5                  SEAN PHILLIP KINNEY,

 6       called as a witness, having been first duly

 7       sworn in by the reporter, was examined and

 8       testified as follows:

 9

10                      EXAMINATION

11   BY MS. BOGOSIAN:

12       Q.   Please state and spell your full name for

13   the record, including any middle names.

14       A.   Sean, S-e-a-n, Phillip, P-h-i-l-l-i-p,

15   Kinney, K-i-n-n-e-y.

16       Q.   Thank you, sir.  Good morning.

17       A.   Good morning.

18       Q.   Before we went on the record I introduced

19   myself, but I'll do it again for the record.  My

20   name is Tamara Bogosian, I am a Senior Assistant

21   City Attorney with the Santa Ana City Attorney's

22   Office and a police legal advisor.

23       A.   Awesome.

24       Q.   I will be taking your deposition today in

25   connection with the lawsuit that you filed against
```

Page 6

Sean Phillip Kinney

```
 1              (The document referred to was

 2         marked Defendants' Exhibit 11.21

 3         for identification.)

 4    BY MS. BOGOSIAN:

 5         Q.    Sir, do you recognize what's depicted in

 6    this photograph?

 7         A.    It is a shotgun.

 8         Q.    What color?

 9         A.    Black and black metallic, and it looks

10    like the stock -- there's a glare on the screen,

11    it looks like it might be a black or a dark gray.

12         Q.    Do you recognize this shotgun?

13         A.    That is a generic shotgun.

14         Q.    Was that the shotgun that you had in your

15    home on October 4th, 2021 that you pointed at

16    Mr. Felix and then subsequently gave consent for

17    officers to go retrieve?

18         A.    That does not look exactly like it, my gun

19    has a prettier stock.

20         Q.    Okay.  We'll talk about that in just a

21    moment.  Are you saying this could be?

22         A.    It could.  If I was not clear, I'm being

23    very clear now; the picture is low quality, and the

24    stock does -- the color of the stock is different

25    than the pump action bolt, which looks clearly
```

Sean Phillip Kinney

```
 1        A.    I see that.
 2        Q.    Was the shotgun that you pointed at
 3   Mr. Felix that was under your bed in the primary
 4   bedroom that officers seized after you gave them
 5   consent a Maverick 12, I believe "GA" stands for
 6   gauge --
 7        A.    Gauge.
 8        Q.    -- shotgun?
 9        A.    I recalled and told the officers at the
10   time that I thought it was a Remington, not anything
11   else.  I described it and pointed at the shotgun
12   they had in the car as a reference.
13        Q.    Okay.  But what you thought it was was a
14   Remington, but what's noted here in terms of the
15   swab taken by Mr. Wolen is that it's a Maverick;
16   do you see that?
17        A.    I see that's what it says, and I think
18   they are incorrect.
19        Q.    But the serial number here that Miss Wolen
20   has listed, "S/N MV77895B," do you agree or disagree
21   that that matches the photograph of the firearm
22   that I showed you in Exhibit 11.21 and 11.25?  And
23   I can go back to those if you want.
24        MS. KINNEY:  I'll object to the extent it calls
25   for speculation.  If you want to memorize that
```

**Page 89**

Sean Phillip Kinney

```
 1    really quick, the documents speak for themselves.
 2        THE WITNESS:  I agree that that's what was
 3    represented in the picture, I don't agree that that
 4    was my gun.
 5    BY MS. BOGOSIAN:
 6        Q.   Do you know where Miss Wolen would have
 7    gotten a Maverick 12 gauge shotgun?
 8        A.   I'm sure Santa Ana Police Department has
 9    hundreds of shotguns.
10        Q.   So are you alleging that Miss Wolen went
11    to the Santa Ana Police Department and got a shotgun
12    and listed in the report that that was the shotgun
13    taken from your home?
14        A.   I have no idea what she did.
15        Q.   Okay.  Do you have any evidence of that,
16    sir?
17        A.   I have no evidence of what she does on her
18    day-to-day basis, nor am I accusing her of doing
19    anything, she is a probably a sweet, lovely lady;
20    that doesn't mean that some red tape or something
21    got messed up, sorry, I --
22        Q.   We have video of her going into your room
23    to get the weapon.
24        A.   Good.
25        MS. KINNEY:  Let him finish his answer.
```

Sean Phillip Kinney

1    and I am entitled to ask you Interrogatories and

2    propound questions to you as to what evidence you

3    have to dispute a Santa Ana witness.

4        MS. KINNEY:  And I'm objecting that it's

5    argumentative and he answered "I don't know" and

6    you can move on.

7    BY MS. BOGOSIAN:

8        Q.   You don't know if you have evidence or

9    not, is that your answer today here?

10       A.   I don't know what evidence we have, what

11   it does or does not show.

12       Q.   But you still brought a lawsuit one way

13   or another, correct?

14       A.   This has nothing to do with the lawsuit

15   that we brought.

16       Q.   Actually, it does, sir.  I know you haven't

17   read the Complaint, but there is a Cause of Action

18   here in the Complaint for your Second Amendment

19   Right.

20       A.   Great.  They took a gun that looked

21   different than the gun you showed me all day long,

22   and they would not allow us to review the gun to get

23   the serial number so we could register it, and then

24   when we showed up, the gun they gave us back was not

25   the gun that I originally had, that's all it's

1    COUNTY OF LOS ANGELES,   )

2    STATE OF CALIFORNIA,     )

3          I, Annette Shaver, Certified Shorthand

4    Reporter licences in the State of California,

5    License No 6169, hereby certify that the deponent

6    was by me first duly sworn and the foregoing

7    testimony was reported by me and was thereafter

8    transcribed with Computer-Aided Transcription; that

9    the foregoing is a full, complete, and true record

10   of said proceeding.

11         I further certify that I am not of counsel or

12   attorney for either or any of the parties in the

13   foregoing proceeding and caption named or in any

14   way interested in the outcome of the cause in said

15   caption.  The dismantling, unsealing, or unbinding

16   of the transcript will render the reporter's

17   certificates null and void.

18         In witness whereof, I have hereunto set my

19   hand this day: 18th of February, 2025.

20         __X__ Reading and Signing was requested.

21         _____ Reading and Signing was waived.

22         _____ Reading and Signing was not requested.

23

24   _____

25         ANNETTE SHAVER, CSR NO. 6169

**Page 226**

Sean Phillip Kinney

```
1              DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Sean Kinney
          vs. Santa Ana Police Department
3    Date of Deposition: 02/05/2025

4    Job No.: 10157551

5

6              I, SEAN PHILLIP KINNEY, hereby certify

7    under penalty of perjury under the laws of the State of

8    ___California___ that the foregoing is true and correct.

9              Executed this __20th__ day of

10   _____March_____, 2025, at ___Santa Ana___.

11

12

13   _____

14              SEAN PHILLIP KINNEY

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,    proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25
```

**Page 227**

```
1    DEPOSITION ERRATA SHEET
     Case Name: Sean Kinney
2          vs. Santa Ana Police Department
     Name of Witness: Sean Phillip Kinney
3    Date of Deposition: 02/05/2025
     Job No.: 10157551
4    Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
5                   3. To correct transcription errors.
```

6   Page __39__   Line __21__   Reason __3__

7   From ___airplanes___          to ___airports___

8   Page __101__   Line __10__   Reason __1__

9   From ___it___          to ___a shotgun___

10  Page __131__   Line __4__   Reason __3__

11  From ___contactually___          to ___contextually___

12  Page __171__   Line __25__   Reason __2__

13  From ___my___          to ___a___

14  Page __176__   Line __19__   Reason __1, 2, 3__

15  From ___"asked my wife…"___          to ___"asked for my wife…"___

16  Page _____   Line _____   Reason _____

17  From _____          to _____

18  Page _____   Line _____   Reason _____

19  From _____          to _____

20  Page _____   Line _____   Reason _____

21  From _____          to _____

22  Page _____   Line _____   Reason _____

23  From _____          to _____

24  Page _____   Line _____   Reason _____

25  From _____          to _____

**Page 228**

Sean Phillip Kinney

Sean Kinney vs.
Santa Ana Police Department

```
1   DEPOSITION ERRATA SHEET

2   Page _____  Line _____  Reason _____

3   From _____ to _____

4   Page _____  Line _____  Reason _____

5   From _____ to _____

6   Page _____  Line _____  Reason _____

7   From _____ to _____

8   Page _____  Line _____  Reason _____

9   From _____ to _____

10  Page _____  Line _____  Reason _____

11  From _____ to _____

12  Page _____  Line _____  Reason _____

13  From _____ to _____

14  Page _____  Line _____  Reason _____

15  From _____ to _____

16  Page _____  Line _____  Reason _____

17  From _____ to _____

18  Page _____  Line _____  Reason _____

19  From _____ to _____

20  Page _____  Line _____  Reason _____

21  From _____ to _____

22  ___X___  Subject to the above changes, I certify that the
             transcript is true and correct
23  _____  No changes have been made. I certify that the
             transcript  is true and correct.

24          _____

25          SEAN PHILLIP KINNEY
```

**Page 229**

# PART TT

**RELEVANT EXCERPTS OF**

**TOC BUI DEPOSITION**

# CERTIFIED TRANSCRIPT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN KINNEY, ) | CASE NO. 8:24-cv-01286-JWH-JDE |
| ) | |
| Plaintiff, ) | HON. JOHN W. HOLCOMB |
| ) | |
| vs. ) | DEPOSITION OF SANTA ANA |
| ) | POLICE DEPARTMENT PMK |
| SANTA ANA POLICE ) | |
| DEPARTMENT; CITY OF ) | TUC BUI |
| SANTA ANA; JIMMY CORREAL, ) | |
| an individual; LUIS ) | |
| CASILLAS, an individual; ) | |
| JESSE HERNANDEZ, an ) | |
| individual; DEBORAH WOLEN, ) | |
| an individual; and DOES 1 ) | |
| to 35, inclusive, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| AND ALL RELATED ACTIONS. ) | |
| _____ ) | |

THURSDAY, OCTOBER 2, 2025

VIA VIDEOCONFERENCE

NAN HOMAN COURT REPORTING
Certified Deposition Reporters

1200 Wilshire Boulevard, Suite 408
Los Angeles, CA 90017

Tel: 844-771-9354  Fax: 213-683-0340

REPORTED BY:  CYNTHIA J. M. GORDON
CERTIFICATE NO. 12834

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   SEAN KINNEY,                )   CASE NO. 8:24-cv-01286-
                                )              JWH-JDE
5                               )
                Plaintiff,      )   HON. JOHN W. HOLCOMB
6                               )
         vs.                    )
7                               )
    SANTA ANA POLICE            )
8   DEPARTMENT; CITY OF         )
    SANTA ANA; JIMMY CORREAL,   )
9   an individual; LUIS         )
    CASILLAS, an individual;    )
10  JESSE HERNANDEZ, an         )
    individual; DEBORAH WOLEN,  )
11  an individual; and DOES 1   )
    to 35, inclusive,           )
12                              )
                Defendants.     )
13                              )
                                )
14  AND ALL RELATED ACTIONS.    )
    _____)

15

16          DEPOSITION OF SANTA ANA POLICE DEPARTMENT PMK

17                        TUC BUI,

18          taken on behalf of the Plaintiffs, via

19          videoconference, at 11:04 a.m., on

20          Thursday, October 2, 2025, before Cynthia J. M.

21          Gordon, CSR No. 12834, a Certified Shorthand

22          Reporter for the State of California, pursuant

23          to Notice.

24

25

```
 1        VIA VIDEOCONFERENCE - THURSDAY, OCTOBER 2, 2025

 2               11:04 A.M. - 12:27 P.M.

 3                       -oOo-

 4

 5        SANTA ANA POLICE DEPARTMENT PMK - TUC BUI,

 6           having been first duly placed under oath,

 7           was examined and testified as follows:

 8

 9        THE REPORTER:  This is Cynthia Gordon, CSR 12834.

10

11                    EXAMINATION

12   BY MS. KINNEY:

13      Q    Is it Officer Bui?

14      A    No, ma'am.  It's police evidence and supplies

15   specialist supervisor.

16      Q    Okay.  Is Mr. Bui okay for the purposes --

17      A    Yeah.

18      Q    -- of this depo?

19      A    Yeah.

20      Q    That would be a very long mouthful for me to say

21   every time.

22           Mr. Bui, have you had any previous depositions

23   before?

24      A    No, ma'am.

25      Q    Okay.  Perfect.
```

```
 1        A    Yes, ma'am.

 2        Q    Okay.  Wonderful.

 3             Have you ever seen this document before?

 4             That's the end of it.  Oh.

 5        A    I don't recall.

 6        Q    Okay.  I'll represent it's the deposition Notice

 7   that you're here for today.  Regardless of seeing this

 8   before, my understanding is you've been designated to talk

 9   about certain categories or topics that we asked for

10   on this Exhibit A.

11             Are you aware of the categories that you've been

12   designated to testify about?

13        A    Yes, ma'am.

14        Q    Okay.  What are those?

15             MS. WILLIAMS:  For the record, this witness is

16   here to address Category 7 and, I believe it's,

17   Category 14.

18             MS. KINNEY:  Okay.  Let's go through that, then.

19   BY MS. KINNEY:

20        Q    So, Category 7 is the chain of custody for the

21   shotgun seized in the October 4, 2021 incident.

22             Is that your understanding, that you've been

23   designated to testify about that?

24        A    Yes, ma'am.

25        Q    Okay.  Category 14 is more broad.  The specific
```

1    policies and procedures governing the return of seized

2    weapons.

3            Is that your understanding, that you've been

4    designated to talk about that today?

5        A    Yes, ma'am.

6    Q    Okay.  Is there anything else you've been

7    designated to testify about on this list, to your

8    knowledge?

9        A    No, ma'am.

10    Q    Okay.  Wonderful.

11            All right.  Let me close this.  Let's start --

12    hold on one sec.

13            What materials have you reviewed in preparation

14    for your testimony on these topics today?

15        A    I've looked at the chain of custody.  I

16    reviewed the property receipt.  I've looked at the

17    DOJ Law Enforcement Release Form, which authorized the

18    release of the weapon.  And I've also looked at the

19    Firearm Tracking Sheet.

20        Q    Did you review any body camera footage relevant

21    to your testimony on chain of custody?

22        A    No, ma'am.

23        Q    Okay.  Have you identified all documents that you

24    reviewed relevant to the chain of custody?

25        A    I believe so, ma'am.

1    Q    Okay.  In reference to Category 14, which we'll
2    also talk about, have you looked at any of the Santa Ana
3    Police Department policies for what protocols to follow
4    in connection with the return of the seized weapon?
5    A    Yes, ma'am.
6    Q    Okay.  What policies did you review?
7    A    It is 6103.6.19.
8    Q    Okay.  Is that the only part of Policy 6103 that
9    you focused on?
10   A    Yes, ma'am.
11   Q    Okay.  Did you speak with anyone other than your
12   counsel to prepare for the deposition?
13   A    No, ma'am.
14   Q    Do you perform any online searches for
15   information concerning other of these topics?
16   A    No, ma'am.
17   Q    Do you believe you've reviewed all information
18   known or reasonably available to the Police Department
19   regarding the Notice to topics?
20   A    Yes, ma'am.
21   Q    Wonderful.
22        Is there any area within these two designated
23   topics today where you feel you've not -- you do not have
24   sufficient knowledge to testify on those topics?
25   A    No, ma'am.

1    Q    Okay.  Let's start with Category 7 of the depo

2   Notice, which is the chain of custody for the shotgun

3   seized in the October 4th incident.  Give me just one

4   moment.

5        Okay.  Based on your review of this matter, I'd

6   like you to walk me through what the chain of custody was

7   for the shotgun seized on October 4, 2021.

8        Before doing that, what is your -- how would you

9   explain what the phrase "chain of custody" means?

10   A    Chain of custody is the -- the tracking of

11   all -- of all or any property that enters into evidence

12   and is released to any individual.  Once it's released,

13   we track where it went, if it went to an investigator and

14   when it came back and the final location of it.  That's

15   the chain of custody.  It's just the tracking of the

16   package --

17   Q    Okay.

18   A    -- as long as it's in our possession.

19   Q    Are there specific reports that are required by

20   the Santa Ana Police Department to be filled out in order

21   to keep track of this chain of custody?

22        MS. WILLIAMS:  Overly broad.  Incomplete

23   hypothetical.  Vague.

24        You can answer, sir.

25        THE WITNESS:  We -- we track everything digitally

```
 1   that comes through us.  We scan it in or code it
 2   so we understand where the property is at all times.
 3   BY MS. KINNEY:
 4       Q    So, if an officer handles property on the scene
 5   and then passes it off, does that get recorded?
 6           MS. WILLIAMS:  Overly broad.  Vague.  Incomplete
 7   hypothetical.
 8           Go ahead.
 9           THE WITNESS:  I wouldn't know, ma'am.  I could
10   only tell you once we receive it.
11   BY MS. KINNEY:
12       Q    Okay.  So, the chain of custody actually starts
13   getting tracked at the point that it arrives at your
14   department or at the police station?  Or when do you start
15   tracking it?
16           MS. WILLIAMS:  Lacks foundation.  Vague.
17   Incomplete hypothetical.
18           THE WITNESS:  I track it once I physically touch
19   the property.
20   BY MS. KINNEY:
21       Q    Okay.  Is that when it's at the Santa Ana
22   Police Department?
23       A    Correct.
24       Q    As part of the chain of custody tracking, are you
25   aware whether a CLETS entry form for firearms was ever
```

1    Q    Are you able to walk me through the proper

2  procedure, according to Santa Ana Police Department

3  policies, for chain of custody in terms of how weapons

4  should be handled once they are seized?

5    A    I can walk you through once we receive it.  Which

6  is, the officer would book it in; they would place it into

7  an evidence locker located with the Police Department; one

8  of our staff would collect that weapon; we would scan it,

9  since there would be a bar code attached to it; once we

10 scan that item, we would move it to a designated location

11 within the office that the item would fit, we place it in

12 there; and we would scan that location.

13         At that point, that weapon would be at that

14 location until it's been requested by a detective, a crime

15 scene investigator for whatever reason.  But we would not

16 move that item at that point.

17   Q    Okay.  Do you know if the shotgun in question was

18 ever requested by a detective or crime seen investigator

19 after it was placed within your office?

20   A    Yes, ma'am.

21   Q    Okay.  Who was it requested by?

22   A    It was requested by the crime lab.  The person

23 it was released to was Kenneth Nakanishi.

24   Q    Can you spell that for everybody?

25   A    It's N-a-k-a-n-i-s-h-i.  Badge Number 3640.

1    Q    Okay.  In the chain of custody documents you're

2    looking at, can you tell how long the shotgun was in

3    Mr. -- or Officer Nakanishi's possession?

4    A    I can only tell when it was returned back to us,

5    ma'am.

6    Q    Does it not get tracked once it's released to the

7    crime lab, as far as who handles it there?

8         MS. WILLIAMS:  Lacks --

9         THE WITNESS:  Not --

10         MS. WILLIAMS:  -- foundation.

11         Go ahead.

12         THE WITNESS:  Sorry.

13         Not from our end.

14    BY MS. KINNEY:

15    Q    Do you know if anybody tracks that?

16    A    I do not know.

17    Q    When -- what was the day that it was released to

18    Nakanishi?

19    A    October 5th, 2021.

20    Q    What was the next date, the date that it was

21    returned to you?

22    A    October 8th, 2021.

23    Q    Were there any other requests for release of the

24    shotgun outside of Nakanishi?

25    A    No, ma'am.

1      Q    Okay.  Do you have any knowledge of what

2    the crime lab did with the shotgun while it was in

3    their possession?

4      A    No, ma'am.

5      Q    Just to clarify, when we talk about chain of

6    custody as it is tracked by the Santa Ana Police

7    Department, it does not track anything happening at the

8    scene?  It's from the point that you receive it?  And if

9    it goes outside, that's also not tracked; correct?

10            MS. WILLIAMS:  Lacks foundation.  Misstates

11   the Witness's testimony.  Goes beyond the scope of this

12   Witness's designated categories.

13   BY MS. KINNEY:

14      Q    You can answer, if you understand the question.

15      A    I can only tell you what happens to it once

16   it comes into our possession.

17      Q    Okay.  Let's see.  You said you looked at the

18   chain of custody.

19            Is there a document that lists the chain of

20   custody?

21      A    Yes, ma'am.

22      Q    Okay.  Can you walk me through what that document

23   says?

24      A    The document that I'm looking at shows that

25   it was booked in by CSI Debbie Wolen on 10-4-2021.

1          On 10-5-2021, Staff Allen Crowe, Badge Number

2     3031, took possession of the weapon and located it to a

3     designated area, which was Long Gun 69.

4          On October 5th, 2021, Kenneth Nakanishi received

5     the gun from Staff Kyle Matlock.

6          On October 8th, 2021, it was returned back to

7     Staff Alan Crowe, who moved the weapon to the designated

8     location of Long Gun 35.

9          Then on June 14th, 2022, the weapon was released

10    by Staff Tiffany Laregos to a Mr. Sean Phillip Kinney.

11        Q    Okay.  Have you told me all of the information

12    of -- that's documented for the chain of custody of the

13    shotgun?

14             MS. WILLIAMS:  Vague and ambiguous.  Overly

15    broad.

16    BY MS. KINNEY:

17        Q    Go ahead.

18             MS. WILLIAMS:  For that specific document?

19             MS. KINNEY:  Yes.

20             MS. WILLIAMS:  You can answer, sir.

21             THE WITNESS:  Yes, ma'am, that is directly from

22    our chain of custody.

23    BY MS. KINNEY:

24        Q    Perfect.

25             You also mentioned reviewing the

1          A      That is the time when we physically are in

2    possession of it.

3          Q      Correct.

4                 So, I'll ask again:  Do you know the total number

5    who handled the shotgun from the point it was initially

6    seized beneath the bed on October 4th, 2021 until the time

7    it was returned to Mr. Kinney?

8          A      No, ma'am.

9          Q      Okay.  All the people on the chain of custody

10   report that you are aware of, are they all employed by the

11   Santa Ana Police Department?

12                MS. WILLIAMS:  Vague and ambiguous.  Vague as to

13   time.  Calls for speculation.

14                MS. KINNEY:  At the time of.

15                THE WITNESS:  Yes, ma'am.

16   BY MS. KINNEY:

17         Q      I think you answered this.  I apologize.

18                But, again, onsite -- if a shotgun is handed off

19   to another officer onsite before it gets to you, are you

20   aware whether they're required under Santa Ana

21   Police Department procedures or policies to do anything

22   to address that changing of the guard?

23                MS. WILLIAMS:  Vague and ambiguous.  Calls for

24   speculation.  Incomplete hypothetical.  It goes beyond the

25   scope of this witness's designated categories.

1    BY MS. KINNEY:

2        Q    You can answer.

3        A    No, ma'am.

4        Q    Okay.  Are you aware under, again, Santa Ana

5    Police Department's policies and procedures once a shotgun

6    has been seized onsite whether an officer is supposed

7    to stay with the shotgun the whole time until it gets to

8    the police station for tagging or processing?

9            MS. WILLIAMS:  Vague and ambiguous.  Overly

10   broad.  Incomplete hypothetical.  And goes beyond the

11   scope of this witness's designated categories.

12           I'm going to instruct the Witness not to answer.

13           Because the category is the chain of custody for

14   this shotgun, not policies and procedures regarding

15   chain of custody.

16           MS. KINNEY:  Well, we also have Category 14.  I

17   think that they go in tandem here

18           MS. WILLIAMS:  Which is the return of these

19   weapons, not chain of custody.

20           MS. KINNEY:  Oh, I understand.  But this is the

21   chain of custody for this weapon.  And if he's here to

22   talk about that chain of custody and policies for return,

23   I think that it's a fair question.

24   BY MS. KINNEY:

25       Q    Are you going to follow your attorney's

```
 1            Is it accurate that a firearm will only be
 2   released under Santa Ana Police Department policies with
 3   an approved Law Enforcement Release Application which gets
 4   handle by the California Department of Justice?
 5       A    Could you repeat that, please?
 6       Q    Yes.
 7            MS. KINNEY:  Cynthia, do you mind re-reading it
 8   for the Witness?
 9            (The record was read as follows:
10            "QUESTION:  Is it accurate that a firearm
11            will only be released under Santa Ana
12            Police Department policies with an approved
13            law Enforcement Release Application which gets
14            handle by the California Department of Justice?")
15            THE WITNESS:  Correct.  Yes, ma'am.
16   BY MS. KINNEY:
17       Q    Okay.  Is it -- is it accurate that that approval
18   is only good for 30 days from the date of those letters?
19       A    Yes, ma'am.
20       Q    Okay.  Is it true that a person cannot submit
21   a Law Enforcement Release Application until they're
22   first notified by a Santa Ana Police Department evidence
23   specialist following a written request for the return of
24   property that a firearm has been approved for release?
25            MS. WILLIAMS:  Incomplete hypothetical.  Vague
```

1  and ambiguous.

2  BY MS. KINNEY:

3       Q    You can answer, if you know.

4       A    Yes, ma'am.

5       Q    Okay.  Do you know how long that process usually

6  takes from the Santa Ana Police Department's side?

7            MS. WILLIAMS:  Overly broad.  Calls for

8  speculation.  Incomplete hypothetical.

9  BY MS. KINNEY:

10      Q    You can answer.

11      A    No, ma'am.

12      Q    Okay.  There's nothing in the written policies

13  specifying, you know, this -- that process is only

14  supposed to take "X" amount of time; right?  It can vary?

15           MS. WILLIAMS:  Calls for speculation.

16           You can answer, if you're able.

17           THE WITNESS:  There is nothing stating timeframe

18  now.

19  BY MS. KINNEY:

20      Q    Is it a policy that the SAPD will only retain

21  firearms for up to six months, and after that point, they

22  can destroy the evidence?

23           MS. WILLIAMS:  Overly broad.  Vague and

24  ambiguous.  Incomplete hypothetical.

25  ///

```
 1   BY MS. KINNEY:

 2        Q    You can answer.

 3        A    No, ma'am.

 4        Q    No?

 5             Okay.  I believe we read something about a

 6   180-day hold period, and then they can destroy a weapon.

 7             MS. WILLIAMS:  The policy said after notification

 8   that the firearm can be released.

 9   BY MS. KINNEY:

10        Q    Is that your understanding?

11        A    Yes, ma'am.

12        Q    Okay.  Does the Santa Ana Police Department

13   require that people trying to seek the return of their

14   weapon seek an appointment with an evidence specialist for

15   that property release?  They have to schedule a date

16   before they come in and get it?

17             MS. WILLIAMS:  Overly broad.  Incomplete

18   hypothetical.  Vague and ambiguous.

19   BY MS. KINNEY:

20        Q    You can answer.

21        A    It's not written, ma'am.

22        Q    But is that an unwritten rule of how the

23   Santa Ana Police Department handles the release or return

24   of a seized weapon?  They require an appointment?

25        A    To best be efficient, yes, ma'am.
```

```
 1    storage fees be paid in cash?
 2            MS. WILLIAMS:  Calls for speculation.  Goes
 3    beyond the scope of this witness's designated categories.
 4            You can answer, if you're able.
 5            THE WITNESS:  I am not aware, ma'am.
 6    BY MS. KINNEY:
 7        Q    Do you know how information gets conveyed
 8    to property owners about all of the things they're
 9    required to bring with them for the return of a seized
10    weapon?
11            MS. WILLIAMS:  Incomplete hypothetical.  Vague.
12            You can answer.
13            THE WITNESS:  From our end, we send a letter,
14    a postcard, advising that their weapon can be picked up
15    and "Please contact us so that we can give you further
16    information."
17    BY MS. KINNEY:
18        Q    So, the further information is just conveyed with
19    the evidence specialist when they set up an appointment?
20        A    Yes.  The -- the letter would basically tell,
21    "Contact us so that we can advise you to go ahead and
22    apply for the Law Enforcement Release letter.
23        Q    Are you aware whether or not that happened
24    in this case?
25            MS. WILLIAMS:  Calls for speculation.  Goes
```

JOINT EXHIBIT 309

1    I, CYNTHIA J. M. GORDON, CSR 12834, a Certified

2    Shorthand Reporter within and for the State of California,

3    do hereby declare:

4    That pursuant to 2093(b) CCP, I administered the

5    oath to the deponent;

6    That the foregoing videoconference deposition was

7    taken before me at the time and place set forth and was

8    taken down by me in shorthand and thereafter transcribed

9    into typewriting under my direction and supervision;

10    That the foregoing videoconference deposition is

11    a full, true and correct transcript of my shorthand notes

12    so taken.

13    I further declare that I am neither counsel for

14    nor related to any of the parties to said action nor in

15    any way interested in the outcome thereof.

16    I declare under penalty of perjury this 12th day

17    of October, 2025, that the foregoing is true and correct.

18

19

20

21    CYNTHIA J. M. GORDON
CERTIFIED SHORTHAND REPORTER
22    FOR THE STATE OF CALIFORNIA

23

24

25

# PART UU

## NEWS ARTICLE FROM THE SANTANERO

JOINT EXHIBIT 310





**Santanero**



OPINION

# Opinion: Santa Ana's Police Policies Betray Public Trust



**Ray Diaz**

*15 Jan 2025 — 3 min read*

Published: January 15, 2025, 8:31 am

↳ Last updated: January 22, 2025, 4:57 am

💬 0    ⬆ Share

The Santa Ana Police Department's (SAPD) lack of transparency and accountability in its use of militarized equipment is a betrayal of public trust and a violation of state law.

In 2022, the Santa Ana City Council approved a military equipmentment use policy in a 4-2-1 vote. While Councilmembers Jessie Lopez, David Penaloza, Thai Viet Phan, and former Councilmember Nelida Mendoza voted in favor, Councilmember Johnathan Ryan Hernandez and former Mayor Vicente Sarmiento dissented, voicing concerns about the policy's implications for community safety and trust. I argue that the community concerns are well-founded.

Santa Ana's use of military equipment remains out of compliance with two critical state laws: AB 481 and AB 48. AB 481 requires California law enforcement agencies to publish detailed information about their militarized gear and to engage the community in discussions about its use. AB 48 restricts the use of chemical agents and "less lethal" projectiles for crowd control unless there is an imminent threat of death or great bodily injury. Yet, Santa Ana's officials have failed to meet these legal obligations. The SAPD has not published its finalized military equipment use policy, annual public reports, or held the mandatory community engagement meetings.

Councilmember Hernandez's remarks at the May 17, 2022 City Council meeting underline the need for reform: "To have policing strategies that are overly aggressive does not contribute to us feeling safer."

Santa Ana's neglect stands in stark contrast to neighboring cities like Anaheim, Tustin, and Irvine, which maintain accessible websites featuring updated military equipment policies and annual public reports. These cities provide a blueprint for transparency and accountability, showing that compliance with the law is both possible and necessary. The SAPD's continued failure to follow suit raises troubling questions about its commitment to serving the public. If other cities can meet these standards, why can't Santa Ana?

The urgency of these requirements is highlighted by recent incidents of police misconduct involving militarized equipment. During the 2020 civil unrest following the murder of George Floyd, Santa Ana police fired tear gas canisters and rubber bullets at protesters. On September 28, 2021, Santa Ana police deployed a Bearcat SWAT vehicle in a stand-off that ended in the death of Brandon Lopez, an unarmed man shot 22 times by Anaheim police while his

family for nearly $6 million in June 2024. These tragedies underscore the dangers of militarized policing and the urgent need for accountability. The use of military-grade equipment in such situations does not enhance public safety; it endangers lives and deepens the divide between law enforcement and the community.

## A Call to Action for Santa Ana's Future

Santa Ana residents must demand immediate action from city leaders to address critical issues surrounding police practices and public safety. The time for transparency, accountability, and meaningful reform is now.

To start, the Santa Ana Police Department (SAPD) must enforce **full compliance** with AB 481 and AB 48. This means publishing a finalized military equipment use policy, releasing annual public reports, and scheduling accessible, well-publicized community engagement meetings. These steps are not just requirements of the law—they are essential for rebuilding trust between law enforcement and the community.

City leaders must prioritize increasing oversight of the SAPD. Hiring an Oversight Director and empowering the Santa Ana Police Oversight Commission (SAPOC) to thoroughly review the department's use of militarized equipment are necessary measures to ensure compliance with state laws and maintain checks on police power.

Equally important is the need to prioritize de-escalation in policing strategies. Investments should be made in non-lethal alternatives, and comprehensive training for officers in de-escalation techniques.

The community must be at the heart of these reforms. Santa Ana's leaders should establish regular forums where residents can openly voice concerns, ask questions, and provide feedback about police policies and practices. Dialogue is essential for creating a more inclusive and equitable approach to public safety.

Santa Ana's leaders have a choice: continue to enable a culture of misconduct and dangerous policing practices, or take meaningful steps toward transparency,

**safety cannot come at the expense of public trust.**

The SAPD must not only comply with state laws but also strive to become a model of integrity and accountability. Anything less is unacceptable.

 *The Santanero* accepts opinion articles on any topic involving Santa Ana. Views written and published do not represent the views of *The Santanero*. You can publish your [own opinion piece](#) or comment below by [signing up](#) for free.



### Ray Diaz

Ray Diaz is a Santanero, dedicated advocate, educator, and writer with a passion for community empowerment and social justice. He holds a B.A. in Politics and is committed to public service and equity

**ALL ARTICLES >**

Tags:  OPINION

## Comments

0 comments

### Start the conversation

Become a member of **The Santanero** to start commenting.

**Sign up now**

Already a member? **Sign in**

# More in Opinion

JOINT EXHIBIT 314



OPINION

## *High Cost of Living is Redefining the American Dream*

*by* THE SANTANERO OPINION   /   MAY 9, 2024



  

Subscribe

©2025 The Santanero. Published with Ghost & Gazet.

# PART VV

## NEWS ARTICLE FROM THE LAIST



Become a sponsor

Audience-funded nonprofit news

NEWS                    ((•)) LISTEN                    DONA

CIVICS & DEMOCRACY

# Santa Ana police have been violating state military equipment law for 2 years: 'We messed up'

By [Yusra Farzan](#)

Published Aug 15, 2025 5:00 AM



Reinforcements from the Santa Ana Police Department arrive to keep the demonstrators from advancing on Bristol Street during a protest against the Minneapolis police killing of George Floyd during the coronavirus pandemic in 2020.

(Ana Ferazzi/Los Angeles Times via Getty Imag / Los Angeles Times)

*With our free press under threat and federal funding for public media gone, your support matters more than ever. Help keep the LAist newsroom strong,* [*become a monthly member or increase your support today during our fall member drive.*](#)

...ublicly document how they use military equipment, including less-lethal bean bag shotgun rounds, drones and armored vehicles, under a state law passed in 2022.

...ut Santa Ana's Police Department has been out of compliance with this law for the past two years, Commander Mat Sorenson told a crowd of about 10 people at a community meeting Wednesday.

..."We messed up," Sorenson said. "We dropped the ball, now we're trying to fix it."

...he law, Assembly Bill 481, requires law enforcement to make annual public reports describing how and why military equipment was deployed, including summaries of complaints, internal investigations and potential violations related to the equipment.



Support for LAist comes from

Become a sponsor

...olice Chief Robert Rodriguez said the department prepared ...eports for the years of 2023 and 2024. But because of what ...odriguez called an "administrative oversight," those reports were ...ot shared publicly or presented to city leaders as required by the ...w to continue using the weapons.

...he department retroactively produced the reports and discussed a ...eport covering the past year at the sparsely attended community ...eeting Wednesday afternoon. LAist spoke with everyone who ...ttended the meeting as a community member. Each one said they

etail in the reports.

INT EXHIBIT 317

avid Pulido — who's on the police accountability committee at
ommunity Service Organization Orange County, a group
dvocating for Chicano rights — told LAist after the meeting, "I
asn't happy with the presentation. I felt it was kind of like
nning cover for the department. It was brief, not well publicized,
oorly attended."

## What the reports say

ccording to a report covering May 2024 to April 2025 that was
resented Wednesday, the Santa Ana Police Department has access
o military equipment like armored vehicles, a "long range acoustic
evice" and one "tactical robot." The report says the maintenance
f the equipment cost the department around $30,000.

he report lacks summaries of why and how the equipment was
eployed. It explains that Santa Ana police deployed military
quipment in response to "field based incidents" 30 times —
ncluding four instances with the SWAT team — and to
community events" 11 times. Police detained 21 suspects while
sing military equipment, the report states.

---

rending on LAist

 LA County district attorney announces charges against 13
county employees for unemployment fraud

 What does LA's emergency declaration on the ICE raids mean?

 Kaiser nurses go on strike in the pouring rain. Here's why —
and how it will affect patients

We are looking for men who haven't exercised in years and want to start a body transformation challenge till the mid of Autumn 2025 with our TAI CHI PROGRAM!

MAD

Become a sponsor

o information was provided on whether the use of these weapons esulted in serious injuries. The report does say that no one was lled by Santa Ana police using military equipment during the view period.

ccording to the report, the police department did not receive ommunity complaints and the use of these weapons were eemed appropriate" per an internal review by police.

## roblems with the law

he contents of military equipment reports vary by agency. If those attendance Wednesday are disappointed with the thoroughness Santa Ana's reports, Sorenson said they could blame state wmakers.

The legislature's very good at telling us what we have to do, but ot how to do it," Sorenson told the audience.

e said he looked at other agencies' reports: some that were a few ages long, others that were 65 pages long, and picked a happy edium.

don't know that anybody's gonna go through 65 pages of stuff," orenson said.



# Watch What Happens When Older Dogs Eat Eggs...



Become a sponsor

...lido, of the Community Service Organization Orange County, ...greed that weaknesses in the report stem from weaknesses in the ...nderlying law.

...t's not enough to have a report," he said, adding that a report can ...e "biased" as it is up to law enforcement agencies on how they ...ant to frame it. The report provided by Santa Ana police was ...very brief" and "lacking information," Pulido said.

...ssembly Bill 481 does not lay out any enforcement mechanisms, ...nother weakness according to Pulido.

...f it has no enforcement mechanisms, it's not gonna get enforced," ...e said.

## ...ommunity weighs in

...he presentation did not satisfy Bulmaro "Boomer" Vicente, a ...sident of Santa Ana and policy and political director at Chispa ...ho was at Wednesday's meeting.

...t was concerned and disappointed in the report itself because ...here were some things that were missing, some costs that were ...issing as it related to transportation personnel costs, training ...d usage upgrade, things that should have been included," Vicente ...id. "His response to not having a more detailed report is he ...oesn't think people will read them, which is very problematic."




# Watch What Happens When Older Dogs Eat Eggs...

Become a sponsor

icente added that the report lacked information "important for transparency, for accountability, and also to ensure that epartment is being fully compliant with state law."

icente was also disappointed that the meeting appeared to be astily put together for a time when few people could attend.

he meeting was announced on the police department's social edia accounts on July 10 and held at the department's eadquarters at 4 p.m. before the end of a typical work day. Vicente id that time and location was not accessible for all constituents the city.

e said he wishes the meeting was held at a time where working ass families can attend and at a "more community central space here people who may not feel comfortable entering the police epartment can have the opportunity and feel comfortable in xpressing their questions, their concerns, and their grievances."

## ity leader weighs in

ouncilmember Jessie Lopez was the only city leader present at ednesday's community meeting.

appreciate them being honest," she said. "Their cknowledgement that a mistake happened and this is why they aven't had community meetings and I think it's a good starting oint."

JOINT EXHIBIT 321

dequate, calling it a "quick presentation."

We're a city of over 300,000 residents, and so there wasn't even 20 people in that room. It was being hosted at 4 p.m. during a workday. There was no Zoom link available," she said about the limited community engagement.

The new reports will come in front of the City Council Tuesday. Lopez said the meeting Wednesday will help her prepare for the Council meeting.

It helps me draft and come up questions that I'll be asking from the dais," she said.

## How to watchdog your police department

One of the best things you can do to hold officials accountable is pay attention.

AB481 requires police departments, including those at transit agencies, school districts and university campuses, sheriff's departments, district attorney's offices and probation departments, to provide reports about the use of military equipment..

So how do you know if they're in compliance? It's simple, search for the law enforcement agency name and AB 481 on any search engine and a public page should pop up.

You can learn more about the use of equipment at community meetings law enforcement agencies are required to hold to provide transparency and discuss the policies that affect your community.

You can also attend City Council meetings where this is discussed.

- Read tips on how to get involved.

- The next scheduled Santa Ana City Council meeting is Tuesday, Aug. 19. You can check out the Santa Ana City Council full calendar here and learn how to submit a public comment.

...ould like to share a tip, reach out to yfarzan@laist.com

JOINT EXHIBIT 322

t LAist, we believe in journalism without censorship and the right ... a free press to speak truth to those in power. Our hard-hitting ...atchdog reporting on local government, climate, and the ongoing ...ousing and homelessness crisis is trustworthy, independent and ...eely accessible to everyone thanks to the support of readers like ...ou.

*...ut the game has changed:* Congress voted to eliminate funding ...r public media across the country. Here at LAist that means a ...ss of $1.7 million in our budget every year. We want to assure ...ou that despite growing threats to free press and free speech, ...Aist will remain a voice you know and trust. Speaking frankly, the ...mount of reader support we receive will help determine how ...rong of a newsroom we are going forward to cover the important ...ews in our community.

**...e're asking you to stand up for independent reporting that ...ill not be silenced.** With more individuals like you supporting ...is public service, we can continue to provide essential coverage ...r Southern Californians that you can't find anywhere else.

**...ecome a monthly member today to help sustain this ...ission.**

...hank you for your generous support and belief in the value of ...dependent news.

**...legan Garvey**
...enior Vice President News, Editor in Chief
...he/her)



<span style="background-color: yellow">...hip in now to fund your local ...ournalism</span>

○ Monthly Donation          ● One-Time Donation



# PART WW

## RELEVANT EXCERPTS OF

## CHRISTIANE KINNEY DEPOSITION

JOINT EXHIBIT 323

**Christiane Kinney**

**Sean Kinney vs.**
**Santa Ana Police Department**

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                   SOUTHERN DIVISION

 4

 5   SEAN KINNEY,                  )
                                   )
 6           Plaintiff,            )
                                   )
 7      vs.                        ) Case No. 8:24-cv-01286
                                   )            JWH-JDE
 8   SANTA ANA POLICE DEPARTMENT; )
     CITY OF SANTA ANA; JIMMY      )
 9   CORREAL, an individual; LUIS )
     CASILLAS, an individual;      )
10   JESSE HERNANDEZ, an           )
     individual; and DOES 1 to 35,)
11   inclusive,                    )
                                   )
12           Defendants.           )
     _____)
13

14

15

16

17          DEPOSITION OF CHRISTIANE KINNEY

18               Santa Ana, California

19               February 6, 2025

20

21

22

23   Stenographically Reported by:
     Vicki Resch, RPR, CSR 6645
24
     Job No. 10157552
25
```

Page 1

JOINT EXHIBIT 324

Christiane Kinney

Sean Kinney vs.
Santa Ana Police Department

```
 1                    SANTA ANA, CALIFORNIA
 2              THURSDAY, FEBRUARY 6, 2025
 3                       10:02 A.M.
 4                         * * *
 5
 6                    CHRISTIANE KINNEY,
 7    having been first duly sworn by the Deposition
 8    Officer, was examined and testified as follows:
 9
10                      EXAMINATION
11    BY MS. BOGOSIAN:
12        Q    Please state and spell your full name for the
13    record.
14        A    Christiane, C-H-R-I-S-T-I-A-N-E.  Last name
15    Kinney, K-I-N-N-E-Y.
16        Q    What's your date of birth, ma'am?
17        A    [REDACTED]
18        Q    And where do you currently reside?
19        A    We still have a place on Baker Street that
20    we're renting, and we spend the rest of our time at my
21    parents' because they're ill and we're taking care of
22    them.
23        Q    And that's 3405 West Baker?
24        A    Yes.
25        Q    And from your husband -- you're married to
```

JOINT EXHIBIT 325

Christiane Kinney

Sean Kinney vs.
Santa Ana Police Department

```
 1        A    I think it was before we moved in.
 2        Q    Okay.  And from the date you moved in to the
 3   date of the incident, did landscapers come on Mondays?
 4        A    We never encountered the landscapers prior to
 5   this date.
 6        Q    Okay.  That wasn't my question.  Sorry.  I
 7   wasn't clear.
 8        A    Mm-hmm.
 9        Q    Did landscapers come to your home, to your
10   knowledge?
11        A    Not to my knowledge.
12        Q    Did you see any landscaping work done on your
13   property either in the front or the back following a
14   Monday after you moved in and before the incident?
15        A    I could not tell.
16        Q    Have you had any law enforcement contacts
17   prior to the date of the incident?  And again, as I
18   said yesterday, I don't need to know about traffic
19   tickets or parking tickets or consensual contacts, but
20   significant law enforcement contacts where you were
21   either investigated or suspected of a crime.
22        A    I have never been investigated or suspected
23   of a crime.
24             I was just going to add, I worked in the
25   Beverly Hills D.A.'s office, so I had significant
```

Page 11

JOINT EXHIBIT 326

Christiane Kinney

Sean Kinney vs.
Santa Ana Police Department

```
 1   experience with law enforcement as a certified law
 2   clerk.
 3       Q    So you would be familiar with the laws of the
 4   State of California both as an attorney and working as
 5   a law clerk with the Beverly Hills Police Department?
 6       A    I would certainly not say that I am familiar
 7   with every California law, no.
 8       Q    Laws related to law enforcement.
 9       A    No, I don't feel that I was competent that
10   day or even today in all of them.
11       Q    Have you had any contacts -- had you had any
12   contact with Santa Ana officers prior to the date of
13   the incident?
14       A    Yes.
15       Q    Okay.  In what capacity?
16       A    I just remember because I grew up in
17   Santa Ana, I remember an incident with some Santa Ana
18   Police Department officer where I was pulled over.
19   This was probably when I was 19 years old.  There was
20   a stop sign that had a sign, and it said, "No turning
21   right before 9:00 a.m.," so I didn't go that route.  I
22   would always go straight.
23           So I told him -- I went straight because I
24   know that they would only sit there and try to get
25   their quotas in for their tickets.  And he said, "Do
```

JOINT EXHIBIT 327

Christiane Kinney

Sean Kinney vs.
Santa Ana Police Department

```
1    you know this person?"  And he pointed in the backseat
2    of his vehicle, and my boyfriend was there,
3    handcuffed, because he had turned right at a stop sign
4    before 9:00 a.m.
5              And I remember they were going to tow his
6    truck, and I offered to take it to my house and walk
7    back and get mine.  They were going to take him in.
8    They did take him in.  They questioned him for hours,
9    and then he was released eventually.
10             If I remember correctly, because I was in
11   college, I was working at the Orange County D.A.'s
12   office as an extern, I believe.  And I called them to
13   find out what was going on, see if I could get any
14   information, which I was told they're just doing an
15   attitude adjustment with him, and let him go.
16        Q    Did that cause you to have a negative
17   attitude towards Santa Ana Police?
18        A    It didn't cause me to have a positive one.
19        Q    So you did have a negative attitude towards
20   Santa Ana Police as a result of that incident?
21        A    I would say yes.
22        Q    And I'm assuming, but I need to ask, you've
23   never been convicted of a felony?
24        A    Correct.
25        Q    Okay.  Were you home on the morning of
```

JOINT EXHIBIT 328

**Christiane Kinney**

**Sean Kinney vs.
Santa Ana Police Department**

```
 1          I, VICKI RENEE RESCH, RPR, CSR No. 6645,

 2   certify:  that the foregoing proceedings were taken

 3   before me at the time and place herein set forth; at

 4   which time the witness was duly sworn; and that the

 5   transcript is a true record of the testimony so given.

 6

 7       Witness review, correction and signature was

 8   (X) by Code.                (X) requested.

 9   ( ) waived.                ( ) not requested.

10   ( ) not handled by the deposition officer due to

11       party stipulation.

12

13       The dismantling, unsealing, or unbinding of the

14   original transcript will render the reporter's

15   certificate null and void.

16          I further certify that I am not financially

17   interested in the action, and I am not a relative or

18   employee of any attorney of the parties, nor of any of

19   the parties.

20          Dated this 14th day of February, 2025.

21

22          _____

23                   VICKI RESCH

24

25
```

Page 121

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2    Case Name: Sean Kinney
             vs. Santa Ana Police Department
 3    Date of Deposition: 02/06/2025

 4    Job No.: 10157552

 5

 6              I, CHRISTIANE KINNEY, hereby certify

 7    under penalty of perjury under the laws of the State of

 8    ___California___ that the foregoing is true and correct.

 9              Executed this __20th__ day of

10    _____March_____, 2025, at ___Alhambra___.

11

12

13                        _____

14                        CHRISTIANE KINNEY

15

16    NOTARIZATION (If Required)

17    State of _____

18    County of _____

19    Subscribed and sworn to (or affirmed) before me on

20    this _____ day of _____, 20__,

21    by_____,    proved to me on the

22    basis of satisfactory evidence to be the person

23    who appeared before me.

24    Signature: _____ (Seal)

25
```

**Page 122**

**Christiane Kinney**

```
 1   DEPOSITION ERRATA SHEET
     Case Name: Sean Kinney
 2        vs. Santa Ana Police Department
     Name of Witness: Christiane Kinney
 3   Date of Deposition: 02/06/2025
     Job No.: 10157552
 4   Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
 5                  3. To correct transcription errors.

 6   Page   9    Line   4    Reason   1, 2, 3

 7   From _____me_____ to _____him_____

 8   Page   9    Line  10    Reason   1, 2, 3

 9   From _____he said_____ to ____I said____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24   Page _____ Line _____ Reason _____

25   From _____ to _____
```

**Page 123**

Christiane Kinney

```
 1    DEPOSITION ERRATA SHEET

 2    Page _____  Line _____  Reason _____

 3    From _____ to _____

 4    Page _____  Line _____  Reason _____

 5    From _____ to _____

 6    Page _____  Line _____  Reason _____

 7    From _____ to _____

 8    Page _____  Line _____  Reason _____

 9    From _____ to _____

10    Page _____  Line _____  Reason _____

11    From _____ to _____

12    Page _____  Line _____  Reason _____

13    From _____ to _____

14    Page _____  Line _____  Reason _____

15    From _____ to _____

16    Page _____  Line _____  Reason _____

17    From _____ to _____

18    Page _____  Line _____  Reason _____

19    From _____ to _____

20    Page _____  Line _____  Reason _____

21    From _____ to _____

22    ___X___   Subject to the above changes, I certify that the
              transcript is true and correct

23    _____  No changes have been made. I certify that the
              transcript  is true and correct.

24              _____

25                   CHRISTIANE KINNEY
```

**Page 124**

# PART XX

## RELEVANT EXCERPTS OF

## COMMANDER LOPEZ DEPOSITION

# CERTIFIED TRANSCRIPT

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SEAN KINNEY, | ) | CASE NO. 8:24-cv-01286 |
| | ) | JWH-JDE |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SANTA ANA POLICE DEPARTMENT; | ) | |
| CITY OF SANTA ANA; JIMMY | ) | |
| CORREAL, an individual; LUIS | ) | |
| CASILLAS, an individual; | ) | |
| DEBORAH WOLEN, an individual; | ) | |
| and DOES 1 to 35, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| AND ALL RELATED CROSS-ACTIONS | ) | |
| _____ | ) | |

### DEPOSITION OF COMMANDER JORGE LOPEZ

### VIA VIDEOCONFERENCE

### FRIDAY, SEPTEMBER 26, 2025

*NH*

**NAN HOMAN COURT REPORTING**
Certified Deposition Reporters

**REPORTED BY:**
**CLAUDIA P. MARSH, CSR NO. 6353**

1200 Wilshire Boulevard, Suite 408
Los Angeles, CA 90017

Tel: 844-771-9354  Fax: 213-683-0340

```
 1          VIA VIDEOCONFERENCE; FRIDAY, SEPTEMBER 26, 2025

 2                      11:01 A.M.

 3                       -oOo-

 4      THE COURT REPORTER:  New code regulations dictate I

 5 must state my name and certification for the record:

 6          My name is Claudia Marsh, and I am a Certified

 7 Shorthand Reporter with the State of California, CSR

 8 Number 6353, licensed since 1983.

 9

10              COMMANDER JORGE LOPEZ,

11 was called as a witness by and on behalf of the

12 Plaintiff, and having been first duly sworn by the

13 Certified Shorthand Reporter, was examined and testified

14 as follows:

15

16                    EXAMINATION

17

18 BY MS. KINNEY:

19      Q    Thank you, Commander.  It is my understanding

20 you are here as a 30(b)(6) witness to testify on behalf

21 of the Santa Ana Police Department as to a few specific

22 categories we will go over in a moment.

23          Is that correct?

24      A    That is correct.

25      Q    Have you ever been deposed as is a 30(b)(6)
```

1          Go ahead.

2       THE WITNESS:  Can you repeat the question?

3   BY MS. KINNEY:

4       Q    We are here to talk about how these types of

5   internal investigations are handled.  So what would be

6   an example of a supervisory reprimand?

7       A    Essentially, a "supervisory reprimand," is a

8   document that essentially documents an incident which

9   can be any incident.  It can be any type of allegation

10  or -- that was sustained, whether it's policy,

11  procedure, misconduct, different things.  It's just a

12  document that documents, you know -- summarizes what

13  occurred, and based on what occurred, they will be

14  receiving a supervisory reprimand.

15      Q    And that's basically a piece of paper in the

16  file that goes against their record, I suppose?  Is that

17  kind of what a "supervisory reprimand," is?

18      A    I guess --

19      MS. WILLIAMS:  Vague and ambiguous.

20          Go ahead.

21      THE WITNESS:  It is a document that's -- you know,

22  ends up in their personnel file.

23  BY MS. KINNEY:

24      Q    Is there a process where, if you have had three

25  supervisory reprimands, then something else happens?  Is

1    there anything of that sort, as far as how these

2    internal investigations get handled?

3        MS. WILLIAMS:  Goes beyond the scope of this

4    witness's designated topics.  This is no longer dealing

5    with handling of internal investigations.

6            I will let the witness answer, if you are able.

7        THE WITNESS:  Yeah.  I don't think there is

8    anything in place that if you receive, you know, "X,"

9    amount of reprimands, something happens, no.

10   BY MS. KINNEY:

11       Q    In terms of the handling of these internal

12   investigations or administrative complaints, what is an

13   "official reprimand"?

14       A    The only difference -- I should say, the big

15   difference about the official and the supervisory

16   reprimand is an official reprimand comes, you know, from

17   the chief to the officer, whereas a supervisory

18   reprimand will come from a commander to the officer.

19       Q    So a piece of paper in the file, correct?

20       A    Essentially the same.

21       Q    What is "supervisory counseling"?

22       A    Again, it's -- depending on the situation, the

23   case is evaluated or -- the situation, and then if it's

24   deemed that a supervisory counseling was to be provided,

25   and it's a counseling of the officer, it's documented in

```
 1   BY MS. KINNEY:
 2       Q    So what are these policies designed to deal
 3   with?
 4       A    This is specific for an administrative
 5   investigation.
 6       Q    This is a bit jumping the gun to the next
 7   category, but out of curiosity, the internal
 8   investigation of this incident that we are here -- that
 9   this lawsuit is about, was that an administrative
10   investigation, or something else?
11       A    It was an administrative investigation.
12       Q    Perfect.  Let's go down the rabbit hole.
13            .2, you said was administrative investigation
14   procedures.
15            What does that outline?
16       A    So these -- in this section, it basically
17   outlines what POBOR, the Peace Officer Bill of Rights --
18   we wanted to make sure that the investigator, who is
19   investigating this investigation, is abiding by those
20   rights.  So it basically outlines, or actually has
21   those, to make sure that they are not violating the
22   officer's rights while they are conducting this
23   administrative investigation.
24       Q    And what is the Police Officer Bill of Rights?
25   Is it listed there?
```

1    A    That goes back to what we just talked about,

2    the administrative investigation format.

3    Q    Okay.  So let's go back to that.

4         I heard about the due process to the police

5    officers, but what is best practice, as far as how the

6    investigation is handled?  For example, would the

7    investigator want to talk to the people that are

8    complaining about the misconduct?  Would the police

9    officer only interrogate the police officers involved?

10         What is the best practices within the Santa Ana

11   Police Department in that regard?

12   MS. WILLIAMS:  Overly broad.  Vague and ambiguous.

13   Lacks foundation.  Incomplete hypothetical.  Calls for

14   speculation.

15   THE WITNESS:  It depends.

16   BY MS. KINNEY:

17   Q    The favorite answer of lawyers and police

18   officers.

19         What does it depend on?

20   A    Again, depending if we have an anonymous

21   complaining party.  That's difficult to be able to

22   interview the complainant, gather additional

23   information.  You know, again, depending on where this

24   occurred, are there additional witnesses that we may

25   want to talk to or not?  Again, depending on the

1    location of where this incident occurred, is there

2    surveillance footage, different things we can collect as

3    evidence in order to have a complete, thorough and

4    complete investigation?

5         So, again, it depends on various different

6    things.  You know, is the complaining party cooperative

7    after the initial submission of their complaint?  Things

8    of that nature.

9         Q    If, where the incident occurred, is convenient

10   and there are additional witnesses, is it best practices

11   within the police department for them to be asked about

12   what happened, as part of this internal investigation?

13        MS. WILLIAMS:  Lacks foundation.  Vague.  Calls for

14   speculation.  Incomplete hypothetical.

15        THE WITNESS:  It depends.

16   BY MS. KINNEY:

17        Q    What would that depend on?

18        A    Again, it depends on, you know -- again, if

19   there's already surveillance footage, body-worn camera

20   footage, that may refute whatever the allegation is --

21   you can have 100 bystanders that may or may not have

22   seen it.  You know, the investigator may or may not

23   choose to interview them if there is already other

24   evidence that may refute what the allegations may be.

25   It just depends.

1    Q    Is there anything within the policies and

2    procedures that are before you where it talks about

3    favoring surveillance footage or body camera footage

4    over eyewitness testimony?

5    A    No.

6    Q    That's left to the investigator's discretion in

7    the department?

8    MS. WILLIAMS:  Vague and ambiguous.  Overbroad.

9    Incomplete hypothetical.

10    THE WITNESS:  I wouldn't say, "It's left to the

11    discretion."

12    Depending on what leads or what the

13    investigation leads the officer or investigator -- you

14    know, there's different avenues.  Every case is

15    different.  You know, it's really up to the investigator

16    to think outside the box or just, you know, what they

17    feel they can get or look at.

18    BY MS. KINNEY:

19    Q    2.5 talks about notice to complainant of

20    investigation status.

21    Is that just a short letter?

22    A    No.  That's -- oftentimes it just says that the

23    officer -- the investigator, could potentially -- during

24    -- that they are having contact with the complaining

25    party, they can just notify them what the status is,

```
 1        THE WITNESS:  When an investigation is not
 2   completed, you know, we can say something that is
 3   probably not accurate, since we may not have interviewed
 4   everybody.  We haven't collected all the evidence.
 5   So --
 6   BY MS. KINNEY:
 7        Q     Regardless of body cam footage, are there
 8   people you are required to interrogate or interview as
 9   part of this process?
10        MS. WILLIAMS:  Incomplete hypothetical.  Vague.
11   Overly broad.
12        THE WITNESS:  Normally, the policy says there is a
13   requirement as to who you have to interview.  Again,
14   depending on the situation, you will interview --
15   potentially interview, different people.
16   BY MS. KINNEY:
17        Q     Including people outside of the police
18   department, as well as inside?
19        A     Yes.
20        Q     Section 3, you said it talks about the
21   post-administrative investigative procedures.
22             So is that after completion of an
23   investigation?
24        A     Yes.
25        Q     3.1 -- so this breaks down different
```

```
 1        THE WITNESS:  Generally speaking, no.
 2   BY MS. KINNEY:
 3        Q    Give me a second, here.
 4             Is there any consideration made for a potential
 5   conflict of interest within the internal affairs
 6   department?  For example, if the assigned internal
 7   investigator has had a relationship in the past with
 8   some of these officers, how is that handled?
 9        MS. WILLIAMS:  Overly broad.  Vague.  Incomplete
10   hypothetical.
11        THE WITNESS:  I'm not sure if I follow your
12   question, considering my -- the internal affairs
13   investigators are employees of the department and,
14   obviously, at one point, may have worked with officers,
15   supervised officers, or whatnot.
16   BY MS. KINNEY:
17        Q    That's kind of what I'm getting at.
18             Is there any consideration given to potential
19   conflicts of interest with somebody that might be close
20   to somebody they are investigating?
21        MS. WILLIAMS:  Overly broad.  Incomplete
22   hypothetical.  Vague.
23        THE WITNESS:  It's possible, but I can tell you,
24   part of the -- my responsibility, or the responsibility
25   of the internal affairs commander, is to ensure that all
```

```
 1    investigations are, you know, complete, thorough and
 2    objective, without any biases.
 3            So is it possible that we may -- the department
 4    may choose to do that?  It's possible, but not
 5    necessarily.
 6    BY MS. KINNEY:
 7       Q    Do the officers handling internal
 8    investigations receive any special trainings on these
 9    policies and procedures that we have walked through here
10    today?
11       A    All officers are required to review and
12    understand our policies and procedures.
13            To answer your question, our investigators
14    assigned to internal affairs often review and use this
15    policy as, you know -- as they investigate cases, to
16    make sure they are following the right procedures.  They
17    get other training as well.
18       Q    What is the other training?
19       A    They go to different classes that they may have
20    to go to, or -- so they can further investigate
21    misconduct complaints, or complaints of policy and
22    procedure.
23       Q    Are they specific things, like, once a year you
24    have to attend so many hours of training, anything
25    specific like that?
```

```
 1    will not allow further questions as to that.
 2        THE WITNESS:  I believe, it's the Santa Ana Police
 3    Oversight Commission.
 4    BY MS. KINNEY:
 5        Q    I would like to go over to Category 4, that you
 6    were designated to testify on, which is "The handling of
 7    any disciplinary actions, internal investigations or
 8    citizen complaints against any officers involved in the
 9    October 4th, 2021, incident, in the last five years."
10            We will walk through the internal investigation
11    of this specific case.  But beyond that, did you find
12    other disciplinary actions, internal investigations or
13    citizen complaints against any of the officers that were
14    involved in this incident?
15        MS. WILLIAMS:  I will object as vague and ambiguous
16    and overly broad with respect to "any of the officers
17    involved in the incident," as it is unclear.
18            Second, I will object as it seeks information
19    that would call for the invasion of police officer
20    privacy rights, as protected by POBOR, as protected by
21    the California Government Code, the California Penal
22    Code and the California/United States constitutions.  I
23    will object as it seeks information that is protected by
24    the Official Information Privilege, and on those
25    grounds, I will instruct the witness not to answer that
```

```
 1    witness's testimony.  Calls for speculation.

 2         THE WITNESS:  No.

 3    BY MS. KINNEY:

 4         Q    I'm trying not to invade the objections because

 5    that will probably be the subject of a motion, but you

 6    said you have looked.

 7              How did you determine how to look for these

 8    past complaints?  How did you determine what names to

 9    look for?

10         MS. WILLIAMS:  Seeks information that would invade

11    the attorney-client privilege.

12              If you are able to answer that without

13    divulging any information provided by counsel, you may.

14              If you can answer that question without

15    divulging any conversations you have had with myself

16    about whose names to look for, you can answer that.

17    Otherwise, don't answer that.

18         THE WITNESS:  I won't be answering.

19    BY MS. KINNEY:

20         Q    So that information would be covered, in your

21    view, by the attorney-client privilege?

22         A    That's correct.

23         Q    Let's talk about this internal investigation.

24    When I say, "this," I'm talking about the October 4th,

25    2021, incident.
```

```
 1      THE WITNESS:  Not necessarily.  It did go to the

 2  chief.  It didn't necessarily go to the other two

 3  reviews.

 4  BY MS. KINNEY:

 5      Q    So in this situation, you took Gripentrog's

 6  administrative investigative report, and then you

 7  prepared findings?

 8      A    That's correct.

 9      Q    Did you do any additional investigative review

10  before preparing the findings memo, or did you just base

11  that on Sergeant Gripentrog's report?

12      A    If I can speak to -- the process I take when I

13  review an administrative investigation, you know, first

14  and foremost, I have to make sure or I ensure it is

15  complete, thorough, objective, and that it's grounded

16  with factual evidence and conclusions.

17          In this particular case, I ensured that was the

18  case.  Then, I assessed the evidence and conclusions,

19  and then drafted a findings memorandum.

20      Q    How did you ensure that his report was

21  complete, thorough, objective, and grounded with factual

22  evidence and conclusions?

23      A    Again, I reviewed the administrative

24  investigation.  In the administrative investigation,

25  there is a list of attachments, that, depending on the
```

1    type of investigation, it will include all the evidence

2    that was collected, whether it's interviews, evidence,

3    body-worn camera, surveillance footage.  It could be

4    anything.  Different kinds of reports, police reports,

5    data reports.  You name it.  So I review all that as

6    part of the investigation, and then make an assessment

7    of it and then draft a formal findings memo.

8        Q    In this particular case, speaking to the

9    attachments, what were the attachments to the

10   administration investigation report?

11       A    I believe, if my mind serves me correctly,

12   there is an email that's between you and

13   Sergeant Gripentrog.  There's a couple of phone calls or

14   voicemails between you and Sergeant Gripentrog.  There's

15   a phone-call interview.  There's body-worn camera.

16   There's photographs, reports, supplemental reports,

17   different things that were attached to those reports as

18   to -- the reports, that were documented by the officers

19   at the time of the incident.

20       Q    Were there any interviews with the officers in

21   this case?

22       A    No, I don't believe so.

23       Q    Was there any interview with Mr. Kinney, the

24   plaintiff in this case?

25       A    I don't believe so.  At least, not by

1  Josh Gripentrog.  I think he was interviewed at the time

2  of the incident.

3      Q    But that wasn't about what happened at the

4  incident, right?  That was about something that happened

5  prior?

6      MS. WILLIAMS:  Vague and ambiguous.  Lacks

7  foundation.

8  BY MS. KINNEY:

9      Q    I will ask it this way:

10          No one ever interviewed Mr. Kinney about these

11  complaints, correct?

12     A    That's correct.

13     Q    And there was no interview with the minor

14  plaintiff, correct?

15     A    That's correct.

16     Q    Did you personally review all of the body

17  camera footage?

18     A    Yes.

19     Q    Did you note that body camera footage was not

20  always running in this action?

21     MS. WILLIAMS:  Vague and ambiguous.

22     THE WITNESS:  Yes.

23  BY MS. KINNEY:

24     Q    Did you note that the chain of custody for the

25  gun on the body camera footage did not contain a

1    complete chain of custody?

2        MS. WILLIAMS:  Lacks foundation.  Argumentative.

3    Vague and ambiguous.

4        THE WITNESS:  I'm not sure if I'm following the

5    question.

6    BY MS. KINNEY:

7        Q    Did you notice that multiple officers at

8    different times handled the weapon?

9        A    Yes.

10       Q    Did you notice Jimmy Correal's arm was blocking

11   some of his body camera footage when the weapon was

12   being retrieved?

13       A    It's possible.  I don't recall.

14       Q    That wasn't something you were looking for at

15   the time, necessarily.

16            Did you notice that officers came in, placed a

17   weapon on a bed, left, and other officers came in to

18   photograph?

19       A    I vaguely remember, yeah.

20       Q    Did you notice that other officers then handled

21   the gun, and then passed off to someone who then walked

22   off camera?

23       A    It's possible.

24       Q    And then, did you notice there was no body

25   camera footage ever again for that weapon?

```
 1        MS. WILLIAMS:  Lacks foundation.  Vague.

 2        THE WITNESS:  Without me remembering all the

 3   details, that's possible.

 4   BY MS. KINNEY:

 5        Q    Did you ever see any of the body camera footage

 6   from the gentlemen that were in the Terradyne vehicle

 7   that day?

 8        A    Yes.

 9        Q    There were four officers for which no body

10   camera footage was ever produced in this case.

11             Were you aware of that, as part of this

12   internal investigation?

13        MS. WILLIAMS:  Lacks foundation.  Vague.

14        THE WITNESS:  Yeah.  I'm not aware of that.  I'm

15   not sure what officers you are referring to.

16   BY MS. KINNEY:

17        Q    Would you like me to name them?  Would it make

18   a difference?

19        A    Sure.

20        Q    Give me one second.

21             One of them was "Zachary Mora."

22             Do you know who that is?

23        A    I believe I know he is an officer for the Santa

24   Ana Police Department.

25        Q    "Tony Villa," do you know who that is?
```

1      A      I believe he is a civilian employee of the

2  department.

3      Q      One was "Alan Gonzalez."

4             Do you know who that is?

5      A      He was a sworn officer through the department.

6      Q      And the other is "Christopher Guerra."

7             Do you know who that is?

8      A      I don't recognize that name.

9      Q      I think you said Tony Villa was a "civilian" --

10  what did you say Tony was?

11     A      "Civilian employee."

12     Q      What does that mean?

13     A      From what I remember, he is traffic control,

14  traffic control officer.

15     Q      Do you know why a traffic control officer would

16  have been there that day?

17     MS. WILLIAMS:  Calls for speculation.

18     THE WITNESS:  It's safe to say, depending on the

19  type of call, sometimes the responding officers may

20  request traffic control in order to mitigate any traffic

21  traveling on the street.  So they may be down the

22  street, 100 yards, two blocks a way, a mile away,

23  depending on what kind of traffic control they may be

24  doing.

25     ///

1  BY MS. KINNEY:

2      Q    Are civilian officers required to have the same

3  training as other SAPD officers?

4      A    No.

5      MS. WILLIAMS:  Vague and ambiguous.  Overly broad.

6  Goes beyond the scope this witness's designated

7  categories.

8  BY MS. KINNEY:

9      Q    I believe you said, "No"?

10     A    Correct.

11     Q    Did you ever see body camera footage at the

12  time of the internal investigation, where the people in

13  the Terradyne vehicle said something to the effect of,

14  "This is bullshit.  We are out of here."  And Mr. Kinney

15  said, "Are your body cameras on?"  And they said, "Yes"?

16     A    That's possible.  I don't remember.  It's been

17  a couple of years.

18     Q    Do you know why that wouldn't have been

19  produced in this case?

20     MS. WILLIAMS:  Calls for speculation.  Goes beyond

21  the scope the witness's designated categories.  He's

22  here to answer questions about the internal

23  investigation that was done, not discovery issues you

24  have with respect to this lawsuit.

25          I will instruct the witness not to answer on

```
1    the findings, after assessing the evidence and the

2    conclusions on the administrative investigation, that

3    the findings were that this was a complaint of service

4    and procedure.

5    BY MS. KINNEY:

6        Q    What does that mean?

7        A    Oftentimes, you know, complaints that are

8    classified as complaints of service and procedure are

9    those that relate to the quality or the service provided

10   to the, I guess, complaining party.

11       Q    And how was that notice given, if you know, if

12   you recall?

13       A    I don't follow your question.  To who?

14       Q    To us, as the complaining party.

15       A    I believe there was a letter that was drafted

16   by Josh Gripentrog, and then emailed to you, or emailed.

17   I'm not sure how that was provided to you.

18       Q    Provided in some fashion?

19       A    Correct.

20       Q    Was there any disciplinary action related to

21   this investigation?

22       A    No.

23       Q    I am going to put on the record, I'm not going

24   to close this deposition out right now.  So it's pending

25   discussion with the judge, perhaps, if he will hear it,
```

```
 1   STATE OF CALIFORNIA      )
                             )    ss.
 2   COUNTY OF LOS ANGELES    )

 3

 4

 5       I,  Claudia P. Marsh, a Certified Shorthand

 6   Reporter, CSR No. 6353, hereby certify:

 7       I am the deposition officer that stenographically

 8   recorded the testimony in the foregoing deposition;

 9       Prior to being examined, the deponent was by me

10   first duly sworn;

11       That the foregoing deposition is a true record of

12   the testimony given.

13       Before completion of the deposition, review of the

14   transcript __X__was/____was not requested.  If requested,

15   any changes made by the deponent (and provided to the

16   reporter) during the period allowed are appended hereto.

17

18

19   Dated:  OCTOBER 20, 2025.

20

21

22                    CLAUDIA P. MARSH, CSR No. 6353

23

24

25
```